1  Alison Berry Wilkinson, SBN 135890
2  BERRY | WILKINSON | LAW GROUP
   4040 Civic Center Drive, Suite 200
3  San Rafael, CA 94903
   Telephone/Facsimile: 415.259.6638
4  Email:     alison@berrywilkinson.com

5
   Attorneys for Defendant Marysol Domenici
6

7

8
                    **UNITED STATES DISTRICT COURT**
9
                 **NORTHERN DISTRICT OF CALIFORNIA**
10

11
   WANDA JOHNSON, individually and as        CASE NO.:  C09-00901 MHP
12 personal representative of the ESTATE of
   OSCAR J. GRANT III, the ESTATE OF          Consolidated Cases:
13 OSCAR J. GRANT III, SOPHINA MESA          C09-04014 MHP  (Oscar Grant, Jr.)
   as Guardian ad Litem of minor, T.G.,      C09-04835 MHP (Bryson, et al.)
14                                            C10-00005 MHP (Caldwell)
15              Plaintiffs,
16        vs.
                                             DEFENDANT MARYSOL DOMENICI'S
17 BAY AREA RAPID TRANSIT DISTRICT;          MOTION FOR SUMMARY
   GARY GEE, in his official capacity as      ADJUDICATION OF ALL CLAIMS
18 CHIEF OF POLICE for BAY AREA              ASSERTED AGAINST HER BY NIGEL
   RAPID TRANSIT DISTRICT,                   BRYSON, JACK BRYSON, CARLOS
19 JOHANNES MEHSERLE individually and       REYES, MICHAEL GREER, AND THE
   in his official capacity as a police officer for   ESTATE OF OSCAR GRANT
20 BART; MARYSOL DOMENICI,
   individually and in her official capacity as a   Hearing Date:   March 14, 2011
21 police officer for BART, ANTHONY         Time:            2:00 p.m.
22 PIRONE, individually and in his personal  Courtroom:       15, 18th Floor
   capacity as a police officer for the Bay Area   Judge:          Hon. Marilyn Hall Patel
23 Rapid Transit District; and DOES 1-50,
   inclusive                                 Trial Date:      May 2, 2011
24
25            Defendants.

26

27

28
   502434

# NOTICE OF MOTION AND MOTION

TO THE COURT, PLAINTIFFS NIGEL BRYSON, JACK BRYSON, JR. CARLOS REYES, MICHAEL GREER, AND THE ESTATE OF OSCAR GRANT, AND THEIR ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN THAT, on March 14, 2011, at 2:00 p.m. in Courtroom 15 of the above-entitled Court, located at 450 Golden Gate Avenue in San Francisco, California, Defendant MARYSOL DOMENICI will, and hereby does, move the Court for an order granting summary adjudication in her favor, and against Plaintiffs Nigel Bryson, Jack Bryson, Jr., Carlos Reyes, Michael Greer, and The Estate Of Oscar Grant III on the First, Second, Third, Fourth, Sixth, Seventh, Eighth, and Ninth Causes of Action enumerated in the Complaint entitled *Bryson, et al. v. Bay Area Rapid Transit District*, Case No. C09-04835; and the First, Second, Third, Fourth, Fifth, Sixth, Twelfth, Thirteenth, Fourteenth and Fifteenth Causes of Action enumerated in the Complaint entitled *Johnson et al. v. Bay Area Rapid Transit District*, Case No. C09-00901.

In the alternative, Defendant will, and hereby does, move the court for an order granting summary adjudication in her favor, and against one or more of the Plaintiffs as to any one or more of such claims as appropriate, and dismissing such claim(s) with prejudice.

This motion is made pursuant to Federal Rule of Civil Procedure 56 on the ground that no genuine issue of material fact exists as to the above-mentioned claims, and Defendant is entitled to judgment as a matter of law.

This motion is based on this Notice, on the Memorandum of Points and authorities below, on the Declarations of Alison Berry Wilkinson, Gary Hesson, Keecha Williams, and Michael Schott filed herewith and all exhibits attached thereto, on all the pleadings and materials contained as part of the Court's file in this matter, and on such oral and/or documentary evidence as may be presented at the hearing of this motion.

# STATEMENT OF RELIEF SOUGHT

Defendant seeks an order granting summary adjudication in her favor, and against Plaintiffs Nigel Bryson, Jack Bryson, Jr., Carlos Reyes, Michael Greer, and The Estate of Oscar Grant, on the following causes of action:

(1) Claims of unlawful detention under the Fourth Amendment contained in the First Cause of Action enumerated in the Complaint entitled *Bryson, et al. v. Bay Area Rapid Transit District*, Case No. C09-04835 (hereafter "*Bryson* Complaint"), and contained in the First and Second Causes of Action enumerated in the Complaint entitled *Johnson et al. v. Bay Area Rapid Transit District*, Case No. C09-00901 (hereafter "*Johnson* Complaint");

(2) Claims of unlawful arrest under the Fourth Amendment (*Bryson* Complaint Second Cause of Action; *Johnson* Complaint First and Third Causes of Action);

(3) Claims of excessive force under the Fourth Amendment (*Bryson* Complaint Third Cause of Action; *Johnson* Complaint First and Fourth Causes of Action);

(4) Claims of conspiracy to violate civil rights under 42 U.S.C. 1985 or violation of civil rights under any derivative liability theory brought by any of these Plaintiffs (*Bryson* Complaint Fourth Cause of Action; *Johnson* Complaint Sixth Cause of Action);

(5) Claims of interference with constitutional rights brought under California Civil Code section 52.1 (*Bryson* Complaint Sixth Cause of Action; *Johnson* Complaint Twelfth Cause of Action;

(6) Claims of discrimination brought under California Civil Code section 51.7 (*Bryson* Complaint Seventh Cause of Action; *Johnson* Complaint Thirteenth Cause of Action;

1         (7)    Common-law tort claims of intentional infliction of emotional distress

2 (*Bryson* Complaint Eighth Cause of Action; *Johnson* Complaint Fourteenth Cause of

3 Action);

4         (8)    Common-law tort claims of assault and battery (*Bryson* Complaint Ninth

5 Cause of Action; *Johnson* Complaint Fifteenth Cause of Action); and

6         (9)  All claims of deliberate indifference to medical needs brought by the

7 Estate of Oscar Grant, Jr. (*Johnson* Complaint Fifth Cause of Action).

8         In the alternative, Defendant Domenici seeks an order granting summary

9 adjudication in her favor and against Plaintiffs Nigel Bryson, Jack Bryson, Jr., Carlos

10 Reyes, Michael Greer, and The Estate Of Oscar Grant, as to any one or more of such

11 claims as appropriate, and dismissing such claims with prejudice.

12         Dated:  February 6, 2011

13                   Respectfully submitted,

14

15                   Berry | Wilkinson | Law Group

16

17                   By_____

18                       Alison Berry Wilkinson

19                   Attorneys for Marysol Domenici

20

21

22

23

24

25

26

27

28

DOMENICI'S MOTION FOR SUMMARY ADJUDICATION OF ALL FEDERAL CIVIL RIGHTS CLAIMS ASSERTED AGAINST HER   C09-0091 MHP

## MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

I STATEMENT OF ISSUES TO BE DECIDED ...................................................... 1

II INTRODUCTION ................................................................................ 2

III STATEMENT OF FACTS ..................................................................... 5

    A.  Domenici's New Year's Eve Shift ................................................... 5

    B.  2:00 A.M. and the Call of a Fight onboard a Train Holding at the Fruitvale Station ........................................................................ 6

    C.  Pirone Detains the Men Suspected of Being Involved in the Fight ........... 8

    D.  Domenici Arrives on the Platform ................................................ 10

    E.  Domenici Guards the Detained Men ............................................. 11

    F.  Anicete and Caldwell Approach Domenici ..................................... 13

    G.  Domenici Had No Contact with Any of These Plaintiffs After the Shooting ............................................................................. 14

IV ARGUMENT ................................................................................. 15

    A.  Summary Judgment on the Civil Rights Claims is Proper Because None of These Plaintiffs Have Evidence Establishing Any Wrongdoing by Domenici ............................................................................. 15

    B.  Domenici Cannot Be Liable for Wrongfully Detaining Plaintiffs ............ 16

        1.  Introduction .................................................................. 16

        2.  Domenici Did Not Make the "Stop" ...................................... 17

        3.  Pirone Had Reasonable Suspicion to Make the Stop ..................... 18

        4.  Domenici's Brief Continuation of the Detention Is Supported By the Collective Knowledge Doctrine and the Plaintiffs' Resistant Conduct ...................................................................... 20

        5.  Domenici Is Entitled to Qualified Immunity for "Following Directions" That Were Reasonable Under the Circumstances ............ 21

    C.  Domenici Is Not Liable for Unlawful Arrest .................................... 24

v

D.  Domenici Is Not Liable for Use of Excessive Force .......................................24

    1.  Standards for Gauging Excessive Force.............................................24

    2.  It Was Not Excessive Force for Domenici Momentarily Hold Back Jack Bryson and Oscar Grant......................................................25

    3.  It Was Not Excessive Force to Point Her Taser at Plaintiffs...............26

    4.  At the Very Least, Domenici's Use of the Taser Is Entitled to Qualified Immunity .......................................................................29

E.  Domenici is Not Liable for Conspiracy to Violate Civil Rights (42 U.S.C. § 1985) ......................................................................................30

    1.  Allegations in Complaint ..................................................................30

    1.  Nature of Liability Under Section 1985 .............................................30

    2.  There Was No Racial Motive.............................................................31

    3.  There Was No Conspiracy .................................................................31

F.  Domenici Did Not Integrally Participate in Wrongdoing ..............................32

G.  There Can Be No Liability for Failure to Intervene ......................................33

H.  Plaintiffs' Claims that California Civil Code Section 52.1 Was Violated Fail, As a Matter of Law, Because Domenici Did Not Violate the Plaintiffs' Fourth Amendment Rights ...........................................................36

I.  Plaintiffs' Claims that California Civil Code Section 52.1 Was Violated Fail, As a Matter of Law, Because Domenici Did Not Violate the Plaintiffs' Fourth Amendment Rights ...........................................................37

J.  Domenici is Not Liable for Intentional Infliction of Emotional Distress.........37

K.  Domenici is Not Liable for Assault and Battery.............................................39

L.  Domenici is Not Liable for Deliberate Indifference to Medical Needs...........39

V CONCLUSION ........................................................................................................40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Addisu v. Fred Meyer, Inc.,*
198 F.3d 1130 (9th Cir. 2000) (quoting *Griffin,* 403 U.S. at 102) .............................31

*Bilida v. McCleod,*
211 F.3d 166, 174-74 (1ˢᵗ Cir. 2000)..................................................................23

*Boyd v. Benton,*
374 F.3d 773 (9ᵗʰ Cir. 2004) ...........................................................................33

*Brosseau v. Haugcn,* 543 U.S. 194 (U.S. 2004) ................................................22

*Bryan v. MacPherson,*
2010 WL 4925422 (9ᵗʰ Cir. 2010) ..............................................................25, 29

*Butler v. San Diego Dist. Attorney's Office,*
370 F.3d 956 (9ᵗʰ Cir. 2004) ...........................................................................16

*Chuman v. Wright,*
76 F.3d 292 (9ᵗʰ Cir. 1996) ............................................................................33

*Cunningham v. Gates,*
229 F.3d 1271 (9ᵗʰ Cir. 2000) .........................................................................34

*Diamond Door Co. v. Lane-Stanton Lumber Co.,*
505 F.2d 1199 (9ᵗʰ Cir. 1978) .........................................................................15

*Edson v. City of Anaheim*
63 Cal. App. 4th 1269 (1998) ...........................................................................39

*Franklin v. Foxworth,*
31 F.3d 873 (9ᵗʰ Cir. 1994) ............................................................................25

*Giraldes v. Prebula,*
2010 WL 2610986 (E.D. Cal. 2010)...................................................................16

*Graham v. Conner,*
490 U.S. 386(1989) ...........................................................................24, 25, 26, 29

*Griffin v. Breckenridge,*
403 U.S. 88, 102-103,91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)....................................31

*Harlow v. Fitzgerald,*
457 U.S. 800 (1983) .......................................................................................21

