1
2
3
4
5
6                 UNITED STATES DISTRICT COURT
7           NORTHERN DISTRICT OF CALIFORNIA
8
                           No. CV 09-00901 MHP
9 WANDA JOHNSON, et al.,

10        Plaintiffs,         **<u>MEMORANDUM & ORDER</u>**

11   v.                 **Re: Cross Motions for Summary Judgment**

12 BAY AREA RAPID TRANSIT, et al.,

13        Defendants.

14     —————————————————/

15       The Estate of Oscar Grant III, Wanda Johnson, Sophina Mesa as guardian ad litem of minor,

16 T.G., Jack Bryson, Jr., Nigel Bryson, Michael Greer, Carlos Reyes, Fernando Anicete Jr., Oscar

17 Grant Jr. and Johntue Caldwell, (collectively "plaintiffs"), filed this action against the Bay Area

18 Rapid Transit ("BART"), BART Police Chief Gary Gee, BART Manager Dorothy Dugger and

19 BART officers Johannes Mehserle, Anthony Pirone, Marysol Domenici, Jon Woffinden and Emery

20 Knudtson, (collectively "defendants"), for civil rights violations under federal and state law.  Before

21 the court are the parties' cross-motions for summary judgment.  Having considered the parties'

22 submissions and arguments, the court enters the following memorandum and order.

23

24 <u>BACKGROUND</u>

25 I.    <u>The Incident</u>

26       The unfortunate events underlying this action occurred in the early morning hours of January

27 1, 2009.  Oscar Grant III ("Grant"), Jack Bryson Jr. ("J. Bryson"), his younger brother, Nigel Bryson

28 ("N. Bryson"), Carlos Reyes ("Reyes"), Michael Greer ("Greer"), Fernando Anicete Jr. ("Anicete"),

**United States District Court**
For the Northern District of California

1   Johntue Caldwell ("Caldwell") and several friends were returning home to the East Bay via BART,

2   having celebrated New Year's Eve in San Francisco.  BART is a governmental entity, organized

3   under the laws of the state of California and provides train services throughout the San Francisco

4   Bay Area.  Plaintiffs rode in the lead car of a Dublin-Pleasanton-bound train, which traveled

5   eastward from San Francisco into the East Bay.  A fight broke out on the train sometime between its

6   stop at the Lake Merritt Station and its subsequent stop at the Fruitvale Station.[1]  A concerned

7   passenger alerted the train operator via intercom of the altercation, and the train operator radioed the

8   information to BART officials.

9          BART officer Anthony Pirone ("Pirone") and Marysol Domenici ("Domenici") were

10  assigned to the Fruitvale Station that evening.  As the train pulled into the Fruitvale Station, Pirone

11  and Domenici received a call over their police radios alerting them to the fact that an alleged

12  misdemeanor battery, as codified at California Penal Code section 242, was in progress.  Pirone ran

13  up the stairs to the train platform in order to investigate the matter.  By the time Pirone reached the

14  platform, the train had already arrived and passengers were disembarking.  Pirone noticed Grant,

15  Greer, J. Bryson, N. Bryson and Reyes standing and talking outside the lead car.  He drew and

16  armed his Taser and ordered the five young men to sit down against the platform's retaining wall.

17  Neither Grant, Greer, J. Bryson, N. Bryson nor Reyes complied with Pirone's order.  Instead, Grant

18  and Greer re-boarded the now idling train, and J. Bryson, N. Bryson and Reyes continued walking

19  past Pirone.  Pirone next threatened to tase J. Bryson, N. Bryson and Reyes if they did not comply

20  with his order, at which point all three young men sat down against the wall.

21         After detaining J. Bryson, N. Bryson and Reyes, Pirone radioed to Domenici for assistance

22  on the platform.  Domenici arrived shortly thereafter and pulled her Taser.  Pirone directed her to

23  continue the detention of J. Bryson, N. Bryson and Reyes so that Pirone could proceed to detain

24  Grant and Greer, who were now both aboard the still-idling train.  Having returned to the idling

25  train, Pirone located Grant through a train window and remaining outside the train, focused the laser

26  beam of his Taser on Grant as a means of coercing Grant into compliance.  Faced with the threat,

27  Grant got off the train and cooperated with Pirone as he escorted Grant over to the retaining wall to

28

United States District Court

For the Northern District of California

1    sit alongside J. Bryson, N. Bryson and Reyes.  Pirone then focused his attention on Greer.  He

2    shouted into the train for anyone involved in the alleged fight to come off.  Greer, standing with his

3    back to Pirone, did not comply with this order.  Pirone located Greer and removed him from the train

4    by force.  Pirone used a "hair pull leg-sweep" to bring Greer to the ground and proceeded to

5    handcuff Greer.

6         At some point during the detention of Grant and Greer, several BART officers, including

7    named defendants Johannes Mehserle ("Mehserle"), Jon Woffinden ("Woffinden") and Emery

8    Knudtson ("Knudtson") arrived to provide back-up to the quickly-evolving situation.  Having

9    detained all five of the plaintiffs that he perceived to be suspects in the fight, Pirone ordered the

10   back-up officers, including Mehserle, to continue the detention of Grant, Greer, J. Bryson, N.

11   Bryson and Reyes.  Pirone once again left the group to speak with the train operator, whose booth

12   was adjacent to the lead car.  Pirone spoke briefly with the train operator and then returned to the

13   group.  Upon his return, he indicated to Mehserle that Grant and Greer were to be arrested for

14   obstructing an officer and resisting arrest pursuant to California Penal Code section 148.  Greer had

15   previously been handcuffed by Pirone, and Mehserle proceeded to handcuff J. Bryson before turning

16   his attention to Grant, who at this point had risen to his knees and was engaged in some verbal

17   exchange with Pirone.

18        Anicete and Caldwell, neither of whom had been detained at this point, watched the

19   unfolding events from the platform.  At some point during this time Knudtson tackled Anicete and

20   handcuffed him.  Mehserle and Pirone proceeded to use physical force to handcuff Grant.  Mehserle

21   pushed Grant from his kneeling position onto his back but also across the legs of Reyes, who sat to

22   Grant's right.  Mehserle and Pirone maneuvered Grant onto his belly, away from Reyes' legs, and

23   continued to attempt to handcuff Grant.  After a very brief time, Mehserle, who was kneeled over the

24   bottom half of Grant's body, ordered Pirone to stand back, pulled his service pistol, stood and fired a

25   single bullet into Grant's back.

26        After the shot, Mehserle handcuffed Grant for a brief period of time.  BART officers ordered

27   the still-idling train to finally depart the station.  Reyes and N. Bryson, who at that point had not

28

3

been handcuffed, were handcuffed by unknown BART officers, and J. Bryson, N. Bryson, Reyes, Greer and Anicete were detained in BART police cars parked around the Fruitvale station area. They all ultimately were transported to BART Police Headquarters, where they remained handcuffed at least for the next four hours without any arrest.

II.    The Complaints

This action is comprised of four consolidated cases. *See* Docket No. 83.

1.    The Johnson Complaint

Having originally filed a complaint on March 2, 2009, Wanda Johnson, the Estate of Oscar Grant III and Sophina Mesa as guardian ad litem of minor, T.G., filed a first amended complaint ("FAC") on November 19, 2009, pleading the following causes of action: (1) on behalf of Oscar Grant III, unreasonable seizure in violation of the Fourth Amendment under 42 U.S.C. § 1983; (2) on behalf of Oscar Grant III, unlawful detention in violation of the Fourth Amendment under 42 U.S.C. § 1983; (3) on behalf of Oscar Grant III, unlawful arrest in violation of the Fourth Amendment under 42 U.S.C. § 1983; (4) on behalf of Oscar Grant III, excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983; (5) on behalf of Oscar Grant III, deliberate indifference to medical needs in violation of the Fourteenth Amendment under 42 U.S.C. § 1983; (6) on behalf of Oscar Grant III, conspiracy to violate civil rights under 42 U.S.C. § 1985; (7) wrongful death as a result of the violation of civil rights under 42 U.S.C. § 1983; (8) on behalf of Wanda Johnson and T.G., denial of familial relationship in violation of the Fourteenth Amendment under 42 U.S.C. § 1983; (9) municipal liability for the violation of civil rights under 42 U.S.C. § 1983; (10) on behalf of Oscar Grant III, pain and suffering as a result of civil rights violations under 42 U.S.C. § 1983; (11) on behalf of T.G., wrongful death pursuant to Cal. Code of Civ. P. §§ 377.60 and 377.61; (12) on behalf of Oscar Grant III, a violation of Cal. Civ. Code § 52.1; (13) on behalf of Oscar Grant III, a violation of Cal. Civ. Code § 51.7; (14) intentional infliction of emotional distress; and (15) on behalf of Oscar Grant III, assault and battery. *See* Docket No. 43 (FAC).

**United States District Court**

For the Northern District of California

2.      The Grant Jr. Complaint

On August 28, 2009, Grant's father, Oscar Julius Grant Jr., filed a complaint pleading a single cause of action: (1) denial of familial relationship in violation of Fourteenth Amendment under 42 U.S.C. § 1983. *See* CV-09-04014 MHP, Docket No. 1 (Grant Jr. Complaint).

3.      The Bryson Complaint

On October 13, 2009, J. Bryson, N. Bryson, Reyes, Greer and Anicete filed a complaint alleging the following causes of action: (1) unreasonable seizure in violation of the Fourth Amendment under 42 U.S.C. § 1983;[2] (2) unlawful arrest in violation of the Fourth Amendment under 42 U.S.C. § 1983; (3) excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983; (4) conspiracy to violate civil rights under 42 U.S.C. § 1985; (5) municipal liability for the violation of civil rights under 42 U.S.C. § 1983; (6) a violation of Cal. Civ. Code § 52.1; (7) a violation of Cal. Civ. Code § 51.7; (8) intentional infliction of emotional distress; and (9) assault and battery. *See* CV-09-04385 MHP, Docket No. 1 (Bryson Complaint).

4.      The Caldwell Complaint

Lastly, on January 4, 2010, Caldwell filed a complaint pleading the following causes of action: (1) a violation of the Fourth Amendment pursuant to 42 U.S.C. § 1981; (2) unreasonable seizure in violation of the Fourth Amendment under 42 U.S.C. § 1983; (3) unlawful detention in violation of the Fourth Amendment under 42 U.S.C. § 1983; (4) excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983; (5) conspiracy to violate civil rights under 42 U.S.C. § 1985; (6) failure to intervene under 42 U.S.C. § 1986; and (7) municipal liability for the violation of civil rights under 42 U.S.C. § 1983. *See* CV-10-00005 MHP, Docket No. 1 (Caldwell Complaint).

Now before the court are plaintiffs' consolidated motion for summary judgment; Pirone, Mehserle and Domenici's individual motions for summary judgment; BART, Gee, Dugger, Knudtson and Woffinden's consolidated motion for summary judgment; and Knudtson and Woffinden's motion for summary judgment.

LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-55 (1986). A fact is "material" if it may affect the outcome of the proceedings, and an issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248. The court may not make credibility determinations. *Id.* at 255. The moving party bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Fed R. Civ. P. 56(c); *see Anderson*, 477 U.S. at 250

DISCUSSION

At the outset, plaintiffs, in their moving papers, move to dismiss their claims with respect to conspiracy under 42 U.S.C. § 1985 and 42 U.S.C. § 1986, deliberate indifference to medical needs under 42 U.S.C. § 1983 and all claims asserted against defendant Dorothy Dugger. Accordingly, these claims as asserted in Count 4 and Count 5 (only as to Dugger) of the Bryson Complaint, Counts 5, 6 and 7 (only as to Dugger) of the Caldwell Complaint and Counts 5, 6 and 9 (only as to Dugger) of the Johnson Complaint are DISMISSED with prejudice.

At the hearing, plaintiffs moved to dismiss their claim for intentional infliction of emotional distress ("IIED") under state law, and their claim under Cal. Civ. Code section 51.7 except as it is pled against defendant Pirone on behalf of the Estate of Oscar Grant. Accordingly, these claims as asserted in Count 8 (IIED) of the Bryson Complaint, Count 14 (IIED) of the Johnson Complaint and Count 7 (section 51.7) of the Bryson Complaint are DISMISSED with prejudice.

United States District Court

For the Northern District of California

1    Lastly, at the hearing, plaintiff Caldwell moved to dismiss his claim under 42 U.S.C. § 1981

2   as asserted in Count 1 of the Caldwell Complaint.  Accordingly, this claim is DISMISSED with

3   prejudice.  The court now considers the parties' respective motions.

4   I.    Defendants' Motions

5          A.    Initial Seizure

6                 1.    Pirone

7    Pirone seeks summary judgment as to plaintiffs' claim that Pirone's initial seizure of

8   plaintiffs J. Bryson, N. Bryson, Reyes, Grant and Greer was unconstitutional for lack of articulable

9   suspicion.  Generally, the Fourth Amendment prohibits an officer from effecting an unwarranted

10  seizure absent probable cause.  The Supreme Court, however, has "held that an officer may,

11  consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a

12  reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119,

13  123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  "While reasonable suspicion is a less

14  demanding standard than probable cause and requires a showing considerably less than

15  preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective

16  justification for making the stop.  The officer must be able to articulate more than an inchoate and

17  unparticularized suspicion or hunch of criminal activity." *Id.* (internal citations and quotation marks

18  omitted).  Moreover, "to establish reasonable suspicion, an officer cannot rely solely on

19  generalizations that, if accepted, would cast suspicion on large segments of the law-abiding

20  population.  Seemingly innocuous behavior does not justify an investigatory stop unless it is

21  combined with other circumstances that tend cumulatively to indicate criminal activity." *United

22  States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006) (citing *United States v.

23  Montero-Camargo*, 208 F.3d 1122,1129-33 (9th Cir. 2000)).

24   Pirone argues that his detention of plaintiffs was lawful because he allegedly relied upon

25  several facts that, taken together, establish  a reasonable suspicion that the plaintiffs were engaged in

26  criminal activity.  Plaintiffs, however, proffer evidence which supports the inference that Pirone's

27  seizure was unreasonable given the totality of the circumstances presented to him.  For example,

28

7

United States District Court

For the Northern District of California

1    plaintiffs proffer Pirone's deposition testimony, taken in preparation for this action, as well as

2    Pirone's testimony in the matter of the *People v. Johannes Mehserle*.  By Pirone's own account, he

3    first received a report over his police radio that there was a potential misdemeanor battery pursuant

4    to California Penal Code section 242.  Docket No. 135-2 (Pirone Testimony) at 2784:5-13.  After

5    receiving the call on his police radio, Pirone, who was in the outside, unpaid area of the Fruitvale

6    station at the time of the first call, made his way into the paid area of the station and moved toward

7    the stairs that lead up to the train platform.  On his way up the stairs toward the platform, Pirone

8    received a second call over his police radio, which related more information regarding the alleged

9    misdemeanor fight.  This second call related the following information: "It's the lead car, no

10   weapons, all black clothing, large group of BMs is all we have."  *Id.* at 2789:12-22.  Armed with this

11   information alone, Pirone arrived on the platform and proceeded to act.

