UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WANDA JOHNSON, *et al.*, | No. C-09-0901 EMC |
| Plaintiffs, | **RELATED TO** |
| v. | C-09-4014 EMC (Grant) |
| BAY AREA RAPID TRANSIT DISTRICT, *et al.*, | C-09-4835 EMC (Bryson, *et al.*) <br> C-10-0005 EMC (Caldwell) |
| Defendants. | **ORDER GRANTING DEFENDANTS MEHSERLE AND DOMENICI'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON REMAND** |
| AND RELATED ACTIONS. | |
| | **(Docket Nos. 285, 286)** |

## I. INTRODUCTION

Before the Court are the renewed summary judgment motions filed by Defendants Johannes Mehserle and Marysol Domenici seeking qualified immunity as to Plaintiffs' "extended detention" claims. Judge Patel previously denied Domenici and Mehserle qualified immunity as to these claims. The Ninth Circuit vacated Judge Patel's order on this point, finding that Judge Patel had erroneously relied on the Ninth Circuit case of *Dubner v. City and County of San Francisco,* 266 F.3d 959 (9th Cir. 2001) and had failed to examine whether genuine disputes of material fact existed as to whether Domenici and Mehserle were involved in Plaintiffs' extended detentions.

On remand, Mehserle argues he is entitled to qualified immunity as to the extended detention claims of Anicete, Reyes, Greer, and Nigel Bryson. Domenici claims she is entitled to the extended detention claims of all Plaintiffs.

For the foregoing reasons, the Court **GRANTS** the motions.

## II. FACTUAL & PROCEDURAL BACKGROUND

The facts of this case have been extensively laid out in Judge Patel's published order and the Ninth Circuit's published opinion. *See Johnson v. Bay Area Rapid Transit Dist.* (*"Johnson II"*), 724 F.3d 1159, 1164-67 (9th Cir. 2013); *Johnson v. Bay Area Rapid Transit* (*"Johnson I"*), 790 F. Supp. 2d 1034, 1040-42 (N.D. Cal. 2011). Accordingly, rather than restate the facts, this Court incorporates into this order the factual sections of *Johnson I* and *Johnson II*. However, where necessary, the Court will provide a recitation of relevant facts regarding Mehserle's and Domenici's post-shooting conduct.

In *Johnson I*, Judge Patel granted-in-part and denied-in-part Mehserle's and Domenici's initial motions for summary judgment on the basis of qualified immunity. In addressing these motions and in describing the incidents of January 1, 2009, Judge Patel utilized a "three-part chronology." Specifically, the "first time period began when Pirone detained Reyes and the Brysons, the second began when Pirone ordered Mehserle to arrest 'him and him,' and the third encompassed the prolonged detentions of Reyes, the Brysons, and Anicete, beginning when Mehserle shot Grant." *Johnson II*, 724 F.3d at 1167. The Ninth Circuit recognized that Judge Patel had granted "Mehserle and Domenici qualified immunity from the same claims during the first time period, but denied both of them immunity from the time Pirone ordered Mehserle to arrest 'him and him,' onward – that is, for the second and third time periods." *Id.*

On appeal Mehserle argued that he was entitled to qualified immunity as to "claims arising from the extended detentions of Anicete, Reyes, and Nigel Bryson at BART police headquarters" and "Jack Bryson's unlawful arrest claim." *Id.* at 1167-68. As to Jack Bryson's unlawful arrest claim, the Ninth Circuit affirmed Judge Patel's denial of qualified immunity, finding that "the question whether Mehserle reasonably misunderstood" Pirone's arrest command or otherwise had probable cause to arrest Jack Bryson for a violation of Cal. Penal Code § 148 was a question to be left for the jury. *Johnson II*, 724 F.3d at 1174.

