Michael L. Rains (SBN 091013)
Steven M. Betz (SBN 271543)
**RAINS LUCIA STERN, PC**
2300 Contra Costa Blvd., Suite 500
Pleasant Hill, CA 94523
Tel: (925) 609-1699
Fax: (925) 609-1690
Email: mrains@rlslawyers.com
      sbetz@rlslawers.com

Attorneys for Defendant
JOHANNES MEHSERLE

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **WANDA JOHNSON, individually and as personal representative for the ESTATE OF OSCAR J. GRANT III, the ESTATE OF OSCAR J. GRANT III, SOPHINA MESA as Guardian ad Litem of minor, T.G.,**<br><br>    **Plaintiffs,**<br><br>vs.<br><br>**BAY AREA RAPID TRANSIT DISTRICT (BART); GARY GEE, in his official capacity as CHIEF OF POLICE for BART; JOHANNES MEHSERLE, individually and in his official capacity as a police officer for BART; ANTHONY PIRONE, individually and in his personal capacity as a police officer for BART; MARYSOL DOMENICI, individually and in her official capacity as a police officer for BART; and DOES 1-50, inclusive,**<br><br>    **Defendants.** | CASE NO.:   No. C09-00901 EMC<br><br>Consolidated Cases:<br><br>C09-04014 EMC (Oscar Grant, Jr.)<br>C09-04835 EMC (Bryson, et al.)<br>C10-00005 EMC (Caldwell)<br><br>**DEFENDANT JOHANNES MEHSERLE'S PRE-TRIAL BRIEF**<br><br>Pretrial Conf:  May 27, 2014<br>Time:           2:30 p.m.<br>Courtroom:      5<br>Judge:          Hon. Edward M. Chen<br>Trial Date:     June 9, 2014 |

---

*Johnson vs. Bay Area Rapid Transit District, et al.*, Case No. C09-00901
DEFENDANT JOHANNES MEHSERLE'S PRE-TRIAL BRIEF

## I. INTRODUCTION

This matter involves two combined cases jointly proceeding to trial. In the first matter, *Oscar Grant Jr. v. Bay Area Rapid Transit District*, Case No. C09-04104, Plaintiff OSCAR GRANT JR. (hereinafter "Grant Jr.") seeks damages against Defendant JOHANNES MEHSERLE for a purported violation of the Fourteenth Amendment to the United States Constitution for loss of familial relationship pursuant to 42 U.S.C. section 1983. (See, CV-09-04014 EMC, Docket No. 1 [Grant Jr. Complaint].) Mehserle defends that action on the basis that he never acted with a "purpose to harm" the decedent, Oscar Grant III (hereinafter "Grant III") while engaged in the legitimate law enforcement action of handcuffing him following his arrest. *See County of Sacramento v. Lewis,* 523 U.S. 833, 850 (1998); *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Additionally, Mehserle contends that Grant Jr. did not have a sufficiently deep attachment and commitment to his son in order to assert a claim for loss of familial relationship under the Fourteenth Amendment to the United States Constitution. *Lewis*, 523 U.S. at 685; *Love v. Watts*, 414 F.3d 183 (7th Cir 2005).

In the second case, *Caldwell v. Bay Area Rapid Transit District, et al.,* Case No. C10-0005, Plaintiff JOHNTUE CALDWELL alleges violations of 42 U.S.C. section 1983 (unreasonable search and seizure and unlawful detention), California Civil Code section 52.1 (intentional infliction of emotional distress), and assault and battery. While named as a defendant in the complaint, Mehserle was never served, and Plaintiff's counsel has announced her intention to dismiss Mehserle.

## II. SUMMARY OF RELEVANT FACTS[1]

### A. MEHSERLE'S BACKGROUND AND TRAINING AS A PEACE OFFICER

Johannes Mehserle was hired by BART in the capacity of a peace officer in March 2007, after attending the Napa Police Academy. Prior to January 1, 2009 (the night of the shooting that led to the filing of these actions), Mehserle had never been disciplined for any misconduct as a BART police officer. Coworkers and supervisors describe Mehserle as an officer who exercised great restraint and exhibited a "low-key" and non-aggressive approach to situations that had the potential for verbal and physical conflict.

