THE LAW OFFICE OF JESSICA R. BARSOTTI
Jessica Barsotti, Esq., SBN 209557
5032 Woodminster Lane
Oakland, CA 94602-2614
510.530.4078
510.530.4725 (FAX)

Attorney for Plaintiff, Zeporia Smith, personal representative of Johntue Caldwell

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| ZEPORIA SMITH, personal representative of Johntue Caldwell;<br><br>  Plaintiff,<br>v.<br><br>BAY AREA RAPID TRANSIT DISTRICT; GARY GEE, in his official capacity as CHIEF OF POLICE for BAY AREA RAPID TRANSIT DISTRICT, JOHANNES MEHSERLE individually and in his official capacity as a police officer for BART; ANTHONY PIRONE, individually and in his personal capacity as a police officer for BART; MARYSOL DOMENICI, individually and in her official capacity as a police officer for BART; and DOES 1-50, inclusive,<br><br>  Defendants. | Case No.: C09-00901 EMC<br><br>Related Cases:<br>C09-04014 EMC (Oscar Grant, Jr.)<br>C09-04835 EMC (Bryson, et al.)<br>C10-00005 EMC (Caldwell)<br><br>**PLAINTIFF ZEPORIA SMITH'S TRIAL BRIEF**<br><br>**Trial Date: June 9, 2014**<br>**Time:** 8:30 a.m.<br>**Judge:** Hon. Edward Chen<br>**Location:** United States District Court<br>  450 Golden Gate Avenue<br>  San Francisco, California |
|---|---|

## I.  FACTS

During the early morning hours of January 1, 2009, Mr. Johntue Caldwell was riding a Bay Area Rapid Transit District train ("Train") back to the east bay after a night of celebrating New Year's Eve in San Francisco. He was accompanied by Oscar Grant III, and several other friends and acquaintances.

At or about the Lake Merritt BART Station, an altercation broke out on the Train. The altercation lasted for only a couple of hectic minutes and was punctuated by a brief exchange of pushing shoving and punches. There is no evidence that physical injuries or acts of vandalism occurred during the course of the altercation. An anonymous passenger used the train's emergency intercom to report the fight and the train operator relayed the passenger's report to BART dispatch. Unbeknownst to the Train's passengers, several BART police officers were dispatched to meet the train at the Fruitvale BART Station to quash the altercation; the officers were also told that no weapons were used in the fight. However, the Train was peaceful when it arrived at the Fruitvale BART Station.

When the Train pulled into the Fruitvale BART Station platform, its doors opened and many of its passengers disembarked. The Train remained with its doors open on the platform for several minutes. At or about this same time, Officer Anthony Pirone made his way onto the Station's platform.

Without knowledge of any particularized facts identifying any one individual as having been involved with the altercation and without seeing anyone engaged in criminal activity, Officer Pirone approached Mr. Jack Bryson, Mr. Nigel Bryson and Carlos Reyes. He pulled his taser out of its holster and directed the young men to sit against the Platform's retaining wall. The young men complied with his orders. Shortly thereafter, BART Police Officer Marysol Domenici arrived on the scene and assumed the duty of watching over the young men while Officer Pirone walked over to the Train.

When Officer Pirone arrived at the Train he began yelling profanities and threatening its passengers. He then set his sights on Mr. Grant and ordered him to get off the train. Mr. Grant complied with his orders and walked to the exit. Officer Pirone met Mr. Grant at the door and escorted him over to the same retaining wall that his friends were sitting against. Mr. Grant sat down.

Next, Officer Pirone went back to the Train. He once again began cursing and ominously warned the Train's passengers about the consequences if he had to get on the Train. He then set his sights on Mr. Grant's friend, Mr. Michael Greer. Officer Pirone stepped onto the Train and walked up to Mr. Greer from behind. Without giving any commands or warning he grabbed Mr. Greer around his neck, pulled his hair and dragged him backwards off the Train. Once outside the Train car, he first attempted to throw Mr. Greer to the ground backwards. Mr. Greer verbally objected to the rough treatment. Nevertheless, Officer Pirone slung Mr. Greer to the ground and kneed him on or about Mr. Greer's upper body causing a pre-existing wound on Mr. Greer's nose to bleed.