*Harvey v. Plains Tp. Police Dept.,*
421 F.3d 185 (3ʳᵈ Cir. 2005), *cert. den.,* 126 S.Ct. 2325 (2006); .............................23

*Hooper v. County of San Diego,*
2011 WL 9732 (9ᵗʰ Cir. 2011). ........................................................................27

*Hopkins v. Bonvicino,*
   573 F.3d 752 (C.A. 9 2009).................................................................21

*Hughes v. Pair,*
   46 Cal. 4th 1035 (2009)..................................................... 37, 38, 39

*Illinois v. Wardlaw,*
   528 U.S. 124 (2000)............................................................................20

*Lauro v. Charles,*
   219 F.3d 202  (2d Cir. 2000) ............................................................23

*Marquez v. City of Phoenix,*
   2010 WL 3342000, 16 (D. Ariz. 2010).............................................23

*Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha,* 290 F.Supp.2d
   1083 (C.D. Cal. 2003) ............................................................... 15, 16

*Mendocino Env. Ctr. v. Mendocino County,*
   192 F.3d 1283 (9th Cir. 1999) ...........................................................32

*Paine v. City of Lompoc,*
   160 F.3d 562 (9th Cir. 1998) .............................................................20

*Petrolino v. County of Spokane,*
   678 F.Supp.2d 1082 (E.D. Wash. 2009) ...........................................34

*Potter v. Firestone Tire & Rubber Co.,* 6 Cal. 4th 965 (1993) ........................38

*Robinson v. Solano County,*
   278 F.3d 1007 (9th Cir. 2002) ....................................................26, 29

*Runge v. Ippollito,*
   2010 WL 1239571, 4 (N.D. Cal. 2010)..............................................23

*Smith v. City of Hemet,*
   394 F.3d 689 (9th Cir. 2005) .............................................................25

*U.S. v. Cheek,*
   586 F.Supp.2d 1099 (D. Ariz. 2008)..................................................20

*U.S. v. Holiday,*
   2010 WL 3733890, 3 (S.D. Cal. 2010)...............................................20

*U.S. v. Ramirez,*
   473 F.3d 1026 (9th Cir. 2007) ...........................................................20

*U.S. v. Sokolow,*
   490 U.S. 1 (1989)...............................................................................19

*Varrone v. Bilotti,*
   123 F.3d 75 (2d Cir. 1997) ................................................................23

*Wilkins v. County of Alameda,*
   2010 WL 4942508 (N.D. Cal. 2010) .................................................32

*Wilkinson v. Torres,*
    610 F.3d 546 (9th Cir. 2010) ................................................................. 25

*Williams v. Goord,*
    142 F.Supp.2d 416 (S.D.N.Y. 2001) ...................................................... 23

**Statutes**

California Civil Code
    section 51(b ...................................................................................... 39
    section 51.7 ....................................................................................... 39

California Penal Code
    Section 148 ........................................................................................ 28
    section 242 ........................................................................................ 28

Federal Rule of Civil Procedure,
    Rule 56 .............................................................................................. 14
    Rule 56(c) .......................................................................................... 14

United States Code,
    Title 42, Section 1985 ....................................................................... 31
    Title 42, Section 1985(1) ................................................................... 31
    Title 42, Section 1985(2) ................................................................... 31
    Title 42, Section 1985(3) ............................................................. 31, 32

# I
## STATEMENT OF ISSUES TO BE DECIDED

This motion presents the following issues for decision: whether Defendant Marysol Domenici is entitled to judgment as a matter of law as to Plaintiffs Nigel Bryson, Jack Bryson, Jr., Michael Greer, Carlos Reyes, and the Estate of Oscar Grant, with respect to the following sets of claims:

(1)    Claims of unlawful detention under the Fourth Amendment (*Bryson* Complaint First Cause of Action; *Johnson* Complaint First and Second Causes of Action);

(2)    Claims of unlawful arrest under the Fourth Amendment (*Bryson* Complaint Second Cause of Action; *Johnson* Complaint First and Third Causes of Action);

(3)    Claims of excessive force under the Fourth Amendment (*Bryson* Complaint Third Cause of Action; *Johnson* Complaint First and Fourth Causes of Action);

(4)    Claims of conspiracy to violate civil rights under 42 U.S.C. 1985 or violation of civil rights under any derivative liability theory brought by any of these Plaintiffs (*Bryson* Complaint Fourth Cause of Action; *Johnson* Complaint Sixth Cause of Action);

(5)    Claims of interference with constitutional rights brought under California Civil Code section 52.1 (*Bryson* Complaint Sixth Cause of Action; *Johnson* Complaint Twelfth Cause of Action);

(6)    Claims of discrimination brought under California Civil Code section 51.7 (*Bryson* Complaint Seventh Cause of Action; *Johnson* Complaint Thirteenth Cause of Action);

(7)    Common-law tort claims of intentional infliction of emotional distress (*Bryson* Complaint Eighth Cause of Action; *Johnson* Complaint Fourteenth Cause of Action);

(8)    Common-law tort claims of assault and battery (*Bryson* Complaint Ninth Cause of Action; *Johnson* Complaint Fifteenth Cause of Action); and

502434

1

(9) All claims of deliberate indifference to medical needs brought by the Estate of Oscar Grant, Jr. (*Johnson* Complaint Fifth Cause of Action)

## II
## INTRODUCTION

For multiple reasons, the claims stated by Plaintiffs Nigel Bryson, Jack Bryson, Carlos Reyes, Michael Greer, and the Estate of Oscar Grant are without merit.

All BART Police Officer Marysol Domenici did at a little after 2:00 a.m. on New Year's Day 2009 was to guard Plaintiffs Nigel Bryson, Jack Bryson, Jr., Carlos Reyes, Michael Greer, and Oscar Grant for a period of about six minutes while other officers investigated a fight that had been reported on a BART train that was holding at the Fruitvale station in Oakland, California. During those few minutes, she told the Plaintiffs to sit down, momentarily touched two of them to prevent them from stepping away from the detention area to interfere with the investigation, and briefly displayed her Taser in an effort to gain compliance after her commands to "sit down" and "stay out of it" were met with aggressive gestures, obscenities, and threats. It is uncontradicted that her actions caused no injury to any of the Plaintiffs. It is also uncontradicted that it was not Domenici, but other officers, that ultimately made the various arrests that occurred on that evening.

The motion should be granted because Domenici's mere presence "on the scene", or as part of a "team", is insufficient to establish liability under 42 U.S.C. § 1983. Since there is an absence of facts to show that she integrally participated in actual wrongdoing that proximately caused a constitutional violation, liability under § 1983 cannot be established.

Despite her minimal role in the events early that morning, these five Plaintiffs sue Domenici for three alleged civil rights violations under 42 U.S.C. § 1983, asserting violation of the Fourth Amendment for unlawful detention, unlawful arrest and the unlawful use of excessive force. In addition, these men sue Domenici under 42 U.S.C. § 1985 for racial discrimination in the course of her supposed Fourth Amendment

1    violations, and also make a variety of related state and common law claims.  But as a

2    matter of law, none of these claims have any merit.

3              First, Domenici cannot be liable for the *wrongful detention* of any of these

4    men.  The initial detention – made by another officer – was well supported by reasonable

5    suspicion and her actions in keeping the men briefly detained were proper under the

6    principle of "collective knowledge" and the continuing need to keep these belligerent

7    individuals safely away from the ongoing police work.  In addition, she is also entitled to

8    qualified immunity for obeying the instruction given to her by Officer Pirone upon her

9    initial arrival to guard these suspects because under the circumstances that request made

10   sense and was not, and did not appear, invalid on its face.

11             Second, there can be no liability for *wrongful arrest* because Domenici did not

12   arrest any of these individuals. The uncontradicted facts show that the arrests were made

13   by other officers under circumstances that demonstrated they were valid.  There is also an

14   absence of fact to demonstrate that Domenici participated in effecting any of the arrests.

15             Third, there can be no liability for excessive force because three of these

16   individuals (Carlos Reyes, Nigel Bryson, and Michael Greer) admit that Domenici never

17   touched them at all.  While she very briefly touched Jack Bryson, Jr. and Oscar Grant III

18   after they jumped up from a seated position in order to prevent them from moving forward

19   in the direction of where Defendant Pirone was handcuffing Michael Greer,  J. Bryson did

20   not even recall her touching him, and her momentary contact with Grant did not injure

21   him in any way.  Domenici's only additional action with respect to these Plaintiffs was to

22   ensure that they did not interfere with the police investigation by first ordering them to

23   "sit down" and "stay out of it", and thereafter displaying her Taser to gain compliance

24   with her commands.  Uncontradicted facts show that her conduct in momentarily touching

25   Bryson and Grant, and in displaying her Taser towards these individuals in order to gain

26   compliance with her commands, were well within Fourth Amendment standards:

27             (a)    Domenici did not know and, under the circumstances could not have

28   known, whether Plaintiffs were armed.

502434                                    -3-

(b)   These Plaintiffs were violating California Penal Code section 148 by interfering with legitimate police work, including disobeying her commands to be seated, cursing at her, as well as while lunging forward in the direction of a fellow officer who was in the process of handcuffing Michael Greer.

(c)   Domenici was suddenly confronted with two others from Plaintiffs' group of friends (Fernando Anicete and JohnTue Caldwell) who aggressively approached from her right flank while cursing at her, which raised legitimate further concerns for officer safety.  Threatened from multiple directions, Domenici did not have the luxury of politely asking the Plaintiffs to be seated.  Her display of the Taser to gain compliance was essential to maintaining order and safety.

(d)   The encounter with the Plaintiffs unfolded rapidly as a volatile, increasingly chaotic situation with some of the intoxicated New Year's Eve revelers coming off the stopped BART train cursing at her, throwing objects, disregarding her authority and disobeying her commands. Faced with this kind of difficult and unpredictable situation, her split-second but reasonable decisions about how best to control the situation are protected under the Fourth Amendment.

Fourth, Domenici cannot be liable for a violation of 42 U.S.C. § 1985 because there was no racial discrimination or denial of equal protection on her part.  All witnesses agree that she did not use any racial slurs.  Thus, there is no evidence of any improper or racially based motive for Domenici's conduct.

Fifth, Domenici cannot be held derivatively liable for anyone else's alleged constitutional violations.  Under the circumstances present here, she was entitled to rely upon the knowledge possessed, and instructions given to her, by fellow officers in the fast developing, unpredictable situation with which she was confronted.  There was no conspiracy to deprive anyone of civil rights and there was, in any event, no opportunity for her to intervene and stop any such violation if it occurred.  Indeed, because her conduct and her beliefs about what she was called upon to do were at all times objectively

1   reasonable under the circumstances, Domenici is, at the very least, entitled to protection

2   under the doctrine of qualified immunity.

3           Finally, Domenici cannot be held liable for the various state law and common

4   law causes of action because they are all derived from, and predicated upon, the above

5   constitutional violations for which there is no liability.  As a result, summary adjudication

6   is appropriate.

### III

### STATEMENT OF FACTS

9   **A.   Domenici's New Year's Eve Shift**

10          On the afternoon of December 31, 2008, Officer Marysol Domenici, a BART

11  police officer with four and a half years of experience (PX[1] at 571:6-8 [Domenici]), was

12  assigned to work her usual 3:30 p.m. to 1:15 a.m. shift, although she actually reported to

13  duty earlier than that to cover an overtime shift. (PX at 575:1-11 [Domenici]; ARB[2] at

14  90:5-25) Although Domenici started her shift on solo patrol, because it was New Year's

15  Eve the patrol sergeant paired up all the solo officers with a second officer in order to

16  operate as patrol teams.  (Gibson Dep.[3] at 32:13-22; ARB at 89:14-24)  Thus, at around

17  6:00 p.m. that night, Domenici was assigned to work with Officer Pirone patrolling the

18

19

20

21

22  [1] The relevant excerpts from the Reporter's Transcript of the Preliminary Hearing conducted in the matter
    of *People v. Johannes Mehserle*, are attached to the Declaration of Alison Berry Wilkinson as Exhibit A,
23  and will be referred to throughout this pleading as "PX." followed by the applicable page and line
    references and the name of the testifying witness in brackets.