12           Pirone testified that upon arrival on the platform, he saw the plaintiffs standing outside the

13   lead car.  He testified that they did not appear to be engaged in any illegal activity, were not

14   speaking with raised voices and were not fighting with any other individual on the platform.  Docket

15   No. 127 (Rapoport Dec.), Exh. 1 (Pirone Depo.) at 48:21-51:19.  Pirone also conceded that he

16   passed through a second group that matched the description of the individuals allegedly involved in

17   the fight, but that he made no attempt to stop this group, given his singular focus on plaintiffs.  *Id.* at

18   2793:18-2794:4.  Pirone testified that prior to reaching the group and without any questioning of the

19   group or of any other individuals located on the platform as to what had actually occurred, including

20   the train operator whose head was visible outside the train operator's booth, Pirone pulled and armed

21   his Taser with the intent of forcing plaintiffs, through "intimidation," to comply with Pirone's

22   attempts to detain them.  *Id.* at 2799:1-11.  Plaintiffs started walking toward Pirone in order to exit

23   the BART station.  As they and Pirone drew closer to one another, Pirone, with armed Taser pulled

24   and pointed at plaintiffs, ordered plaintiffs to sit down against the retaining wall of the Fruitvale

25   BART station.[3]  *Id.* at 2791:19-2792:7; 2799:20-2803:12; Pirone Depo. at 51:4-16.

26           Pirone argues that at this point all five plaintiffs took evasive action, which makes the stop

27   legal pursuant to *Illinois v. Wardlow*, 528 U.S. 119 (2000).  In *Wardlow*, the petitioner took off

28

running in response to seeing officers drive past him. *Id.* at 121-22.  Relying on this "unprovoked flight," the respondent officers pursued petitioner, seized him and conducted a pat down, which in turn resulted in the discovery of an illegal weapon. *Id.* at 125.  The Court held that this unprovoked flight from the officers, in conjunction with the petitioner's presence in a high crime neighborhood supported the officers' reasonable suspicion that petitioner may have been involved in some criminal conduct. *Id.* at 124 ("[I]t was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police.")

Unlike in *Wardlow*, however, the plaintiffs here were not in a high crime area and viewing Pirone's testimony in the light most favorable to plaintiffs, the trier of fact could reasonably infer that plaintiffs were not engaged in evasive action similar to that observed in *Wardlow*.  Indeed, J. Bryson, N. Bryson and Reyes did not run away from Pirone, but instead walked from the lead car toward Pirone as they had to in order to exit the train station.  Meanwhile, Grant and Greer simply reboarded the train.  The trier of fact could reasonably infer that plaintiffs' actions here were not evasive, but calculated to avoid what appeared to be an unmotivated detention.  *See id.* at 120 (citing *Florida v. Royer*, 460 U.S. 491 (1983) ("[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business");("any 'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.'"(quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991))).  Viewing the facts in the light most favorable to plaintiffs, the facts suggest that plaintiffs merely refused to cooperate with Pirone's order to get against the wall and attempted to avoid contact with Pirone.  And, "even if [an officer] reasonably suspected that [p]laintiff[s were] avoiding him, such noncooperation, without more, does not support a suspicion that [p]laintiff[s were] engaged in criminal activity." *Liberal v. Estrada*, 632 F.3d 1064, 1078 (9th Cir. 2011).

Pirone argues that even if the detention was unconstitutional, he is entitled to qualified immunity.  "A finding of qualified immunity depends on a two-part inquiry by the court." *Peng v. Mei Chin Penghu*, 335 F.3d 970, 976 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001) overruled on other grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009)).  The court must

9

United States District Court

For the Northern District of California

determine whether the facts alleged, "taken in the light most favorable to the party asserting the

injury," show the violation of a constitutional right, and whether the right was clearly established at

the time of the violation. *Id*; *see Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007)

(citing *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004) ("Defendants are entitled to

such relief only if the facts alleged and evidence submitted . . . show that their conduct did not

violate a federal right; or, if it did, the scope of that right was not clearly established at the time.")).

In analyzing the two-pronged qualified immunity standard, the court may consider either prong first,

however "it is often beneficial" to determine whether a constitutional right was violated prior to

considering whether the scope of the right was clearly established. *Pearson*, 555 U.S. at __ ("The

judges of the district courts and the courts of appeal should be permitted to exercise their sound

discretion in deciding which of the two prongs of the qualified immunity analysis should be

addressed first in light of the circumstances in the particular case at hand.").  Having concluded that

the trier of fact could reasonably infer that Pirone's initial detention violated plaintiffs' Fourth

Amendment rights, the court addresses whether plaintiffs' right was clearly established.

    "Whether a right is clearly established for purposes of qualified immunity is an inquiry that

must be undertaken in light of the specific context of the case, not as a broad general proposition.  In

other words, the contours of the right must be sufficiently clear that a reasonable official would

understand that what he is doing violates that right. " *Blankenhorn*, 485 F.3d at 476 (internal

quotation marks and citations omitted).  Pirone testified that as he arrived on the platform, he saw

plaintiffs standing and talking outside of the lead car.  He testified that they did not appear to be

engaged in any illegal activity, and they did not appear to be  fighting.  According to Pirone,

however, they met the physical description of the suspected persons allegedly involved in the fight

and consequently Pirone drew his Taser and proceeded to detain them.  Thus, Pirone's suspicions

appear to have been largely aroused by his perception that the plaintiffs matched the physical

description of the suspected fighters; namely, plaintiffs are five Black or dark-skinned men, who

were wearing dark clothing on the evening in question.  It is well-established law, however, that

general appearance, including racial characteristics that reflect a significant portion of the

1   population, is of little probative value absent a more particularized set of circumstances that would

2   indicate the possibility that the suspects are engaged in criminal activity. *See Unites States v.*

3   *Montero-Camargo*, 208 F.3d 1122, 1131-36 (9th Cir. 2000).  Accordingly, it would be clearly

4   established to a reasonable officer in Pirone's situation that conducting a brief, investigatory stop

5   without particularized, articulable suspicion beyond plaintiffs' alleged physical and racial

6   resemblance to the suspects would not comport with plaintiffs' constitutional rights.[4]  Thus, Pirone

7   is not entitled to qualified immunity, and summary judgment as to plaintiffs' claims with respect to

8   the initial detention is DENIED.

9                    2.    Remaining Defendant Officers

10          Domenici and Mehserle argue that they are not liable for Pirone's alleged constitutional

11  violation under the collective knowledge doctrine.  Under the collective knowledge doctrine,

12  "[w]here one officer knows facts constituting reasonable suspicion or probable cause (sufficient to

13  justify action under an exception to the warrant requirement), and he communicates an appropriate

14  order or request, another officer may conduct a warrantless stop, search, or arrest without violating

15  the Fourth Amendment." *United States v. Ramirez*, 473 F.3d 1026, 1037 (9th Cir. 2007).  Domenici

16  and Mehserle argue that they reasonably relied on Pirone's determination of reasonable suspicion

17  and consequently detained plaintiffs upon Pirone's order.  However, because there is a genuine issue

18  of material fact as to whether the totality of the circumstances supported Pirone's determination of

19  reasonable suspicion, the collective knowledge doctrine absolves neither Domenici nor Mehserle of

20  liability at this stage of the action.

21          Domenici and Mehserle next argue that even if the continued seizure was unlawful, they are

22  entitled to qualified immunity because their actions were reasonable given the circumstances.

23  Pirone testified that after detaining the Bryson brothers and Reyes against the platform wall, he

24  radioed to Domenici requesting her assistance on the platform.  After Domenici arrived on the

25  platform, Pirone asked her to stand guard over the plaintiffs, without telling her more.  Domenici

26  relied on Pirone's assessment of the situation in continuing to detain plaintiffs.  Once Pirone pulled

27  Grant and Greer off the train, Domenici then continued to assist in their seizure as well.  Although

28

United States District Court

For the Northern District of California

1    Domenici did not question the legality of the seizure, there was no indication at that point that the

2    seizures were in fact unlawful.  She relied upon Pirone's assessment of the situation and, taking his

3    directive, continued the detentions.  Pirone similarly ordered the BART back-up officers, including

4    Mehserle, Woffinden and Knudtson, to keep watch over plaintiffs.  They complied with Pirone's

5    order without questioning the nature of Pirone's articulable suspicion.

6           Pirone then left Domenici, Mehserle, Woffinden and Knudtson to guard plaintiffs while he

7    walked back to the train to question the train operator as to the alleged fight.  When Pirone returned,

8    he simply instructed that Grant and Greer be arrested for a violation of section 148, but said nothing

9    more about his investigation of the alleged section 242 violation.  According to defendants, Pirone

10   merely pointed generally in the direction of Grant and Greer.  Because J. Bryson was positioned

11   immediately beside Grant, however, defendants contend that Mehserle reasonably believed that

12   Pirone was referring to J. Bryson for arrest.[5]  Accordingly, Mehserle proceeded to arrest J. Bryson

13   while officers Domenici, Woffinden, Knudtson continued to participate in the detention of Grant,

14   Greer, N. Bryson and Reyes.

15          Given the totality of the circumstances presented to Domenici, Mehserle, Woffinden and

16   Knudtson, while a reasonable officer may not have questioned the validity of the detentions up until

17   the point that Pirone returned and ordered that Grant and Greer be arrested, the trier of fact could

18   conclude that a reasonable officer could not have believed that the continued detention of the Bryson

19   brothers and Reyes was reasonable.[6]  Pirone gave no orders as to them, and neither Domenici nor

20   Mehserle had any independent reason to suspect that any of the three young men had engaged in

21   criminal activity.  This rationale applies to Woffinden and Knudtson as well.

22          Accordingly, Domenici, Mehserle, Woffinden and Knudtson are entitled to qualified

23   immunity as to Grant and Greer's detention and arrest and as to the detention of J. Bryson, N.

24   Bryson and Reyes up to the time that Pirone announced his intent to arrest Grant and Greer.  To the

25   extent that the finder of fact determines that defendants participated in the extended detention of

26   plaintiffs beyond Pirone's announcement that Grant and Greer were to be arrested, defendants are

27

28

**United States District Court**
For the Northern District of California

1  not entitled to qualified immunity.  Accordingly, summary judgment as to this claim is GRANTED

2  in part in favor of defendants Domenici, Mehserle, Woffinden and Knudtson and DENIED in part.

3        B.    <u>Unlawful Arrest</u>

4            1.    <u>Pirone</u>

5                a.    <u>Grant and Greer</u>

6        Pirone moves for summary judgment as to plaintiffs' claim of unlawful arrest.  Pirone

7  concedes that he placed Greer and Grant under arrest upon returning to the retaining wall after his

8  brief discussion with the train operator.  He subsequently directed Mehserle to arrest Grant and

9  Greer.  Greer was already in handcuffs, and Pirone ordered Merserle to handcuff Grant.  It was

10 during the course of this attempt to handcuff Grant that Mehserle shot Grant in the back.  After the

11 shooting, Pirone persisted by ordering Mehserle to handcuff the fatally wounded Grant. Pirone

12 Testimony at 2931:7-19.  Pirone argues that he had probable cause to arrest Grant and Greer for  a

13 violation of section 148 because both Greer and Grant reboarded the train in response to Pirone's

14 attempts to detain the group, allegedly tried to conceal themselves amidst the "crush load" on the

15 idling train and came off the train only after Pirone threatened Grant with a Taser and after Pirone

16 physically removed Greer from the train.  According to Pirone, Grant and Greer's actions obstructed

17 his "work as a police officer." Docket No. 152 (Pirone Motion for Summary Judgment) at 25:18.

18       Plaintiffs proffer evidence that Pirone formed the intent to place Grant and Greer under arrest

19 pursuant to section 148 after he spoke with the train operator. Pirone Testimony at 2888:2-25.  The

20 record reflects that Pirone personally placed Greer, the last plaintiff to be detained, in handcuffs

21 prior to walking to the lead car ostensibly to check for victims of the alleged fight and to question

22 the train operator as to what she had witnessed.  *Id.* at 2879:17-2881:18.  Plaintiffs proffer evidence

23 that Pirone simply asked the train operator, "What do we have here?", to which the train operator

24 simply replied, "Some bs."[7]  Docket No. 134-1 (Williams Testimony) at 3025:4-3026:13.  Indeed,

25 the train operator's testimony reflects that Pirone did not ask her if there were any victims; did not

26 ask her if anyone had come forward regarding the alleged fight; did not ask her if she could identify

27 anyone involve in the alleged fight; did not ask if anyone appeared to be wounded; did not ask her to

28

United States District Court

For the Northern District of California

1  identify the five plaintiffs as suspects; did not ask her if anyone else was involved; and did not ask

2  her if she knew if any weapons were involved. *Id.* at 3027:1-3028:28. Nor did the train operator

3  share any of this information with Pirone or express the opinion that plaintiffs were in fact involved

4  in the alleged fight. *Id.* at 3029:1-16. Pirone himself testified that he did not ask the train operator to

5  step out of her booth to make an identification of the detained plaintiffs. Pirone 2882:24-2883:17.

6  Instead, he walked away from this brief interaction with her, having formed the intent to arrest Grant

7  and Greer for resisting his efforts to detain them for suspicion of misdemeanor fighting. Pirone

8  Testimony at 2887:20-2888:28. Accordingly, upon returning to the group, Pirone instructed

9  Mehserle to arrest both the already-handcuffed Greer and to handcuff and arrest Grant. Pirone

10  2888:10-21.

11  *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) is instructive as to the

12  lawfulness of Pirone's arrest of Grant and Greer pursuant to section 148. In *Blankenhorn*, the Ninth

13  Circuit considered the lawfulness of plaintiff's arrest for a violation of section 148 stemming from

14  an alleged trespass. The court instructed that arrest for resisting arrest is not lawful if the arrest for

15  the underlying criminal violation is unwarranted. *Id.* at 472 (citing *Arpin v. Santa Clara Valley*

16  *Transp. Agency*, 261 F.3d 912, 920 (9th Cir. 2001) ("If there was no probable cause to arrest

17  Blankenhorn for trespassing in the first place, it makes no difference for present purposes if he

18  resisted arrest.")).

19  "'Probable cause exists when, under the totality of the circumstances known to the arresting

20  officers (or within the knowledge of the other officers at the scene), a prudent person would believe

21  the suspect had committed a crime.'" *Blankenhorn*, 485 F.3d at 471-72 (quoting *Dubner v. City &*

22  *County of San Francisco*, 266 F.3d 959, 966 (9th Cir. 2001)). Here, Pirone had no probable cause to

23  believe that Grant or Greer were involved in the alleged misdemeanor fight or any other criminal

24  activity for that matter. Having detained the plaintiffs and having instructed the back-up BART

25  officers to continue the detention so that he could then conduct his investigation, Pirone made no

26  reasonable attempt to uncover any evidence linking plaintiffs to the alleged criminal conduct.

27  Indeed, he testified that he did not even attempt to perform any investigation of the scene of the

28

14

United States District Court

For the Northern District of California

1   alleged crime, namely, the lead car of the train.  According to Pirone, he merely glanced into the

2   lead car, but never entered to ascertain if anyone was injured or to collect evidence of the alleged

3   criminal activity. Pirone Testimony at 2883:22-2884:12.