The Ninth Circuit, however, vacated Judge Patel's order to the extent that it denied Mehserle qualified immunity as to the extended detentions of Anicete, Reyes, or Nigel Bryson. The Court stated that Judge Patel had "held that it did not matter whether Anicete, Reyes, and Nigel Bryson

2

had any evidence implicating Mehserle in their prolonged detentions, and instead, that the burden fell to Mehserle to exculpate himself from their claims." *Id.* at 1172. The Ninth Circuit held that Judge Patel appeared to have "misread our opinion in *Dubner v. City and County of San Francisco*, 266 F.3d 959 (9th Cir. 2001)." *Johnson II*, 724 F.3d at 1172. *Dubner*, the Ninth Circuit clarified, "establishes only that we will find the police lack probable cause to make an arrest – and therefore that the arrest is unlawful – if the police are unable to identify who made the arrest, or why." *Id.* at 1173. The Court found, however, that this case was inapplicable because "the issue we must evaluate here is not whether Mehserle had probable cause to arrest Anicete, Reyes, or Nigel Bryson; it is whether Mehserle was at all responsible for their prolonged detentions." *Id.* The Court concluded that Judge Patel did not rely on the record in trying to answer this question, but rather "relied erroneously on *Dubner* to conclude that the absence of evidence implicating Mehserle was, as a matter of law, 'of no account.'" *Id.* Thus, the Ninth Circuit remanded this issue to this Court "with instructions to review the record and determine whether there are disputed issues of fact as to Mehserle's involvement with Anicete's, Reyes's, and Nigel Bryson's detentions." *Id.*

On appeal, Domenici contended she was entitled to "qualified immunity for Reyes's, Greer's, Anicete's, and the Brysons' prolonged detentions at BART headquarters, because like Mehserle, there is no evidence of her involvement in those detentions." *Id.* at 1178-79. The Ninth Circuit recognized that, unlike Mehserle, Judge Patel "*did* make a factual finding regarding Domenici's involvement in the extended detentions of the Brysons and Reyes, pointing to her appearance in eyewitness video of the incident, after Mehserle shot Grant, and therefore observing that the '[e]vidence suggests that nonetheless Domenici continued to participate in [the] detentions up until the time that Mehserle shot Grant *and thereafter*.'" *Johnson II*, 724 F.3d at 1179 (quoting *Johnson I*, 790 F. Supp. 2d at 1053) (emphases in *Johnson II*). However, as to Greer's and Anicete's extended detentions, the Ninth Circuit recognized that Judge Patel "reached no conclusions" and instead "rel[ied] improperly on *Dubner*" as she had with Mehserle. *Id.* The Court concluded that to "the extent the district court relied upon disputed facts to deny Domenici immunity, we lack jurisdiction to review that denial." *Id.* But, "[t]o the extent the district court relied solely on *Dubner* to deny Domenici immunity from any of the plaintiffs' claims, we remand to

3

the district court to determine whether the facts support granting Domenici immunity from those claims." *Id.*

In relevant part, the Ninth Circuit's mandate stated:

- Because the district court relied improperly on *Dubner* in denying Mehserle qualified immunity as to their extended detention claims, its judgment is VACATED, and on remand, the district court shall determine whether there is any evidence that Mehserle is responsible for the extended detentions of Fernando Anicete, Jr., Carlos Reyes, or Nigel Bryson;

. . . .

- To the extent the district court relied on *Dubner* to deny Domenici immunity, its judgment is VACATED, and it shall reconsider its decision on remand in accordance with this opinion; beyond that, we lack jurisdiction to review Domenici's appeal.

*Id.* at 1181. On remand, both Mehserle and Domenici have filed motions for summary judgment seeking qualified immunity on the "extended detention" claims, consistent with the Ninth Circuit's remand.

### III. DISCUSSION

Under the traditional qualified immunity analysis, a court must address two questions. First, a court must consider whether the facts in the case show that a defendant's conduct violated a constitutional right. *See C.B. v. City of Sonora*, 730 F.3d 816, 825 (9th Cir. 2013). Second, the court must ask whether the "right at issue was clearly established at the time of the incident such that a reasonable officer would have understood her conduct to be unlawful in that situation." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that district courts have discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

A. Defining Plaintiffs' "Extended Detention" Claims

As an initial matter, the Court must determine what constitutes Plaintiffs' "extended detention" claims. On one hand, Plaintiffs' "extended detention" claims could be viewed broadly as beginning at the point that Officer Pirone ordered that "him and him" (meaning Grant and Greer)

were to be arrested. As Judge Patel recognized, from this point forward, the jury "could conclude that a reasonable officer could not have believed that the continued detention of the Bryson brothers and Reyes was reasonable." *Johnson I*, 790 F. Supp. 2d at 1048. On the other hand, the "extended detention" claims could be construed as only applicable to the decision to detain Plaintiffs for several hours following the shooting.