---

[1] These facts have been established through witness testimony and introduction of documentary evidence at the criminal trial of Mehserle held in Los Angeles during the month of June, 2010.

1

*Johnson vs. Bay Area Rapid Transit District, et al.*, Case No. C09-00901
DEFENDANT JOHANNES MEHSERLE'S PRE-TRIAL BRIEF

During the roughly two years he was a BART police officer, Mehserle had arrested three separate individuals who were carrying weapons concealed in their right front pocket. On the morning of the incident in question, Mehserle had been at the West Oakland BART station just prior to being assigned to assist Officer Pirone and other officers at the Fruitvale BART station. While at the West Oakland station, Mehserle and other BART police officers had pursued an individual who was arrested and was carrying a firearm in his right front pocket.

Prior to January 1, 2009, Mehserle had practiced drawing his firearm from its holster with his "dominant" right hand hundreds if not thousands of times at the police academy, in subsequent firearms training sessions, in the police locker room, and in his home in order to develop what is commonly known as "muscle memory." In contrast, Mehserle had received just six hours of taser training on December 3, 2008 at the BART Police Department, slightly more than three weeks before this incident occurred. That training included registration, discussion of policy, and taking a written test at the conclusion of the course, breaks and lunch time. During the training, Mehserle fired the taser once during a classroom setting at a paper target. Mehserle also volunteered to be tased in the back by the training staff to demonstrate the effect of the taser on another person. Mehserle and his classmates drew tasers between 7-10 times in a classroom setting using three different holster configurations.

Following the conclusion of taser training, Mehserle carried a taser while on duty only sporadically in the ensuing three weeks, as the BART Police Department had not purchased enough tasers for each officer to carry during each of his or her shifts. During the period between the training on December 3, 2008 and the incident on January 1, 2009, Mehserle had only removed a taser from its holster one time while on duty and had not practiced systemically drawing the taser from one particular holster configuration in order to establish "muscle memory."

**B.   THE SHOOTING INCIDENT**

On January 1, 2009, shortly after 0200 hours, Mehserle and his partner, Officer John Woffinden, were at the West Oakland BART station. Mehserle and Woffinden were directed by a sergeant to go to the Fruitvale Station to assist officers who had responded to a fight in the lead car of a BART train as it arrived at the Fruitvale BART station. In the video taken by the platform camera at the Fruitvale station, Mehserle and Woffinden arrive on the platform at 2:08:35. According to officers

*Johnson vs. Bay Area Rapid Transit District, et al.*, Case No. C09-00901
DEFENDANT JOHANNES MEHSERLE'S PRE-TRIAL BRIEF

as well as witnesses on the train, the scene was chaotic and loud. People on the train and the platform were screaming, swearing, advancing on and threatening the police.

As Mehserle arrived on scene, BART Officers Pirone and Domenici had five individuals detained near a wall on the platform. Among these individuals were Oscar Grant III, Grant Jr.'s son. Officer Pirone instructed Mehserle to watch the individuals detained while Officer Pirone went to the lead car to talk to the train operator. For about one minute, Mehserle stood facing the detained individuals with a taser in his hand. Mehserle had earlier drawn his taser as he arrived on scene because he noticed that Officers Pirone and Domenici had their tasers displayed and due to the fact that the detained individuals had displayed angry and aggressive behavior toward Officers Pirone and Domenici.  While standing with the detainees, Mehserle never yelled or swore at the men.

When Officer Pirone returned from speaking with the train operator, he pointed to Grant III and Jack Bryson—two of the men detained—and instructed Mehserle "him and him are going [to jail] for 148 [resisting a peace officer]." Pirone later would claim that he intended to arrest Michael Greer (rather than Jack Bryson) and Grant III, however both Merhserle and BART Officer John Guerra believed Officer Pirone directed them to arrest Jack Bryson in addition to Grant III.