The young men and the Train's passengers were all shocked. The young men, along with the Train's passengers, verbally responded to Officer Pirone's unwarranted use of force and patent unprofessionalism. To that end, Mr. Grant, the Bryson brothers and Mr. Reyes stood up and voiced their displeasure to Officer Domenici. She in turn began threatening to tase the young men if they did not "shut up and sit the f* down." As Mr. Jack Bryson spoke with Officer Domenici, Mr. Grant tried to play peacemaker by stepping between Mr. Bryson and Officer Domenici. He placed his hand on Mr. Bryson's abdomen, pushed Mr. Bryson back and away from Officer Domenici while telling Mr. Bryson to "be cool."

Officer Pirone observed the interaction and clearly misinterpreted Mr. Grant's behavior as being hostile and/or physically aggressive toward Officer Domenici. Officer Pirone overreacted and rushed over from where he was handcuffing Mr. Greer to where Mr. Grant was standing. He lashed out at Mr. Grant, striking him about his head and kneeing him. Officer Pirone then pulled his taser and ordered all of the young men to "sit the f* down" under threat of being tased in the face. Officer Domenici followed suit calling the young men "b*ches" and began making similar threats while fanning her taser in the face of

the scared young men. Mr. Grant, who had been tased on a prior occasion, sat down and pled with the Officers to not tase him. He also tried to appeal to the Officers sense of humanity telling them that he had a four-year old daughter at home.

Next, Officer Pirone left the group and walked over to the Train's engineer, an act that should have taken place upon initial arrival at the station and before anyone was stopped, creating the heightened scene in the first place. He asked the Train engineer "what do we have here?" She responded by telling him "some bulls…" referring to problems, like fighting, that occur on BART trains on occasion and especially on special occasions such as New Year's Eve. The train operator did not have any additional information to provide Officer Pirone regarding the altercation. She was unable to identify any supposed victim or any of the young men as being involved in the reported altercation. In fact, after their brief exchange, Officer Pirone did not have any objective evidence indicating that an altercation had taken place or that any of the young men had committed a crime.

Mr. Grant, who was sitting and talking on his cell phone to the mother of his four year-old daughter, Sophina Mesa, told her "baby, the police are beating us for no reason" and quickly hung up his phone. As Officer Pirone was walking back towards the group, he gave orders for the officers to place the young men under arrest. Mr. Grant asked the Officers immediately in front of him what Officer was in charge. He was told to speak to Officer Pirone. Mr. Grant then slowly rose to a catcher's position, with his palms up in the air indicating peace and asked Officer Pirone if he could speak to him.

Officer Pirone walked over to Mr. Grant forcefully pushed him back down toward the ground, pulled his taser out and told him "No." Officer Pirone then went on to say words to the effect that "if you get back up I will fuck you up." Then Officer Pirone leaned into Mr. Grant's face and began taunting him calling Mr. Grant a "bitch ass nigger" twice. At or about this time, Officers Mehserle who was standing

nearby finished handcuffing Mr. Jack Bryson, Jr. Without warning or giving any orders indicating that the Officers wanted Mr. Grant to lay prone or place his hands behind his back, Officer Mehserle came from behind and pushed Mr. Grant down to the ground.

As Mr. Grant was bringing his arm behind his back to be handcuffed, Officer Mehserle inexplicably stood up, drew his firearm and pointed it directly at Mr. Grant's back. Without justification or provocation he fired a single shot from his weapon into Mr. Grant's back as he lay face down on the platform. Mr. Grant was unarmed, both his hands were behind his back and he was not posing a threat to Officer Mehserle or anyone else when he was shot. The shooting stunned the crowd, the young men and the Officers alike. It prompted the crowd and the young men to all yell at the Officers.