24  [2] The relevant excerpts of the Reporter's Transcript of the testimony given by Domenici at the Arbitration
    Hearing between the Bay Area Rapid Transit District and the BART Police Officers Association
25  (California Statement Mediation and Conciliation Service Case No. ARB-09-0644) are attached to the
    Declaration of Alison Berry Wilkinson as Exhibit B, and will be referred to throughout this pleading as
26  "ARB." followed by the applicable page and line references.

27  [3] The relevant excerpts of the Deposition of Commander William Gibson are attached to the Declaration of
    Alison Berry Wilkinson as Exhibit C, and will be referred to throughout this pleading as "Gibson Dep."
28  followed by the applicable page and line references.

502434                                          -5-

DOMENICI'S MOTION FOR SUMMARY ADJUDICATION OF ALL FEDERAL CIVIL RIGHTS CLAIMS ASSERTED AGAINST HER   C09-00901 MHP

1   beat that included the Coliseum and Fruitvale stations. (PX at 575:27-576:4 [Domenici];

2   Pirone Dep.[4] at 34:17-35:8; ARB at 91:13-93:13)

3          The New Year's Shift had a different tone than a regular workday.  There was

4   more radio traffic than normal, including more fights and arguments.  (ARB 93:14-25)

5   There were many intoxicated train patrons that would "do things that they wouldn't do

6   normally."  (ARB 94:2-11.)  Around 1:30 a.m., there were radio communications

7   concerning a fight at the Embarcadero station involving a man with a gun who potentially

8   was on board the train headed in the Fruitvale direction.  (ARB 94:11-96:22; PX 378:14-

9   19; 379:1-380:3; 409:1-17 [Woffinden]; 513:11-20 [Knudtson].)  When the train from

10  Embarcadero stopped at the West Oakland station, Domenici heard radio traffic involving

11  officers chasing a suspect who jumped from the platform.  (ARB 97:3-12.)  Domenici was

12  at the Fruitvale Station when these calls were broadcast. (ARB 95:19-23)   Shortly

13  thereafter, Officer Pirone arrested a man who was intoxicated and trying to fight with

14  other patrons.  (ARB 103:1-16; 105:16-108:18)

15  **B.     2:00 A.M. and the Call of a Fight onboard a Train Holding at the**
16  **         Fruitvale Station**

17          At just before 2:00 a.m. on January 1, 2009, the train operator on the Dublin-

18  bound train headed into the Fruitvale Station reported that there was a fight on the lead car

19  of that train involving black males wearing all black.  (Declaration of Keecha Williams at

20  ¶ 2, 7-12 (hereafter "Williams Decl.," filed herewith.)  Central dispatch told the train

21  operator to hold the train at the Fruitvale station.  (*Id*)  It is undisputed that Oscar Grant

22

23

24

25

26

27  [4] The relevant excerpts of the Deposition of Defendant Anthony Pirone are attached to the Declaration of
    Alison Berry Wilkinson as Exhibit D, and will be referred to throughout this pleading as "Pirone Dep."
28  followed by the applicable page and line references.

1  was involved in that fight and that Nigel Bryson, Jack Bryson, Jr., Carlos Reyes, and

2  Michael Greer were all part of the group that was present when Grant got into the fight.[5]

3        At the time of the train operator's report, Officers Domenici and Pirone were in

4  the downstairs area of the Fruitvale BART station completing the arrest of an individual

5  for public intoxication.  Domenici was downstairs in the front of the ticket turnstile, and

6  Pirone was nearby, placing the arrested person into his patrol car.   (PX 577:1-18

7  [Domenici]; Pirone Dep., at 42:19-43:24.)

8        At 2:02:44 a.m., BART police dispatch assigned Pirone via the radio to

9  respond to a fight that had occurred on a train that was holding at the Fruitvale Station.

10  (Pirone Dep. at 39:16-41:24; PX 577:24-28 [Domenici], 577:22-26)  The radio broadcast

11  specifically stated: "514[6], they've got a 242[7] on a train that's holding there, Dublin bound,

12  getting details." (Hesson Decl.[8] at ¶ 10(a); see also Pirone Dep. at 39:17-40:24.)

13        When Pirone received the fight call, he asked the station agent to come over

14  and watch the man he had placed in the patrol car, and thereafter immediately headed

15

16  [5] Nigel Bryson testified that as the train pulled into the Fruitvale station he noticed there was a fight on the
    train between Oscar Grant and a "white dude" that involved "tussling", "arguing" and calling each other
17  names such as "bitches" and "mother fuckers". (N. Bryson Dep. at 91:4-25; 260:.10-23) Jack Bryson, Jr.
    testified that just before the train pulled into Fruitvale he observed Oscar Grant and a male who "could
18  have been white" but "to me he looked Hispanic" involved in an altercation during which they were
    "pushing" and "shoving" and "just kind of wrestling mostly" for "maybe a minute, minute and a half,
19  maybe two at the most." (J. Bryson Dep. at 95:17-24, 101:17-102:19, 106:6-14, 107:17-24.)  Carlos
    Reyes testified that on the train Oscar Grant got into a "shoving contest" with a "white man with a shaved
20  head" that involved "yelling", "pushing" and "grabbing." (Reyes Dep. at 64:3-65:10.)  Fernando Anicete
    testified that he saw Oscar fighting with a white man, and that the had "seen a couple punches. (Anicete
21  Dep. at 103:15-104:1)  Michael Greer also testified that Grant was involved in the fight on the train.
    (Greer Dep. at 69:5-17.)

22  [6] The number "514" was a reference to Officer Pirone's badge number. (Trial 6.18.2010 [Pirone] at
23  2773:1-19.)  Generally, when working solo patrol, Pirone's radio call sign would be his beat identification
    "1 Boy 10".  When doubled up on a shift, the beat identification would be the call sign for both members
24  of the team, and the individual team members would be distinguished by dispatch by reference to the
    applicable  badge number. (Id.)  True and correct copies of the relevant excerpts from the Reporters
25  Transcript of the criminal trial of People v. Mehserle are attached as Exhibit E to the Declaration of Alison
    Berry Wilkinson, filed herewith.

26  [7] The number "242" is a reference to California Penal Code section 242, which states:  "Battery defined.
27  A battery is any willful and unlawful use of force or violence upon the person of another."

28  [8] The Declaration of Gary Hesson filed herewith is referred to throughout as "Hesson Decl." followed by
    the applicable paragraph reference.

1  towards the platform.  (PX 577:22-28 [Domenici]; Pirone Dep. p. 42:19-44:2.)  As he

2  passed Domenici, he told her "I've got a fight upstairs" and kept on going.  (Pirone Dep.

3  at 46:19-47:5.)  Domenici began to follow but was stopped by two women who were

4  arguing loudly.  (PX 577:26-28, 578:17-21 [Domenici].)

5          At 02:03:02 a.m., eighteen seconds after the original broadcast and while

6  Pirone was on the stairs headed up to the platform, dispatch made a further radio

7  broadcast that included additional information about the suspects involved in the fight on

8  the train:  "It's the lead car, no weapons, all black clothing, large group of BMs is all we

9  have (Hesson Decl. at ¶ 10(b); see also Pirone Dep. at 40:17-21, 44:1-22; PX 730:24-

10  731:10 [Pirone].)

11      **C.    Pirone Detains the Men Suspected of Being Involved in the Fight**

12          When Pirone arrived on the Fruitvale platform, he looked toward the lead car

13  of the train where he saw five black men in black or dark attire,[9] accompanied by a

14  woman who "had a finger up in someone's face" (PX 731:11-26 [Pirone]) and who was

15  talking "with a loud voice."  (Greer Dep. at 161-162; *see also* Pirone Dep. at 48:4-23.)

16  After Pirone began walking toward the lead car, the group of men began walking in his

17  direction.  (Pirone Dep. at 49:8-18, 51:2-8.)  As he was walking, Pirone drew the Taser

18  from his holster and held it in his hand.  (PX 736:3-7 [Pirone].)

19          When Pirone got close enough to talk to the members of the group, he said "I

20  need everyone to get against the wall" as well as  "I need to talk to you."  (Pirone Dep. at

21  51:20-53:18.)  The men, however, made no verbal response.  (*Id.* at 54:11)  Instead, two

22  of them – Oscar Grant and Michael Greer – quickly jumped back into the train to avoid

23

24

25

26  ---

27  [9] The men all matched the description given by dispatch. Oscar Grant was wearing a black sweater, a
black beanie, and blue jeans. Jackie Bryson was wearing a black shirt and blue jeans. Carlos Reyes was

28  wearing a black jacket, a black hat, and blue jeans. Mike Greer was wearing a black jacket, a white t-shirt,
and blue jeans.  (Anicete Dep. at 257:5-25)

1   Pirone.[10]  (Pirone Dep. at 54-55; PX 737: 3-7; Greer Dep.[11] at 26:10-20; 165:5-16; 170:6-

2   25; (J. Bryson Dep. at 115.[12])  The other three men – Carlos Reyes, Jackie Bryson, Jr., and

3   Nigel Bryson – tried avoid the officer.  (Pirone Dep., p. 55, PX 737:26-738:15 [Pirone].)

4           Pirone again said: "I need you to get against the wall," and pointed toward the

5   area where he wanted them to go.  (Pirone Dep. at 57.)  But again the men ignored his

6   command.  At that point, Pirone put his hand on the chest of one of the men to prevent

7   him from walking past,[13] pointed his Taser at him and told all of them that if they did not

8   line up against the wall he was going to Tase them.  (Pirone Dep. at 58-59, PX 738:24-

9   739:19.)  In response to this threat of force, Carlos Reyes, Nigel Bryson, and Jack Bryson,

10  Jr. complied with Pirone's request and moved over to the wall where they sat down.

11  (Pirone Dep. at 61-62; PX 739:5-21 [Pirone]; Reyes Dep.[14] 81:2-9; J. Bryson Dep. at

12  187:20-188:7; N. Bryson Dep.[15] at 115:12-20; 117:4-5.)

13          Pirone told the men that he was investigating a fight.  (Pirone Dep. at 62:18-22;

14  PX 741:22-27)  The men responded with curses and profanities.  (Pirone Dep. at 62:18-

15  63:18, PX 741:22-742:23.)   Pirone then told them to keep their hands out of their pockets,

16  [10] Michael Greer testified that when he saw Officer Pirone, he got back on the train because he wanted
17  "just to avoid everything", especially "any interaction with the police."  (Greer Dep. at 26:10-20; see also
     165:5-16.)  Greer further testified that when he saw Pirone stopping his friends, he "just didn't want to be
18  part "of the group that Pirone had directed to the wall. (Greer Dep. at 172:1-11)  On the night of the
     incident, Greer was on probation, a condition of which was that he obey all laws and not be involved in
19  any fights. (Greer Dep. at 173:7-22)

20  [11] The relevant excerpts from the Deposition of Plaintiff Michael Greer are attached to the Declaration of
     Alison Berry Wilkinson as Exhibit F, and will be referred to throughout this pleading as "Greer Dep."
21  followed by the applicable page and line references.

22  [12] The relevant excerpts from the Deposition of Plaintiff Jack Bryson, Jr. are attached to the Declaration of
     Alison Berry Wilkinson as Exhibit G, and will be referred to throughout this pleading as "J. Bryson Dep."
     followed by the applicable page and line references.

23  [13] By the process of elimination, that individual was Carlos Reyes. Reyes testified that Pirone grabbed his
24  "arm or shoulder" and then told him to go sit down. (Reyes dep. at 80:22-81:7.)  Both Nigel and Jackie
     Bryson testified that Pirone never touched them that night. (N. Bryson Dep. 270:11-18, JB 116:24-117:3)

25  [14] The relevant excerpts from the Deposition of Plaintiff Carlos Reyes  are attached to the Declaration of
     Alison Berry Wilkinson as Exhibit H, and will be referred to throughout this pleading as "Reyes Dep."
26  followed by the applicable page and line references.

27  [15] The relevant excerpts from the Deposition of Plaintiff Nigel Bryson are attached to the Declaration of
     Alison Berry Wilkinson as Exhibit I and will be referred to throughout this pleading as "N. Bryson Dep."
28  followed by the applicable page and line references.

1    and called for Officer Domenici to come meet him on the platform.  (Pirone Dep. at 64:2-

2    7, PX 740:2-24, 743:2-15 [Pirone].)