4     Viewing Pirone's account of the events in the light most favorable to plaintiffs, the trier of

5   fact could reasonably infer that Pirone lacked probable cause to believe that any of the plaintiffs

6   committed a violation of section 242 of the Penal Code or any other criminal violation.  Per

7   *Blankenhorn*, without probable cause to believe that plaintiffs had committed any underlying

8   criminal violation, and without reasonable suspicion to detain plaintiffs for investigatory purposes,

9   Pirone lacked probable cause to arrest plaintiffs pursuant to section 148.

10   Pirone also argues that Grant violated section 148 by interfering with Pirone's attempts to

11   arrest Greer.  Pirone contends that Grant, the Bryson brothers and Reyes all engaged in a "concerted

12   effort to obstruct, (sic) the handcuffing and arrest of Michael Greer." Pirone's Motion at 26:1-2.

13   Plaintiffs proffer evidence, however, to support the reasonable inference that neither Grant, the

14   Bryson brothers nor Reyes engaged in activity that could reasonably be construed as obstructing

15   Pirone's handcuffing of Greer.  Plaintiffs adduce testimony that Pirone removed the much smaller

16   Greer from the train by force, threw him into the retaining wall then executed a "hair-pull takedown

17   maneuver" to bring Greer into a sitting position. Pirone Testimony at 2253:14 -2856:8.  Plaintiffs

18   present evidence that Grant, the Bryson brothers and Reyes objected verbally to this perceived use of

19   unreasonable force against their friend and that J. Bryson and Grant both stood in protest. Docket

20   No. 135-7 (J. Bryson Testimony) at 3461:9- 3462:13.  Pirone contends that the force he used was

21   necessary, but plaintiffs argue that Pirone's force was excessive.

22   Although section 148 "proscribes resisting, delaying, or obstructing a police officer, the First

23   Amendment protects a significant amount of verbal criticism and challenge directed at police

24   officers.  In fact, [t]he freedom of individuals verbally to oppose or challenge police action without

25   thereby risking arrest is one of the principal characteristics by which we distinguish a free nation

26   from a police state." *In re Mohammed C.*, 95 Cal. App.4th 1325, 1330 (2002) (quoting *City of*

27   *Houston, Texas  v. Hill*, 482 U.S. 451, 461, (1987) (internal quotation marks omitted)).  Indeed,

28

United States District Court

For the Northern District of California

1   "[s]peech is often provocative and challenging . . . [But it] is nevertheless protected against

2   censorship or punishment, unless shown likely to produce a clear and present danger of a serious

3   substantive evil that rises far above public inconvenience, annoyance, or unrest." *Houston*, 482 U.S.

4   at 461 (quoting *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949)).  Pirone does not contend that either

5   Grant, the Bryson brothers or Reyes did more than protest verbally and stand up after witnessing

6   Pirone's use of force on Greer.  To the extent that Pirone argues that Grant and J. Bryson's act of

7   standing constituted an obstruction of his ability to conduct his police duties, there is at least a

8   question of material fact whether in standing up, either J. Bryson or Grant did anything more than

9   "stand[] passively." *People v. Wetzel*, 11 Cal.3d 104, 107 (1974).  Ultimately, viewing the evidence

10  in the light most favorable to plaintiffs, the finder of fact could reasonably conclude that neither

11  plaintiffs' verbal objections nor passive stance operated to obstruct Pirone's ability to handcuff

12  Greer.

13          Nonetheless, Pirone argues that even if the arrests were unconstitutional, he is entitled to

14  qualified immunity due to his error of judgment.  However, the qualified immunity inquiry considers

15  what the *reasonable* officer in a given set of circumstances could have believed to be reasonable

16  given the state of the law, and it was clearly established at the time of the incident, per *Blankenhorn*,

17  that absent probable cause of some criminal violation, Pirone could not have reasonably arrested

18  Greer or Grant for obstructing justice or resisting arrest for simply avoiding Pirone.  Moreover, it

19  was clearly established that Grant, the Bryson brothers and Reyes were entitled to criticize Pirone's

20  actions without being arrested for allegedly obstructing Pirone's attempts to handcuff Greer.

21  Accordingly, Pirone's motion as to plaintiffs' claim of unlawful arrest as to plaintiffs Grant and

22  Greer is DENIED.

23              b.    J. Bryson, N. Bryson and Reyes

24          Pirone argues that he cannot be liable for unlawful arresting the Bryson brothers and Reyes

25  because he did not, as a formal matter, place them under arrest.  Pirone contends that he merely

26  detained them pursuant to *Terry v. Ohio*.  The arresting officer's subjective intent to arrest is not

27  dispositive when determining whether an individual has been arrested however, and the

28

United States District Court

For the Northern District of California

1    circumstances surrounding an investigatory stop may cause the action to cross the line into an arrest.

2    Indeed, in the Ninth Circuit:

3           It is well-settled that the purpose of a *Terry* stop is to allow the officer to pursue
            his investigation without fear of violence.  Generally, a *Terry* stop involves no
4           more than a brief stop, interrogation and, under proper circumstances, a brief
            check for weapons.  *If the stop proceeds beyond these limitations, an arrest*
5           *occurs, which requires probable cause.*  There has been an arrest if, under the
            circumstances, a reasonable person would conclude that he was not free to leave
6           after brief questioning.

7           Under ordinary circumstances, drawing weapons and using handcuffs are not part of a
            *Terry* stop. Nevertheless, we allow intrusive and aggressive police conduct without
8           deeming it an arrest ... when it is a reasonable response to legitimate safety concerns on the
            part of the investigating officers. In determining whether a stop amounts to an arrest, we
9           also consider the specificity of the information that leads the officers to suspect that the
            individuals they intend to question are the actual suspects being sought and the number of
10          police officers present.

11          We have permitted the use of intrusive means to effect a stop where the police have
            information that the suspect is currently armed or the stop closely follows a violent crime.
12          Under such circumstances, holding a suspect at gunpoint, requiring him to go to his knees
            or lie down on the ground, and/or handcuffing him will not amount to an arrest.

13
            *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001) (internal quotation marks,
14          citations and alterations omitted) (emphasis added).

15   Plaintiffs proffer evidence from which the reasonable trier of fact could conclude that Pirone

16   arrested Bryson brothers and Reyes, even though he did not form the subjective intent to do so.

17   Specifically, when Pirone arrived on the platform, there appeared to be no objective indication of

18   violent activity or of any criminal activity for that matter, yet Pirone drew his Taser immediately and

19   threatened all five plaintiffs with tasing if they did not comply with his order to sit down against the

20   retaining wall.  Pirone was informed prior to encountering plaintiffs that the alleged fight from

21   which this entire business stemmed *did not* involve the use of weapons, yet he employed a

22   significant measure of force in detaining plaintiffs.  Even after the arrival of Domenici, Woffinden,

23   Mehserle, Knudston and other BART officers, neither Pirone nor any of the other BART officers

24   made any apparent attempts to conduct a patdown of plaintiffs for officer safety or public safety

25   purposes.  Lastly, prior to the shooting of Grant, Pirone made little or no attempt to investigate the

26   fight.  Instead, defendants detained the plaintiffs without taking steps to conduct a reasonable

27

28

                                                        17

United States District Court

For the Northern District of California

1    investigation.  Viewing the facts in the light most favorable to plaintiffs, the trier of fact could

2    conclude that a reasonable person would not believe that he was at liberty to leave.

3         Nor is Pirone entitled to qualified immunity.  In the Ninth Circuit, it is clearly established

4    law that "the use of especially intrusive means of effecting a stop [is only permissible] in special

5    circumstances, such as (1) where the suspect is uncooperative or takes action at the scene that raises

6    a reasonable possibility of danger or flight; (2) where the police have information that the suspect is

7    currently armed; (3) where the stop closely follows a violent crime; and (4) where the police have

8    information that a crime that may involve violence is about to occur." *Washington v. Lambert*, 98

9    F.3d 1181, 1189 (1996).  Because viewing the evidence in favor of plaintiffs, the finder of fact could

10   conclude that none of the above circumstances were present here, Pirone is not entitled to qualified

11   immunity and summary judgment as to the unlawful arrest of the Bryson brothers and Reyes is

12   DENIED.

13                         2.    Domenici

14        Domenici argues that to the extent plaintiffs were unlawfully arrested, she is not liable

15   because she did not integrally participate in the arrest of any of the plaintiffs.  In light of the court's

16   conclusion above that the trier of fact could reasonably infer that the *Terry* stop had crossed the line

17   into an unlawful arrest, Domenici's arguments are unavailing.

18        "An officer's liability under section 1983 is predicated on his "integral participation" in the

19   alleged violation." *Blankenhorn*, 485 F.3d at 481 (citing *Chuman v. Wright*, 76 F.3d 292, 294-95

20   (9th Cir. 1996)). " '[I]ntegral participation' does not require that each officer's actions themselves

21   rise to the level of a constitutional violation." *Id.* (quoting *Boyd v. Benton County*, 374 F.3d 773, 780

22   (9th Cir. 2004)). "But it does require some fundamental involvement in the conduct that allegedly

23   caused the violation." *Id.*  Domenici admittedly assisted in the detention of plaintiffs.  To the extent

24   that the trier of fact concludes that the detentions in fact constituted arrests, the trier of fact could

25   also reasonably conclude that Domenici "participated in some meaningful way." *Boyd*, 374 F.3d 773

26   at 780.

27

28

United States District Court

For the Northern District of California

1    Moreover, even if plaintiffs were not unlawfully arrested prior to the time that Mehserle shot

2    Grant, the continued detention of Greer, J. Bryson, N. Bryson, Anicete and Reyes for several hours

3    without probable cause was unlawful.  Plaintiffs argue that Domenici continued to participate in

4    their detention after Grant's shooting, and the trier of fact could reasonably conclude that she

5    meaningfully participated in this constitutional deprivation even though she did not see it through

6    until its end.

7    Domenici also argues that in the event that defendants unlawfully arrested plaintiffs, she is

8    entitled to qualified immunity.  As to the pre-shooting detention period, Domenici's arguments are

9    convincing.  Having heard the initial broadcast regarding the alleged misdemeanor fight, she arrived

10   at the platform pursuant to Pirone's call for help.  Upon her arrival, Pirone had already detained the

11   Bryson brothers and Reyes, and he ordered her to stand guard over them while he detained Grant

12   and Greer.  After detaining them, Pirone left to ostensibly conduct his investigation by speaking with

13   the train operator and by checking for injured victims in the lead car.  After conducting an

14   investigation unlikely to uncover any facts to support probable cause as to the alleged section 242

15   violation, Pirone returned and announced that Grant and Greer should be arrested for violating

16   section 148.  Pirone Testimony 2888:15-25.  At this point, the continued detention of J. Bryson, N.

17   Bryson and Reyes was patently unreasonable.  Pirone's announcement should have signaled to the

18   present officers, including Domenici, that there was no reasonable suspicion to detain nor probable

19   cause to arrest plaintiffs J. Bryson, N. Bryson and Reyes.  Evidence suggests that nonetheless

20   Domenici continued to participate in their detentions up until the time that Mehserle shot Grant and

21   thereafter.  *See* Docket No. 156 (Rains Dec.), Exh. K (Matrix Video).  Considering these

22   circumstances, it would have been clearly established to a reasonable officer that the continued

23   detention of these plaintiffs was unreasonable.  Accordingly, Domenici is entitled to qualified

24   immunity as to the detentions of all plaintiffs prior to Pirone's announcement that Grant and Greer

25   were to be arrested.  She is not entitled to qualified immunity to the extent that she participated in

26   the continued detention of J. Bryson, N. Bryson and Reyes after Pirone's announcement.  Because

27   issues of material fact remain as to the degree to which Domenici continued to participate in these

28

United States District Court

For the Northern District of California

1 | detentions after Pirone's order, summary judgment is GRANTED in part in favor of Domenici and

2 | DENIED in part.

3 |                  3.    <u>Mehserle</u>

4 |       Plaintiffs claim that Mehserle is liable for the unlawful arrest of Grant and J. Bryson.

5 | Mehserle argues that he merely attempted to arrest Grant pursuant to Pirone's order to do so.

6 | Mehserle had arrived on the platform after the Bryson brothers, Reyes, Grant and Greer had already

7 | been detained by Pirone and Domenici.  Mehserle testified that he drew his Taser after seeing other

8 | BART officers, including Pirone and Domenici, with their Tasers drawn. Docket No. 156 (Rains

9 | Dec.), Exh. F (Mehserle Testimony) at 4133:4-5, 17-20.  Mehserle testified that having drawn his

10 | Taser, he was told by Pirone to guard plaintiffs while Pirone left. *Id.*  Pirone gave no additional

11 | information about the nature of his suspicion allegedly warranting the detentions. *Id.* at 4133.

12 | Indeed, according to Mehserle, Pirone gave no indication that he had "had trouble" with plaintiffs up

13 | to that point; did not tell Mehserle that he was leaving the scene of the detention to go speak with the

14 | train operator; and did not indicate whether or not plaintiffs had been searched for weapons. *Id.*

15 | Mehserle, for his part, did not ask Domenici, who had arrived on the scene prior to Mehserle,

16 | anything about the detentions, and simply proceeded to follow Pirone's order. *Id.*  Accordingly,

17 | Mehserle joined in with Domenici, keeping his "[T]aser trained on [plaintiffs]" as they sat against

18 | the wall. *Id.* at 4135:2-3.

19 |       Mehserle contends that he is not liable for the alleged unlawful arrest of J. Bryson because he

20 | believed that when Pirone returned to the retaining wall after speaking with the train operator,

21 | Mehserle believed that Pirone indicated that J. Bryson and Grant were to be arrested rather than

22 | Greer and Grant.  Mehserle argues that when identifying the individuals to be arrested for section

23 | 148 violations, Pirone merely stated that "him and him" should be arrested and pointed generally in

24 | the direction of Grant and Greer. *Id.* at 4206:21-23.  Pirone testified that he pointed specifically to

25 | Grant and Greer, not to J. Bryson, and that as Mehserle started to handcuff J. Bryson, Pirone had no

26 | knowledge of why J. Bryson was being arrested, Pirone Testimony 2888:15-25; 2893:9-20.

27 | Viewing the facts in the light most favorable to plaintiffs, the finder of fact could conclude that

28 |

United States District Court

For the Northern District of California

1  Mehserle made an unreasonable mistake of fact and unlawfully arrested J. Bryson.  Moreover,

2  because the reasonableness of Mehserle's mistake of fact turns on an as-yet unresolved issue, he is

3  not entitled to qualified immunity as to the arrest of J. Bryson since it was clearly established that an

4  arrest without probable cause would have been unlawful.

5       As to Grant, Mehserle contends that he was merely following Pirone's order.  Because there

6  is a genuine issue of material fact as to whether Pirone had probable cause to arrest Grant, the court

7  must consider whether it was objectively reasonable for Mehserle to follow Pirone's order given the

8  circumstances.  Mehserle arrived on the scene after Pirone had initiated the detentions and after

9  Grant had allegedly obstructed Pirone's attempts to investigate the alleged misdemeanor battery

10 report.  Mehserle testified that after Pirone instructed Mehserle to watch plaintiffs, Pirone left the

11 retaining wall without informing him that he intended to investigate the alleged crime.  Upon

12 Pirone's return he ordered the arrests for a section 148 violation.[8]  Although Mehserle had no

13 individual sense of probable cause, it was reasonable for him to follow Pirone's order to arrest

14 Grant.  Accordingly, Mehserle is entitled to qualified immunity as to Grant's arrest and summary

15 judgment is GRANTED in Mehserle's favor, however summary judgment as to the arrest of J.