The Court adopts the latter approach. First, on remand, Domenici and Mehserle have only sought qualified immunity as to the hours long detention of Plaintiffs following the shooting. *See* Dkt. No. 285, at 3 (Domenici Motion) ("No facts exist to show that Defendant Domenici had any role whatsoever in the decision, or the implementation of the decision, to continue detaining these Plaintiffs for several hours following the shooting."); Dkt. No. 286, at 2 (Mehserle Motion) (stating Mehserle was seeking summary judgment to Plaintiffs claims relating to their "prolonged detention after Grant was shot"); Dkt. No. 297, at 3 (Mehserle Reply) ("Here, the facts show that the conduct that caused the alleged violation is the decisions of Gee and White to hold the Plaintiffs at the BART precinct and the subsequent hours long detentions that followed. The evidence is clear – Mehserle had no involvement with the conduct which caused the violation here complained of – the prolonged detention.").

Second, and more significantly, it is apparent that the Ninth Circuit viewed the extended detention claims as revolving around the decision to detain Plaintiffs at BART Headquarters for several hours. In the course of addressing Mehserle's appeal, the Ninth Circuit stated:

> On the orders of BART police Commanders White and Gibson (neither of whom is a defendant in this case), Reyes, both of the Brysons, Greer, and Anicete were taken to BART police headquarters and detained, in handcuffs, for hours. Mehserle argues he had nothing to do with the prolonged detentions of Anicete, Reyes, or Nigel Bryson, and is therefore entitled to qualified immunity from their claims arising out of those detentions.

*Johnson II*, 724 F.3d at 1172. The Ninth Circuit described Domenici's appeal in a similarly narrow way:

> Domenici raises only one issue on appeal: she contends that she is entitled to qualified immunity for Reyes's, Greer's, Anicete's, and the Brysons' prolonged detentions at BART headquarters, because like Mehserle, there is no evidence of her involvement in those detentions.

5

*Id.* at 1178-79.

Thus, the Ninth Circuit's discussion of Plaintiffs' "prolonged" detention claims was limited to the detention of Plaintiffs for several hours at BART headquarters. As a result, the Court will examine whether Mehserle or Domenici were "integral participants" in the detention at BART Headquarters for several hours.[1] This order leaves untouched *Johnson I*'s holding that Mehserle and Domenici are not entitled to qualified immunity as to the Fourth Amendment claims arising from the time period (1) after Pirone ordered the arrest of Grant and Greer but (2) before the shooting.[2] These claims are unaffected by this order and will proceed to trial.

B.  "Integral Participant" Legal Standard

There is no dispute in this record that the decision to take Plaintiffs to BART police headquarters (where Plaintiffs were kept in handcuffs for hours) was made by Commanders White and Gibson (who have not been sued in this lawsuit). *See Johnson*, 724 F.3d at 1172 ("On the orders of BART police Commanders White and Gibson . . . , Reyes, both of the Brysons, Greer, and

---

[1] As the Ninth Circuit recognized, Judge Patel in *Johnson I* stated that "[e]vidence suggests that . . . Domenici continued to participate in their detentions up until the time that Mehserle shot Grant *and thereafter*." *Johnson I.*, 790 F. Supp. 2d at 1053 (emphasis added). The Ninth Circuit interpreted this statement as a "factual finding regarding Domenici's involvement in the extended detentions of the Brysons and Reyes." *Johnson II*, 724 F.3 at 1179.

To the extent that *Johnson I* can be construed as having determined that there was a genuine dispute of material fact that Domenici was an integral participant in the extended (as defined above) detention of Plaintiffs, the Court revisits this prior ruling. *See Gray v. Golden Gate Nat'l Recreational Area*, 866 F. Supp. 2d 1129, 1132 (N.D. Cal. 2011) ("A district court has the discretion to reconsider its prior orders.").

[2] In his post-remand motion, Mehserle contends that he has "been granted summary judgment on all of Plaintiffs' claims up to the time the shot was fired." Dkt. No. 286, at 2 n.1 This is incorrect. *Johnson I* expressly found that Defendants Domenici, Mehserle, Woffinden and Knudtson were not entitled to qualified immunity as to the Fourth Amendment claims of the Bryson brothers and Reyes from the time Pirone gave his arrest order. *See Johnson I*, 790 F. Supp. 2d at 1048-49.