As Officer Pirone gave his instructions to Mehserle, Grant III started to stand. Mehserle put his hand on Grant III's head and Grant sat down. Jack Bryson then stood up directly in front of Mehserle. According to Mehserle, Bryson appeared angry and hostile. Bryson swung his fist at Mehserle's face. Mehserle pushed Bryson to his knees and told Bryson that he needed to start listening to commands or he would be tased. Bryson told Mehserle, "Okay, there won't be any problems." Mehserle then handcuffed J. Bryson without incident.  Bryson was on his knees while he was handcuffed.

After securing Bryson, Mehserle moved to behind Grant III to place him in handcuffs. Grant III was on his knees facing Officer Pirone. Grant III initially placed both his arms behind his back as if he were submitting to the handcuffing. However, when Mehserle grabbed Grant III's right hand, Grant III broke free and moved forward.  Contrary to Plaintiff's claims, Mehserle did not push Grant forward onto the platform.  He intended to handcuff Grant just as he had Bryson – while on his knees.

As Grant III went forward, he rotated his body, and landed on the platform on his back.

3

*Johnson vs. Bay Area Rapid Transit District, et al.*, Case No. C09-00901
DEFENDANT JOHANNES MEHSERLE'S PRE-TRIAL BRIEF

Nineteen seconds before the shooting, Officer Pirone and Mehserle were able to turn Grant III onto his stomach in order to attempt to handcuff him. When Grant went onto his stomach, he placed his right hand underneath him, near the waistband. Fourteen seconds before the shooting, Officers Pirone and Mehserle were both attempting to restrain and handcuff Grant. Mehserle commanded Grant to release his right hand, which was under his torso. At this moment, Officer Guerra reported to BART dispatch, "We have a crowd surrounding us."

At 2:10:55, eight seconds before the shooting, Grant III came off the platform rising up on his left side around his waist. Officer Pirone was able to push the left side of Grant III's body back to the platform and reposition himself to try to keep Grant III prone until Mehserle could control Grant III's hands.

At 2:10:56 and at 2:10:57, Mehserle is depicted in video tugging at, but not removing, Grant III's right arm from beneath Grant III's body. One of the witnesses on the train, who was watching the event, remarked to her friend about how strong Grant III must be, since Mehserle, despite tugging on Grant III's arm, could not bring the arm out from beneath Grant III's body.

About five seconds before the shooting, Mehserle saw Grant III's right arm begin to move out from beneath Grant III's body and then immediately into Grant III's right front pant pocket. Mehserle believed Grant III was "digging around" in the pocket. Mehserle never saw a firearm in the pocket or in Grant III's possession, but Mehserle was concerned that a firearm could be in Grant III's pocket, based upon Mehserle's experience finding firearms in the right front pocket of individuals, as described above.

Office Pirone heard Mehserle say, "Tony, get back, get back, get up—I'm going to tase him." Additionally, Bryson, while handcuffed and just several feet from Grant III and Mehserle, heard Mehserle say that he was going to tase Grant III.

At 2:10:58 and after Mehserle's taser warning, the video shows Mehserle moving his right hand toward the holster of his firearm. At about the same time, Officer Pirone, apparently having heard Mehserle's taser announcement, lifted his knee from Grant's shoulder area, and began to stand up. Pirone stood up to give Mehserle a large area on Grant's back for the taser to be deployed. As Officer Pirone stood up, Grant III's right shoulder came off the platform. Just as Grant III was coming out

4

*Johnson vs. Bay Area Rapid Transit District, et al.*, Case No. C09-00901
DEFENDANT JOHANNES MEHSERLE'S PRE-TRIAL BRIEF

from under Officer Pirone, Mehserle placed his hand on his gun holster and made four separate unsuccessful attempts to release the firearm from his holster. However, Mehserle was using thumb movements to unholster a taser on his gun holster, and due to the different thumb movements required to unholster the taser and firearm, he could not get the firearm out of the holster. After three unsuccessful and increasingly forceful efforts to release the firearm from its holster, Mehserle inexplicably, on the fourth attempt, drew the firearm from its holster.