Officers Pirone and Mehserle stood up and rolled Mr. Grant over. They saw what would have been the bullet's exit wound in the upper part of Mr. Grant's chest and finished placing him in handcuffs. Mr. Grant told the Officers "You shot me, you f*… shot me" and quickly began to lose consciousness. No first aid was administered at this time. Despite Mr. Grant's friends repeatedly asking the Officers to administer first aid and call an ambulance, none of the assembled BART Police Officers attempted to render first aid until several minutes later. Instead, one or more of the BART Officers told the young men to "shut the fuck up" and warned them that they better be quiet or the Officers would not call an ambulance for Mr. Grant.

Within moments of the shooting, BART Police Officers immediately began seizing witnesses' cameras and other recording devices. Five of Mr. Grant's friends were arrested, placed in handcuffs and taken to the BART Police Station against their will. They were all forced to remain handcuffed and in custody for over 5 hours before they were released. To date, no criminal charges have been filed against the young men.

At the time of the shooting, Plaintiff Caldwell was observing the activities of the officers and becoming very concerned for his friends. Caldwell, along with Fernando Anicete and Jamil Dewar, were watching as the police attacked their friends for no apparent reason. It was not clear to anyone on the platform why the police had confronted these young men, indeed there appeared to be no problem on the platform until police arrived as seen on the BART platform video.

Officers Pirone, Domenici and Woofidin testified at Officer Mehserle's preliminary hearing. They gave testimony that sought to exaggerate the conditions present on the platform that night. To that end, they all described the scene as being extremely chaotic and being in fear for life. However, their claims are unsupported by the videotape evidence. Ms. Karina Vargas' videotape of the incident shows the platform as quiet and Mr. Grant's group peacefully sitting on the platform floor. It was not until Officer Pirone needlessly attacked Mr. Greer and Mr. Grant did the young men or the Train's passengers begin to vocalize their displeasure. Despite the fact that they themselves were being unlawfully detained, none of the young men threatened and/or attempted to physically assault any of the BART Officers.

### III. FACTUAL ANALYSIS

UNWARRANTED STOP AND DETAINMENT

Testimony of Officers Pirone and Mehserle indicate that they had very little information regarding the fight to which they were responding on the fateful night at Fruitvale Station. The only information that had been gathered before they began to herd the young black men to the wall to detain them was gathered from an anonymous passenger who used the train's emergency intercom to report a fight in the train's lead car. The operator relayed that message to dispatch who then relayed it to several officers in the area. The dispatcher also told the officers that no weapons were used in the fight. The message contained no information regarding what the people engaged in the fight looked like nor how

many people were involved. That means the only information that Officer Pirone had when he arrived on scene was that there were people in the lead car that were involved in the fight. Without having more information, Pirone did not have the required individualized reasonable suspicion to stop anyone—let alone detain them.

Instead of talking to the train operator to try to gain more information, Pirone stopped a group of black men that were near the lead car of the train and immediately started badgering them and flashing his taser.

## UNWARRANTED USE OF THE TASER

Videotape of the incident and Officer Pirone and Domenici's testimony at the preliminary hearing, indicates Officer Pirone and Domenici repeatedly fanned and pointed their tasers into the face of Oscar Grant, Johntue Caldwell and their friends. Officer Pirone and Domenici repeatedly threatened to tase Oscar Grant even though he was not presenting a physical threat to either Officer or anyone else's safety during the instances they either deployed and/or threatened to use their tasers against him. Domenici also threatened to tase Caldwell prior to shoving him onto the train in the moments after Grant was shot by Mehserle

## UNPROVOKED PHYSICAL ATTACKS

### 1ST attack: Officer Pirone Attacks Oscar, The Peacemaker

Immediately before the chain of events that resulted in Oscar being attacked by Officer Pirone, he along with the three other young men he was detained with were passively sitting down along the BART platform retaining wall. After he witnessed Officer Pirone violently throw Mr. Michael Greer to the ground he stood up along with the other young men. They began vociferously protesting Officers Pirone and Domenici's conduct. According to the videotape of the incident, Mr. Jack Bryson was standing in front of Officer Domenici and they began exchanging profanities. Officer Domenici also began

threatening to tase the young men. Oscar, seeing the argument and fearing it may escalate, took a step toward Jack. As he took the step, he placed his hand between Jack and Officer Domenici, at about Jack's waist. The young men recall Oscar making statements to the effect of "calm down, calm down" and Oscar nudging Jack back and away from Officer Domenici.