3    **D.    Domenici Arrives on the Platform**

4         Pirone used his police radio to summon Domenici at 02:05:15, which was just

5    over two minutes after Pirone arrived on the platform[16].  (PX 743:6-15 [Pirone], PX

6    578:8-28 [Domenici]; Hesson Decl. ¶10(d).)  In response, Domenici ran up the escalator

7    and made it to the platform just seconds later.  (Schott Decl.[17] at ¶8).  As Domenici

8    explained, "As I got up there, that's when everything started happening."  (PX 578:5-6.)

9         When Domenici got to the top of the escalator, the train was still holding at the

10   platform, with its doors open, and was packed with a New Year's Eve crowd.  (PX

11   579:20-23 [Domenici]; ARB 125:1-13, 128:4-11; Anicete Dep. at 82:23-83:3 [The train

12   was "crowded as in like sticky crowded … like basically you could barely move."] )

13        As she looked to her right, Domenici saw people were still exiting the train,

14   and that Officer Pirone had placed some men against the wall towards the lead car.  (PX

15   580:4-18 [Domenici])  Domenici then ran from where she arrived on the train platform at

16   the top of the escalator to the wall where Officer Pirone had the subjects detained. (PX

17   580:10-12 [Domenici]; ARB 128:12-25

18        When Domenici arrived at the location where Pirone had detained the men

19   against the wall, Pirone told her to "stay with them" and then returned to the train to

20   retrieve a fourth suspect – Oscar Grant.  (PX 581:3-8 [Domenici]; ARB 140:7-16.)  It is

---

[16] Pirone "Tac One" references the tactical channel used by patrol officers for the Oakland area.  All communications on that channel are recorded.. (Hesson Declaration at ¶11.) The full radio broadcast that occurred at 02:05:15 was:

| 514(Pirone) | 496, Tac One | |
| 496(Domenici): | Go | |
| 514: | Can you 98 me upstairs? | |
| 496: | Which side? | |
| 514: | Dublin-side | |
| 496: | 10-4 | (Hesson Declaration at ¶10(d).) |

[17] References to the Declaration of Michael Schott, filed herewith, will be referred to throughout as "Schott Decl." followed by the applicable paragraph number.

1    undisputed that Grant had been involved in the fight on the BART train just as it entered

2    the Fruitvale Station.  (See footnote 5, *supra*.)

3            Grant was then placed against the wall with the other three.  (Pirone Dep. at.

4    74:7-75:11, PX 746:21-747:5 [Pirone])   Officer Pirone again then left Domenici to watch

5    the men while Pirone headed back to the train to apprehend another suspect, Michael

6    Greer.  (Pirone Dep. at 83:2-24; PX 749: 17-25 [Pirone])  Reyes, Greer and the Bryson

7    brothers all agreed that Pirone then removed Grant and Michael Greer from the train and

8    placed them both against the wall as well (J. Bryson Dep., 118:4-22; 120:14-21; 121:2-16;

9    J. Bryson Dep. 115:13-116:14; 89:25-90:23; Reyes Dep. 93:22-25; 95:17-96:11; Greer

10   Dep. 30:3-11; 30:21-31:9; 31:21-32:13), and that Officer Domenici first arrived on the

11   platform during this time.  (Bryson Dep., 121:17-22; 122:5-7; Bryson, Jr. Dep. 119:5-23;

12   Reyes Dep. 93:9-94:20.)

13       **E.    Domenici Guards the Detained Men**

14          Rather than sit down on the floor, the men suggested that they sit on a nearby

15   bench.  (PX 581:11-15 [Domenici]; ARB 140:7-24.)  Since Domenici had no idea if the

16   men were armed, and for better protection against potential assault by any of those

17   detained, Domenici wanted them seated on the floor rather than on a bench.  (PX 581:19-

18   22; 582:2-19 [Domenici]; ARB 142:22-143:16.)  When Domenici told them to sit on the

19   floor, they initially would not sit down. (PX 581-584 [Domenici]; ARB 142:22-143:16.)

20   After she spoke louder and more authoritatively, the four men begrudgingly sat down.

21   (*Id.*)

22          Behind her, Officer Pirone was struggling to take Michael Greer off the train.

23   (PX 585:21-588:22 [Domenici]; ARB 146:15-147:24)  As Domenici was primarily

24   occupied with guarding the four men she was told to watch, she was only able to take

25   quick glances back at Pirone as he removed Greer from the train and used a leg sweep to

26   put him on the ground for handcuffing.  (*Id.*)

27          As Pirone was dealing with Greer, three of the four detainees – Grant, Reyes

28   and Jack Bryson, Jr. – got quickly to their feet and began challenging the officers, cursing,

1   and saying: "that's wrong" "don't do that" and "why are you doing this to us." (PX 584:5-

2   20; 585:7-23; 588:23-590:4 [Domenici]; ARB at 147:10-24;  J. Bryson Dep. at 195:7-11,

3   254:15-24, 257:14-19; N. Bryson Dep. at 126:5-127:6; Reyes Dep. at 98:4-13.)

4         Nigel Bryson testified that when Pirone brought Greer to the ground, "that's

5   when Oscar and [my] brother Jackie, and Carlos Reyes all stood up" and were angry. (N.

6   Bryson Dep. at 269:5-12.)  Although Nigel Bryson remained seated, he told Domenici she

7   was a "stupid bitch," "fake ass police", and  a "devil".  (N. Bryson Dep. at 124:4-7, 126:3-

8   13; PX 588:23-590:4 [Domenici])

9         After Grant stood up, he told Domenici: "This is fucked up.  This is fucked

10   up" and began moving towards where Officer Pirone was handcuffing Michael Greer.

11   (PX at 589:3-11 [Domenici]; ARB 149:16-150:5)  Several times Domenici had to push

12   Grant back while saying: "Stay out of it, stay out of it."  (*Id.*)  At that point, Jack Bryson

13   started coming away from the wall, and Domenici had to push him back also and tell him

14   to "stay out of it." (PX at 589:3-13 [Domenici]; ARB 150:6-10, 151:25-152:8.)

15         Jack Bryson testified that he was "upset" initially when Grant was removed

16   from the train (J. Bryson Dep. at 251:23-252:1), and became "more upset" when Michael

17   Greer was removed from the train.  (J. Bryson Dep. at 254:2-255:3.) Bryson then stood

18   up, began "arguing" with Domenici, and was yelling: "fuck y'all". (J. Bryson Dep. at

19   122:2-6; 127:2-18, 131:6-9, 318:13-319:3; N. Bryson Dep. at 129:16-20.)  While arguing

20   with Domenici, Jack Bryson used language that included words such as  "nigger," "bitch",

21   and  "fake police".  (N. Bryson Dep., p. 132:9-17; J. Bryson Dep. at 128:2-13, 259:2-13;

22   318:13-319:3.)  In response, Domenici forcefully told Jack Bryson, Oscar Grant, and

23   Carlos Reyes to "sit down" and "stay out of it."  (PX at 589:3-11 [Domenici]; ARB

24   149:16-150:10;  J. Bryson Dep. at 312:20-25; N. Bryson Dep. at 307:12-25.)   As Jack

25   Bryson, Jr. was arguing with Domenici, Oscar Grant injected himself between the two.[18]

26   (J. Bryson Dep. at 131:6-24; 132:11-133:20; N. Bryson Dep. at 307:12-21.)

---

27   [18] While Plaintiffs maintain that Grant had jumped up to be a "peacemaker" and calm down Jack Bryson,
Pirone testified that he heard nothing like this and that Grant was combative throughout this period.
28   (Pirone Dep., p. 125; PX 761-763.)

502434

-12-

1    Once he completed the handcuffing of Michael Greer, Pirone intervened to

2   assist Domenici in controlling Bryson, Reyes and Grant.  He told Grant and Bryson to "sit

3   the fuck down", then pushed Grant back against the wall, and down to the ground.

4   (Pirone Dep. at 120; PX 761 [Pirone]; Greer Dep. at 35:17-36:16;  J. Bryson Dep. at

5   132:11-133:24) J. Bryson then also sat down.  (J. Bryson Dep. at 132:11-133:24.)  The

6   crowd on the platform got loud, and started screaming and swearing at the officers.

7   (N. Bryson Dep. at 137:13-138:1; Anicete Dep.,[19] at 285:14-286:6.)  Simultaneously with

8   Pirone's approach, Domenici noticed that Nigel Bryson kept looking towards his left  and

9   was calling out "Blood, this is fucked up" towards the people who were on Domenici's

10   right. (PX 589:22-590:24 [Domenici]; ARB 152:7-154:4.)  The deteriorating situation

11   caused Domenici to have heightened officer safety concerns.  (*Id.*)

12   **F.    Anicete and Caldwell Approach Domenici**

13    Just as Pirone came over to assist Domenici with J. Bryson and Grant, and as

14   the crowd started getting loud and aggressive, Domenici turned to look toward where

15   Nigel Bryson had been calling out and saw two additional men approaching from her right

16   flank – Fernando Anicete, Jr. and Johntue Caldwell.  (PX 590:13-24 [Domenici]; ARB

17   152:1-25)

18    As they approached, Anicete was gesticulating while yelling at Domenici,

19   including shouting "what the fuck you all doing" and other obscenities, which caused

20   Domenici to become further concerned about officer safety.  (Anicete Dep. at 148:14-22;

21   ARB 148-149, 152-153)   Domenici told Anicete to "get back" (Anicete Dep. at 158:2-

22   16), but after retreating a step or two, Anicete lunged forward again, taunting her and

23   calling her a "fucking bitch".  (PX 601:12-14 [Domenici]; ARB 152:25.)

24    When Domenici turned toward her right, she saw Anicete with a look on his

25   face "like I want to fuck you up" (ARB 152:21-25).  Several times Anicete made back and

26

27   [19] The relevant excerpts from the Deposition of Plaintiff Fernando Anicete, Jr., are attached to the
    Declaration of Alison Berry Wilkinson as Exhibit J, and will be referred to throughout this pleading as
28   "Anicete Dep." followed by the applicable page and line references.

forth lunges or "power walks" in the direction of Officer Domenici. (Anicete Dep. at 160:8-164:10; 166:12-23; 168:15-169:3; ARB 156:2-25)  On at least one of the times when he walked up to the officers – and after they told him to stay away – Anicete held a cell phone cupped in his hand. (*Id.*, 165:7-11; 169:8-13; 175:19-22.)  Confronted with such threatening action, Domenici pointed her Taser at Anicete. (Anicete Dep. at 159:1-8)  But just when she thought she was going to have to Tase Anicete, Officer Knudtson, rushed up from behind Anicete and tackled him.  (PX 606:10-20 [Domenici]; ARB 156:2-157:25; Anicete Dep. at 175:2-9.)  After taking Anicete down, Officer Knudtson started to cuff him and Domenici concentrated on covering his back – with her attention now also increasingly occupied with persons who were coming off the train and taunting the officers.  (PX 608:5-15 [Domenici]; ARB 159:2-8)

Just then, she heard a "pop." (PX 612:14-613:8 [Domenici]; ARB 159:11-23)  Moments later when she smelled gun powder she knew someone had fired a gun, but she did not know who had been shot.  (*Id.*)

### G.   Domenici Had No Contact with Any of These Plaintiffs After the Shooting

Once the shooting occurred, Domenici had no further interaction with any of these Plaintiffs.  From that time forward, Domenici was fully engaged in maintaining crowd control, urging people to cooperate and herding them back away from where the shooting had occurred and onto the train. (ARB 160-162)  The Plaintiffs were handcuffed by others, moved off the platform, and taken to BART police vehicles, which drove them to BART police headquarters.  There they were questioned and then released.

## IV
## ARGUMENT

**A.   Summary Judgment on the Civil Rights Claims is Proper Because None of These Plaintiffs Have Evidence Establishing Any Wrongdoing by Domenici**

Under F.RC.P. Rule 56, summary judgment, or summary adjudication,[20] should be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Once a defendant challenges a plaintiff to proof, it is the plaintiff's burden to provide *evidence* of wrongdoing:

> When the moving party does not have the ultimate burden of proof at trial, it need not produce evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. 2548. "Instead, ... the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Sony Pictures Entm't, Inc. v. Fireworks Entm't Group, Inc.*, 156 F.Supp.2d 1148, 1152 (C.D. Cal. 2001) (emphasis added) (quoting *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548).

*Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*, 290 F.Supp.2d 1083, 1087 (C.D. Cal. 2003).

In establishing such proof, the plaintiff may not rest on the allegations of the complaint:

> Furthermore, "[o]nce the moving party satisfies this initial burden, 'an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... The adverse party's  response ... must set forth specific facts showing that there is a genuine issue for trial.'" *Sony Pictures Entm't*, 156 F.Supp.2d at 1152 (quoting Fed.R.Civ.P. 56((e)).

*Matrix Motor Co., Inc., supra.*

---

[20] Under Rule 56(d), summary adjudication may be sought for discrete or separate claims for relief. *Diamond Door Co. v. Lane-Stanton Lumber Co.*, 505 F.2d 1199 (9th Cir. 1978).

To create an issue of material fact, furthermore, proof beyond a mere scintilla of evidence is necessary:

> A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish the essential elements to that party's cause, and on which that party would bear the burden of proof at trial. *Celotex*, 477 I.S. at 322-23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Matrix Motor Co., supra*, at 1087.[21]

Here, it is Plaintiffs' burden to establish that Domenici was an active, integral participant in conduct that proximately caused a constitutional violation. In response to this motion, therefore, Plaintiffs must present not just proof of a constitutional violation, or that she was present when such occurred, but real evidence that Domenici actively participated in the wrongdoing. In addition, to overcome the qualified immunity defense, Plaintiffs will have to present actual evidence that Domenici unreasonably violated a clearly established constitutional rule. Simply stated, Plaintiffs are not able to muster such proof.

## B.   Domenici Cannot Be Liable for Wrongfully Detaining Plaintiffs

### 1.   Introduction

The First Cause of Action in the *Bryson* Complaint, directed at all Defendants, alleges "Defendant officers *detained plaintiffs without reasonable suspicion*, violated plaintiffs' rights to be free from unreasonable seizures as provided for under the Fourth

---

[21] These same principles apply in the context of summary judgment sought on the ground of qualified immunity in a section 1983 case. "A motion for summary judgment based on the defense of qualified immunity is analyzed under the ordinary framework established for such motions. *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004). A defendant who makes a properly supported motion for summary judgment based on the defense of qualified immunity shifts the burden such that plaintiff must produce evidence in opposition. *Butler*, 370 F.3d at 964." *Giraldes v. Prebula*, 2010 WL 2610986 (E.D. Cal. 2010); 2010 WL 3433243 (E.D. Cal. 2010).

1  Amendment to the United States Constitution." The *Johnson* Complaint makes a similar

2  claim related to Oscar Grant in both its First and Second Causes of Action.

3       Domenici cannot be held liable for wrongfully detaining Grant, Reyes, Greer,

4  or the Bryson brothers because:

5       (a)   Domenici did not make the "stop";

6       (b)   The stop was lawful under the Fourth Amendment;

7       (c)   The continued detention was reasonable under the circumstances; and

8       (d)   Domenici is entitled to qualified immunity.

9       **2.**    **Domenici Did Not Make the "Stop"**

10       Neither of the Complaints filed, nor any of the testimony given by the

11  Plaintiffs, allege that it was Domenici who decided to detain these individuals.  According

12  to paragraphs 22 through 25 of the *Bryson* Complaint, and paragraph 15 of the *Johnson*

13  complaint, it was Officer Pirone who made the initial decision to detain and question all

14  the Plaintiffs.   In the *Bryson* Complaint at ¶ 22, Domenici is alleged to have simply

15  "arrived on the scene and stood guard over" these Plaintiffs.

16       All the Plaintiffs agree that it was Pirone, not Domenici, that detained Nigel

17  Bryson, Jackie Bryson, Jr., Carlos Reyes, Michael Greer, and Oscar Grant:

18     •  Nigel Bryson testified that after he got off the train, Officer Pirone came up to

19       the platform alone, stopped him, and told him to get against the wall.  (N.

20       Bryson Dep. at 109:6-22, 110:12-15, 111:23-116:9.)  Pirone then ordered

21       Jack Bryson, Jr., and Carlos Reyes to sit against the wall. (N. Bryson Dep. at

22       117:6-12.)  Next, Pirone retrieved Oscar Grant from the train and sat him at

23       the wall (N. Bryson Dep. at 118:8-22, 266:11-267:20), and then Pirone

24       returned to the train to retrieve Michael Greer (N. Bryson Dep. at 121:3-22,

25       267:25-269:7).  Nigel Bryson further testified that Domenici did not arrive

26       until *after* he was already sitting down at the wall.  (N. Bryson  Dep. at

27       121:25-122:14.)

28

502434                      -17-

- Jackie Bryson, Jr. testified that it was Pirone who came up to the platform and told him to sit down at the wall. (J. Bryson Dep. at 113:18-119:10, 185:3-188:16.) He further testified that he was already seated at the wall at the time Domenici arrived. (J. Bryson Dep. at 246:1-3)
- Michael Greer testified that it was Officer Pirone who came onto the train, removed him, and then handcuffed him. (Greer Dep. at 178:14-180:17) Greer testified that Officer Domenici and he never spoke on the platform, and that she never touched him. (Greer Dep. at 126:21-127:7; 129:2-3; 131:14-16)
- Carlos Reyes testified that Officer Pirone stopped him by grabbing his shoulder and ordering him to go sit down. (Reyes Dep. at 81:2-9.) Reyes testified that no other officer was on the platform at the time he was ordered to the wall, and that it was not until Oscar Grant was being removed from the train that Domenici arrived on the platform. (Reyes Dep. at 93:3-21)

There is thus no evidence that Domenici made or participated in the stop that initially detained these Plaintiffs.

### 3.    Pirone Had Reasonable Suspicion to Make the Stop

Even if Domenici's conduct in continuing the detention could somehow make her liable for wrongfully initiating it, she would not face liability here. In this case, the stop was perfectly legal. Under well-established law, a police officer can stop and briefly detain a person where there is reasonable basis for suspecting criminal conduct even though there is not "probable cause" for arrest:

> In *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884-85, 20 L.Ed.2d 889, we held that the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot" even if the officer lacks probable. The officer, of course, must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" The Fourth Amendment requires "some minimal level of objective justification" for making the stop. That level of suspicion is considerably less than proof of

> wrongdoing by a preponderance of the evidence. We have held that
> probable cause means "a fair probability that contraband or
> evidence of a crime will be found," and the level of suspicion
> required for a *Terry* stop is obviously less demanding than that for
> probable cause, see *United States v. Montoya de Hernandez*, 473
> U.S. 531, 541, 105 S.Ct. 3304, 3310, 3312, 87 L.Ed.2d 381 (1985).

*U.S. v. Sokolow*, 490 U.S. 1, 2, 109 S.Ct. 1581, 1582 (1989).

As the court further explained, innocent and lawful behavior can create reasonable suspicion.

> [T]here could, of course, be circumstances in which wholly lawful
> conduct might justify the suspicion that criminal activity was
> afoot." Indeed, *Terry* itself involved "a series of acts, each of them
> perhaps innocent" if viewed separately, "but which taken together
> warranted further investigation."

*U.S. v. Sokolow, supra*, at 1587.

Here, Officer Pirone had more than ample grounds to form a reasonable suspicion that these individuals were involved in the fight that he had been called upon to investigate. These five Plaintiffs matched the description of the men involved in a fight on the BART train that was broadcast over the police radio at 02:03:02 a.m. on January 1, 2009. The report described a fight involving a group of black males in black clothing on the lead BART car at the Fruitvale station. When Pirone arrived on the platform, just moments after the call, he saw five young black men in dark clothing standing outside the lead car in the company of a woman who was both pointing and yelling. As he started to walk toward them and started to tell them he needed to talk to them, two of the individuals (Greer and Grant) suddenly hopped back on the train. The other three acted like they did not hear and took an evasive path.

A "Terry stop" under these circumstances met the requirements of the Fourth Amendment. The individuals reasonably matched the description – black males in dark clothing – and stood outside the lead train car at the Fruitvale station. This itself provided the "minimal levels of objective justification for making a stop." *U.S. v. Sokolow, supra.* The fact that these individuals took evasive action further confirms the validity of the

502434

-19-

1    stop.  As the United States Supreme Court has held, "nervous, evasive behavior is a

2    pertinent factor in determining reasonable suspicion."  *Illinois v. Wardlaw*, 528 U.S. 119,

3    124 (2000); *Paine v. City of Lompoc*, 160 F.3d 562, 566 (9th Cir. 1998); *U.S. v. Cheek*,

4    586 F.Supp.2d 1099, 1106-1107 (D. Ariz. 2008).  Thus, there was no Fourth Amendment

5    violation in detaining these five Plaintiffs.

### 4.  Domenici's Brief Continuation of the Detention Is Supported By the Collective Knowledge Doctrine and the Plaintiffs' Resistant Conduct

8            Under the "collective knowledge" doctrine, Domenici is shielded from liability

9    for the claims of unlawful detention. Indeed, Domenici is deemed to know what Pirone

10   knew and observed when he made the initial stop:

> Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment.

15   *U.S. v. Ramirez*, 473 F.3d 1026, 1036 (9th Cir. 2007).

16           As another court has explained:

> Under the collective knowledge doctrine, courts must determine whether an investigatory stop, search, or arrest complied with the Fourth Amendment by "look[ing] to the collective knowledge of all officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually undertakes the challenged action." *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007).

22   *U.S. v. Holiday*, 2010 WL 3733890, 3 (S.D. Cal. 2010).

24           Not only was the initial stop lawful and Domenici protected by the collective

25   knowledge that made it so, but Domenici's continuation of  the detention for the next five

26   or six minutes was also proper.  The Plaintiffs' belligerent, threatening behavior only

27   confirmed and solidified – objectively as well as in Domenici's mind – that there was a

28   legitimate reason and a great need to keep these men detained for the few minutes

1   involved here.  Thus, no Fourth Amendment violation occurred by Domenici's actions,

2   and summary adjudication on the wrongful detention claims made by Oscar Grant, Nigel

3   Bryson, Jack Bryson, Jr., Carlos Reyes, and Oscar Grant should be granted.

**5.      Domenici Is Entitled to Qualified Immunity for "Following Directions" That Were Reasonable Under the Circumstances**

**a.      The Doctrine of Qualified Immunity**

8        Even if there had been a Fourth Amendment violation in the initiation or the

9   maintenance of Plaintiffs' brief detention, Domenici would still be protected by the

10  doctrine of qualified immunity.  Under this doctrine, public officials "generally are

11  shielded from liability for civil damages insofar as their conduct does not violate clearly

12  established statutory or constitutional rights of which a reasonable person would have

13  known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1983).

14       In analyzing a police officer's assertion of qualified immunity from claims of

15  unlawful detention or arrest, the court must determine (1) whether there was a violation of

16  a constitutional right, and (2) whether the right was clearly established such that a

17  reasonable officer would understand that his conduct violated that right:

> If the alleged conduct did not violate a constitutional right, then the
> defendants are entitled to immunity and the claim must be
> dismissed.  However, if the alleged conduct did violate such a right,
> then the court must determine "whether the right was clearly
> established" at the time of the alleged unlawful action.  *Id.*  A right
> is clearly established if "a reasonable official would understand that
> what he is doing violates that right."  *Id.* at 202,121 S.Ct. 2151.  If
> the right is not clearly established, then the officer is entitled to
> qualified immunity.[22]  *Pearson v. Callahan.* — U.S. —, 129 S.Ct.
> 808, 818, 172 L.Ed.2d 565 (2009).

*Hopkins v. Bonvicino,* 573 F.3d 752, 762 (C.A.9 2009).

---

[22] "While the order in which these questions are addressed is left to the court's 'sound discretion,' 'it is often beneficial' to perform the analysis in the sequence outlined above." *Pearson, supra.*

1        Here, as discussed above, there was more than ample reason to conduct a

2    "Terry stop." That should negate any chance of liability for wrongful detention at the

3    outset. Significantly, however, qualified immunity may protect an officer from suit –

4    even if there *was* a constitutional violation – as long as the officer's mistake was

5    "reasonable."