16 Bryson is DENIED.

17            4. Woffinden and Knudtson

18       With respect to plaintiffs J. Bryson, N. Bryson, and Reyes, questions of material fact remain

19 as to Woffinden and Knudtson's participation in the continued detention of the plaintiffs after Pirone

20 announced that only Grant and Greer were under arrest, as well as in the period immediately

21 following the shooting of Grant during which time J. Bryson, N. Bryson, Reyes, and Greer were

22 arrested and detained at BART PD headquarters.  Accordingly, for the reasons set forth above with

23 respect to Domenici, summary judgment as to these plaintiffs is DENIED.

24       As to Anicete, Woffinden and Knudtson concede that they arrested Anicete for obstructing a

25 peace officer in violation of section 148(a) and for assaulting a peace officer in the performance of

26 her duties in violation of California Penal Code section 241. Docket No. 21 (Woffinden and

27 Knudtson Motion) at 12-13.  Woffinden and Knudston assert that Anicete and another man

28

21

1   obstructed the officers by "breach[ing] an established police perimeter" when they repeatedly

2   approached then retreated from the officers as they detained the Bryson brothers, Grant, Greer and

3   Reyes in spite of Woffinden and Domenici's commands that they back away from the area. *Id.*

4   Anicete claims that he was merely protesting what he perceived to be the unwarranted detention of

5   his friends and the unnecessary use of force against them.  Plaintiffs proffer evidence that Anicete

6   posed no threat to the ongoing detention of the Bryson brothers, Grant, Greer and Reyes, other than

7   to express verbal dissent and to approach and retreat from the area where his friends were being

8   detained. Docket No. 21-6 (Anicete Depo.) 168:15-175:9.  Accordingly, there is an issue of material

9   fact whether Woffinden and Knudtson had probable cause to believe that Anicete violated section

10  148(a).  Moreover, Woffinden and Knudtson had no reason to believe that Anicete was involved in

11  the alleged section 242 violation since they arrived on the scene after Pirone had already detained

12  the individuals he believed to have been involved in the misdemeanor fight.  Resolving the questions

13  of fact in favor of plaintiffs, Anicete was merely protesting the detention and did nothing to obstruct

14  the officers' ability to conduct their detention.

15      Woffinden and Knudtson also allege that Anicete assaulted them by throwing a cell phone at

16  them as they attempted to engage in their police work.  Plaintiffs argue that Anicete did not throw

17  the phone and that it was unreasonable for the officers to believe that he had in fact thrown the

18  phone. Anicete Depo. at 175.  Consequently, there is a genuine issue of material fact whether

19  defendants had probable cause to believe that Anicete violated section 241.  Because fact questions

20  remain, Woffinden and Knudtson's motion for summary judgment as to Anicete's claim is

21  DENIED.[9]

22          D.      Excessive Force

23                  1.      Pirone

24      Pirone argues that his use of force throughout the events underlying this action was

25  reasonable under the totality of the circumstances.  "A claim against law enforcement officers for

26  excessive force is analyzed under the Fourth Amendment's 'objective reasonableness' standard."

27  *Arpin v. Santa Clara Valley Trans. Agency*, 261 F.3d 912, 921 (9th Cir. 2001) (citing *Graham v.*

28

*Connor*, 490 U.S. 386, 388 (1989)). "The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them." *Blankenhorn*, 485 F.3d at 477 (citing *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985)). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Arpin*, 261 F.3d at 921 (quoting *Graham*, 490 U.S. at 396)). "To determine whether a specific use of force was reasonable, we must balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake.'" *Blankenhorn*, 485 F.3d at 477 (quoting *Graham*, 490 U.S. at 396). "Relevant factors to this inquiry include, but are not limited to, 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.*

The record is replete with evidence of the force used by Pirone against plaintiffs Grant, Greer, the Bryson brothers and Reyes. The court considers each plaintiff in turn.

        a.   <u>Greer</u>

Plaintiffs proffer evidence that Pirone removed Greer from the train by force. Greer testified that Pirone never asked him directly to step off the train, but instead yelled into the idling train for anyone involved in the alleged fight to step off the train. Docket No. 127 (Rapaport Dec.), Exh. E (Greer Depo.) at 30-31. Greer testified that because he was not involved in the fight, he simply stood with his back to Pirone and did not step off the train as ordered. Without addressing Greer specifically, however, Pirone next grabbed Greer and dragged him by his neck and hair over to the retaining wall. *Id.* at 31. Greer further testified that once on the platform, Pirone performed a leg sweep in order to bring Greer to the ground. *Id.* at 32. Once he had Greer on the ground, Pirone handcuffed him. *Id.* at 33-34. Greer alleges that during the course of handcuffing and without provocation, Pirone slammed Greer's head into the ground which resulted in an abrasion on Greer's head. *Id.* at 34. Pirone contends, however, that up until the time of handcuffing, Greer was resisting arrest. Pirone Testimony at 2854:28-2855:1. Pirone testified that once he removed Greer from the

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

train and "nudged" Greer against the retaining wall, Greer took a "combative stance" and appeared ready to confront Pirone. *Id.* at 2855:13. It was at that point that Pirone used the leg sweep to take down Greer. *Id.* at 2856:5-10.

Viewing the facts in the light most favorable to plaintiffs, there is a genuine issue of material fact whether Pirone's use of force against Greer was excessive given the circumstances. The trier of fact could reasonably infer that the crime of misdemeanor fighting without weapons was not sufficiently severe to warrant the level of force Pirone used in detaining Greer. Indeed, there is no evidence in the record that Greer posed an immediate threat to public safety or to Pirone or that Greer was involved in the alleged fight. Greer merely failed to cooperate with Pirone's general order that anyone involved in the fight step off the train. Moreover, the parties present very different versions of the facts with respect to whether Greer was compliant or combative in response to Pirone's attempts to remove him from the train. Viewing the facts in favor of Greer however, the finder of fact could reasonably conclude that Pirone's use of force was unreasonable.

Pirone argues that even if he violated Greer's right against the use of excessive force, he is entitled to qualified immunity. Having concluded that the trier of fact could reasonably infer that Pirone's use of force against Greer was excessive, the court must consider whether the right was clearly established such that a reasonable officer in Pirone's situation would have understood his actions to be unlawful. Resolving the facts in favor of Greer, the non-moving party here, Pirone dragged Greer by the neck and hair off the train without first simply asking Greer to step off the train.[10] Moreover, even though Greer was compliant, Pirone threw him into the retaining wall, took him to the ground with a hair-pull leg-sweep, then smashed his head into the platform while handcuffing him. The law was clearly established that this measure of force employed against a non-resistant suspect of a misdemeanor was unreasonable. Thus, because questions of fact underlie the reasonableness of Pirone's use of force, he is not entitled to qualified immunity at this point as to his use of force against Greer.

                b.     <u>Grant</u>

24

United States District Court

For the Northern District of California

The same analysis applies to Pirone's use of force against Grant.  After Grant reboarded the train, Pirone walked along the outside of the train looking into the windows to locate Grant.  After locating Grant, who allegedly reboarded the train on the second car and had walked through the second car into the third car, Pirone held his Taser up to the window and focused the Taser's laser beam on Grant to get Grant's attention. Pirone Testimony at 2819:17-2820:10.  Facing the threat of being tased, Grant cooperated with Pirone, and Pirone walked Grant over to the retaining wall. *Id.* at 2823:3-2824:4.  Grant complied with Pirone's order to sit against the wall, and Pirone next returned to the train to detain Greer. *Id.* at 2828:26-2829:7.

As discussed above, Pirone used a considerable amount of physical force in detaining Greer. In protest to this use of force against his friend, Grant and J. Bryson stood and verbally expressed their objections.  Domenici allegedly asked Grant and J. Bryson to sit back down and "stay out of it."  Pirone argues that Grant appeared to hit Domenici's arm prompting Pirone to approach Grant and strike Grant about the face using his forearm. *Id.* at 2878:23-27.  Plaintiffs present evidence, however, that rather than attempting to strike Domenici, Grant was attempting to keep the peace and made no attempt to touch Officer Domenici.  Defendants' video evidence supports this version of the events. Rains Dec., Matrix Video.  In this video, while Pirone is off to the left handcuffing Greer, Grant, J. Bryson and Reyes are seen standing to the right, apparently protesting Pirone's use of force. *Id.*  Grant appears to place his hand in front of J. Bryson to keep him against the retaining wall, even as plaintiffs continue to express some verbal displeasure with the turn of events. *Id.* Pirone is next seen approaching Grant, striking him in the head area and engaging in some other form of punching or hitting. *Id.*  Pirone conceded in testimony that he appeared to use his forearm to hit Grant in the "head or face area." Pirone Testimony at 22878:23-27.  Grant and J. Bryson subsequently appear to throw their hands up in submission and sit back down against the wall, even as Pirone draws his bright yellow Taser and points it at Grant. Rains Dec., Matrix Video.  At this point, N. Bryson and Reyes also sit back down in submission against the retaining wall. *Id.* Viewing the evidence in the light most favorable to plaintiff, the finder of fact could reasonably conclude that Pirone's use of force here was unreasonable in light of the circumstances.  Indeed, it is unclear

whether Grant was engaging in any threatening or obstructive activity to warrant Pirone's use of force.

Lastly, after his contact with the train operator, Pirone returned to the group and instructed Mehserle that Grant and Greer were to be arrested for violating Penal Code section 148.  According to plaintiffs' evidence, in response to this announcement, Grant stood up.  Pirone told Grant to, "Sit the fuck down," Pirone Testimony at 2889:24-2890:1, and Mehserle and Pirone pushed Grant back down to the ground in a sitting position. Rains Dec., Matrix Video; Pirone Testimony at 2890:23-25 (conceding that he pushed Grant down).  Pirone next appeared to knee Grant in the side and followed with additional hitting. Rains Dec., Matrix Video.  Pirone alleges that Grant's hand was in his pocket, and that Pirone used his knee to address the potential threat.  Pirone Testimony at 2892:22-25.  Pirone, however, conceded that video evidence did not show Grant's hand in his pocket as Pirone alleges. *Id*. 2891:11-20.  Viewing the facts in the light most favorable to plaintiffs, the finder of fact could reasonably conclude that this use of force was excessive.

After Pirone kneed Grant in the side, Pirone remained bent over Grant, who was now back in a sitting position. Rains Dec., Matrix Video.  J. Bryson appeared to protest the renewed use of force against Grant, and Mehserle proceeded to handcuff J. Bryson. *Id.*; Pirone Testimony at 2893:10-2894:8.  While Mehserle handcuffed J. Bryson, Pirone stepped away from Grant, who once again was sitting against the retaining wall. Rains Dec., Matrix Video.  Grant next rose from his sitting position to his knees, with his hands up in submission, and began to speak with Pirone. *Id.*

Pirone testified that at this point, Grant was pleading with him, saying, "Why are you messing with me, I respect the police, I got a four year old daughter." Pirone Testimony at 2896:6-28.  Pirone testified that he responded to Grant by asking him what his four-year-old daughter would think of Grant's behavior on the platform. *Id.* at 2897:23-2898:3.  Pirone alleges that in response Grant called Pirone a "bitch-ass nigga." *Id.*  Plaintiffs contend, however, that Grant never said these words to Pirone and that Pirone, of his own accord, shouted "bitch-ass nigga" at Grant.  Pirone argues that he merely repeated the words to Grant, but concedes that the video evidence only shows

Pirone "shouting the words 'bitch-ass nigger, bitch-ass nigger' in the face of Mr. Grant." *Id.* at 2899:23-26.

After this exchange, Mehserle, who by this time had completed handcuffing J. Bryson, turned his attention to Grant and appeared to use his weight to push Grant down from his kneeling position in front of Pirone into a prone position on the platform. Rains Dec., Matrix Video.  Grant appeared to land on his back initially, partially lying across Reyes' legs, who was sitting against the wall to Grant's right. *Id.*  Pirone next appeared to grab Grant by the hair or head and placed his knee and the weight of his body in Grant's neck, while Mehserle was atop the lower portion of Grant's body. *Id.*  The right side of Grant's head appeared to be pushed into the ground under the weight of Pirone's left knee in his neck. *Id.*  Pirone testified that during this action, Grant was attempting to wiggle free in defiance and that he did not recall Grant speaking.  Pirone Testimony at 2905:25-2906:10.  Plaintiffs proffer evidence, however, that during these actions, Grant was telling Pirone and Mehserle, "I can't breathe.  Just get off me.  I can't breathe.  I quit.  I surrender.  I quit." J. Bryson Testimony at 3489:8-17.

Pirone contends that both he and Mehserle repeatedly ordered Grant to give up his hands for handcuffing, but that Grant continued to "wiggle." Pirone Testimony at 2906:4-26; 2910:11-14.  Pirone testified, however, that even as he pressed his left shin into Grant's right shoulder and back area in order to force Grant to flip over on to his stomach, that Grant displayed no "physical resistance." *Id.* at 2912:21-2913:5.

Pirone next appeared to briefly ease the pressure on Grant's neck in order to facilitate Grant rolling onto his stomach, and off of Reyes' outstretched legs.[11] Rains Dec., Matrix Video.  Pirone's left knee next came back down onto Grant's neck, and Mehserle continued to appear to manipulate Grant's lower body. *Id.*  Very shortly thereafter, Mehserle drew his gun and rose upward, away from his previous position atop Grant's body. *Id.*  Pirone testified that Mehserle told Pirone to stand up and away from Grant as it was Mehserle's intent to tase Grant for allegedly resisting handcuffing.  Pirone Testimony at 2919:26-2920:8.  Defendants' evidence, however, reveals that Grant was face

27

down on the platform with his hands behind his back, apparently offered for handcuffing, in the seconds before Mehserle fatally shot Grant. Rains Dec., Matrix Video.

Viewing the evidence in the light most favorable to plaintiffs, there is a genuine issue of material fact whether Grant was resisting being handcuffed or whether under the weight of the two officers, Grant was incapable of complying with their order to offer his hands for handcuffing. The finder of fact could reasonably conclude that starting from the time Grant was on his knees pleading with Pirone, Grant was not resisting arrest and that Pirone's use of force from that point forward, specifically placing his knee and body weight into Grant's neck when Grant was not in fact resisting being handcuffed, amounted to excessive force.

Pirone also acknowledges that he ordered Mehserle to handcuff Grant after he was shot. Pirone Testimony at 2931:7-19. Handcuffing a suspect when the suspect poses no physical threat to officer safety may constitute excessive force. *See Estrada*, 632 F.3d at 1078 (affirming the district court's denial of qualified immunity as to excessive force in the case of an officer who handcuffed the petitioner where, resolving the issue in favor of petitioner, petitioner posed no safety threat to officers.) Indeed, defendants' evidence supports the inference that after Mehserle shot Grant, Grant was completely incapacitated and posed no threat to anyone on that platform. Rains Dec., Matrix Video. Accordingly, the finder of fact could infer that Pirone's is liable for excessive force for ordering Grant's handcuffing after he was shot.