Similarly, to the extent that Domenici's counsel argued at the hearing that there is no genuine dispute of material fact as to whether she heard Pirone's arrest order (and thus, by implication, that she is entitled to qualified immunity for all pre-shooting Fourth Amendment claims), the Court rejects her argument. The Court has reviewed the video. Pirone gave his arrest order beginning at 2:09:53. Dkt. No. 285-2, Ex. E. A mere 7 seconds later, Domenici can be seen at the detention area, directly in front of Plaintiffs. *Id.* On this basis, a reasonable jury could conclude she was aware that only Greer and Grant were to be arrested and, by implication, that there was no basis for detaining the other Plaintiffs.

Anicete were taken to BART police headquarters and detained, in handcuffs, for hours."). Thus, Mehserle and Domenici did not directly cause the constitutional violation themselves.

However, the "integral participant" doctrine "extends liability to those actors who were integral participants in the constitutional violation, even if they did not directly engage in the unconstitutional conduct themselves." *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009). This doctrine requires "some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007). An officer's "fundamental involvement" need not rise to the level of a constitutional violation. *See Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004) ("Specifically, 'integral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation.").

A defendant's " mere presence" on the scene where a violation occurs or membership in the "group" or "team" that collectively caused the violation is insufficient to find "fundamental involvement." *See Jones v. Williams*, 297 F.3d 930, 939 (9th Cir. 2002) ("We reject the idea that mere presence at a search or membership in a group, without personal involvement in and a causal connection to the unlawful act, can create liability under section 1983."). In *Hopkins v. Bonvicino*, the Ninth Circuit explained that it had "rejected 'the team effort standard [that] allows the jury to lump all the defendants together, rather than require it to base each individual's liability on his own conduct.'" *Hopkins*, 573 F.3d at 769-70 (quoting *Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir. 1996)). Thus, the Court held that an officer "'[b]eing a mere bystander [to his colleagues' conduct] was insufficient' to support § 1983 liability." *Id.* (quoting *Chumash*, 76 F.3d at 294).

In determining where "mere presence" ends and "fundamental involvement" begins, the Court is guided by Ninth Circuit cases which have applied the above standard in a number of circumstances. For example, in *Boyd*, the Ninth Circuit found that all officers who executed a search warrant could be held liable for excessive force resulting from the deployment of a flash-bang device during the execution of the warrant. *Boyd*, 374 F.3d at 780. The Court made this determination even though only one officer actually deployed the device. The Court held that each officer who executed the search warrant was "aware of the decision to use the flash-bang, did not

object to it, and participated in the search operation knowing the flash-bang was to be deployed" and were thus were "integral participants" in the alleged excessive force. *Id.* at 780.

Similarly, in *Blankenhorn*, Plaintiff alleged that a number of police officers involved in his arrest employed excessive force. He specifically took issue with the fact that three officers gang tackled him and, after he was handcuffed, one of the officers applied "hobble restraints" – a restraint device which attaches to handcuffs and immobilizes an individual. *Blankenhorn*, 485 F.3d at 479. The Ninth Circuit found that defendant Kayano – who had arrived on the scene *after* the gang tackling and only applied the handcuffs, was not entitled to qualified immunity as to the application of the hobble restraints. *Id.* at 469 n.3, 481 n.12.[3] The Court stated "Kayano's own declaration indicates that his help in handcuffing Blankenhorn was instrumental in the officers' gaining control of Blankenhorn, which culminated in Ross's application of hobble restraints. Therefore, Kayano's participation was integral to the use of the hobble restraints." *Id.* at 481 n.12. The Court similarly found that two officers who gang tackled the plaintiff likewise "participated in an integral way in the application of the hobble restraints." *Id.*

By contrast, in *Torres v. City of Los Angeles*, 548 F.3d 1197 (9th Cir. 2008), the Court found that a detective was not an "integral participant" in an allegedly unlawful arrest. There, plaintiff asserted claims for unlawful arrest against a number of detectives who had investigated a shooting in which they believed plaintiff had participated. The Court affirmed dismissal of plaintiffs' unlawful arrest claim against one of the detectives, Detective Hickman. The Court found that it was "undisputed that Detective Hickman was not present when Torres was arrested, and there is no evidence that Detective Hickman instructed the other detectives to arrest [plaintiff] or that any of those detectives consulted with her before making the arrest." *Id.* at 1206. Accordingly, the Court found that there was no evidence of integral participation by Detective Hickman. *See id.* The Court reached this conclusion despite the fact that Detective Hickman had been involved in the investigation and gathered evidence regarding Plaintiff's potential involvement. *See id.* at 1203-04.