Thereafter, and consistent with the training he had received concerning the taser, Mehserle stood up, moved slightly backwards, and with his eyes continually trained on Grant III's back, fired what he believed to be a taser at the middle of Grant III's back. Just before the gunshot was fired, the video shows Mehserle's right thumb moving upward along the slide of the firearm, a movement consistent with activating the selector switch on the taser, but a thumb movement which made no sense if Mehserle believed he was holding a firearm. Mehserle stood up and moved slightly backward, because he wanted to create distance from Grant III and what he believed was his taser in order for the taser darts to spread at least four inches before striking Grant III, which was necessary to achieve neuro-muscular incapacitation.

At the time Grant III was shot, he did not have both hands behind his back. Video, audio and forensic evidence establishes that Grant III's left shoulder was off the ground, his left arm was up in the air, and he was attempting to roll on his right shoulder as if to get up off the platform.

Following the shooting, Mehserle was in a state of shock. Tommy Cross, a passenger on the train, noted that Mehserle said either "oh shit!" or "oh my God!" in response to the shooting. Carlos Reyes, Grant III's friend, noted that Mehserle said, "Oh shit, I shot him!" Mehserle, contrary to his training, did not continue to train his firearm on Grant III, but instead immediately holstered it and brought his hands up to his ears. He then doubled over and put his hands on his knees. He testified at the criminal trial he wanted to vomit.

### C.   GRANT JR.'S RELATIONSHIP WITH GRANT III

Grant Jr. has been in prison since 1985 following a conviction for First Degree Murder. Grant Jr.'s son, Grant III, was born in 1986. Thus, Grant Jr. has been in prison for the entirety of Grant III's life.

5

*Johnson vs. Bay Area Rapid Transit District, et al.*, Case No. C09-00901
DEFENDANT JOHANNES MEHSERLE'S PRE-TRIAL BRIEF

According to deposition testimony of Grant Jr, as a child, Grant III visited Grant Jr. on a regular basis, roughly every other week. However, the regular visits stopped in 1998, when Grant III was 12 years old, because Grant Jr. was moved to "lock up." Grant III visited Grant Jr. one final time in 2002.

Grant Jr. purportedly spoke on the telephone with Grant III on a daily basis including a phone call two days before Grant III was killed. Grant Jr. and Grant III also exchanged some correspondence, including Christmas cards. The last time Grant III wrote Grant Jr. a Christmas card was in 2000.

### III.  LEGAL ISSUES PERTAINING TO THE COMPLAINT

The complaint alleges that Mehserle, "acting under color of state law, and without due process of law, deprived Plaintiff of his right to familial relationship by seizing Grant III, his only child, by use of unreasonable, unjustified and deadly force and violence . . . ." (CV-09-04014, Docket No. 1 [Grant Jr. Complaint].) For reasons set forth below, Plaintiff cannot prevail on this claim.

#### A.  PLAINTIFF CANNOT SHOW THAT MEHSERLE ACTED WITH PURPOSE TO HARM

It is clear under the law of the 9th Circuit that parents have a Fourteenth Amendment interest in the companionship of their children. *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). Where parents are deprived of this interest by official conduct which "shocks the conscience," a party can claim a due process violation. *Id.*; *see also Lewis v. County of Sacramento*, 523 U.S. 833, 847 (1998); *Porter v. Osborn*, 546 U.S. F.3d 1131, 1136 (9th Cir. 2008). Mere negligence does not meet the standard of a substantive due process violation. *Lewis*, 523 U.S. at 849.

The "shocks the conscience" standard may be met by showing that an officer engaged in excessive force with "deliberate indifference" or that he "acted with a purpose to harm . . . unrelated to legitimate law enforcement objectives." *Porter*, 546 F.3d 1131, 1137 (9th Cir. 2008). Whether a claim should be analyzed under the deliberate indifference standard or purpose to harm standard depends upon the degree to which, under the circumstances, actual deliberation is practical. *Wilkinson*, 610 F.3d at 554. In her Memorandum & Order Re: Cross Motions for Summary Judgment, Judge Patel found that the proper standard for this case is the purpose to harm standard. (*Johnson* Docket 207, at 37:9-38:9.)