Officer Pirone interpreted Oscar's actions as being aggressive in nature and has testified that he believed Oscar had reached out and grabbed a hold of Officer Domenici's arm and/or elbow. The videotape clearly shows Oscar was not acting aggressively, did not grab a hold of Officer Domencici and was in fact, playing a peacemaker. Plaintiffs allege that Officer Pirone's misperception, unwarranted sense of anxiety and resulting brutality were due in part to a non-professional relationship between the two Officers.

Officer Pirone seeing what he believed was Oscar being aggressive toward Officer Domenici finished handcuffing Mr. Greer and rushed over to where Oscar was standing. He violently reached out and struck Oscar about his head. Then, he pulled Oscar's head down while pushing him back into the wall and kneeing him. Next, Officer Pirone deployed his taser and threatened to tase Oscar and the other young men. He fanned the taser toward the group, while shouting profanities and training the taser's infrared beam on their face. Oscar pleaded not to be tased and immediately sat down. Officer Pirone then left the scene and walked down the platform to speak to the BART Train Operator.

**2nd Attack: Oscar Grant, the "Bitch Ass Nigger"**

After Officer Pirone returned from speaking to the BART Train Operator, he walked back over to where the group of young men and now, several BART Police Officers were standing. Knowing that the BART Train Operator was unable to provide a description of the "fight" participants or identify a victim, he decided to place the young men under arrest in an effort to cover up and/or justify his own unwarranted attack on them. To that end, he walked over to the group and announced they were under arrest.

Oscar, who was kneeling in a baseball catcher's stance, began to rise up. Officer Pirone pulled his taser and once again rushed over to where Oscar was standing and forcefully pushed Oscar to the ground.

Shockingly, Officer Pirone stood before Oscar and leaned into his face and began yelling profanities and racial slurs. He told Oscar "if you stand up, I will fuck you up." Oscar who was now on his knees with his hands up, asked Officer Pirone if he could talk to him. Officer Pirone retorted "No" and according to Officer Pirone's own deposition testimony, Officer Pirone yelled "Bitch Ass Nigger, Bitch Ass Nigger" into Oscar's face moments before Oscar was needlessly forced to the ground from behind by Officer Johannes Mehserle.

**3rd Attack: The Fatal Flaw**

At or about the same time Officer Pirone was taunting Oscar Grant with racial slurs, Officer Mehserle finished handcuffing Jackie Bryson. Jackie who was kneeling beside Oscar Grant was handcuffed without incident. There is no reason why Oscar could not have been placed in handcuffs in a similar fashion as well.

The Officers did not have to take Oscar to the ground in order to be handcuffed. In fact, Oscar was not engaged in any aggressive conduct and was complying with the Officers' orders at the time he was forced to the ground by Officer Mehserle. According to the video, Oscar's attention was directed at Officer Pirone when Officer Mehserle snuck up from behind and forced him to the ground. Oscar landed on top of Carlos Reyes' legs. Oscar apparently had his hands extended out underneath his body in an effort to break his fall.

The position Oscar was placed in made it difficult if not impossible for Oscar to comply with the Officers demands to place his hands behind his back. That difficulty was created by the Officers pinning Oscar's arms and hands beneath his body, not Oscar. Oscar's 5'8" 165 pound frame was no match for Officer Pirone's 6'2" 250 pound and Officer Mehserle's 6'3" 190 pound frames that were pinning him to

the ground. At some point while Oscar was on the ground, Officer Pirone readjusted and/or turned Oscar's body so as to allow Carlos to remove his leg from underneath Oscar's body. Within moments of Carlos retrieving his left leg from underneath Oscar, videotape of the incident shows Oscar placing his hands behind his back as Officer Mehserle is in the process of standing up and unholstering his gun. Nevertheless, Officer Mehserle stood up, drew his handgun for several seconds and then fired it directly into Oscar's back. The bullet struck Oscar in the back inches above Oscar's hands. Videotape clearly shows Oscar's hands were crossed behind his back in handcuffing position.