6            Qualified immunity shields an officer from suit when she makes a
7            decision that, even if constitutionally deficient, reasonably
             misapprehends the law governing the circumstances she confronted.
8            *Saucier v. Katz*, 533 U.S., at 206, 121 S.Ct. 2151 (qualified
9            immunity operates "to protect officers from the sometimes 'hazy
             border between excessive and acceptable force'"). ... If the law at
10           that time did not clearly establish that the officer's conduct would
             violate the Constitution, the officer should not be subject to liability
11           or, indeed, even the burdens of litigation.

12   *Brosseau v. Haugcn*, 543 U.S. 194, 198, 125 S.Ct. 596, 599 (U.S. 2004).

13       Here, nothing in the law would have informed Domenici that her conduct in

14   keeping the men detained – under the circumstances present here – would have offended

15   any constitutional principle. Thus, her conduct in continuing the detention was

16   reasonable, and qualified immunity shields her from liability.

17           **b.    Domenici's Conduct in Following Reasonable**
18                **Instructions and Maintaining the Detention Is**
19                **Subject to Qualified Immunity**

20       One circumstance in which the doctrine of qualified immunity has been

21   invoked successfully is where an officer follows the reasonable directions of a fellow

22   officer:

23           While it is typically no defense for an officer to claim he was
24           simply "following orders," *Villanueva v. George*, 659 F.2d 851, 855
             (8th Cir. 1981) (en banc), "[p]lausible instructions from a superior or
25           fellow officer" can "support qualified immunity where, viewed
             objectively in light of the surrounding circumstances, they could
26           lead a reasonable officer to conclude that the necessary legal
             justification for his actions exists." *Bilido v. McCleod*, 211 F.3d
27           166, 174-75 (1st Cir. 2000); *see also Lauro v. Charles*, 219 F.3d
28           202, 216 n. 10 (2d Cir. 2000).

1  *Harvey v. Plains Tp. Police Dept.*, 421 F.3d 185, 199 (3rd Cir. 2005), *cert. den.*, 126 S.Ct.

2  2325 (2006); *see also, Runge v. Ippollito*, 2010 WL 1239571, 4 (N.D. Cal. 2010).[23]

3           In this case, as soon as Domenici arrived on the platform, Pirone told her to

4  guard the suspects whom he had placed by the wall while he went back to the train for

5  other suspects.  As far as Domenici could tell, there was nothing facially wrong or

6  unreasonable about this request.  Domenici knew there was a report of a fight on the train

7  and there was nothing unusual or odd about the need to watch the young men while her

8  patrol partner went back to apprehend other suspects.  The detention lasted only a few

9  minutes and from everything Domenici could observe the directive to watch over these

10  persons made good sense.  Their aggressive, threatening behavior in cursing and swearing

11  at her, calling her a "bitch," a "devil" and "fake cop" while jumping up to interfere with

12  Pirone as he attempted to take Greer into custody only reinforced the idea that it *was*

13  necessary to stand guard over these individuals.  At the very least, any mistake Domenici

14  made on this score was a *reasonable* mistake of judgment.

> Qualified immunity applies whether an officer's error is a mistake
> of law, a mistake of fact, or a mistake of the application of law to
> facts.  An officer will not be liable for mere mistakes in judgment.
> *Butz v. Economou*, 438 U.S. 478, 507, 98 S.Ct. 2894, 57 L.Ed.2d
> 895 (1978) (cited with approval by *Pearson*, 129 S.Ct. at 816).

19  *Marquez v. City of Phoenix*, 2010 WL 3342000, 16 (D. Ariz. 2010).

20           Thus, the *worst* that might conceivably be said about Domenici's conduct in

21  following the directive to keep these men detained for a few minutes is that she

---

[23] *See also, Varrone v. Bilotti*, 123 F.3d 75, 81 (2d Cir. 1997)  ("Since the four subordinate officers were
merely carrying out [the Inspector General's] instruction and that of their immediate superior when they
ordered the strip search, they were entitled to [qualified] immunity."); *see also Bilida v. McCleod*, 211
F.3d 166, 174-74 (1st Cir. 2000) ("Plausible instructions from a superior or fellow officer supported
qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a
reasonable officer to conclude that the necessary legal justifications for his actions exist."); *cf. Lauro v.
Charles*, 219 F.3d 202, 216 n. 10 (2d Cir. 2000) (fact that defendant was following orders given by his
superiors further supported the existence of qualified immunity)."  *Williams v. Goord*, 142 F.Supp.2d 416,
430 (S.D.N.Y. 2001).

1    mistakenly believed that the order was reasonable under the circumstances.  But this is

2    precisely the kind of reasonable mistake that qualified immunity is designed to protect.

3    **C.    Domenici Is Not Liable for Unlawful Arrest**

4            The Second Cause of Action in the *Bryson* Complaint, and the Third Cause of

5    Action in the *Johnson* Complaint, claims a Fourth Amendment violation for wrongful

6    arrest.  There is no testimony from *any* competent witness, however, that Domenici played

7    *any* role whatsoever in arresting any of these Plaintiffs.

8            During the few crucial minutes involved here, Domenici's attention was

9    wholly occupied (1) first in guarding these young men and in dealing with their

10   aggressive, threatening behavior, (2) next in dealing with the new threats posed by

11   Anicete and Caldwell when they approached from the side of the platform with Anicete

12   screaming obscenities and lunging at her, and then (3) in protecting the other officers and

13   maintaining crowd control after Anicete was tackled and Oscar Grant was shot.  Fully

14   focused, as she was on these tasks, she played no part in the arrest of any of these

15   Plaintiffs.  Summary adjudication is appropriate as there is an absence of fact to

16   demonstrate that Domenici participated in effecting any of the arrests.

17   **D.    Domenici Is Not Liable for Use of Excessive Force**

18          **1.    Standards for Gauging Excessive Force**

19          The Third Cause of Action in the *Bryson* Complaint and the Fourth Cause of

20   Action in the *Johnson* Complaint allege violations of the Fourth Amendment by use of

21   excessive force.  But it is impossible to hold Marysol Domenici liable under the facts

22   presented here.

23          The standard for excessive force claims is "objective reasonableness," *Graham*

24   *v. Connor*, 490 U.S. 386, 388 (1989), and such claims are judged according to a three-part

25   test.  Because reasonableness "is not capable of precise definition or mechanical

26   application," the inquiry requires "attention to the facts and circumstances of each

27   particular case, including [1] the severity of the crime at issue, [2] whether the suspect

28

1   poses an immediate threat to the safety of the officers or others, and [3] whether he is

2   actively resisting arrest or attempting to evade arrest by flight. *Id."  See also Smith v. City*

3   *of Hemet*, 394 F.3d 689 (9th Cir. 2005); *Jarbo v. County of Orange*, 2010 WL 3584440

4            In gauging whether the force used is excessive, moreover, three additional

5   principles come into play.  First, the court is not constrained in its analysis by the three

6   factors listed in *Graham*.  "These factors are not exclusive.  Rather, we examine the

7   totality of circumstances and consider whether specific factors may be appropriate in a

8   particular case, whether or not listed in *Graham*."  *Franklin v. Foxworth*, 31 F.3d 873 876

9   (9th Cir. 1994).  Second, the need for force, or for the threat of force, cannot be judged

10  with the luxury of hindsight:

11           "The 'reasonableness' of a particular use of force must be judged
             from the perspective of a reasonable officer on the scene, rather
12           than with the 20/20 vision of hindsight." *Id*. (citation omitted).  In
             addition, "[t]he calculus of reasonableness must embody allowance
13           for the fact that police officers are often forced to make split-second
             judgments – in circumstances that are tense, uncertain, and rapidly
14           evolving – about the amount of force that is necessary in a
             particular situation." *Id*. at 396-97, 109 S.Ct. 1865.
15

16  *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010).

17           Third, among the interests that must be weighed, "the most important factor

18  under *Graham* is whether the suspect posed an immediate threat to the safety of the

19  officers or others." *Smith v. City of Hemet*, 394 F.3d 689, 709 (9th Cir. 2005); *Bryan v.*

20  *MacPherson*, 2010 WL 4925422 (9th Cir. 2010).

21       **2.    It Was Not Excessive Force for Domenici Momentarily**
22           **Hold Back Jack Bryson and Oscar Grant**

23           Under these standards, there is no legitimate way that Domenici can be held

24  liable for use of excessive force.  The claims against her on this issue, while not well

25  articulated by Plaintiffs, are potentially twofold.

26           First, the Estate of Grant and Jack Bryson could conceivably claim that it was

27  excessive force for Domenici to touch them while she was detaining them near the wall of

28

502434                                    -25-

1 the Fruitvale station.  But such a claim, if made, would have no merit.  The uncontradicted

2 evidence shows that this use of "force" was minimal, non-injurious, and fully justified by

3 the provocative, imminently threatening conduct of Jack Bryson and Oscar Grant.

4    The uncontradicted evidence shows that after being directed to remain seated,

5 both Grant and Bryson jumped up, yelling obscenities or protests when Officer Pirone

6 approached and took down Greer.  Though Plaintiffs will contend that Grant was simply

7 trying to play the role of a peacemaker, what matters here is how his conduct appeared,

8 objectively, to the officers involved.  Both Grant and Bryson gave every indication that

9 they were about to interfere with Pirone's work leaving Domenici no alternative but to

10 push them back, touching them briefly, but without injuring either of them when she did

11 so.  Indeed, Jack Bryson testified that he could not even recall if Domenici had ever

12 touched him. This minimal, non-injurious use of "force" cannot constitute excessive force

13 under the Fourth Amendment.  Even if, by some stretch of the imagination, it was deemed

14 to constitute "excessive force," then Domenici's error on this score can only be regarded

15 as precisely that kind of mistake of judgment that the law permits and which the doctrine

16 of "qualified immunity" is intended to shield.

17   **3. It Was Not Excessive Force to Point Her Taser at Plaintiffs**

18    The second claim of excessive force leveled against Domenici is that it was

19 excessive force to *threaten to use her Taser against the Plaintiffs*.  Cases alleging Fourth

20 Amendment violations by virtue of threats of force that were unnecessary and therefore

21 unreasonable are analyzed under the factors described in *Graham v. Connor*.  *Robinson v.*

22 *Solano County*, 278 F.3d 1007, 1013, 1014 (9th Cir. 2002).[24]  Thus, in evaluating the threat

23 of force used here one must look at the nature of the crime, the degree of threat posed by

24 the suspect, whether the suspect was resisting, and the totality of the circumstances.

25

26

---

27 [24] In *Robinson*, the court held there was a Fourth Amendment violation when several officers pointed their guns at the head of a clearly unarmed, non-resisting man that they confronted in front of his home, and then handcuffed him and shoved him in the back of the patrol car where they kept him for 15 to 30

28 minutes.  Thus, there was *no* reason for the threat of deadly force in *Robinson*.

### a.  The Nature of The Threat Employed by Domenici

The Plaintiffs characterize Domenici's use of the Taser in slightly different ways. The *Bryson* Complaint alleges that she "threatened to tase the young men if they did not 'shut up'" (¶ 26), and that she thereafter "fanning her Taser in the face" of the men. (¶ 27)  The *Johnson* Complaint alleges that Domenici "repeatedly pointed her Taser at them threatening to tase them in the face." (¶ 16)

### b.  The Crimes at Issue

The Plaintiffs were initially detained for investigation of a fight on the BART train – a violation of California Penal Code section 242.  From the outset, however the BART police were confronted with violations of Penal Code section 148.  As the Ninth Circuit has recognized, Penal Code section 148 does not *just* prohibit resisting arrest, but *broadly prohibits interference with police work*:

> Section 148(a)(1) is often referred to as a statute prohibiting "resisting arrest."  In fact, however, the statutory prohibition is much broader than merely resisting arrest.  Section 148(a)(1) provides, "Every person who willfully resists, delays, or obstructs any … peace officer … in the discharge or attempt to discharge any duty of his or her office or employment, … shall be [guilty of a misdemeanor]."

*Hooper v. County of San Diego*, 2011 WL 9732 (9th Cir. 2011).  Under this standard, it is clear that *all* the Plaintiffs detained here were resisting arrest within the meaning of Penal Code section 148.

Nigel Bryson was screaming obscenities at Domenici, calling her a "devil" and a "fake ass cop" while challenging her right to detain them.