Moreover, the court concludes that Pirone is not entitled to qualified immunity. As stated above, the law was clearly established that the measure of force Pirone used against Grant would be unreasonable accepting plaintiffs' version of the facts that Grant was not resisting being handcuffed, but rather was first imploring Pirone to show mercy and subsequently pleading for the ability to breathe. Pirone Testimony at 2901:6-10. In addition, it was clearly established that handcuffing a mortally wounded suspect who posed no threat to officers or to the public would violate Grant's rights against the use of excessive force. Thus, because questions of fact underlie these issues and are material to the reasonableness of Pirone's use of force against Grant, Pirone is not entitled to qualified immunity at this point as to his use of force against Grant.

United States District Court

For the Northern District of California

c.    The Bryson Brothers and Reyes

Pirone drew and armed his Taser before he initially approached plaintiffs and prior to asking any questions about the alleged fight.[12]  As stated above, after his initial order to sit down against the retaining wall, the Bryson brothers and Reyes ignored him and continued walking.  At this time, Pirone threatened to tase them unless they complied with his order.  Fearing being tased, the Bryson brothers and Reyes complied with the order.

Pirone argues that his initial threat of force against the Bryson brothers and Reyes was reasonable.  In addressing Pirone's argument, the court considers "relevant factors" such as "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Blankenhorn*, 485 F.3d at 477 (quoting *Graham*, 490 U.S. at 396).  As stated above with respect to the articulable suspicion inquiry, plaintiffs proffer evidence that although the crime at issue was misdemeanor fighting, a crime that could implicate public and officer safety, Pirone arrived to a platform that appeared to be calm and under control.  Plaintiffs were standing calmly, talking with one another, and did not appear to be involved in any criminal activity.  Moreover, Pirone knew that the alleged incident did not appear to involve weapons.  In addition, even though the Bryson brothers and Reyes ignored Pirone's first order to sit down, they did not attempt to escape but rather continued to walk toward the platform's exit.  Viewing these facts in the light most favorable to plaintiffs, the finder of fact could reasonably conclude that Pirone's immediate threat of tasing was excessive.

Pirone argues, however, that in the event that the use of his Taser to coerce plaintiffs is deemed excessive force, he is entitled to qualified immunity.  Pirone cites *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010) for the proposition that the law regarding Taser use was insufficiently developed at the time of the incident to put Pirone on notice that the use of his Taser as a coercive mechanism was unconstitutional.  In *MacPherson*, a police officer, MacPherson, pulled over Bryan for failing to wear his seatbelt. *Id.* at 822.  MacPherson allegedly ordered Bryan to remain in his car, but Bryan, who allegedly did not hear MacPherson's command, proceeded to step out of the car and

started "yelling gibberish and hitting his thighs, clad only in his boxer shorts and tennis shoes." *Id.*
Although Bryan "did not verbally threaten Officer MacPherson and, according to Officer
MacPherson, was standing twenty to twenty-five feet away and not attempting to flee," MacPherson
deployed his Taser in dart-mode, causing injury to Bryan as he fell forward uncontrollably. *Id.*

The Ninth Circuit held that the use of a Taser in dart-mode constituted intermediate force,
and that MacPherson's use of his Taser in such a manner was excessive because Bryan did not pose
an intermediate threat to the officer or to the public. *Id.* at 826.  The court, however, granted
qualified immunity to MacPherson, stating that as of 2005, it was not clearly established that such
use was unconstitutional. *Id.* at 833.  Indeed, the law regarding Taser use, in its various formats,
remains unclear in this Circuit.  At the time of the incident here, the law was not clearly established
that threatening to tase in order to gain compliance with orders would be an unconstitutional use.
Accordingly, Pirone is entitled to qualified immunity as to his alleged Taser use against J. Bryson,
N. Bryson and Reyes.

Given the court's conclusions above, Pirone's motion for summary judgment as to the use of
excessive force against plaintiffs Grant and Greer is DENIED and as to the use of excessive force
against J. Bryson, N. Bryson and Reyes is GRANTED.

            2.    <u>Mehserle</u>

                 a.    <u>Grant</u>

Mehserle fired a single shot into Grant's back that resulted in Grant's death.  Mehserle
argues that he intended to tase Grant, but mistakenly drew his pistol.  Mehserle argues that tasing
Grant was reasonable because Grant actively resisted arrest by failing to produce his right arm for
handcuffing.  Mehserle argues that although he placed significant pressure on Grant's arm, Grant
avoided handcuffing and appeared to be reaching for something in his waist-band.  There is a
genuine issue of material fact, however, whether Grant was resisting arrest and thus whether the use
of *any* force, not just the mistaken use of a gun instead of a Taser was reasonable.

As stated above, plaintiffs proffer evidence that Grant announced his intention to surrender
and give up prior to Mehserle's alleged attempted tasing.  Plaintiffs also proffer evidence that Grant

30

pleaded for air and expressed an inability to move pursuant to Mehserle and Pirone's commands because he was unable to move under the weight of the two officers.  Defendants' evidence also supports plaintiffs' version of the facts insofar as video evidence appears to show that immediately prior to the fatal shot, Grant had both hands behind his back.  Rains Dec., Matrix Video; *see also* Pirone Testimony 2925:22-2926:8.  Thus, the relevant inquiry here does not go to the mistaken use of a gun instead of a Taser because viewing the evidence in the light most favorable to plaintiffs, the trier of fact could conclude that any use of force against an individual who was not resisting arrest was excessive.

Mehserle argues, however, that pursuant to the Ninth Circuit's decision in *Torres v. City of Madera*, 524 F.3d 1053 (9th Cir. 2008) and *Torres v. City of Madera*, 655 F.Supp.2d 1109 (E.D.Cal. 2009) ("*Torres II*"), he is entitled to qualified immunity.  The facts of *Torres* are distinguishable from the facts here.  In *Torres*, the family of Everardo Torres sued Officer Noriega of the Madera City Police for violating Torres' right against the use of excessive force after Noriega mistakenly shot and killed Torres with her service pistol instead of deploying her Taser.  The court did not reach the issue of whether Torres' use of a Taser as a primary matter was reasonable, finding that there was insufficient evidence in the record on appeal. *Id.* at 1057.  Rather, the Ninth Circuit answered the question "whether the officer's mistake in using the Glock rather than the Taser was objectively unreasonable." *Torres*, 524 F.3d at 1056.  In so doing, the court set forth a five factor test for determining when such a mistake could be deemed  unreasonable and remanded the case to the district court for consideration of whether Noriega's use of a Taser, in the first instance, was reasonable. *Id.*

On remand, the district court, in *Torres II*, considered the case anew. 655 F.Supp.2d 1109 (E.D.Cal. 2009).  With respect to Noriega's Taser use in those circumstances, there was no dispute of fact that Torres was yelling and kicking the windows of the patrol car.  Consequently, the use of a Taser to bring him under control was deemed reasonable. *Id.* at 1131-2.  In coming to this conclusion, the court affirmed however that "by October 27, 2002, a reasonable officer would have

known that using force against an arrested person who had been subdued was unconstitutional." *Id.*
at 1131.

Here, there is a genuine issue of material fact whether Grant was in fact resisting or whether he was subdued. Pirone testified that prior to Mehserle telling him to get up so that he could deploy his Taser, Pirone had full control of Grant. Pirone Testimony at 2918:16-22, 2919:20-22, 2923:24-2924:12 (testifying, "I mean I was holding [Grant] down and I had control of [Grant's] body . . . I found [Mehserle's request that Pirone relinquish this control so that Mehserle could Tase Grant] odd." Plaintiffs also proffer evidence that Grant made statements such as "I surrender" and "I quit," and that he was unable to breathe or move in compliance with the officers' orders because Pirone's knee was pressed into Grant's neck and Mehserle was straddled across the lower portion of his body. J. Bryson Testimony at 3489:8-3491:14. Moreover, video evidence suggests that once Mehserle removed his weight to stand and allegedly fire his Taser in dart-mode into Grant's back, Grant's hands were indeed behind his back, offered for cuffing. Rains Dec., Matrix Video. Viewing the facts in the light most favorable to plaintiffs, the finder of fact could reasonably conclude that Mehserle's use of a Taser was unreasonable and excessive. Because the issue of qualified immunity here turns on issues of material fact, Mehserle is not entitled to qualified immunity at this point.

Moreover, the handcuffing of Grant after he had been shot also exposes Mehserle to plaintiffs' excessive force claim. Mehserle argues that he briefly handcuffed the mortally wounded Grant pursuant to BART policy so that he could search Grant for weapons. Docket No. 156-7 (Mehserle Testimony) at 4256:14-23. Plaintiffs, however, proffer evidence that Mehserle handcuffed Grant pursuant to Pirone's order and that Pirone was motivated by a concern for officer safety. Pirone Testimony at 2931:7-19. The trier of fact could reasonably conclude that Grant posed absolutely no safety threat to officers as he lay mortally wounded on the platform and that Mehserle's handcuffing of Grant was excessive force.

Nor is Mehserle entitled to qualified immunity because at the time of the incident in 2009, it was clearly established in the Ninth Circuit that "[t]he use of a force against a person who is helpless or has been subdued is constitutionally prohibited." *Motley v. Parks*, 432 F.3d 1072, 1088 (9th Cir.

United States District Court

For the Northern District of California

1  2005).  Similarly, it was clearly established that following an official policy authorizing the violation

2  of individual constitutional rights does not provide a defense to officers where the authorized

3  conduct is objectively unreasonable.  *California Attys. for Crim. Justice v. Butts*, 195 F.3d 1039,

4  1050 (9th Cir. 1999).  Mehserle may not rely on BART policy to avoid liability for the

5  unreasonableness of handcuffing a mortally wounded individual posing no apparent safety threat.

6  Accordingly, Mehserle's motion for summary judgment is DENIED.

7             b.    <u>Remaining Plaintiffs</u>

8        The remaining plaintiffs allege that Mehserle is liable for excessive force stemming from the

9  use of his Taser to coerce J. Bryson, N. Bryson, Reyes and Greer into compliance.  Given the court's

10  conclusion above that the law regarding such use of a Taser was not clearly established at the time of

11  the incident, Mehserle is entitled to qualified immunity as to these claims.

12        Plaintiffs also argue that Mehserle is liable for the alleged excessive force employed against

13  Grant and Greer by Pirone.  Plaintiffs do not point to evidence in the record to show that Mehserle

14  integrally participated in Pirone's use of force.  Accordingly, as to the remaining plaintiffs' claims of

15  excessive force, Mehserle's motion for summary judgment is GRANTED.

16          3.    <u>Domenici</u>

17        Domenici argues that she used reasonable force in detaining plaintiffs.  Plaintiffs, however,

18  proffer evidence that at various times while Domenici detained plaintiffs against the retaining wall,

19  she pointed her Taser at their faces and threatened to tase them if they did not cease their verbal

20  protestations against their detentions and Pirone's alleged use of excessive force against Grant and

21  Greer. *See*, *e.g.*, Docket No. 182-11 (N. Bryson Depo.) at 126:16-20.  Domenici counters that

22  plaintiffs were hostile and threatening while she detained them against the retaining wall.  Docket

23  No. 150-4 (Domenici Arbitration Hearing Testimony) at 151:25-154:4.  Specifically, she contends

24  that they insulted her, calling her a "bitch" and a "fake cop," and that various plaintiffs stood up

25  threateningly after witnessing Pirone's use of force against Grant and Greer. *Id.*; Docket No. 150-6

26  (Bryson Depo.) at 251:23-255:3.  Plaintiffs contend, however, that Domenici also used abusive

27  language towards them, including testimony that Domenici first referred to plaintiff J. Bryson as a

28

United States District Court

For the Northern District of California

"bitch."[13] Bryson Depo. at 259:22-24.   Nonetheless, Domenici perceived plaintiff's alleged actions as constituting a threat to her own safety and therefore contends that her use of her Taser to keep plaintiffs under control was reasonable.  She also contends that she did not point her Taser at plaintiffs' faces.

 Accepting plaintiffs' version of the facts as true, however, they were merely protesting the alleged unreasonable detention and use of excessive force and at no time threatened the officers' safety.  As stated above, "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.  In fact, [t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *In re Mohammed C.*, 95 Cal. App.4th at 1330 (quoting *City of Houston, Texas  v. Hill*, 482 U.S. at 461) (internal quotation marks omitted).  Viewing the facts in the light most reasonable to plaintiffs, the trier of fact could reasonably conclude that Domenici's use of force was excessive insofar as she threatened to tase plaintiffs in the face.

Domenici next argues that even if her use of force was unconstitutional, she is entitled to qualified immunity.  Given the court's conclusions above with respect to Pirone's use of his Taser to coerce plaintiffs into compliance, Domenici is similarly entitled to qualified immunity.  Accordingly, summary judgment as to this claim is GRANTED in favor of Domenici.

4.   Knudtson

Knudtson concedes that he tackled Anicete.  He contends that given the circumstances, this use of force was reasonable.  Plaintiffs proffer evidence that Anicete posed no physical threat to the officers. *See, e.g.*, Anicete Depo. at 175:5-25.  He was not suspected of having participated in the initial alleged misdemeanor fight, as evidenced by the fact that Pirone did not initially detain him against the retaining wall, and he testifies that he merely approached and retreated from the area where his friends were detained in order to verbally protest what he believed was an unlawful detention. *Id.*  Resolving the facts in favor of plaintiffs, Knudtson's full-body tackle of Anicete was unreasonable under the circumstances.  Indeed, the governmental interest in tackling Anicete if he

posed no physical threat to the officers or to the public and if he did little to obstruct the officers was insufficient to justify the level of force that Knudtson used. Accordingly, Knudtson's motion for summary judgment is DENIED.[14]

As to Greer's claim of excessive force against Woffinden and Knudtson, plaintiffs make no argument nor point to evidence in the record that establishes this claim. Accordingly, Woffinden and Knudtson's motion for summary judgment as to Greer's claim of excessive force is GRANTED.

D.    Extended Detentions

Plaintiffs J. Bryson, N. Bryson, Reyes, Greer and Anicete assert that the continued detentions after the time that Grant was shot were unlawful because BART officers and officials lacked probable cause to suspect that plaintiffs had committed any criminal activity. Plaintiffs present evidence that after returning from interviewing the train operator, Pirone indicated to the officers present, both verbally and by pointing, that Grant and Greer alone were to be arrested for violating section 148. He gave no other instruction to the remaining officers that either J. Bryson, N. Bryson, Reyes or Anicete were to be arrested. Nonetheless, after Mehserle shot Grant, N. Bryson and Reyes were handcuffed, and all five young men were temporarily detained in police cars at various locations in and around the Fruitvale Station. Docket No. 173-2 (White Depo.) at 74:18-20; 75:18-21. Shortly thereafter, BART Commanders White and Gibson determined that all five young men were to be transported to the BART Police headquarters at the Lake Merritt Station where they remained handcuffed for at least four hours although BART did not affirmatively arrest any one of them. *Id.* at 72:21-6; Docket No. 173-3 (Gee Depo.) at 110:18-21 (stating that plaintiffs remained in handcuffs from approximately 2:30 a.m. until at least 6:30 a.m.).