---

[3] Similarly, the Fifth Circuit has held that officers who provided armed backup to officers conducting an allegedly unconstitutional search were not entitled to qualified immunity because their armed backup was "integral to the search" and thus rendered them participants rather than bystanders. *James ex rel. James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990).

8

Similarly, in the *Blankenhorn* case described above, the Ninth Circuit concluded that an officer who "at most provided crowd control" during the alleged use of excessive force did not participate "in any integral way in the arrest" and was therefore entitled to summary judgment. *Blankenhorn*, 485 F.3d at 481 n.12.

In summary, the Court finds that these cases combine for the proposition that defendants are "fundamentally involved in the alleged violation when they provide some affirmative physical support at the scene of the alleged violation and when they are aware of the plan to commit the alleged violation or have reason to know of such a plan, but do not object." *Monteilh v. County of Los Angeles*, 820 F. Supp. 2d 1081, 1089 (C.D. Cal. 2011).

### C. Mehserle Is Entitled to Qualified Immunity as to the Extended Detentions of Anicete, N. Bryson, Greer, and Reyes[4]

#### 1. Mehserle's Post-Shooting Actions

Mehserle's post-shooting actions do not appear to be in dispute. In the immediate aftermath of the shooting, it appears that Pirone took Mehserle aside. Dkt. No. 156, Ex. I, at 96. Sgt. Alvarez responded to Fruitvale Station and was informed by Pirone that Mehserle had been involved in the shooting. Dkt. No. 115, Ex. C, at 4907. Sgt. Alvarez went to Mehserle and took him to Lieutenant Franklin[5] to have Mehserle provide a safety statement regarding the shooting. *Id.* at 4908. Sgt. Alvarez told Lieutenant Franklin that Mehserle was "involved in a shooting. You need to get him out of here." *Id.* Lieutenant Franklin explained to Mehserle the purpose of a safety statement and that he was going to ask him questions. *Id.* at 4923. Mehserle then answered a number of questions regarding the shooting. *Id.* at 4923-28. According to the video, at 2:21:30am (approximately 10 minutes after the shooting), Lieutenant Franklin escorted Mehserle off the platform. *Id.* at 4928-29;

---

[4] Mehserle did not argue before the Ninth Circuit that he was entitled to qualified immunity as to the extended detention claims of Jack Bryson – whom Mehserle mistakenly handcuffed after receiving Pirone's arrest order. On remand, Mehserle has stated that the "Ninth Circuit affirmed the District Court's denial of Summary Judgment to Mehserle on Jack Bryson Jr.'s claim for false arrest *which would presumably include the claim of his prolonged detention*." Dkt. No. 286, at 2 n.1. Accordingly, Mehserle thus concedes that he was an integral participant in the extended detention of Jack Bryson and this Court will not address this claim as it relates to Mehserle.

[5] Domenici estimates that Lt. Franklin arrived at Fruitvale Station around 6 minutes after the shooting. Dkt. No.285-2, Ex. A, at 614.

1  Dkt. No. 285-2, Ex. E, at 14; Ex. F.  Downstairs, Mehserle went to the restroom to wash blood off
2  his hands.  Dkt. No. 115, Ex. C, at 4931-32.  Mehserle and Lt. Franklin then drove to BART Police
3  headquarters at Lake Merritt.  *Id.* at 4933. Mehserle was removed from the Fruitvale Station before
4  the BART commanders had arrived on the scene.  Dkt. No. 286, Ex. D, at 71.  According to Lt.
5  Franklin's police report, once at Lake Merritt, he placed Mehserle in a small conference room and
6  waited with him (alone) until the BART Police Officer's Association President arrived.  Dkt.156,
7  Ex. L, at 4.

        2.      <u>Mehserle Did Not "Set in Motion" a Series of Events Which Caused the Extended Detentions of Anicete, N. Bryson, Greer, or Reyes</u>

10  Plaintiffs' opposition to Mehserle's renewed motion for summary judgment on their
11 extended detention claims rests entirely on one legal assertion:  that Mehserle caused the prolonged
12 detention by shooting Mr. Grant.  *See* Dkt. No. 291, at 12 ("Thus, plaintiffs were held because
13 Mehserle had shot someone."); *see also id.* at 13 ("[I]t is entirely foreseeable that the consequences
14 of shooting one of several subdued subjects may include violations of the other subjects' Fourth
15 Amendment rights.").