6

*Johnson vs. Bay Area Rapid Transit District, et al.*, Case No. C09-00901
DEFENDANT JOHANNES MEHSERLE'S PRE-TRIAL BRIEF

There is simply no evidence to suggest that Mehserle acted in any way with a "purpose to harm" Grant III unrelated to a legitimate law enforcement objective. Mehserle attempted to subdue Grant III, who was actively resisting arrest, in a manner consistent with his training, which permitted the use of tasers. The evidence shows that Mehserle vocalized his intent to tase Grant moments before the shooting. Mehserle's unsuccessful attempt to draw his firearm, use of thumb movements consistent with arming a taser, standing to create distance between Grant III and him, and expression of surprise, shock, and dismay following the shooting all indicate that Mehserle intended to use his taser on Grant III but tragically drew his firearm by mistake. The evidence will show that Mehserle at all times was attempting to bring Grant III into custody, as he had the right to do, in a manner that was consistent with the professional training he received.  In *Lewis, supra,* 523 U.S. AT 852-853, the Supreme Court found that the relevant inquiry is whether "force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  Here, the evidence will show Mehserle was simply attempting to obtain control of Grant's hands to handcuff him.

Mehserle was the 9th law enforcement officer since 2000 to mistakenly shoot an individual he intended to tase.  His shooting, and all the others, had two common elements: (1) the officers used their dominant hand to draw and fire both the taser and firearm; and (2) the officers fired only a single round at the arrestee when they could have fired multiple rounds from their firearms.

The fact that Mehserle mistakenly drew his firearm and shot Grant III is not sufficient to form the basis of a claim against Mehserle, even if the trier of fact finds Mehserle's actions negligent. The standard requires a *purpose to harm* Grant III, unrelated to legitimate law enforcement objectives, yet the evidence is overwhelming that what occurred was an accident. Absent a showing of a purpose to harm, Grant Jr. cannot succeed on this claim against Mehserle.

**B.   GRANT JR. DOES NOT HAVE A SUFFICIENTLY DEEP ATTACHMENT TO GRANT III TO SUSTAIN A CLAIM**

A parent has a "fundamental liberty interest" in "the companionship and society of his or her child and the "state's interference with that liberty interest without due process of law is remediable under 42 U.S.C. section 1983." *Kelson v. City of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985)

7

(citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). Moreover, "the First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" *Bd. Of Dir. v. Rotary Club*, 481 U.S. 537, 545 (1978) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 619-20 (1984); *see also Conti v. City of Fremont*, 919 F.2d 1385, 1388-89 (9th Cir. 1990).

A fundamental question exists as to whether Grant Jr. had a sufficiently "deep attachment and commitment" to his son, Grant III, in order to state a successful claim pursuant to section 1983. Grant Jr. was in prison for the entirety of Grant III's life. While Grant Jr. and Grant III purportedly had regular contact while Grant III was a child, that contact apparently tapered off as Grant III became a teenager and adult: Grant III visited Grant Jr. in 1998 and then one final time in 2002. He did not visit Grant Jr. at all after 2002 until his death.

The law presupposes a "deep attachment and commitment" between parent and child in actions regarding loss of familial relationship. Given Grant Jr.'s incarcerated status throughout the duration of his son's life, Grant Jr. does not possess a sufficient connection to his son in order to prevail on this claim.

### IV.  CONCLUSION

Defendant Mehserle respectfully submits this brief in support of his position on the legal and evidentiary issues that may arise during the trial of this case.

Dated: May 13, 2014　　　　　　　　　　　　　Respectfully submitted,
　　　　　　　　　　　　　　　　　　　　　　　　**RAINS LUCIA STERN, PC**


　　　　　　　　　　　　　　　　　　　　　　　　/s/       *Michael L. Rains*
　　　　　　　　　　　　　　　　　　　　　　　　By:  Michael L. Rains
　　　　　　　　　　　　　　　　　　　　　　　　Attorneys for Defendant JOHANNES MEHSERLE

8

*Johnson vs. Bay Area Rapid Transit District, et al.*, Case No. C09-00901
DEFENDANT JOHANNES MEHSERLE'S PRE-TRIAL BRIEF