**Final Action: removal of witnesses**

Immediately after Mehserle shot the defenseless Grant in the back, police began an attempt to remove witnesses from the scene. Domenici threatened Caldwell and Dewar with her taser and forced them onto the still idling BART train. No attempts to interview these witnesses, or any other witness on the BART was made at the time by these attending officers. In this attempt to remove witnesses from the scene of this unlawful shooting, Caldwell was seized, detained, assaulted and battered by Domenici.

## IV. <u>SUMMARY BRIEFING ON CONTROLLING ISSUES OF LAW</u>

### A. Unwarranted Stop and Detainment

One must have reasonable suspicion for a proper *Terry* stop. Anonymous tips, such as the one received by the train operator which was relayed to the BART dispatcher who then relayed it to the officers, are the least reliable and require further corroboration by officers for proper reasonable suspicion to be formed. *Alabama v. White* 496 U.S. 325, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990). Furthermore, one must develop reasonable suspicion before any action is taken and must tie the reasonable suspicion to the individual (individualized reasonable suspicion). Lastly, the reasonable suspicion must be based on articulable facts. Just the fact that Mr. Grant and his friends were black males in a group is not enough to create reasonable suspicion (see *Florida v. J. L.* (529 U.S. 266, 120

S.Ct. 1375, 146 L.Ed.2d 254 (U.S. 2000)), which ruled that an anonymous tip identifying a person who is carrying a gun is not, without more reason, sufficient to justify a police officer's stop and frisk of that person. The U.S. Supreme Court concluded that the tip, which stated that a young black male was standing at a particular bus stop, wearing a plaid shirt, and carrying a gun, lacked sufficient reliability to provide reasonable suspicion to make a *Terry* stop). Because the officers did not even have the authority to stop these young men, they certainly did not have the authority to detain them.

The police officers should not have detained Oscar Grant III and his friends at the lead car without reasonable suspicion and probable cause, as lacking that meant they lacked the authority to stop anyone. This terrible tragedy could have been avoided if the responding officers had confirmed the anonymous tip given to dispatch by speaking to the train operator; if they had done so, they would have been told that is was normal "bulls*" and Oscar Grant III might still be alive today. Because the initial stop and detainment of these individuals was illegal in the first place, everything that took place after these illegal events, and especially including the murder of Oscar Grant III, are "fruit of the poisonous tree" including the unlawful seizure and detention of Caldwell and the assault and battery by Domenici.

### B. The Use of Excessive Force

An application of excessive force is determined under the Fourth Amendment's "objective reasonable standard." *Graham v. Connor*, 490 U.S. 386, 394 (1989). The reasonableness of a particular use of force is judged "from the perspective of a reasonable officer on the scene" and "in light of the facts and circumstances confronting them." *Id*. at pp. 396-97. Applying this standard "require[s] a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing government interests at stake." *Ibid.*

The analysis of an excessive force claim further "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect

poses an immediate threat to the safety of the officers or others and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham, supra*, at p. 396. Where a victim of a seizure alleges that officers unreasonably employed excessive force under the circumstances in order to detain or subdue her, the "reasonableness of force should be analyzed in light of such factors as the requirements for the officers' safety, the motivation for the arrest [or detention], and the extent of the injury inflicted." *Smith v. Fontana*, 818 F.2d 1411, 1416 (1987), *overruled on other grounds Hodgers-Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999).

Here, Officers Pirone and Domenici used excessive force against Mr. Grant. Their stop and detention of Mr. Grant, Mr. Caldwell and their friends was unreasonable and hence unlawful. The Officers did not have any particularized information and/or articulable reasons for stopping Mr. Grant. Neither Mr. Grant nor his friends physically accosted or threatened any of the Officers on the scene. Nevertheless, Officer Pirone viciously struck Mr. Grant about his head and Officers Domenici and Pirone threatened to tase Mr. Grant and Caldwell in the face. This is the basis of the assault and battery claim against Domenici.

**C. Unlawful Seizure and Detainment**

Dominici admitted that she detained Caldwell that night and forced him onto the train against his will. The detention against the side of the train and subsequent forcing onto the train was an illegal detention of Caldwell.