Jack Bryson was likewise screaming obscenities, challenging her authority, disregarding her command to remain seated, and jumped up to aggressively protest and actively interfere with the arrest of Michael Greer.

Carlos Reyes also leapt up, disregarded Domenici's commands, and sought to aggressively protest and actively interfere in the arrest of Michael Greer.

1    Grant likewise had fled from Pirone, had resisted commands to sit down and

2  leapt forward in Domenici's direction when Pirone arrested Greer.

3    Greer had fled from Pirone, had resisted his efforts to take him from the train,

4  and had been combative when Pirone cuffed him.  Notably, the complaint by Michael

5  Greer cannot be sustained as there is no showing that Domenici ever touched, *or* pointed

6  her Taser at Greer.

7         **c.    Whether the Suspects Pose An Immediate Threat to**
              **Safety and/or Were Actively Resisting Arrest or**
8             **Attempting Flight**

9    As described above, all these Plaintiffs were actively resisting legitimate

10  commands and their conduct constituted a definite threat to the safety of the officers.

11  Indeed, the totality of the circumstances fully justifies Domenici's threat to use the Taser

12  against these Plaintiffs.  Given the manner in which events unfolded that night it was

13  impossible for Domenici to know whether the suspects were armed or not.  Prior calls for

14  service that night involved guns being carried by passengers.  She had responded to the

15  call of a fight on a BART train.  It was New Year's Eve, with the trains full of intoxicated

16  passengers.  The suspects she was guarding were aggressive, belligerent and resistant to

17  her commands.

18    The scene was not just unfolding in front of Domenici, but all around her.

19  People were coming off the train behind her, Pirone was grappling with other suspects to

20  her left, and the friends of the persons detained were aggressively approaching her on the

21  right.  The noise level was rapidly increasing, making it difficult to think, let alone

22  communicate with either the suspects or her fellow officers.  Domenici was quite

23  reasonably concerned for her safety and had every right to point her Taser at these

24  individuals– to forcefully grab their attention so that these noncompliant suspects would

25  obey the commands that were essential to the safety of all concerned.

26    It has long been established "that the right to make an arrest or investigatory

27  stop reasonably carries with it the right to use some degree of physical coercion or threat

28

502434                                    -28-

1   thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). As cases emphasize,

2   moreover, it is not for courts to second guess with hindsight the split-second decisions of

3   those facing danger. Under the circumstances, the threat of force employed by Domenici

4   showed remarkable poise and restraint and was in no way a violation of the Fourth

5   Amendment.

6       **4.   At the Very Least, Domenici's Use of the Taser Is Entitled**
            **to Qualified Immunity**
7

8           Even if one were to assume that Domenici's use of her Taser constituted

9   excessive force, it is nonetheless clear that she is entitled to qualified immunity. In

10  January 2009, when this incident took place, the law as to when, and how, Tasers could be

11  used in threats of force to obtain compliance with proper police commands was not clearly

12  established. Though the Ninth Circuit had decided in 2002 that the threat of deadly force,

13  with the use of guns, could be a Fourth Amendment violation in *Robinson v. Solano*

14  *County, supra*, that case presented no useful guidelines for this case. In *Robinson*,

15  multiple officers pointed their guns at the head of a plainly unarmed man, who was clearly

16  committing no crime, and was not in the slightest resisting, while he stood in front of his

17  house. Here, by contrast, Domenici drew her Taser when she was confronted with

18  multiple suspects who might be armed, and who were resisting and threatening, on a train

19  platform in the middle of the night following New Year's Eve celebrations. Indeed, even

20  in *Robinson*, the lack of clear constitutional standards on this question warranted the

21  shield of qualified immunity. And even now, some years later, there are very few cases

22  dealing with whether and under what circumstances the use of threats of force can be a

23  Fourth Amendment violation. There is certainly no clear constitutional rule prohibiting

24  conduct like Domenici's in this situation.

25          Moreover, the Ninth Circuit did not issue clear guidelines regarding the actual

26  use of Tasers until it issued the decision in *Bryan v. MacPherson*, 590 F.3d 767 (9th Cir.

27  2009), superseded by 2010 WL 4925422. Though the Ninth Circuit there decided that the

28

use of a Taser in dart mode constituted an intermediate level of force, that case did not deal with the *threatened* use of a Taser, and was, in any event, decided well after the events on January 1, 2009.  In the absence of clear constitutional guidelines regarding threatened use of a Taser, especially given the provocative and difficult situation involved here, Domenici is entitled to qualified immunity.

### E.   Domenici is Not Liable for Conspiracy to Violate Civil Rights (42 U.S.C. § 1985)

#### 1.   Allegations in Complaint

The Fourth Cause of Action in the *Bryson* Complaint and the Sixth Cause of Action in the *Johnson* Complaint sets out a claim for conspiracy to violate civil rights under 42 U.S.C. § 1985.  The claim seems to be predicated on the unlawful arrest and excessive force claims, and on the theory that Domenici had knowledge of the intended wrongs and did not intervene to stop the unlawful arrest and use of excessive force:

> 52.   In doing the acts complained if herein, Defendants … Domenici … acted in concert and conspired to violate plaintiff's federal civil rights to be free from unreasonable seizure and excessive or arbitrary force.

> 53.   Defendants … Domenici … had knowledge of the wrongs conspired to be done and committed and had the power to prevent or aid in preventing the commission of same.  None of the Defendants attempted to prevent and/or stop the violation of the plaintiff's civil rights.

#### 1.   Nature of Liability Under Section 1985

Though the pleading does not specify which subsection of section 1985 is being invoked, the reference *must* be to section 1985(3) because 1985(1) and (2) deal only with preventing public officials from doing their jobs and obstructing justice in state or federal courts.  Section 1985(3), however, is founded upon the denial of equal protection of the laws on the basis of race.  Section 1985(3) provides in relevant part:

"If two or more persons in any State or Territory conspire '" *for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws* ... the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against anyone or more of the conspirators."

(Emphasis added.)

To prevail on a section 1985(3) claim, the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *Griffin* v. *Breckenridge*, 403 U.S. 88, 102-103, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). *"An indispensable element of a claim under section 1985(3) is some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action."* *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000) (quoting *Griffin*, 403 U.S. at 102).

## 2.    There Was No Racial Motive

Under this test, it is quickly apparent that the Plaintiffs here cannot establish a violation of 42 U.S.C. § 1985(3) for at least two reasons. First, section 1985(3) requires an affirmative showing of racial or discriminatory bias or motive. In this case, there is no evidence that Domenici ever used any racial or ethnic slurs or remarks of any kind, and there is not a shred of evidence suggesting that she was motivated by a racial animus. For that reason alone, the Fourth Cause of Action for conspiracy to violate civil rights on the basis of race must fail.

## 3.    There Was No Conspiracy

The facts on this record do not show anything approximating a deliberate conspiracy. In order to sustain a conspiracy claim, a plaintiff must demonstrate "the existence of an agreement or meeting of the minds to violate constitutional rights."

1   *Mendocino Env. Ctr. v. Mendocino County,* 192 F.3d 1283, 1301 (9th Cir. 1999).  Here

2   there was no advance knowledge of the fight on the train such as would have allowed

3   Domenici or the other officers, to enter into a conspiracy.  When the call about a fight

4   came across the radio, Domenici raced to assist a fellow officer and found herself in the

5   midst of a rapidly deteriorating, potentially volatile situation in detaining uncooperative

6   suspects and in dealing with an unpredictable group of people coming off the train.  She

7   and Officer Pirone needed backup assistance as soon as it could be provided, and other

8   officers arrived and tried to assist without even the opportunity to talk to other officers

9   about what was happening and how such assistance could best be provided.

**F.     Domenici Did Not Integrally Participate in Wrongdoing**

For liability to attach under Section 1983, each individual must actively

participate and proximately cause the deprivation of a constitutional right.

> Liability may be imposed on an individual defendant under 42
> U.S.C. § 1983 if the plaintiff can show that the defendant
> proximately caused the deprivation of a federally protected right.
> *See Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988).  A person
> deprives another of a constitutional right within the meaning of
> section 1983 if he does an affirmative act, participates in another's
> affirmative act or omits to perform an act which he is legally
> required to do, that causes the deprivation of which the plaintiff
> complains. *See id.* at 633.

*Wilkins v. County of Alameda*, 2010 WL 4942508 (N.D. Cal. 2010).

In accord with the rule demanding *individual participation* in constitutional

wrongdoing, courts have rejected the idea that one can be held liable simply by being part

of a "team" that caused constitutional injury:

> The underlying problem with a "team effort" theory is that it is an
> improper alternative grounds for liability.  It removes individual
> liability as the issue and allows a jury to find a defendant liable on
> the ground that even if the defendant had no role in the unlawful
> conduct, he would nonetheless be guilty if the conduct was the
> result of a "team effort."  … In essence, the "team effort" standard
> allows the jury to lump all the defendants together, rather than

require it to base each individual's liability on his own conduct. *See Larez*, 16 F.3d at 1516-17.

*Chuman v. Wright*, 76 F.3d 292, 294-295 (9th Cir. 1996).

To create liability, the Plaintiffs must show Domenici's "integral participation," as where, by virtue of an agreed upon plan, each officer has a role to play in the wrongdoing. The "integral participation" requirement was explained in *Boyd v. Benton*, 374 F.3d 773 (9th Cir. 2004). In *Boyd*, a SWAT team used a flash-bang device when entering into an apartment in which several people were sleeping, and several people were injured when the device ignited. *Id*. at 778. Prior to the raid, the SWAT team supervisor created the raid plan, including what devices they would deploy and how the raid would commence. *Id*. at 777. The Ninth Circuit found that ever "officer involved in the operation knew of the plan to use the flash-bang, did not object to that plan, and actively participated in its operation." *Id*. The Ninth Circuit determined that each officer was liable for the constitutional violation because each officer involved in the search was an "integral participant." *Id*. While the SWAT team was standing behind the officer who deployed the device, they could still be liable because they were all part of the operation, and they were all aware of the decision to use the flash-bang device. *Id*. *See also, Wisler v. City of Fresno*, 2007 WL 833060 (E.D. Cal. 2007).

Here, as discussed above, there was no plan, and no specified roles and no agreement about what would happen. Domenici was reacting to a spontaneously developing situation in an effort to keep control in this volatile unpredictable circumstance. She hardly knew what anyone else was doing and could not see them except for quick glances to the side or back. This was not at all any kind of "integral participation" on her part.

### G.   There Can Be No Liability for Failure to Intervene

Under limited circumstances, officers can be liable for a section 1983 violation for failure to stop the unconstitutional conduct of fellow officers:

> A law enforcement officer has a duty to intercede on behalf of a
> person who is being subjected to objectively unreasonable force by
> a fellow officer when the observing officer ha a realistic opportunity
> to prevent his fellow officer from violating the Constitution.
> However, there are at least two limitations upon an observing
> officer's duty to intercede. First, he must have reason to know that
> his fellow officer is subjecting the victim to objectively
> unreasonable force. *Montano v. City of Chicago*, 535 F.3d 558, 569
> (7th Cir. 2008). Second, he must have a realistic opportunity to
> intervene and prevent a constitutional violation from taking place.
> *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).

*Petrolino v. County of Spokane*, 678 F.Supp.2d 1082, 1090 (E.D. Wash. 2009).

Under this standard, there was clearly no actionable failure to intervene on Domenici's part. As the Ninth Circuit has explained, such a duty only exists where the constitutional violation occurs in a manner that provides a realistic chance for an officer to intervene:

> Importantly, however, *officers can be held liable for failing to
> intercede only if they had an opportunity to intercede. See Bruner v.
> Dunaway*, 684 F2d 422,426-27 (6th Cir. 1982) (holding that officers
> who were not present at the time of the alleged assault could not be
> held liable in a section 1983 action); *Gaudreault v. Municipality of
> Salem*, 923 F.2d 203, 207 n. 3 (1st Cir, 1990) (granting arresting
> officers' motion for summary judgment because the officers had no
> "realistic opportunity" to prevent an attack committed by another
> officer).

*Cunningham v. Gates*, 229 F.3d 1271, 1289-1290 (9th Cir. 2000).