BART Commander, Maria White, testified that she and Commander Gibson made the determination that J. Bryson, N. Bryson, Reyes, Greer and Anicete should be taken to the Lake Merritt Station for questioning. White Depo. at 73:3-6. White conceded that, "[a]t the time, we didn't know their involvement. We knew that we had a fight on the platform. We didn't know the level of involvement [plaintiffs] had. And then we also had somebody who had been shot. We

35

1  didn't know the circumstances of what happened at the shooting." *Id.* at 73:9-14.  Prior to the

2  decision to transport plaintiffs to BART headquarters, neither White nor apparently any BART

3  officer or official made any attempt to question plaintiffs or to otherwise investigate the alleged

4  section 242 misdemeanor for which plaintiffs were ostensibly being detained.

5         For example, starting from Pirone's purported investigation and going forward, there was no

6  attempt to identify plaintiffs as being involved in any criminal activity, no attempt to identify

7  witnesses to the alleged criminal activity and no attempt to otherwise distinguish plaintiffs as either

8  victims or perpetrators of the alleged battery.  In fact, apart from the contention that plaintiffs may

9  have resembled the suspects in the alleged section 242 violation, defendants do not point to any

10  evidence in the record that would establish that probable cause existed to lawfully detain plaintiffs.

11  "If the defendant is unable or refuses to come forward with any evidence that the arresting officers

12  had probable cause and the plaintiff's own testimony does not establish it, the court should presume

13  the arrest was unlawful." *Dubner v. City and County of San Francisco*, 266 F.3d 959, 965 (9th Cir.

14  2001).  Even if there was some basis upon which to conclude that the extended detentions were

15  reasonable, it was patently unreasonable for BART officers to leave plaintiffs in handcuffs for over

16  four hours without any indication, much less probable cause, that they had been involved in criminal

17  activity and without any indication that plaintiffs posed a safety threat to BART officers or to the

18  public.

19         Moreover, it is of no account that plaintiffs are unable to identify exactly which BART

20  officers handcuffed N. Bryson and Reyes and subsequently effected the arrest of plaintiffs by

21  placing them into the various police cars.  Indeed, where there is a "total lack of evidence as to who

22  arrested [plaintiffs] or what they knew at the time, it follows that the defendants failed to satisfy their

23  burden of production and that [plaintiffs have] made out a valid claim of unlawful arrest." *Id.* at 966.

24  Accordingly, defendants' motion for summary judgment is DENIED.

25         Although the court finds that the extended detention of J. Bryson, N. Bryson, Reyes and

26  Anicete was unreasonable as a matter of law, plaintiffs have not identified in their complaints

27  individual officers who may be held liable for the detentions except for then-Chief Gee, whose

28

1   supervisorial liability raises genuine issues of material fact.  As discussed below, BART may not be

2   held liable for the unconstitutional extended detentions and although Commanders White and

3   Gibson admit that plaintiffs were detained and arrested after the shooting pursuant to their orders,

4   neither is a named defendant in plaintiffs' complaints.  Accordingly, the court is unable to grant

5   summary judgment in favor of plaintiffs at this time.

6           E.      Denial of Familial Relations

7           Plaintiff Wanda Johnson and Oscar Grant Jr., Grant's parents, claim that defendants are

8   liable under section 1983 for the loss of familial relationship stemming from the alleged unlawful

9   killing of Grant.  "[P]arents have a Fourteenth Amendment liberty interest in the companionship and

10  society of their children." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).  "Official conduct

11  that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due

12  process." *Id.*  The "shocks the conscience" standard may be met by a showing that an officer

13  engaged in excessive force with "deliberate indifference" or that he "acted with a purpose to harm . .

14  . unrelated to legitimate law enforcement objectives." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th

15  Cir. 2008).  Whether a claim should be analyzed under the deliberate indifference standard or

16  purpose to harm standard depends upon the degree to which, under the circumstances, actual

17  deliberation is practical.  *Wilkinson*, 610 F.3d at 554.  The Ninth Circuit counsels that "our cases . . .

18  require that when an officer encounters fast paced circumstances presenting competing public safety

19  obligations, the purpose to harm standard must apply."  *Porter*, 546 F.3d at 1139.  Finding this the

20  appropriate measure here, the court considers defendants' arguments under the purpose to harm

21  standard.

22          Firstly, plaintiffs have not proffered evidence supporting the conclusion that Pirone,

23  Domenici, Knudston or Woffinden integrally participated in the shooting of Grant, the action from

24  which plaintiffs' claim here originates.  Accordingly, Pirone, Domenici, Knudston or Woffinden's

25  motions for summary judgment as to this claim is GRANTED.

26          Mehserle argues that he did not act with a purpose to harm that was unrelated to legitimate

27  law enforcement objectives.  "Under the Fourteenth Amendment, . . .a denial of due process 'is to be

28

United States District Court

For the Northern District of California

tested by an appraisal of the totality of facts in a given case.'" *Id.* at 1141 (citing *County of*

*Sacramento v. Lewis*, 523 U.S. 833, 850 (1998). This analysis is fact-intensive and is similar to the

reasonableness test required in Fourth Amendment excessive force actions. *Id.* Indeed, an officer's

"motives must . . . be assessed in light of the law enforcement objectives that can *reasonably* be

found to have justified his actions." *Id.* (emphasis added). As stated above, there is a question of

material fact whether either the detentions, the arrests or the use of force, including deadly force,

was lawful under the totality of the circumstances and consequently whether they constitute a

legitimate law enforcement objective so as to relieve defendants of liability here. *See*, *e.g.*, *id.* at

1142.[15]

Mehserle argues that even if his conduct was unconstitutional, he is entitled to qualified

immunity. In *Porter*, the Ninth Circuit considered a case in which a state highway patrol officer

shot and killed a suspect within five minutes of first encountering him. *Id.* at 1133. Officer Osborn

received a report of a vehicle parked for over two hours in a vacant parking lot. *Id.* Upon spotting

the vehicle, Osborn turned on his headlights and left his patrol car to investigate. The plaintiff, who

had been in the car, started slowly driving away and steered his car to avoid Osborn. *Id.* Osborn

turned on his police lights to indicate to the plaintiff that he was being detained. *Id.* The plaintiff,

however, did not stop his car and, in response, Osborn maneuvered his patrol car to prevent plaintiff

from passing. *Id.* When the plaintiff did not stop, Osborn moved his patrol car so that the plaintiff

would not collide with it. *Id.* Another officer, Whittom, arrived as the plaintiff was slowly driving

around Osborn's patrol car. Whittom tried to block the plaintiff with his car, but the plaintiff

continued driving slowly. Whittom's police lights illuminated the interior of plaintiff's car, and

Osborn got out of his patrol car and started to walk alongside plaintiff's slow-moving car while

ordering plaintiff to stop. *Id.* Plaintiff stopped the car, and both Osborn and Whittom ordered

plaintiff to get out of his car. *Id.* Plaintiff rolled down his window and asked Osborn what was

wrong. *Id.* Osborn did not respond and as plaintiff wound up his window, Osborn sprayed pepper

spray into the window. *Id.* Plaintiff first curled up in a fetal position then sat up straight, put both

38

United States District Court

For the Northern District of California

1    hands on the steering wheel and began to rev his car. *Id.* At this point, Osborn fired five shots into

2    plaintiff's car, killing him. *Id.*

3         The Ninth Circuit held that the officer was not entitled to qualified immunity because the law

4    regarding an intent to harm, specifically that "the intent to inflict force beyond that which is required

5    by a legitimate law enforcement objective that 'shocks the conscience' and gives rise to liability

6    under § 1983," was clearly established as of 2003. *Id.* at 1140. Accordingly, the court stated that

7    "whether [the officer] is entitled to qualified immunity on summary judgment turns on whether

8    [plaintiff] can present facts to the district court that would justify a jury finding that [the officer]

9    acted with an unconstitutional purpose to harm Casey." *Id.* Specifically, the court stated that many

10   factors would bear on a determination of the issue and "most important is Osborn's severe and

11   sudden escalation of the situation: where [the plaintiff's] only violation was non-compliance,

12   Osborn's extraordinary response was to fire five shots, which shocked even Whittom." *Id.* at 1142.

13   As in *Porter*, there is a genuine issue of material fact as to whether Mehserle's actions were required

14   by a legitimate law enforcement purpose given that it is disputed whether Grant was non-complaint

15   and whether Mehserle's own actions prevented Grant from offering his hands for cuffing.

16   Accordingly, Mehserle is not entitled to qualified immunity, and there being genuine issues of

17   material fact that bear upon the disposition of this claim, summary judgment is DENIED.

18        F.       Wrongful Death Under Section 1983

19        At the hearing, plaintiffs clarified that Wanda Johnson brings this claim on her own behalf,

20   as well as on behalf of the estate of Oscar Grant, based on the alleged constitutional violations of the

21   Fourth, Ninth and Fourteenth Amendments under section 1983. As to Johnson, however, these

22   claims may not proceed on the basis of the Fourth Amendment because the rights described therein

23   are personal. *See*, *e.g.*, *United States v. Taketa*, 923 F.2d 665, 670 (9th Cir, 1991) (stating that

24   "Fourth Amendment rights are personal rights."). Accordingly, the violations of the right against

25   unreasonable searches and seizures and against excessive force, as alleged here, are personal to

26   plaintiff Oscar Grant and his estate, and Johnson may not recover damages based on a violation of

27   Grant's rights. Indeed, plaintiffs point to no case law that would support such a claim.

28

United States District Court

For the Northern District of California

1    To the extent that Johnson's claim is predicated on the alleged violations of  Fourteenth

2  Amendment rights, the claim is duplicative of Johnson's eighth cause of action, the denial of familial

3  rights.  To the extent that Johnson's claim is predicated on the alleged violations of Ninth

4  Amendment rights, Johnson's claim also fails because the Ninth Amendment standing alone does

5  not provide a basis for a recovery here. *See Schowengerdt v. United States*, 944 F.2d 483, 490 (9th

6  Cir. 1991) (stating that "[the Ninth A]mendment has not been interpreted as independently securing

7  any constitutional rights for purposes of making out a constitutional violation.").

8    To the extent that plaintiffs bring this claim on behalf of the estate of Oscar Grant, this claim

9  is duplicative of the alleged violation of Grant's Fourth Amendment rights, as pled in Counts One

10  through Four of the Johnson Complaint.  Indeed, at the hearing, plaintiffs conceded that this claim

11  goes more to damages flowing from the alleged Fourth Amendment violations against Grant as

12  opposed to stating a separate and distinct cause of action.  Accordingly, plaintiffs' claims here may

13  not stand, and summary judgment is GRANTED in favor of defendants.

14    G.    Pain and Suffering

15    Wanda Johnson, as the representative of the Estate of Oscar Grant, claims that defendants are

16  liable to Grant's Estate under section 1983 for the pain and suffering Grant experienced from the

17  time he was shot until his death several hours later.  The Ninth Circuit has not decided whether these

18  damages are recoverable pursuant to a section 1983 claim.  *See Mahach-Watkins v. Depee*, 595 F.3d

19  1054 1059 (9th Cir. 2010).  This court, however, has previously considered this issue and concluded

20  that limitations on the recovery of pain and suffering damages are inconsistent with the purposes of

21  section 1983. *Williams v. City of Oakland*, 915 F.Supp 1074, 1078 (N.D. Cal., 1996) (Patel, J.).  The

22  court discerns no principled reason to depart from its conclusion in *Williams*.  Plaintiff Johnson here

23  is decedent's mother and like the plaintiff in *Williams*, she "is in a position to vindicate" the rights of

24  her child and is well "within the familial range of those affected by defendant's conduct." *Id.*

25  Because, however, plaintiffs have not proffered evidence supporting the conclusion that Pirone,

26  Domenici, Knudston or Woffinden integrally participated in the shooting of Grant, the action from

27  which plaintiffs' claim here originates, Pirone, Domenici, Knudston or Woffinden's motions for

28

1  summary judgment as to this claim is GRANTED.  Mehserle's motion for summary judgment as to

2  this issue is DENIED.

3          H.      Municipal Liability

4                  1.      *Monell* Claims

5          Under section 1983, a  municipality is liable "when 'action pursuant to official municipal

6  policy of some nature caused a constitutional tort.'" *Christie v. Iopa*, 176 F.3d 1231, 1234 (9th Cir.

7  1999) (citing *Monell v. Department of Social Serv. of N.Y.*, 436 U.S. 658, 681 (1978).  "Although a

8  constitutional violation must result from 'official municipal policy,' a county need not expressly

9  adopt the policy.  It is sufficient that the constitutional violation occurred pursuant to a

10  "longstanding practice or custom." *Id.* (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir.

11  1992)).  Under § 1983, a municipality may also be liable "for injuries it inflicts through deliberate

12  indifference." *Conn v. City of Reno*, 591 F.3d 1081, 1103 (9th Cir. 2010) (citing *Monell v. Dep't of*

13  *Social Servs. of City of N.Y.*, 436 U.S. 658, 690-91 (1978)).  "Municipal liability may be established

14  on account of the city's deliberate acts or omissions; liability under the theory of respondeat

15  superior, however, is insufficient to support a § 1983 violation." *Id.*  "In order to impose liability

16  based on a policy of deliberate inaction, the plaintiff must establish: (1) that he possessed a

17  constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this

18  policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy

19  [was] the moving force behind the constitutional violation." *Oviatt, By and Through Waugh v.*

20  *Pearce*,  954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378,

21  389-91 (1989)) (internal quotations marks omitted).

22          BART is a governmental entity authorized under the laws of California.  BART provides

23  train service to the public throughout much of the San Francisco Bay Area, and maintains a police

24  force ("BART PD") that has jurisdiction on BART property.  BART PD requires its officers to

25  maintain certifications and to comply with training standards that are set forth by the California

26  Commission on Police Officer Standards and Training ("POST"). Docket No. 128-23 (Williamson

27  Dec.) ¶3, 5.  POST is a state-wide quasi-governmental organization composed of law-enforcement

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  executives and advisors that sets standards for basic and continued training of peace officers and that

2  certifies local law enforcement agencies and their officers when in compliance with those standards.

3  At the time of the incident, all defendants were in compliance with POST standards. *Id.* ¶ 7.

4      Plaintiffs allege that BART is liable for being deliberately indifferent to the likelihood that

5  several of its customs and policies increased the risk of constitutional violations.  The court

6  considers each alleged policy in turn.