16  Plaintiffs are correct, that in general, an individual can be liable under § 1983 "not only by
17 direct personal participation, 'but also by setting in motion a series of acts by others which the actor
18 knows or reasonably should know would cause others to inflict the constitutional injury.'"
19 *Hernandez v. City of Napa*, No. C-09-02782 EDL, 2010 WL 4010030, at *12 (N.D. Cal. Oct. 13,
20 2010).  In support of their "set in motion" theory, Plaintiffs rely solely on *Stoot v. City of Everett*,
21 582 F.3d 910 (9th Cir. 2009).  There, plaintiffs alleged that a police detective violated their child's
22 Fifth Amendment rights against self-incrimination by coercing from the child a confession.  *Id.* at
23 922.  This coerced confession was then used by the prosecutor's probable cause affidavit and at the
24 child's arraignment.  *Id.* at 926.  The detective argued he could not be liable for the Fifth
25 Amendment violation because "the prosecutor's separate decision to rely on the statements in this
26 manner" served as a "superseding cause" of the Fifth Amendment violation.  *Id.*  The Ninth Circuit
27 disagreed, finding that "a jury could conclude that the use of the allegedly coerced statements
28 against Paul was a reasonably foreseeable consequence of [the detective's] decision to interrogate

Paul and file a police report detailing his alleged confession." *Id.* In essence, the detective's action was a proximate cause of the harm inflicted on the plaintiff.

However, the facts of this case are far removed from those presented by *Stoot*. First, confessions are routinely used against suspects in probable cause affidavits and subsequent arraignments. In fact, it can be said that this is the very purpose of obtaining confessions. It is thus uncontroversial to state that an officer should reasonably foresee that obtaining a coerced confession from an individual would result in a Fifth Amendment violation when that coerced confession was subsequently used against the individual in a criminal proceeding. It is far different, however, to say that an officer who shoots an individual, allegedly for no reason, should "reasonably foresee" that the victim's four friends will be detained, in handcuffs, for hours – allegedly all without probable cause or reasonable suspicion.

Second, *Stoot* recognized that an "'intervening decision of an informed, neutral decision-maker breaks the chain of causation,' meaning that the harm to the plaintiff can be traced more directly to an intervening actor." *Id.* In *Stoot*, the prosecutor's decision to use the statements in the probable cause affidavit did not "break" the causal chain because, as discussed, it was reasonably foreseeable that a prosecutor would use a suspect's confession in that way, particularly because the defendant officer included several of the incriminating statements in the official police report. Here, by contrast, it is undisputed that it was "intervening decision-makers" – in the form of two BART commanders – who made the actual decision to detain Plaintiffs at BART Headquarters for hours, and that this decision was made well after Mehserle had been removed from the scene. Dkt. No. 294-1, at 4. It cannot be said that the arrests of the other Plaintiffs which ensued was a foreseeable, likely or proximate result of the shooting.

In sum, Mehserle cannot be held liable for Plaintiffs' extended detention under a "set in motion" theory.

3. Mehserle Was Not an "Integral Participant" in the Extended Detentions of Anicete, N. Bryson, Greer, or Reyes

The Court likewise concludes that Mehserle was not an integral participant in the extended detentions of Anicete, N. Bryson, Greer, or Reyes. Again, the question is whether Mehserle had

some "fundamental involvement in the conduct" that caused Plaintiffs to be detained for hours following the shooting. *Blankenhorn* , 485 F.3d at 481 n.12.

First, there is no genuine dispute of material fact as to whether Mehserle provided any "affirmative physical support at the scene of the alleged violation" following the shooting. *Monteilh*, 820 F. Supp. 2d at 1089. Rather, the record suggests that following his shooting of Mr. Grant, Mehserle handcuffed and then searched Grant and then attempted to provide first aid. At this point, Mehserle was taken aside and spoke with Sgt. Alvarez and then Lieutenant Franklin. There is no indication that Mehserle handcuffed any of the Plaintiffs (except for Jack Bryson, prior to the shooting) or participated in the handcuffing of any Plaintiff. Eventually, within minutes of the shooting, Mehserle was taken away from Fruitvale Station – prior to the arrival of the commanders who made the ultimate determination to detain Plaintiffs.