Dominici has given several versions of the events that night in various statements. While these statements have been inconsistent on certain facts, Dominici has consistently testified that she forced Caldwell onto the BART train after Oscar Grant was shot by Mehserle. Dominici has never claimed that Caldwell assaulted her verbally or physically other than asking for her badge number, which is protected

speech under the First amendment. It appears from the facts of this case that Domenici retaliated against Caldwell for this protected speech by forcing him onto the train.

"A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." *People v. Souza* (1994) 9 C.4th 224, 231. Caldwell never interfered with the police activity and was never suspected of any crime.

Police practices expert John Jack Ryan opined that Caldwell was detained against the train and thereafter because his movements were restricted. He also opined that the actions of Dominici in detaining Caldwell against the train and then forcing him onto the train in a continued "detention" was inconsistent with proper police practices given the facts and circumstances of this case.

### D. Retaliation

The testimony of nearly all actors that night indicate that when Pirone aggressively pulled Greer off the train by the hair observers were upset. Independent witnesses of the actions of Pirone immediately began criticizing what appeared to them to be illegal police activities. There was no problem on the platform until Pirone engaged in this illegal activity. The availability of this kind of criticism to the public distinguishes our society from that of a police state. The citizens have a right to question police activity.

Johntue Caldwell also questioned police activity that night. He did so in a way that was completely protected by his civil rights. He observed the police activity from a distance and vocalized his despair when he witnessed police brutalize his friends and then shoot his best friend in the back, for no apparent reason. Pirone had no valid reason to detain, arrest and use force on the other plaintiffs, so Caldwell's actions in criticizing this illegal police activity is protected. Even if Pirone had probably cause to arrest

the other plaintiffs that night, Caldwell violated no laws, and was not suspected of committing any crime and thus was not properly detained but rather retaliated against.

More importantly, even in the face of this brutal and unprovoked attack on his friends, Caldwell never assaulted police or interfered with their illegal actions. Caldwell did nothing more than observe, cringe, cry out in despair and ask Dominici for her badge number when she approached him with her taser and forced him onto the train. There was no valid police purpose for this.

### E. Integral Participation by Pirone

All of the activities of the police that night were precipitated by the illegal stop by Pirone. Each and every officer on the platform on the day in question took their orders and information from Pirone. None of the officers had any independent information upon which to act. Because of this fact, a trier of fact could easily find that the actions by Pirone lead to Dominici detaining Caldwell against the train illegally and to the shooting death of Oscar Grant III. The requirement of active participation does not require that each officer's actions themselves rise to the level of a constitutional violation. It is sufficient if the individual officer participated in the wrongful act in some meaningful way, was aware of his fellow officers' conduct, did not object to such conduct, and/or provided back up enabling the other officers to commit the wrongful act and was not a mere bystander. *Chuman v. Wright,* 76 F.3d 292, 294-95 (9th Cir. 1996) and *Boyd v. Benton County,* 374 F.3d 773, 780 (9th Cir. 2004).

Thus, to be liable for a constitutional violation, an officer must have either "personally participated in" or "have been integral to" the wrongful conduct. *Jones v. Williams,* 297 F.3d 930, 936 (9th Cir. 2002). Mere presence at the scene is not sufficient. The officer must be more than a "'mere bystander' 'no role in the unlawful conduct.'" *Chuman v. Wright,* 76 F.3d 292, 294-95 (9th Cir. 1996) (rejecting "team effort" instruction). However, "integral participation does not require that each officer's actions

themselves rise to the level of a constitutional violation." *Boyd v. Benton County,* 374 F.3d 773, 780 (9th Cir. 2004).

    Here, Pirone's actions in initiating an illegal stop and then ordering other officers to detain or arrest the subjects was integral participation in the illegal detention of Caldwell and the unlawful shooting of Grant.

| DATE | THE LAW OFFICE OF JESSICA R. BARSOTTI |
|---|---|
| May 13, 2014 | /s/ <br> Jessica R. Barsotti, Esq. |

15

PLAINTIFF ZEPORIA SMITH'S TRIAL BRIEF            CASE NO. C09-00901 EMC