Here, there was simply no opportunity for Domenici to intervene to stop any unlawful activity (if any there were) on the part of other officers. From the moment Domenici arrived on the Fruitvale platform she was completely absorbed in a series of unpredictable exigencies, and utterly preoccupied with a string of immediately pressing tasks. She had no idea what was going to unfold, could not see around her except for quick glances back and to the side and had no chance to drop her current business and interfere in anyone else's emergencies.

1    Indeed, as the arbitrator who listened to fourteen days of testimony in her

2 successful appeal of her wrongful termination by BART held:

3        The witness testimony and video evidence revealed that Officer
         Domenici's back was to the train at the time that Officer Pirone
4        removed Michael Greer, that Officer Domenici's primary focus of
         attention at the time Mr. Greer was removed from the train was on
5        the four individuals detained against the wall; and that Officer
         Domenici only captured brief portions of the incident with Michael
6        Greer during the quick glances she took over her shoulder in an
         effort to simultaneously monitor the removal process as well as the
7        individuals who had been detained.

8

9 (12/17/10 Decision of W. Riker [attached as Exhibit K to the Declaration of Alison Berry

10 Wilkinson, filed herewith..)

11    Similarly, with regard to the alleged incident in which Pirone supposedly

12 punched and then later allegedly kneed Oscar Grant, Domenici was again so preoccupied

13 with her immediate tasks that she could not really observe, let alone drop her own

14 important work of guarding the bellicose and resisting young men she was guarding to

15 stop Pirone in his engagement with Grant. Again, based on this evidence, the Arbitrator

16 found that Domenici did not really see or know what Pirone was doing:

17        The Arbitrator finds that at the time of the alleged punch, Officer
         Domenici's focus of attention was fixed directly on detainee Jackie
18       Bryson, Jr., that the contact between Officer Pirone and Oscar Grant
         occurred rapidly in her peripheral vision simultaneous with the
19       focus of her attention shifting from Jackie Bryson, Jr. to the three
         individuals approaching aggressively toward the detention area
20       from her right side. The Arbitrator therefore finds that Officer
         Domenici was only in a position to see a limited portion of the
21       encounter….
22

23 (12/17/10 Decision of W. Riker.)

24    Likewise, she could not really see, and could not do anything about, the alleged

25 knee strike used by Pirone on Oscar Grant. Instead, by that time her attention was

26 diverted toward Anicete and Caldwell who were rapidly and aggressively advancing at

27 her, cursing and swearing from the side of the platform. Again, based on this evidence,

28

the Arbitrator found that Domenici could not see or do anything about the alleged knee strike:

> The video evidence reveals that Officer Domenici was not standing in the vicinity of the alleged knee strike. The evidence further showed that Officer Guerra was standing directly between Officer Domenici and the area where the alleged knee strike occurred. Officer Guerra testified that despite the fact he was standing almost directly in front of the alleged kneeing incident and in a position closer to the alleged event than Officer Domenici, Officer Guerra did not see what transpired between Oscar Grant and Officer Pirone because his focus, like that of Officer Domenici, was on the area to the right of the detention towards the approaching subjects who were aggressively challenging the officers.

(12/17/10 Decision of W. Riker.)

Likewise, when the shooting of Oscar Grant occurred, Domenici was yards away (a) guarding Officer Knudtson who had taken down Anicete and was trying to cuff him, and (b) trying to maintain crowd control and send people back onto the train.

Thus, in the incredibly fast-moving, totally unplanned and unpredictable six minutes that transpired while Domenici was on the platform, there was no way she could have intervened to stop any alleged misconduct of other officers.

**H.   Plaintiffs' Claims that California Civil Code Section 52.1 Was Violated Fail, As a Matter of Law, Because Domenici Did Not Violate the Plaintiffs' Fourth Amendment Rights**

The Sixth Cause of Action in the *Bryson* Complaint and the Twelfth Cause of Action in the *Johnson* Complaint state a claim pursuant to California Civil Code section 52.1, which provides a cause of action for interference, or attempting to interfere, "by threats, intimidation, or coercion" with state or federal constitutional rights. (Cal. Civ. Code § 52.1(a) and (b).) Plaintiffs allege that Domenici violated their Fourth Amendment rights, specifically their rights against unlawful detention, unlawful arrest, and excessive force.

As detailed above in Sections B, C and D, F, and G, Plaintiffs cannot establish, as a matter of law, that these Plaintiffs rights under the Fourth Amendment were violated.

1   Consequently, summary adjudication of the Sixth Cause of Action in the *Bryson*

2   Complaint and the Twelfth Cause of Action in the *Johnson* Complaint is appropriate.

3   **I.   Plaintiffs' Claims that California Civil Code Section 52.1 Was**
        **Violated Fail, As a Matter of Law, Because Domenici Did Not Violate**
4       **the Plaintiffs' Fourth Amendment Rights**

5   The Seventh Cause of Action in the *Bryson* Complaint and the Thirteenth

6   Cause of Action in the *Johnson* Complaint state a claim pursuant to section 51.7, which

7   provides in pertinent part:

8
            (a) [a]ll persons within the jurisdiction of this state have the right to be
9           free from any violence, or intimidation by threat of violence, committed
            against their persons or property because of political affiliation, or on
10          account of any characteristic listed or defined in subdivision (b) or (e) of
            Section 51, or position in a labor dispute, or because other another person
11          perceives them to have one or more of those characteristics [. . . ]

12  California Civil Code section 51(b) lists "race" as a characteristic that may not

13  form the basis for unlawful discrimination.

14  Paragraph 63 of the *Bryson* Complaint and Paragraph 66 of the *Johnson*

15  Complaint allege that perception of and/or prejudice concerning the Plaintiffs' race or

16  color was a motivating reason for Defendants' conduct.  There is no evidence, however, to

17  support this allegation. As detailed above in the sections above, there is no evidence that

18  Domenici used any racial profanities or slurs that evening and that she directed no racial

19  slurs or profanity at the Plaintiffs that night. Accordingly, there is no genuine issue of

20  material fact as to these claims for relief and, as a matter of law, summary adjudication

21  should be granted.

22
    **J.   Domenici is Not Liable for Intentional Infliction of Emotional**
23       **Distress**

24  The Eighth Cause of Action in the *Bryson* Complaint and the Fourteenth Cause

25  of Action in the *Johnson* Complaint state claims for relief under a common-law tort:

26  intentional infliction of emotional distress.  The California Supreme Court listed its three-

27  part test for such claims in *Hughes v. Pair,* 46 Cal. 4th 1035 (2009): "(1) extreme and

28

502434                                    -37-

1   outrageous conduct by the defendant with the intention of causing, or reckless disregard

2   of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or

3   extreme emotional distress; and (3) actual and proximate causation of the emotional

4   distress by the defendant's outrageous conduct." *Hughes*, 46 Cal. 4th at 1050-1051 (citing

5   *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal. 4th 965, 1001)). These elements are

6   listed in Calif. Civil Jury Instruction (CACI) 1600. The *Hughes* Court explained a

7   defendant's conduct is "outrageous" when it is so "extreme as to exceed all bounds of that

8   usually tolerated in a civilized community." (*Id.*)

9           Here, there is a complete absence of evidence that Domenici engaged in

10   conduct that was extreme or outrageous, or that the conduct was done with intent to cause

11   injury. (See Sections B through G, *supra*.) Additionally, there is an absence of evidence

12   that the Plaintiffs suffered severe emotional distress:

13   •   Nigel Bryson testified that he saw a counselor only three times after the

14       incident (Bryson Dep. 253:9-21) and that he did so because he got nervous

15       when he saw police officers and when he rode BART, and because he could

16       hear the BART trains when he was sleeping. (N. Bryson Dep. at 61:2-10.)

17   •   Michael Greer testified that he has seen psychiatrist Dr. Griffin 6-10 times

18       since Jan. 9, 2009. (Greer Dep., 133:21-134:7) He last saw Griffin around

19       August 2010: that visit was due to pressure Greer felt. (*Id.*, 134:8-18).

20   •   Jack Bryson, Jr. testified that he saw Dr. Griffin "may be five times" (J.

21       Bryson Dep. at 40:10-14) because he was "under a lot of stress", was "sad

22       all the time," had trouble sleeping, and had "a lot of flashbacks." (J.

23       Bryson Dep. at 43:6-14)

24   •   Reyes testified he gets upset, gets nightmares and has trouble sleeping.

25       (Reyes Dep. 203:6-22).

26           The emotions described are similar to the plaintiff in *Hughes*, who asserted she

27   suffered "discomfort, worry, anxiety, upset stomach, concern and agitation" resulting

28   from defendant's conduct. The Court was not persuaded: it found her reactions did not

1  constitute severe emotional distress. *Hughes*, 46 Cal. 3d at 1051. Likewise, the emotional

2  reactions described by the Plaintiffs here do not constitute severe emotional distress. As a

3  result, summary adjudication is appropriate.

4  **K.   Domenici is Not Liable for Assault and Battery**

5       The Ninth Cause of Action in the *Bryson* Complaint and the Fifteenth Cause of

6  Action in the *Johnson* Complaint state claims for relief under the common-law tort of

7  assault and battery. Calif. Civil Jury Instruction 1301 details a five-part test for assault: (1)

8  that defendant acted with intent to cause harmful contact; (2) that plaintiff reasonably

9  believed he was about to be touched in a harmful manner; (3) that plaintiff did not

10  consent; (4) that plaintiff was harmed; and that (5) defendant's conduct was a substantial

11  factor in causing plaintiff's harm. For a battery claim against a peace officer, the plaintiff

12  bringing the claim "has the burden of proving unreasonable force as an element of the

13  tort." *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272 (1998)..

14       This claim fails against because, as detailed in Section D above, the force used

15  by Officer Domenici was reasonable and appropriate. Consequently, summary

16  adjudication of these claims is appropriate.

17  **L.   Domenici is Not Liable for Deliberate Indifference to Medical Needs**

18       Deliberate indifference is shown by either a failure to respond to a medical need or

19  a purposeful act ignoring it. *Lanier v. City of Fresno*, No CV F 10-1120 LJO SKO, 2010

20  U.S. Dist. Lexis 1030459, * 21 (E. Dist. Cal. Dec. 9, 2010) (internal citations omitted).

21  Deliberate indifference will not be shown by mere indifference or negligence.

22       The duty is for officers to call for medical assistance or taking an injured

23  detainee to a hospital. *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986).

24  Here, the evidence demonstrates that Domenici was not in the vicinity when Grant was

25  shot, as she was engaged in crowd control. Moreover, the duty was satisfied when both

26  Pirone and Guerra quickly called for medical assistance after the shot was fired, and

27  tended to Grant and his wound. This not only negates the claim, but also establishes

28

DOMENICI'S MOTION FOR SUMMARY ADJUDICATION OF ALL FEDERAL CIVIL RIGHTS CLAIMS ASSERTED AGAINST HER C09-00901 MHP

1    qualified immunity.  Moreover, as in *Lanier*, there is no evidence that any of the officers

2    "denied, delayed, or interfered with" medical treatment for Grant.  *See, e.g., Lanier* at *22.

3    Finally, as there is an absence of evidence that Domenici integrally participated in this

4    alleged violation, she cannot be held liable.   Therefore, summary adjudication of this

5    claim should be granted.

6                                         **V**

7                               **CONCLUSION**

8          For the foregoing reasons, the Court should grant this motion and enter

9    judgment in favor of Domenici and against Plaintiffs Nigel Bryson, Jack Bryson, Jr.,

10    Carlos Reyes, Michael Greer, and The Estate Of Oscar Grant III in the matters entitled

11    *Bryson, et al. v. Bay Area Rapid Transit District*, Case No. C09-04835; and *Johnson et al.*

12    *v. Bay Area Rapid Transit District*, Case No. C09-00901.

13          Dated:  February 6, 2011

14                             Respectfully submitted,

15                             BERRY | WILKINSON | LAW GROUP

16

17                             By _____

18                                 Alison Berry Wilkinson

19                             Attorneys for Marysol Domenici

20

21

22

23

24

25

26

27

28

DOMENICI'S MOTION FOR SUMMARY ADJUDICATION OF ALL FEDERAL CIVIL RIGHTS CLAIMS ASSERTED AGAINST HER  C09-00901 MHP