7                    a.    Reality-Based Force Options Training

8      At the time of the incident, BART trained its officers on Taser use by means of a non-reality-

9  based training program.  In light of this choice, plaintiffs allege that BART is liable for its failure to

10 train BART police officer by means of reality-based training.  Plaintiffs offer no evidence, however,

11 other than the incident here, to bolster their claim that BART's choice of training program increased

12 the likelihood that BART officers would unconstitutionally misuse their Tasers.  Instead, to bolster

13 their claim, plaintiffs merely rely upon the conclusory testimony of an alleged police expert for the

14 proposition that, "[w]ith appropriate force-options training, [Mehserle] would have been less likely

15 to use excessive force against Oscar Grant." Docket No. 178 (Plaintiffs' Opposition to BART's

16 Motion) at 7:20-21.  Otherwise, plaintiffs point to no evidence suggesting that the extant BART

17 training policy was in fact deficient and motivated the alleged use of excessive force.  Nor do

18 plaintiffs point to evidence establishing that Mehserle's lack of reality-based training was the

19 moving force behind his alleged unconstitutional acts.  Without more, plaintiff's arguments are

20 unavailing.                  b.    Tracking Use of Force Patterns

21     Plaintiffs also contend that BART's policy of not tracking each officer's use of force is

22 evidence of BART's deliberate indifference to the potential for unlawful excessive force.   At the

23 time of the incident, BART required the documentation and review of all incidents involving the use

24 of both lethal and non-lethal force. Docket No 125-15 (Chlewboski Dec.) ¶ 3.  BART's Internal

25 Affairs office had access to this information in order to facilitate the investigation of any officer

26 pursuant to a complaint. *Id.* ¶ 4.  Consistent with California Penal Code section 832.5, BART also

27 maintained a written procedure for the investigation of public complaints, and BART Internal

28

**United States District Court**
For the Northern District of California

1   Affairs maintained a record of all citizen complaints and resulting investigations. *Id.* at ¶¶ 6-7.

2   Thus, BART had in place a policy for addressing the use of force by its officers.

3           Plaintiffs contend, however, that an early warning system would have alerted BART to the

4   fact that Mehserle had either brandished or used a weapon on several other occasions.  Plaintiffs

5   offer no evidence, however, that these alleged incidents were in fact unreasonable.  Nor do plaintiffs

6   offer evidence, apart from the incident here, that BART's extant policy was deficient with respect to

7   tracking the use of force.  Although plaintiffs speculate that the alleged constitutional violation here

8   was causally related to BART's lack of an early warning system, they point to no evidence in the

9   record that would substantiate such a conclusion.  Even if such a conclusion was warranted, "the

10  need for more or different action [was] not so obvious, and the inadequacy of the current procedure

11  so likely to result in the violation of constitutional rights, that the policymakers . . . [could]

12  reasonably be said to have been deliberately indifferent to the need." *See Oviatt, by and Through*

13  *Waugh v. Pearce*, 954 F.2d 1470, 1477-78 (9th Cir. 1992) (quoting *City of Canton, Ohio v. Harris*,

14  489 U.S. 378, 390 (1989) (internal quotation marks omitted)).

15                  c.      Sanctioning Personal Relationships

16          Plaintiffs argue that BART was deliberately indifferent to the likelihood that permitting

17  officers engaged in personal relationships to partner with one another on shifts would lead to

18  unlawful conduct.  There is simply, however, no basis in the record to support plaintiffs' assertions

19  here.[16]

20                  d.      Supervisory Followup

21          Plaintiffs argue that prior to the incident, BART had knowledge of a complaint lodged by an

22  assistant district attorney ("ADA") from Alameda County that newly hired BART officers were

23  engaged in racial profiling and arresting individuals without probable cause.  Plaintiffs cite a report

24  that BART commissioned in response to this incident in which it is noted that in January 2008, Chief

25  Gee was informed that the ADA suspected that new BART officers were, "violating rights and

26  making very poor arrests and detentions along with using excessive force." Burris Dec., Ex. DD

27  (Gee Depo.) at 65-67.  Gee testified that a BART sergeant reported in a management meeting that

28  the ADA had concerns about newer BART officers and the inappropriate applications of probable

43

1  cause. *Id.* at 66.  Gee testified that he directed a BART manager to followup on the report. *Id.*

2  Plaintiffs argue that no followup was in fact conducted and this failure to followup is evidence of

3  deliberate indifference.

4        As with plaintiffs' previous arguments, plaintiffs offer no evidence that could support a

5  finding of deliberate indifference.  For example, plaintiffs offer no evidence that BART managers

6  routinely failed to followup on allegations of unconstitutional activity or that there was any

7  indication to BART that these allegations were grounded in fact.  No do plaintiffs provide evidence

8  that the manager's failure to followup on the report was a moving force behind the alleged

9  constitutional violations here, as plaintiff must establish in order to prevail on this claim.

10

11

12                 e.        Detention and Handcuffing Policy

13        Lastly, plaintiffs argue that BART had an affirmative policy of keeping detainees handcuffed

14  indefinitely.  The record cites that plaintiffs provided do not establish that this was in fact a BART

15  policy.  Otherwise, plaintiffs cite to no other occasion to substantiate this claim.

16        Given the conclusions above, defendant BART's motion for summary judgment as to

17  plaintiffs' municipal liability claims is GRANTED in favor of defendants.

18                 2.        Supervisory Liability

19        Plaintiffs claim that then-BART Chief Gee is liable for the unlawful detentions on a theory of

20  supervisory liability.  Specifically, plaintiffs claim that Gee was deliberately indifferent to the

21  extended custodial arrests of plaintiffs Reyes, Greer, Anicete and the Bryson brothers without the

22  requisite probable cause.

23        Defendants cite *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) for the proposition that Gee may not

24  be held liable for the allegedly unconstitutional conduct of his subordinates.  Even after *Iqbal*,

25  however, "[a] defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his

26  or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection

27  between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*,

28

United States District Court

For the Northern District of California

__F.3d__ (9th Cir. 2011) 2011 WL 477094 at *4 (citing *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).  "[A] person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" *Preschooler II v. Clark County School Bd. of Trustees*, 479 F.3d 1175, 1183 (9th Cir. 2007) (internal quotation marks and citation omitted).  "The requisite causal connection may be established when an official sets in motion a series of acts by others which *the actor knows or reasonably should know would cause others to inflict constitutional harms.*" *Id.* (emphasis added).

Plaintiffs present evidence that after returning from interviewing the train operator, Pirone indicated that Grant and Greer were to be arrested for violating section 148, but that he gave no other instruction to the remaining officers that J. Bryson, N. Bryson, Reyes or Anicete were to be similarly arrested.  Nonetheless, after Mehserle shot Grant, N. Bryson and Reyes were handcuffed; Anicete, Greer, Reyes and the Bryson brothers were all temporarily placed in police cars in and around the Fruitvale Station; and ultimately were transported to the BART PD headquarters at the Lake Merritt Station.  Plaintiffs' evidence further shows that all five remained handcuffed for at least four hours although BART did not affirmatively arrest any one of them.  Chief Gee testified that he was aware that plaintiffs were being detained in handcuffs, was in fact present during the detentions and sanctioned this detention upon his belief that there was probable cause that all five were involved in a section 242 violation.  *See*, *e.g.*, Gee Depo. at 107-111.  However, it is apparent that neither BART nor Gee made any attempts to conduct what would likely have been a simple investigation into the allegations against plaintiffs.  To that end, apart from the fact that plaintiffs may have resembled the alleged suspects in the alleged section 242 violation, the record is silent as to what evidence BART officers had to lawfully detain plaintiffs.  Indeed, the record does not support Gee's contention that there was probable cause to believe that plaintiffs had engaged in any activity that warranted plaintiffs being handcuffed for four or more hours.  Viewing the evidence in the light most favorable to plaintiffs, the finder of fact could conclude that Gee personally participated in the detention and that he should have known that sanctioning them would result in constitutional violations.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   Nor is Gee entitled to qualified immunity.  The law as to extended detentions absent the

2   indicia of probable cause was clearly established at the time of the incident.  Moreover, it was

3   clearly established law in this Circuit that a supervisor who participated  in the unconstitutional

4   conduct could be held liable in his individual capacity.  Because there are genuine issues of material

5   fact as to Gee's participation in the constitutional deprivation and which bear on the issue of

6   qualified immunity, defendants' motion as to Gee is DENIED.

7       I.    Caldwell's Claims

8   Caldwell rode with plaintiffs Grant, Greer, J. Bryson, N. Bryson and Reyes on the train from

9   San Francisco.  He watched the events involving his friends unfold, including the fatal shooting of

10  Grant, and then he departed on the train as it left the station in the chaotic minutes after the shooting.

11  Caldwell alleges that after Mehserle shot Grant, Domenici pushed him against the idling train and

12  detained him there.  He alleges that she pointed her Taser in his face, then hit the side of the train to

13  signal to the train operator to reopen the now-closed doors.  After the door opened, Caldwell alleges

14  that Domenici shoved him on the train, forcing him to leave the scene.  *See* Docket No. 174-2

15  (Caldwell Depo.) at 80:1-81:25; 120:14-22.

16  Domenici argues that she had no contact with Caldwell and that his allegations are entirely

17  fabricated.  She argues that his testimony lacks credibility and is fraught with lies.  On a motion for

18  summary judgment, however, the court may not consider the credibility of evidence and must view

19  the evidence in the light most favorable to the non-moving party, here Caldwell.  Accordingly, there

20  are issues of material fact as to the involvement of Caldwell and Domenici during the events of

21  January 1, 2009.

22  Resolving the facts surrounding Domenici's alleged use of force against Caldwell, Domenici

23  is entitled to qualified immunity.  As stated above, the law regarding the lawful use of a Taser to

24  threaten an individual into compliance was not clearly established at the time of the incident.

25  Accordingly, Domenici's motion for summary judgment as to Caldwell's claim of excessive force is

26  GRANTED.

27

28

46

United States District Court

For the Northern District of California

With respect to Caldwell's remaining claims of unreasonable seizure and unlawful detention, issues of material fact, including whether Domenici even had any contact at all with Caldwell, preclude the court from determining whether there is a basis for qualified immunity. Accordingly, Domenici's motion for summary judgment as to Caldwell's unreasonable seizure and unlawful detention claims is DENIED.

> J.    State Law Claims

> > 1.    Cal. Civ. Code § 52.1

California Civil Code section 52.1 provides for damages if a person "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney . . . " Cal. Civ.Code § 52.1(a).  A claim under section 52.1 is established upon proof of a violation of the Fourth Amendment. *See Venegas v. County of Los Angeles*, 32 Cal.4th 820, 850 (2004).[17]  Pirone concedes in testimony that "intimidation" was his motivation in threatening plaintiffs with his Taser even before making any attempt to investigate the alleged section 242 violation.  Given the court's conclusions above that genuine issues of material fact remain as to whether defendants violated plaintiffs' Fourth Amendment rights and whether defendants did so through the use of coercion and force, summary judgment as to this claim is DENIED.

> > 2.    Cal. Civ. Code § 51.7

Section 51.7 states in relevant part that "All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of [actual or perceived race]. " Cal. Civ. Code § 51.7(a).  With respect to Domenici, Mehserle, Knudtson and Woffinden, plaintiffs do not proffer evidence to support the inference that any of these officers committed any alleged civil rights violations on the basis of plaintiffs' race or their perception of plaintiffs' race.  Accordingly,

47

United States District Court

For the Northern District of California

1   summary judgment as to this claim, as to all plaintiffs, is GRANTED in favor of Domenici,

2   Mehserle, Knudtson and Woffinden.

3       Nor do plaintiffs proffer evidence to support the inference that Pirone committed any alleged

4   civil rights violations on the basis of J. Bryson, N. Bryson, Reyes, Greer or Anicete's  race or

5   Pirone's perception of their race.  Accordingly, summary judgment as to this claim, as to J. Bryson,

6   N. Bryson, Reyes, Greer or Anicete, is GRANTED in favor of Pirone.

7       Plaintiffs argue that Pirone's perception of Grant as African American underpinned his

8   alleged use of excessive force.  Plaintiffs point to Pirone's use of the term, "nigger," directed toward

9   Grant, as evidence of the requisite racial animus.  Pirone does not deny that he screamed "bitch-ass

10  nigger" twice in Grant's face, even as Grant was on his knees before Pirone.  Pirone argues,

11  however, that he only repeated, with sarcasm, what Grant had said to him seconds early in order to

12  highlight that Grant did not have any respect for the police.

13      Under section 51.7, "[t]he test is: would a reasonable person, standing in the shoes of the

14  plaintiff, have been intimidated by the actions of the defendant and have perceived a threat of

15  violence?" *Winarto v. Toshiba America Electronics Components, Inc.*, 274 F.3d 1276, 1289 (9th Cir.

16  2001).  Here, viewing the facts in the light most favorable to plaintiffs, the trier of fact could

17  reasonably conclude that racial animus motivated Pirone's alleged violation of Grant's civil rights,

18  and that as an African American male, Grant could have reasonably believed that he was being

19  subjected to the deprivations on the basis of his race.  Accordingly, summary judgment as to this

20  claim is DENIED.

21          3.    Assault & Battery

22      Plaintiffs allege assault and battery against defendant officers.  "A police officer in California

23  may use reasonable force to make an arrest, prevent escape or overcome resistance, and need not

24  desist in the face of resistance." *Edson v. City of Anaheim*, 63 CAl.App.4th 1269, 1272 (1998)(citing

25  Cal. Pen. Code§ 835a). "The standard jury instruction in police battery actions recognizes this: 'A

26  peace officer who uses unreasonable or excessive force in making a lawful arrest or detention

27  commits a battery upon the person being arrested or detained as to such excessive force.' *Id.* Under

28

48

United States District Court

For the Northern District of California

1  state law, in a battery action against a police officer, a plaintiff must show that the use of force was

2  unreasonable. *Id.* at 1272. As stated above, there are issues of material fact as to whether

3  defendants' use of force against plaintiffs was reasonable. Accordingly, defendants' motion as to

4  this claim is DENIED.

5                             4.        <u>Wrongful Death</u>

6        Wanda Johnson brings a state law-based wrongful death claim pursuant to Code Civ P. §

7  377.60. In the FAC however, plaintiffs merely plead this action on behalf of Grant's child, who has

8  since settled with BART. Accordingly, Johnson may not seek to litigate a claim that she has not

9  pled, and summary judgment as to this claim in Johnson's behalf, is GRANTED in favor of

10  defendants. The claim as brought on behalf of Grant's child is DISMISSED as moot.

11                             5.        <u>State Law Immunity</u>

12        At the hearing, defendants asserted that they do not intend to pursue the various state law

13  immunities asserted in their moving papers. Accordingly, the court need not reach these issues of

14  whether these immunities apply in the first instance to the circumstances described in this action,

15  and if they do, whether they immunize defendants here. The court does note, however, that to the

16  extent that defendant officers are found liable for violations of plaintiffs' state civil rights, California

17  Government Code section 815.2(a) imposes respondeat superior liability on BART.

18  II.    <u>Plaintiffs' Motion</u>

19        The court now addresses plaintiffs' consolidated motion for summary judgment. The court

20  notes that although plaintiffs' respective complaints raise numerous claims under federal and state

21  law, plaintiffs, as evidenced by their motion, only seek summary adjudication as to the following

22  issues: (1) the unlawful detention of plaintiffs J. Bryson, N. Bryson and Reyes; (2) the unlawful

23  detention of plaintiffs Greer and Grant; (3) the unlawful use of deadly force against Grant under the

24  Fourth Amendment (excessive force) and Fourteenth Amendment (due process); and (4) the

25  extended detention of plaintiffs J. Bryson, N. Bryson, Greer, Reyes and Anicete. Given the court's

26  conclusions above as to defendant's motions, the court makes the following conclusions with respect

27  to plaintiffs' motion:

28

49

(1) viewing the evidence in the light most favorable to defendants, a question of material fact exists with respect to whether there was articulable suspicion to conduct an investigatory stop. Accordingly, plaintiffs' motion as to the unlawful detention of J. Bryson, N, Bryson, Reyes, Grant and Greer is DENIED.