Nor is there any evidence from which a jury might reasonably infer that Mehserle provided information to Commanders White and Gibson which caused Plaintiffs' arrest and prolonged detention. Mehserle's mere presence on the platform for approximately 10 minutes following the shooting is simply insufficient to find that he was an integral participant in the hours-long detention of Plaintiffs. *See Jones*, 297 F.3d at 939.

### 4. Conclusion

In summary, the Court concludes that Mehserle cannot be held liable for Plaintiffs' hours long detention following his shooting of Mr. Grant. This detention was not a reasonably foreseeable or proximate consequence of the shooting and Mehserle did not have some "fundamental involvement" in the planning or execution of these detentions. Accordingly, Mehserle's motion is **GRANTED**.

### D. Domenici Is Entitled to Qualified Immunity as to Plaintiffs' Extended Detentions Claims

#### 1. Domenici's Post-Shooting Actions

Following the shooting, Domenici was "engaged in maintaining crowd control, urging people to cooperate, and herding people back away from where the shooting had occurred and onto the train so that it could leave the station." Dkt. No. 285-1, at 2. She radioed to BART dispatch to have the train released. Dkt. No. 150-4, at 34. After the train was released, Domenici removed the

remaining bystanders from the station platform. Domenici then returned to the scene of the detention where she remained while the remaining Plaintiffs were handcuffed and eventually escorted off the platform. Dkt. No. 285-2, Ex. E, at 14-15. Eventually, Domenici was ordered to go downstairs and release the individual that she and Pirone had arrested just prior to being dispatched to respond to the fight on the train. Dkt. No. 285-1, at 2; Dkt. No. 285-2, Ex. B, at 162-63.

After releasing this previously arrested individual, BART Commander Gibson took her and Pirone aside and informed them that he was transporting them back to BART Police Headquarters at Lake Merritt and instructed them not to talk to one another. Dkt. No. 285-2, Ex. B, at 165. Domenici has stated that she could not approximate how much time elapsed between the shooting and when she was taken away from Fruitvale Station, but did indicate that it was "several hours." Dkt. No. 294, Ex. 3, at 669. Once at Lake Merritt, Domenici was put in an individual's office along with another female officer who was there to "take care of" and "baby-sit" her. Dkt. No. 285-2, Ex. B, at 166. Eventually, Domenici was photographed and at approximately 8:45 a.m., she was interviewed. *Id.* at 167.

2.    <u>Domenici Was Not an "Integral Participant" in Plaintiffs' Extended Detentions</u>[6]

Plaintiffs argue that Domenici was an integral participant in their extended detention because she was involved in the initial seizure, was a "vital presence throughout the preliminary investigation at Fruitvale," and helped create the impression that Plaintiffs were criminal suspects – an impression which led to their extended detention. Dkt. No. 293, at 11, 15. In support of this argument, Plaintiffs point to the following facts:

- The information that the Plaintiffs were involved in a fight "could only have been supplied by the officers who had detained them, one of whom was Marysol Domenici." *Id.* at 15.
- There was a "long and critical period during which plaintiffs remained handcuffed at Fruitvale while Domenici was present." *Id.* at 16.

---

[6] To the extent that Plaintiffs argue that Domenici is liable for Plaintiffs' extended detention claims based on her involvement in Plaintiffs' initial detentions, the Court rejects this argument on the ground that the subsequent decision by BART commanders to detain Plaintiffs for hours, absent any evidence Domenici provided the commanders information which influenced their decision to arrest Plaintiffs as discussed *infra*, was a supervening cause which broke the causal chain.

13

1  •    Domenici was only instructed not to speak to other officers once she was leaving Fruitvale,
2       implying she was free to speak before that. *Id.*
3  •    Plaintiffs were handcuffed prior to the arrival of the Commanders, and while Domenici was
4       present on the platform, and this "communicated to the arriving investigators that the officers
5       considered the arrestees to represent an ongoing physical threat." *Id.* at 22.
6  Thus, Plaintiffs argue that the "reasonable inference must be accepted that she was a source for the
7  Commander's 'knowledge' the plaintiffs had been involved in violent criminal activity." *Id.* By
8  contrast, Domenici states that she had "no involvement in any of the decisions to continue detaining
9  [Plaintiffs] after Mehserle shot Oscar Grant." Dkt. No. 285-1, at 2. Further, in describing her
10 conduct on the platform, she does not describe being interviewed by superior officers on the
11 platform following the shooting. *Id.* at 2-3.