(2) viewing the evidence in the light most favorable to defendants, a genuine issue of material fact exists as to whether the use of deadly force against plaintiff Grant was excessive and whether any mistake of fact bearing on defendants' entitlement to qualified immunity was reasonable. Accordingly, plaintiffs' motion as to this claim is DENIED.

(3) viewing the evidence in the light most favorable to defendants, there is no genuine issue of material fact that the extended detention of plaintiffs J. Bryson, N. Bryson, Greer, Reyes and Anicete was supported by either reasonable suspicion or probable cause.  However, because issues of fact remain as to whether Gee may be held liable and because plaintiffs have not identified in their complaint any other BART officer who may be held liable for the constitutional deprivations, summary judgment as to this issue may not be granted in favor of plaintiffs at this time.

CONCLUSION

I.      Plaintiffs' claims are DISMISSED with prejudice as follows:

        1.      Count 4 (conspiracy to violate civil rights under 42 U.S.C. § 1985), Count 7 (violation of California Civil Code § 51.7) and Count 8 (intentional infliction of emotional distress) of the Bryson Complaint are DISMISSED with prejudice;

        2.      Count 1 (violation of the Fourth Amendment under 42 U.S.C. § 1981), Count 5 (conspiracy to violate civil rights under 42 U.S.C. § 1985) and Count 6 (failure to intervene under 42 U.S.C. § 1986) of the Caldwell Complaint are DISMISSED with prejudice;

        3.      Count 5 (deliberate indifference to medical needs in violation of 42 U.S.C. § 1983), Count 6 (conspiracy to violate civil rights under 42 U.S.C. § 1985) and Count 14 (intentional infliction of emotional distress) of the Johnson Complaint are DISMISSED with prejudice; and

1    4.      All claims asserted by all plaintiffs against Dorothy Dugger are DISMISSED with

2    prejudice.

3

4    II.    Defendants motions for summary judgment are GRANTED in part and DENIED in part as

5    follows:

6    1.      Pirone's motion for summary judgment as to unlawful seizure, relating to the initial

7    detention of plaintiffs, as asserted in Count 1 of the Johnson Complaint and Count 1 of the Bryson

8    Complaint, is DENIED;

9    2.      Mehserle, Domenici, Woffinden and Knudston's motions for summary judgment as

10   to unlawful detention, as asserted in Count 2 of the Johnson Complaint and Count 1 of the Bryson

11   Complaint, are GRANTED in part and DENIED in part;

12   3.      Pirone's motion for summary judgment as to unlawful arrest of Grant, Greer, J.

13   Bryson, N. Bryson and Reyes, as asserted in Count 2 of the Bryson Complaint and Count 3 of the

14   Johnson Complaint, is DENIED;

15   4.      Mehserle, Domenici, Woffinden and Knudston's motions for summary judgment as

16   to unlawful arrest of Grant, Greer, J. Bryson, N. Bryson and Reyes, as asserted in Count 2 of the

17   Bryson Complaint and Count 3 of the Johnson Complaint, are GRANTED in part and DENIED in

18   part;

19   5.      Woffinden and Knudtson's motion for summary judgment as to unlawful arrest of

20   Anicete, as asserted in Count 2 of the Bryson Complaint and Count 3 of the Johnson Complaint, is

21   DENIED;

22   6.      Pirone's motion for summary judgment as to excessive force, as asserted in Count 4

23   of the Johnson Complaint and Count 3 of the Bryson Complaint, is GRANTED in part and DENIED

24   in part;

25   7.      Domenici's motion for summary judgment as to excessive force, as asserted in Count

26   4 of the Johnson Complaint, Count 3 of the Bryson Complaint and Count 4 of the Caldwell

27   Complaint, is GRANTED;

28

51

1        8.     Mehserle's motion for summary judgment as to excessive force, as asserted in Count

2   4 of the Johnson Complaint and Count 3 of the Bryson Complaint, is GRANTED in part and

3   DENIED in part;

4        9.     Woffinden and Knudtson's motion for summary judgment as to excessive force,

5   relating to J. Bryson, N. Bryson, Reyes, Grant and Greer, as asserted in Count 4 of the Johnson

6   Complaint and Count 3 of the Bryson Complaint, is GRANTED;

7        10.    Knudtson's motion for summary judgment as to excessive force, relating to Anicete,

8   as asserted in Count 3 of the Bryson Complaint is DENIED;

9        11.    Pirone, Domenici, Woffinden and Knudtson's motions for summary judgment as to

10   the denial of familial relationship, as asserted in Count 8 of the Johnson Complaint and Count 1 of

11   the Grant Jr. Complaint, are GRANTED;

12        12.    Mehserle's motion for summary judgment as to the denial of familial relationship, as

13   asserted in Count 8 of the Johnson Complaint and Count 1 of the Grant Jr. Complaint, is DENIED;

14        13.    BART's motion for summary judgment as to municipal liability, as asserted in Count

15   9 of the Johnson Complaint, Count 5 of the Bryson Complaint and Count 7 of the Caldwell

16   Complaint, is GRANTED;

17        14.    Gee's motion for summary judgment as to supervisorial liability, as asserted in Count

18   9 of the Johnson Complaint and Count 5 of the Bryson Complaint, is DENIED;

19        15.    Pirone, Domenici, Woffinden and Knudtson's motions for summary judgment as to

20   pain and suffering, as asserted in Count 10 of the Johnson Complaint, are GRANTED;

21        16.    Mehserle's motion for summary judgment as to pain and suffering, as asserted in

22   Count 10 of the Johnson Complaint, is DENIED;

23        17.    Pirone, Domenici, Mehserle, Woffinden and Knudtson's motions as to California

24   Civil Code § 52.1, as asserted in Count 12 of the Johnson Complaint and Count 6 of the Bryson

25   Complaint, are DENIED;

26

27

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

18.     Mehserle, Domenici, Woffinden and Knudston's motions for summary judgment as to California Civil Code § 51.7, as asserted in Count 13 of the Johnson Complaint and Count 7 of the Bryson Complaint, are GRANTED;

19.     Pirone's motion for summary judgment as to California Civil Code § 51.7, as asserted in Count 7 of the Bryson Complaint, is GRANTED;

20.     Pirone's motion for summary judgment as to California Civil Code § 51.7, as asserted in Count 13 of the Johnson Complaint, is DENIED;

21.     Domenici, Mehserle, Pirone, Woffinden and Knudtson's motions for summary judgment as to assault and battery, as asserted in Count 15 of the Johnson Complaint and Count 9 of the Bryson Complaint, are DENIED.

III.    Plaintiffs' motion for summary judgment is DENIED as follows:

1.      Plaintiffs' motion as to the unlawful detention, related to the pre-shooting detention, as asserted in Count 2 of the Johnson Complaint and Count 1 of the Bryson Complaint is DENIED;

2.      Plaintiffs' motion for summary judgment as to excessive force, as asserted in Count 4 of the Johnson Complaint and Count 3 of the Bryson Complaint, is DENIED;

3.      Plaintiffs' motion for summary judgment as to unlawful detention,  related to the post-shooting detention as asserted in Count 2 of the Johnson Complaint and Count 1 of the Bryson Complaint is DENIED.


IT IS SO ORDERED.


Dated:  May 9, 2011

_____
MARILYN HALL PATEL
United States District Court Judge
Northern District of California

**ENDNOTES**

1.      Both the Lake Merritt and Fruitvale BART Stations are located in the City of Oakland, CA.

2.      The Bryson Complaint does not assert an unlawful detention claim, but rather appears to encompass in Count 1's reference to "unreasonable seizure" the alleged illegality of Pirone's initial stop and the subsequent detention of the Bryson plaintiffs against the retaining wall.  By contrast, the Johnson Complaint alleges both "unreasonable seizure" in Count 1, in apparent reference to the initial stop of Grant, as well as "unlawful detention" in Count 2, in apparent reference to the detention of Grant against the retaining wall.  Similarly, Count 2 of the Bryson Complaint and Count 3 of the Johnson Complaint assert "unlawful arrest," in apparent reference to the prolonged and unreasonable nature of the detentions against the retaining wall as well as the subsequent detention of plaintiffs J. Bryson, N. Bryson, Reyes, Greer and Anicete after Pirone announced that only Grant and Greer were under arrest. The latter includes the detentions following this period, including the extended detentions at the BART Police Headquarters.  Thus, despite the slight inconsistency as between the two pleadings, the Bryson Complaint and the Johnson Complaint both appear to encompass three separate transactions purporting to have violated the Fourth Amendment; namely, Pirone's initial investigatory *Terry* stop, the subsequent detention of the plaintiffs against the retaining wall of the BART station and the continued detention of the plaintiffs after Pirone's arrest order.

        Accordingly, the court construes the Complaints as describing the aforementioned allegedly unlawful actions.  To the extent the distinction is made between the initial seizure and the subsequent detentions, the court, in light of the "continuing seizure rule" in this Circuit, treats Count 1 (unlawful seizure) of the Bryson complaint as encompassing both actions. *See Torres v. City of Madera*, 524 F.3d 1053, 1056 (9th Cir. 2008) (quoting *Robins v. Harum*, 773 F.2d 1004, 1010 (9th Cir. 1985)) ("[T]he Ninth Circuit employs a 'continuing seizure' rule, which provides that 'once a seizure has occurred, it continues throughout the time the arrestee is in the custody of the arresting officers.'")  After all for the purposes of Fourth Amendment jurisprudence, an investigatory stop, a subsequent detention and an arrest are all "seizures" as described in the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 16 (1968) ("We ... reject the notion[] that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a 'technical arrest' or a 'full-blown search.'")

3.      Pirone apparently made no attempt to detain the woman who he alleges was yelling at someone on the train and had her finger pointed in another person's face.  Presumably, he bypassed her as well given his fixation on the plaintiffs since he testified that he had no recollection of what happened to her.

4.

        In reaching our holding, we do not reject the use of factors such as dress or haircut when they are relevant. Nor do we preclude the use of racial or ethnic appearance as *one* factor relevant to reasonable suspicion or probable cause when a particular suspect has been identified as having a specific racial or ethnic appearance, be it Caucasian, African-American, Hispanic or other. We note, however, that a stop based solely on the fact that the racial or ethnic appearance of an individual matches the racial or ethnic description of a specific suspect would not be justified.

*United States v. Montero-Camargo*, 208 F.3d 1122, 1134 fn.21 (9th Cir. 2000) (emphasis in original).

5.      It is unclear why Mehserle proceeded to arrest Grant after handcuffing J. Bryson, if he in fact believed that Pirone was referring to Greer and J. Bryson.

6.      Indeed, the trier of fact could reasonably conclude that there was no mistake as to whom Pirone was referring and that after Pirone's order that Grant and Greer be arrested, Domenici, Mehserle, Woffinden and Knudtson should have released the Bryson brothers and Reyes.

7.      Pirone's account of the exchange with the train operator differs significantly from the train operator's testimony.  Pirone testified as follows:

> And I think I said something like "what do you have," or "what did you see," or what's going on," and she said "those people you have are the people that were causing a problem on my train," and I said "well okay what did you see"?  She said I couldn't really tell, there were people on the seats.  I said, "all right, has anybody come forward to you?" She says "No."

Pirone Testimony 2882:1-8.

8.      Indeed, Mehserle had no reason to know that Pirone conducted a very limited investigation that apparently gleaned no facts substantiating probable cause to arrest.

9.      The court does not reach the issue of qualified immunity as neither Woffinden nor Knudtson raise the issue in their moving papers.  Woffinden and Knudtson raise the issue in their reply papers, but "appellants cannot raise a new issue for the first time in their reply briefs." *Northwest Acceptance Corp. v. Lynnwood Equipment, Inc.*, 841 F.2d 918, 924 (9th Cir. 1988) (internal quotation marks and citation omitted).  Even if Woffinden and Knudtson had properly raised the issue of qualified immunity, genuine issues of material fact would preclude a conclusion that either is entitled to qualified immunity at this stage.

10.     Greer testified that he did not comply with Pirone's general order that anyone who was involved in the fight should come off the train because he was not, in fact, involved in any fighting. Greer Depo. 176:12-13.

11.     Reyes is seen in the Matrix Video gesturing toward his outstretched left leg as the defendants continue to manipulate Grant's body.

12.     Prior to the fatal shooting of Grant, Pirone apparently never did question plaintiffs about their alleged involvement in or knowledge of the alleged fight.

13.      J. Bryson testified that he referred to Domenici as a "bitch" only after she had referred to him in this manner. *Id.*

14.     The court does not reach the issue of qualified immunity as Knudtson does not raise this issue in his moving papers.  As stated above with respect to the unlawful arrest claim, however, Knudtson is not entitled to qualified immunity because there are genuine issues of material fact that bear upon whether a reasonable officer could have believed the circumstances warranted the level of force that he used against Anicete.  Knudtson points to *Jackson v. City of Bremerton*, 268 F.3d 646 (9th Cir. 2001) to support his contention that his use of force here was reasonable.  In *Jackson*, the plaintiff and her group engaged in physical and verbal altercations with officers as they tried to prevent the arrest of plaintiff's son. *Id.* at 649.  Prior to spraying the plaintiff with a chemical irritant, the officers warned plaintiff and her group that she would be sprayed if they did not comply with the officers' orders.  Because plaintiff failed to heed the warning, she was sprayed then forcibly arrested.

The Ninth Circuit determined that the officers were entitled to qualified immunity because plaintiff's "active interference posed an immediate threat to the officers' personal safety and ability to control the group." *Id.* at 652.  Accordingly, the use of force was commensurate with the government's interests and did not constitute a constitutional violation.  Here, there is a question of material fact whether Anicete was actively interfering with the officer's detention of the Bryson brothers, Reyes, Grant and Greer.  Video evidence does not support the contention that there was an unruly crowd physically fighting with the officers. *See, e.g.,* Rains Dec., Matrix Video.  Moreover, unlike in *Jackson*, Anicete testifies that he received no warning, but rather was "blind-sided by a big tall officer." Anicete

55

United States District Court

For the Northern District of California

Depo. at 175:2-12. Accordingly, fact questions would preclude the determination of qualified immunity at this stage.

15.     Mehserle himself testified that he was shocked by the shooting, and plaintiffs present evidence that the shooting sent multiple witnesses as well as officers into a state of shock.

16.     Because plaintiffs filed the evidence purporting to establish this claim under seal, the court limits its discussion of the inadequacy of that evidence.

17.     Under section 52.1 as now amended, whenever any person, whether or not acting under color of law, interferes by threats, intimidation, or coercion with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, a civil action may be brought under its provisions for greatly expanded compensatory damages, substantial fines ($25,000), injunctive and other appropriate equitable relief, as well as attorney fees. *Id.* at 850.

United States District Court
For the Northern District of California