12       The Court finds that Plaintiffs have failed to demonstrate the existence of a genuine dispute
13 of material fact as to whether Domenici was an integral participant in Plaintiffs' extended
14 detentions. First, the video of the post-shooting events show Domenici attempting to get bystanders
15 onto the train so the train can depart and then attempting to get more bystanders off the platform.
16 Such conduct is akin to "crowd control" activities that the Ninth Circuit has found does not make the
17 covering officer an integral participant in the underlying detention occurring behind them. *See*
18 *Blankenhorn*, 485 F.3d at 481 n.12; *see also Argonez v. County of San Bernardino*, No. EDCV 07-
19 00992-VAP (Opx), 2008 WL 4848410 (C.D. Cal. Nov. 18, 2008) ("Providing cover is 'an
20 essentially defensive posture.' As an act designed to secure an area and minimize the risks of
21 unexpected danger, it is analogous to crowd control, which the *Blankenhorn* court determined was
22 not a sufficient basis for liability.").

23       Second, at most Plaintiffs have shown that opportunities existed for Domenici to provide her
24 supervisors information about Plaintiffs. However, they have not pointed to any affirmative
25 statements from the BART commanders stating who told them what about Plaintiffs. Nor have they
26 pointed to any statement from Domenici that could be construed as her having provided them
27
28

14

information.[7] Rather, all Plaintiffs have pointed to regarding the BART commanders' knowledge is the following excerpt from Commander White's deposition:

> Q: Were you briefed at all by anyone about what had taken place, when you arrived?
>
> A: Commander Gibson and, I think, Lieutenant Caganaan gave me some details.
>
> Q: What did they tell you, generally?
>
> A: Officer involved shooting. I can't recall everything that they said, but I think they either – both or maybe it was just the three of us standing there: Subject shot in the back. The subject officer was taken away already. Several other subjects detained from an original fight that was occurring that was the original call.
>
> . . . .
>
> Q: Were you taking [Plaintiffs] to the station because they were under arrest, or what?
>
> A: At the time we didn't know their involvement. We knew that we had a fight on the platform. We didn't know what level of involvement they had. And then we also had somebody who had been shot. We didn't know the circumstances of what happened at the shooting.

Dkt. No. 294, Ex. 1, at 72-73. There is nothing in this statement that suggests Domenici was a source of any information regarding the plaintiffs. *Cf. Aragonez*, 2008 WL 4948410, at *8 n17 ("[T]he Court is not required to indulge the mere speculation advanced by Plaintiffs' counsel at the hearing that Recatto 'must have' known that Huff planned to unlawfully detain and arrest Aragonez."); *see also Temple v. Guardsmark, LLC*, No. C 09-02124 SI, 2010 WL 1461629, at *2 (N.D. Cal. Apr. 7, 2010) ("[C]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment.").

---

[7] Including the multitude of exhibits filed in support of the first round of summary judgment motions filed before Judge Patel, the record in this case is extensive. The Court has not located any statements in the various depositions, reports, and transcripts of testimony which illuminate who provided the responding lieutenants information regarding Plaintiffs' role in the incidents that transpired. More importantly, "[a]s other courts have noted, '[i]t is not our task, or that of the district court, to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)).

United States District Court
For the Northern District of California

Third, to the extent that Plaintiffs argue that the fact that Plaintiffs were handcuffed when BART commanders arrived (and thus conveyed the impression they were criminal suspects), this, too, is insufficient to ascribe liability to Domenici. There is nothing in the record to suggest that Domenici was involved in the handcuffing of any of the Plaintiffs or that she escorted the Plaintiffs off of the platform while they were handcuffed. Further, as discussed above, the mere fact that Domenici was present on the scene while the Plaintiffs were handcuffed is an insufficient basis to find that Domenici was an "integral participant" in the extended detentions. *See Jones*, 297 F.3d at 939.

Plaintiffs have not shown the existence of a genuine dispute of material fact as to whether Domenici was an integral participant in their extended detentions. Accordingly, Domenici is entitled to qualified immunity as to these claims and Domenici's motion is **GRANTED**.

This order disposes of Docket Nos. 285 and 286.

IT IS SO ORDERED.

Dated: November 22, 2013

EDWARD M. CHEN
United States District Judge