**United States District Court**
For the Northern District of California

1
2
3
4
5                    UNITED STATES DISTRICT COURT

6                  NORTHERN DISTRICT OF CALIFORNIA

7

8   WANDA JOHNSON, *et al.*,                      No. C-09-0901 EMC

9            Plaintiffs,                          **CONSOLIDATED CASES**

10        v.                                      C-09-4014 EMC (Grant)
                                                  C-09-4835 EMC (Bryson, *et al.*)
11   BAY AREA RAPID TRANSIT DISTRICT,             C-10-0005 EMC (Caldwell)
     *et al.*,
12                                                **FINAL PRETRIAL CONFERENCE**
             Defendants.                          **ORDER**
13   _____/

14   AND RELATED ACTIONS.
     _____/
15

16

17            I.    **TRIAL DATE & LENGTH OF TRIAL**

18            Jury selection via distribution of questionnaires shall commence on Friday, June 6, 2014, at

19   8:30 a.m.  Completed Jury Questionnaires will be collected and two (2) copies provided to the Court

20   by counsel by 2:00 p.m., June 6, 2014.  The parties will provide a stipulation to the Court as to

21   which prospective jurors will be excused for oral voir dire by 3:00 p.m., June 6, 2014.  Oral voir dire

22   will commence Monday, June 9, 2014, at 8:30 a.m.  Parties shall be prepared to deliver opening

23   statements on Monday, June 9, 2014.  Trial days normally shall last from 8:30 a.m. to 2:00 p.m. (or

24   slightly longer to finish a witness), with one 15-minute break and one 30-minute lunch break.  Each

25   *side* shall each have a total of 25 hours in which to conduct their opening statement, direct and cross

26   examinations, and closing argument.  Each side shall reach an agreement amongst themselves as to

27   how the 25 hours will be allocated among the parties.  They shall notify the Court of how they have

28   divided their time on the first day of trial.  Parties must arrive by 8:00 a.m. or earlier as needed for

1  any matters to be heard out of the presence of the jury.  The jury shall be called at 8:30 a.m.  The

2  trial week is Monday through Friday, excluding holidays.  Thursdays are dark.

3  ## II.   EXPECTATIONS OF COUNSEL

4          The Court is extremely concerned regarding the performance of counsel for all parties in

5  preparing the various pre-trial filings.  The parties failed to comply with the Court's civil pre-trial

6  instructions.  Specifically, the parties (1) failed to properly coordinate and file their motions in

7  limine and the oppositions, thus requiring a number of corrections to docket entries; and (2) failed to

8  file a statement listing 15 bellwether exhibits for which the parties desired a ruling in advance of

9  trial.  Further, the quality of the analysis in the motions in limine and oppositions was below what

10 the Court expects of members of the bar.

11         More troubling, however, are the indications the Court has received that counsel have failed

12 to conduct themselves with the high standard of decorum and professionalism this Court expects of

13 counsel.  "Our adversarial system relies on attorneys to treat each other with a high degree of civility

14 and respect." *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1263 (9th Cir. 2010).  The Court

15 will not tolerate counsel treating each other with hostility, disrespect, or a lack of cooperation.

16 Counsel is admonished to keep this in mind when this Court requires the parties to meet and confer.

17 Any counsel who fails to abide by the highest level of professional standards during the remainder

18 of this litigation will be sanctioned.

19 ## III.   PROCEDURE FOR EXHIBITS AT/DURING TRIAL

20 A.      No later than the end of each trial day, counsel shall inform opposing counsel of which

21         exhibits (including demonstrative evidence), if any, he or she intends to introduce during the

22         next trial day and, if necessary, with respect to which sponsoring witness.  If any such

23         exhibits are still objected to, both counsel shall notify the Court after the jury is excused for

24         the day and shall identify the exhibits at issue and the objections.  The Court will then

25         schedule a conference that afternoon or the following morning to resolve the dispute.

26 B.      At the end of each trial day, counsel shall also provide opposing counsel with a tentative

27         preview of the exhibits he or she intends to introduce during the trial day after next.  Parties

28         are directed to make a good faith effort to ensure such previews are as accurate as possible.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

C.  With respect to exhibits to be used on the first day of trial, counsel shall inform opposing counsel of which exhibits, if any, he or she intends to introduce by Wednesday, June 4, 2014, at 5:00 p.m.  If any such exhibits are still objected to, both counsel shall notify the Court by June 5, 2014, at 2:00 p.m., and shall identify the exhibits at issue and the objections.  The Court will then address the dispute on the first day of trial, June 6, 2014, before any testimony begins.

D.  If a party intends to use a projector or other equipment to show an exhibit (or demonstrative) to the jury, that equipment shall be set up and ready for use by 8:30 a.m. each day.  The parties should immediately file with the Court, if necessary, administrative requests to bring projectors and/or other equipment to the courthouse for use at trial.

## IV.  PROCEDURE FOR WITNESSES AT/DURING TRIAL

A.  Each party shall be prepared, during its case in chief or any rebuttal, to present its next witness.  At any time, if the party whose case is being presented is not prepared to present its next witness, that party shall be deemed to have rested that portion of its case.  No further witnesses shall be permitted by the party who has so rested in that portion of the case (*e.g.*, case in chief or rebuttal).

B.  Counsel are expected to cooperate with each other in the scheduling and production of witnesses, including informing one another of witness order.  At the end of each trial day, Counsel shall give opposing counsel notice of which witnesses will be testifying on the following day.  At that time, counsel shall also provide a tentative preview of witnesses who are expected to testify the day after next.  Witnesses may be taken out of order if necessary.  Every effort shall be made to avoid calling a witness twice (as an adverse witness and later as a party's witness).

C.  Only one lawyer for each party may examine any single witness and make objections.

D.  If a witness is testifying at the time of a recess or adjournment and has not been excused, the witness shall be seated back on the stand when the Court reconvenes.  If a new witness is to be called immediately following recess or adjournment, the witness should be seated in the front row, ready to be sworn in.

United States District Court

For the Northern District of California

E.  Counsel shall refrain from eliciting testimony regarding any undisputed facts as set forth in any stipulation filed with the Court. The Court may read to the jury such undisputed facts at appropriate points in the trial.

F.  Witnesses shall be excluded from the courtroom until completion of their testimony.

## V.  OTHER PROCEDURES AT TRIAL

A.  To make an objection, counsel shall rise, say "objection," and briefly state the legal ground (*e.g.*, hearsay or irrelevant). There shall be no speaking objections or argument from either counsel unless requested by the Court.

B.  Bench conferences, or the equivalent of sidebars, will not be permitted absent truly extenuating circumstances. Disputes regarding exhibits shall be resolved as set forth in Part II, *supra*. Any other disputes or problems should be addressed either before the trial day commences, at the end of the trial day, or during a recess, if necessary.

## VI.  STIPULATIONS OF FACT

In their pre-trial conference statement, the parties have set forward six facts that are undisputed. Specifically, the parties have stipulated that BART operates a "a rail-based transit system through multiple cities and counties in the San Francisco Bay Area." Docket No. 344, at 11. They have further stipulated that the Defendants were on duty in the early morning of January 1, 2009. *Id.* Every other material fact remains in dispute.

## VII.  PRELIMINARY LEGAL ISSUES

A.  Remaining Claims in *Caldwell v. Bay Area Rapid Transit District*

In *Caldwell v. Bay Area Rapid Transit District*, No. C10-0005, Caldwell originally asserted thirteen causes of action against Defendants Bay Area Rapid Transit District, Gee, Mehserle, Pirone, and Domenici. At summary judgment, Judge Patel dismissed the following claims from Caldwell's complaint: (1) the § 1985 claim, (2) the § 1986 claim, (3) the § 1981 claim, (4) the § 1983 excessive force claim against Domenici, (5) as discussed above, the municipal liability claims; (6) the claims under Cal. Civ. Code § 51.7.

At the pre-trial conference, Caldwell conceded that dismissal of a number of his remaining claims was appropriate. First, his intentional infliction of emotional distress claim must be

dismissed as such claims do not survive the death of the victim. *See Copeland v. County of Alameda*, No. 12-cv-04286-JST, 2014 WL 1266198, at *1 (N.D. Cal. Mar. 21, 2014) ("Plaintiffs cannot assert an IIED claim on behalf of the decedent, because emotional distress damages do not survive the death of the person who suffered them."); *see also Martin v. Cal. Dep't of Veterans Affairs*, 560 F.3d 1042, 1051 (9th Cir. 2009) (same). Second, Caldwell agreed that dismissal of Defendant Mehserle from his action is appropriate insofar as he was not served in the *Caldwell* action. *See* Docket No. 344, at 24. Finally, Caldwell conceded that in light of Judge Patel's summary judgment order rejecting a "deliberate indifference" theory of liability stemming from an alleged relationship between Defendants Pirone and Domenici, dismissal of Defendant Gee was required.

In light of the above, Defendants Gee and Mehserle are **DISMISSED** from the *Caldwell v. Bay Area Rapid Transit District* action. Further, Caldwell's claim for intentional infliction of emotional distress is also **DISMISSED**. Accordingly, the Caldwell action has three causes of action: (1) a § 1983 action alleging unreasonable seizure/unlawful detention; (2) a state law claim for violating Cal. Civ. Code § 52.1; and (3) a state law claim for assault and battery. These claims are asserted against Defendants Pirone and Domenici. In response to Defendant Pirone's requests for dismissal in his pretrial filing, the Court issued an order to show cause why the claims against Pirone should not be dismissed. Further, Defendants have moved to dismiss the state law causes of action for failure to comply with the California Tort Claims Act. These outstanding issues will be addressed in a separate order.

B.    Remaining Claims in *Grant v. Bay Area Rapid Transit District*

Plaintiff Oscar Grant, Jr. asserts a single cause of action under 42 U.S.C. § 1983 for denial of familial relationship. In her summary judgment order, Judge Patel granted Defendants Pirone, Domenici, Woffinden, and Knudtson summary judgment on this claim. *Johnson v. Bay Area Rapid Transit Dist.*, 790 F. Supp. 2d 1034, 1066 (N.D. Cal. 2011), *rev'd in part on other grounds* 724 F.3d 1159 (9th Cir. 2013). In response to Defendant Gee's request for dismissal in his pretrial filing, the Court has previously issued an order to show cause why Defendant Gee should not be dismissed from this claim. The Court will address this outstanding issue in a separate order. Further, Plaintiff

5

**United States District Court**
For the Northern District of California

1   Grant Jr. filed a motion to amend his complaint to assert a number of claims on behalf of the estate

2   of his son, Oscar Grant, III.  The Court has denied this motion.  Docket No. 478.

3   C.      Caldwell's Reliance on Domenici's Alleged Taser User for his Assault and Battery Claim

4           Defendant Domenici contends that Caldwell cannot support his state law assault and battery

5   claim based on Domenici's alleged use of her taser.  She bases this on the fact that Judge Patel had

6   previously found her entitled to qualified immunity on Caldwell's Fourth Amendment excessive

7   force claim for use of the taser.  *See Johnson v. Bay Area Rapid Transit*, 790 F. Supp. 2d 1034,

8   1063-64 (N.D. Cal. 2011); *see also* Docket No. 344 ("Since the Court granted Defendant

9   DOMENICI qualified immunity for her use of a Taser during the event, it cannot, as a matter of law

10  be found to have violated the Fourth Amendment.").  Thus, Domenici argues, because a battery

11  plaintiff in California must show "unreasonable" force, this prior order subsequently bars reliance on

12  the same facts for his assault and battery claim.  *See Edson v. City of Anaheim*, 63 Cal. App. 4th

13  1269, 1272-73 (1998).

14          Domenici's claim fails because Judge Patel granted her qualified immunity as to this claim

15  because the unconstitutionality of using tasers in such circumstances was not "clearly established" at

16  the time of the incident.  *Johnson*, 790 F. Supp. 2d at 1061.  Accordingly, Judge Patel made no

17  ruling that Domenici's use of the taser was reasonable – in fact, taking all facts in the light most

18  favorable to Caldwell, she concluded that "the trier of fact could reasonably conclude that

19  Domenici's use of force was excessive insofar as she threatened to tase plaintiffs in the face."  *Id.*

20  Accordingly, there is no basis for preventing Caldwell from introducing such evidence in support of

21  his assault and battery claim.

22                      **VIII.     DOMENICI MOTIONS IN LIMINE**

23  A.      Motion in Limine No. 1: References to Termination and Rehiring

24  In her first motion in limine, Defendant Domenici seeks an order preventing Plaintiffs from

25  presenting evidence, or mentioning or suggesting that BART terminated her employment as a BART

26  police officer as a result of an internal investigation into the events at issue.  Docket No. 340.

27  Domenici appealed the termination to final and binding arbitration, pursuant to the terms of her

28  employment agreement.  *Id.* at 3.  The arbitrator found there was no "just cause" for her termination

United States District Court

For the Northern District of California

1   and the proper remedy was "reinstatement with full back pay and benefits, as well as the removal of

2   all findings inconsistent with this Decision from her personnel record." *Id*. Exh. B at 2.  Only Oscar

3   Grant, Jr. opposes the motion.

4         First, Grant Jr. argues that any conclusions arising from BART's "lengthy investigation" are

5   directly relevant to the extent it reflects "Defendant Domenici not acting within the scope of her

6   mandate as a BART police officer" or any violations of policies or procedures on the Fruitvale

7   Station platform on January 1, 2009.  Docket No. 340, at 25.  However, the Court finds the relevance

8   of Domenici's termination is reduced by the arbitration decision which indicates that the grounds for

9   termination were largely based on: (1) allegations of untruthfulness in Domenici's description of the

10  events of January 1, 2009 during BART's investigation, and (2) of violating procedures not directly

11  related to the events – such as leaving an arrestee in the back of a patrol car upon being called away

12  to the Fruitvale platform.  Docket No. 340 Exh. B at 6-7.  Further, any probative value is eviscerated

13  by the subsequent decision of a neutral arbiter that Domenici was truthful in her account of the

14  events and that she was entitled to reinstatement.  The low probative value of Domenici's

15  termination is substantially outweighed by the risk of unfair prejudice to Domenici as well as the

16  risk of confusion of issues.  Additionally, introducing evidence of the termination will require trial

17  time being spent on BART's reasoning behind the termination as well as a description of the

18  subsequent arbitration and decision.  This use of trial time is inappropriate in light of the collateral

19  nature and low probative value of this evidence.

20        Second, Grant Jr. asserts that "Domenici's employment status at the time a statement or

21  testimony was/is given is relevant and necessary to show bias, interest, or other motive in the

22  testimony given."  Oscar Jr.'s Opp. to Mot. (Docket No. 340) at 2.  The source of the purported bias

23  is that Domenici had or has something "to lose in terms of her employment as a BART police

24  officer."  *Id*. at 3.  Both extrinsic evidence and cross-examination are admissible to show bias.  *See*

25  *United States v. Abel*, 469 U.S. 45, 49-50 (1984).  However, Domenici's termination is not relevant

26  to showing bias.  Assuming that Domenici's status of being employed by BART – either prior to the

27  termination or after reinstatement – was or is a source of bias, this bias can be brought out by

28  demonstrating that she was employed at the time of the statement.  Plaintiffs do not need to bring in

7

United States District Court

For the Northern District of California

1  evidence of the termination.  To the extent that Oscar Jr. is arguing that the status of being a

2  terminated employee desiring reinstatement affected Domenici's prior testimony, the Court finds

3  this theory extremely speculative such that any probative value on the question of "bias" is

4  substantially outweighed by the risk of unfair prejudice.

5       For the foregoing reasons, consistent with F.R.E. 403, Domenici's first motion in limine is

6  **GRANTED**.

7  B.     Motion in Limine No. 2: Alleged Personal Relationship Between Pirone and Domenici

8       In her second motion in limine, Domenici seeks an order precluding Plaintiffs from

9  presenting evidence or testimony suggesting that she had a personal or "non-professional"

10  relationship with Defendant Pirone.  Docket No. 342-3.  Caldwell in his complaint asserts that the

11  "non-professional relationship" between officers on the platform contributed to him being assaulted

12  and unlawfully detained and that, further, BART and Defendant Gee were "deliberately indifferent"

13  to his rights by failing to alter Domenici and Pirone's assignments in light of their relationship.

14  *Id.* at 5.  Domenici argues that any evidence regarding an alleged relationship between her and

15  Pirone is irrelevant to the critical questions raised in the *Caldwell* action – whether Domenici

16  unlawfully detained or assaulted Caldwell.  *Id.* at 7.  She argues any claim that there is a connection

17  between an alleged relationship and the actions which occurred between her and Caldwell is mere

18  speculation.  *Id.* Further, to the extent there is any probative value, she argues it is substantially

19  outweighed by the risk of unfair prejudice.  *Id.* at 8.

20       Caldwell opposes this motion.  She argues the evidence is relevant because:

21           The clear facts are that Pirone and Dominici [sic] acted in
           concert that night.  Dominici [sic] took all of her orders to act that
22           night from Pirone.  She never questioned his actions, nor any of his
           orders despite admitting to having little to no information of her own
23           to justify any detention, seizure or arrest.  The fact that Dominici [sic]
           blindly followed the lead of Pirone without bothering to do her own
24           due diligence as a police officer to justify her actions can be explained
           by the alleged personal relationship between the two.
25

26  Docket No. 342-3, at 15.  Further, she argues the alleged relationship is relevant to the "totality of

27  the circumstances" because it explains why "Pirone acted so aggressively against Grant and ordered

28  him to be arrested by Mehserle."  *Id.*  Under his theory, Pirone's actions can be explained by an

1   erroneous belief that Grant III touched Domenici's arm, thus causing him to be angered that he

2   touched "his 'woman.'" *Id.*

3          First, Caldwell's relevance arguments fail.  There appears to be no evidence that Pirone

4   directed Domenici's conduct towards Caldwell.  She turned her attention to Caldwell and his group

5   on her own volition.  Hence, there is no demonstrated causal relationship between her relationship

6   with Pirone and what she allegedly did to Caldwell.  Second, even were this Court to credit

7   Caldwell's theories of relevance, the Court finds that the minuscule probative value of the evidence

8   is substantially outweighed by the risk that such inflammatory and personal information would both

9   confuse the issues before the jury and waste time.  At most, any testimony regarding an alleged

10  relationship between Domenici and Pirone would support a speculative theory on a very tangential

11  point.

12         Accordingly, Domenici's second motion in limine is **GRANTED**.  *See* F.R.E. 403.

13  C.     Motion in Limine No. 3: Exclude Evidence of Undisclosed Damages

14         Domenici and Pirone move to exclude evidence of damages allegedly suffered by Caldwell

15  on the basis that Caldwell failed to provide a computation of damages in his initial disclosures made

16  pursuant to Federal Rule of Civil Procedure 26(a).  She argues that because of this failure to disclose

17  "Defendants on the eve of trial have no information on what Plaintiff Caldwell's Representative

18  intends to claim, nor to conduct discovery."  Docket No. 343.

19         Caldwell has opposed this motion on three grounds.  First, he contends that the initial

20  disclosures listed as witnesses Caldwell's employer and his therapist, thus "alert[ing] Defendants to

21  the nature and category of damages claimed."  Docket No. 343, at 9.  Second, he asserts that at the

22  time Defendants took Caldwell's deposition, they knew about the nature and category of asserted

23  damages insofar as he was questioned about them during the deposition.  Finally, Caldwell argues

24  that exclusion of damage evidence is a harsh remedy and the Court has the discretion to order a less

25  severe remedy.

26         Under Federal Rule of Civil Procedure 37(c)(1), if a party fails to provide information as

27  required under Rule 26(a), "the party is not allowed to use that information or witness to supply

28  evidence on a motion, at a hearing, or at a trial" unless the court finds the "failure was substantially

United States District Court

For the Northern District of California

justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see also Hoffman v. Construction Protective Servs., Inc.*, 541 F.3d 1175, 1169 (9th Cir. 2008) ("Under Rule 37, exclusion of evidence not disclosed is appropriate unless the failure to disclose was substantially justified or harmless."). The Ninth Circuit has described Rule 37 as a "self-executing, automatic sanction to provide a strong inducement for disclosure of material." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). At the same time, where exclusion under Rule 37 would amount to dismissal of the claim, the Court is "required to consider whether the claimed noncompliance involved willfulness, fault, or bad faith." *R&R Sails, Inc. v. Insurance Co. of Pa.*, 673 F.3d 1240, 1247 (9th Cir. 2012).

The Court begins by noting that there is no evidence that the failure to comply with Rule 26 was the result of bad faith on the part of Caldwell, his personal representative Ms. Smith, or his former attorney. In fact, even Defendants refer to this failure as an "oversight." Docket No. 343, at 6. Accordingly, the Court declines to employ the "harsh sanction" of preclusion in this case – particularly in light of the fact such a sanction would be fatal to Caldwell's entire claim. *See R&R Sails*, 673 F.3d at 1247.

The Court also notes that Defendants have been aware of this apparent "oversight" by Caldwell for some time and have waited until the eve of trial to seek exclusion. This apparent tactical decision to lie in wait, combined with the fact that Defendants had ample opportunity to seek discovery on Caldwell's theory of damages (including a deposition of Caldwell before he died), leads the Court to conclude that the failure to provide a computation of damages in the initial disclosures was harmless. *See Conference Am., Inc. v. DHL Exp. (USA), Inc.*, No. 2:08cv110-SRW, 2009 WL 3806411, at *3 n.2 (M.D. Ala. Nov. 12, 2009); *see also Ning Shing (U.S.A.), Inc. v. Howard Berger Co., Inc.*, No. CIV. 97-604(WGB), 1998 WL 684244 (D.N.J. Mar. 16, 1998) (noting that an initial disclosure violation was harmless, in part, because the defendant could have objected to the nondisclosure during the initial discovery period).

Domenici's third motion in limine is **DENIED.**

United States District Court

For the Northern District of California

## IX.   PIRONE MOTIONS IN LIMINE

A.   Motion in Limine No. 1: Exclude Reference to Pirone's Termination

In his first motion in limine, Pirone seeks to preclude  seeks to preclude Plaintiffs from presenting evidence or mentioning that BART terminated his employment as a BART police officer as a result of an internal investigation into the events at issue.  Docket No. 351 at 2.  Pirone also appealed the termination to final and binding arbitration, but the arbitrator has not yet issued a decision.  *Id*. at 3.

As with Domenici, evidence of Pirone's termination might be relevant if it tended to show Pirone acted unlawfully during the events that took place on the Fruitvale platform on January 1, 2009, and a claim against Pirone remained for trial.  Even if the evidence were relevant for this purpose, however, the Court finds it is properly excluded under Rule 403.  BART's decision to terminate Pirone has minimal probative value in Oscar Grant, Jr.'s case against Mehserle.  *See* Advisory Committee Notes to Rule 403 (advising "balancing the probative value of and need for the evidence against the harm likely to result from its admission").  Although his credibility may be material to the extent he testifies as a percipient witness to the shooting and Mehserle's reaction thereafter, direct evidence of Pirone's actions and statements would be more probative of his actions than BART's after-the-fact assessment and decision.  The probative value of BART's termination is further reduced by its lack of finality of its decision to terminate given the pendency of the arbitration.

Moreover, the minimal probative value of Pirone's termination applies to Caldwell's case as much as it does Grant's.  Caldwell's case focuses on Domenici's conduct, not Pirone's.  The Court finds any minimal probative value of the termination is substantially outweighed by the time it would take to explain the grounds for the termination, the nature and reliability of BART's investigation and assessment, as well as the nature and significance of the arbitration proceedings.

The evidence of Pirone's termination is likewise inadmissible to show bias.  Plaintiffs can argue bias as to statements made while Pirone was still employed by BART by eliciting testimony regarding the fact he was employed by BART at the time the statement was made.  His motive to lie to avoid adverse employment consequences can be argued without referring to the termination.

United States District Court

For the Northern District of California

1    Further, to the extent that Oscar Jr. is arguing that the status of being a terminated employee desiring

2    reinstatement affected Pirone's prior statements, this theory is speculative, and thus its probative

3    value is substantially outweighed by the risk of unfair prejudice.  Fed. R. Evid. 403.

4         Pirone's first motion in limine is **GRANTED**.

5    B.    Motion in Limine No. 2: Exclude Evidence of Pirone's Alleged Excessive Force

6         In his second motion in limine, Defendant Pirone seeks an order preventing Plaintiffs from

7    introducing evidence or testimony suggesting that he used excessive force on Oscar Grant, III, prior

8    to the handcuffing of Jack Bryson, Jr.  Docket No. 352.  Plaintiffs have previously alleged that

9    Defendant Pirone punched or kneed Grant III prior to the time that Jack Bryson, Jr. was handcuffed

10   by Defendant Mehserle.  *Id.* at 4.  Pirone argues these allegations are irrelevant in light of the fact

11   that all claims involving his contact with Grant III were settled with the *Johnson v. Bay Area Rapid*

12   *Transit, et al.*, No. 09-cv-901, litigation.  *Id.*  Finally, Pirone argues that Judge Patel previously

13   granted his motion for summary judgment on Oscar Grant, Jr.'s claims against him for denial of

14   familial relations.  *Id.*

15        Oscar Grant, Jr., opposes this motion, contending that it is "relevant for Plaintiff GRANT

16   JR.'s survival action in which he is bringing a claim for a Fourth Amendment violation on behalf of

17   his son" and will "provide the jury with the totality of the circumstances surrounding the event and

18   unlawful detention."  *Id.* at 13.

19        Grant Jr.'s argument that the evidence of Pirone's alleged excessive force is relevant to his

20   "Fourth Amendment" survival action fails for two reasons.  First, in light of the Court's denial of his

21   motion to amend, Grant Jr.'s complaint asserts a single claim of action – "Violation of Plaintiff's

22   Civil Rights to Familial Relationship."  Such claims are properly asserted under the *Fourteenth*

23   Amendment, not the Fourth.  *See Walker v. Fresno Police Dep't*, No. 1:09-CV-1037, 2010 WL

24   582084 (E.D. Cal. Feb. 11, 2010) ("The Supreme Court has recognized that the right to intimate

25   familial relationships is protected by the Fourteenth Amendment."); *Taitano v. Antioch Police Dep't*,

26   No. C09-1804 RMW (PR), 2009 WL 1949122, at *1 (N.D. Cal. July 6, 2009) ("A wrongful death

27   action under the Fourteenth Amendment right to due process protects *familial* relationships from

28   unwarranted state interference.").  Accordingly, Grant Jr. does not *have* a Fourth Amendment claim

1   on behalf of himself or Grant III.  *See Jarreau-Griffin v. Vallejo*, No. 2:12-cv-02979, 2013 WL

2   6423379 (E.D. Cal. Dec. 9, 2013) ("The relatives of victims of unlawful police killings have

3   personal standing to claim deprivation of familial relationship under the substantive due process

4   clause of the Fourteenth Amendment.  Thus, the Fourteenth Amendment, not the Fourth

5   Amendment, allows plaintiffs to bring claims for deprivation of or interference with familial

6   relationship.").

7        Second, as discussed *supra*, Judge Patel previously granted Pirone summary judgment as to

8   Grant Jr.'s Fourteenth Amendment claim familial relationship claim.  *See Johnson*, 790 F Supp. 2d

9   at 1066.  Accordingly, Grant Jr. does not have any claim against Defendant Pirone.

10       In light of the above, the Court finds that the allegations pertaining to Defendant Pirone's

11  alleged excessive force on Oscar Grant, III, is irrelevant to Grant Jr.'s claim against *Mehserle* for

12  deprivation of familial relationship.  F.R.E. 403.  Further, to the extent such evidence has some

13  relevance as "background" evidence, the low probative value of the evidence is substantially

14  outweighed by the risk of unfair prejudice to Defendant Mehserle and the risk of jury confusion.

15  F.R.E. 403.

16       For the foregoing reasons, the Court **GRANTS** Pirone's second motion in limine.

17                    **X.    MEHSERLE MOTION IN LIMINE**

18  A.    Motion in Limine No. 1: Exclude Reference to Involuntary Manslaughter Conviction

19       In his first motion in limine, Defendant Mehserle seeks to exclude any reference to his prior

20  conviction for involuntary manslaughter (under Cal. Penal Code § 192(b)), arising from the shooting

21  death of Oscar Grant, III.  Docket No. 356.  Mehserle contends that evidence of the conviction

22  should be excluded under Rule 404(b)(1).  In addition, he contends that introduction of the

23  conviction would be unfairly prejudicial as it would create the risk that the jury would simply

24  conclude that their determination regarding "unreasonable force" had already been made.

25       Plaintiff Oscar Grant, Jr., opposes the motion, arguing that the conviction should be admitted

26  under Rule 609 for impeachment purposes as a prior felony conviction.  Docket No. 356.  He further

27  argues (as he does in opposing all of Mehserle's motions in limine), that Mehserle's motion in

28  limine should be denied because Mehserle "included all motions in limine in one document" in

United States District Court

For the Northern District of California

1   violation of this Court's standing order and simply "submitting the same filings prepared for the

2   criminal trial." *Id.* at 8.  The Court will not deny Mehserle's motions in limine on this latter

3   procedural ground.

4          The Court finds that Mehserle's conviction is admissible.  Under Fed. R. Evid. 609, the fact

5   of a prior felony conviction is generally admissible.  The Court has considered the possibility of

6   allowing evidence that Mehserle has been convicted of a felony, without permitting the nature of the

7   felony from being introduced.  *See Giles v. Rhodes*, No. 94 Civ. 6385 (CSH), 2000 WL 1510004, at

8   *2 (S.D.N.Y. Oct. 10, 2000) ("[N]umerous courts have exercised their discretion to admit evidence

9   of the fact that a witness has been convicted of a felony while barring evidence of the underlying

10  details of the offense."); *see also United States v. Brown*, 606 F. Supp. 2d 306, 312 (E.D.N.Y. 2009)

11  ("[I]t is within the discretion of the district courts to further limit the evidence of the prior conviction

12  to exclude the nature or statutory name of the offense.").  If the felony conviction were unrelated to

13  this case, this would be feasible.  However, since Mehserle was, at the time of the incident, a sworn

14  law enforcement officer – a position he could not have held as a convicted felon – introduction of

15  his felony conviction would make it quite apparent to the jury that the felony likely involved the

16  underlying facts of this case.  Without explanation or limiting instruction, this would create a risk of

17  confusion and/or unfair prejudice to *either* party as to the effect of and weight to be given to a prior

18  jury finding of manslaughter.

19         At the same time, the Court finds complete exclusion of this evidence to be unwarranted.

20  Mehserle's credibility is a critical issue in Oscar Grant, Jr.'s case.  Given the general policy reflected

21  in Rule 609 that an individual's status as a convicted felon reflects negatively on a witness'

22  credibility, it would be unfair to deprive Grant Jr. of this impeachment material.

23         Accordingly, Mehserle's first motion in limine is **DENIED**.  However, at the time this

24  evidence is put forward at trial, the Court will immediately give a limiting instruction to the jury

25  informing them (among other things) about the limited purpose of the evidence, the different

26  questions facing them as compared to the criminal jury, and the wholly distinct nature of the

27  proceedings.  The parties are **ORDERED** to meet and confer and file with the Court a joint limiting

28

United States District Court

For the Northern District of California

1   instruction on which the parties agree.  This joint statement shall be filed no later than **Monday,**

2   **June 9, 2014** at **5:00 p.m.**

3   B.      Motion in Limine No. 2: Admit Evidence of Oscar Grant, III's Prior Resisting Arrest

4           Incident

5           Mesherle seeks to admit evidence of a police report involving a prior arrest of Oscar Grant

6   III.  Docket No. 357.  The police report describes an incident in October 2006, where a vehicle in

7   which Grant III was a passenger was pulled over by police.  It reports that Grant III disobeyed

8   orders by suddenly fleeing from the vehicle; threw a gun while fleeing; and, after being tased and

9   falling to the ground, disobeyed orders to put his hands where the officer could see them.  *Id.* Exh.

10  A.  Grant III was put under arrest.  *Id.*  The report also states that Grant is a convicted felon and was

11  on probation at the time.  *Id.*

12          Mehserle claims that the evidence demonstrates Grant III "had the intent to actively resist

13  Mehserle's efforts to detain him."  Mot. at 3.  He also claims that it demonstrates Grant III's

14  knowledge of the consequences of resisting Mehserle's efforts, namely, escalated use of force,  and

15  of the effects of a taser, which Grant III would want to avoid based on his prior experience.  *Id.*

16          Federal Rule of Evidence 404(b) provides in relevant part:

17          (1) Evidence of a crime, wrong, or other act is not admissible to prove
            a person's character in order to show that on a particular occasion the
18          person acted in accordance with the character.

19          (2) This evidence may be admissible for another purpose, such as
            proving motive, opportunity, intent, preparation, plan, knowledge,
20          identity, absence of mistake, or lack of accident.

21          Evidence offered under Rule 404(b)(2) is subject to the balancing of Rule 403.  *See United*

22  *States v. Mehrmanesh*, 689 F.2d 822, 830 (9th Cir. 1982).  Accordingly, even if admissible under

23  Rule 404, the Court may nonetheless exclude the evidence if its probative value is substantially

24  outweighed by the risk of, among other things, unfair prejudice.  Fed. R. Evid. 403.  "'Unfair

25  prejudice' within its context means an undue tendency to suggest decision on an improper basis,

26  commonly, though not necessarily, an emotional one."  Advisory Committee's Notes on Fed. R.

27  Evid. 403.  "Such improper grounds certainly include . . . generalizing a defendant's earlier bad act

28

15

United States District Court

For the Northern District of California

1    into bad character and taking that as raising the odds that he did the later bad act now charged." *Old*

2    *Chief v. United States*, 519 U.S. 172, 180 (1997).

3           Evidence of Grant III's 2006 arrest and interaction with the police is inadmissible. Mehserle

4    essentially argues that, because Grant III disobeyed orders during the prior incident, he likely

5    resisted Mehserle's efforts to detain him.  The probative value of this evidence is low.  First,

6    Mehserle's "knowledge" argument is fundamentally illogical.  Grant III's knowledge that resistance

7    to Mehserle's efforts to detain him would result in Mehserle's use of escalated force and a taser –

8    which, according to the 2006 police report, caused Grant III to fall and injure himself – would

9    rationally lead to a decision *not* to resist, rather than to resist.  Second, assuming that Mehserle is

10   correct that this prior act somehow reflects on Grant III's "intent," the probative value remains low

11   given the dissimilar factual circumstances between the prior incident and the instant action and the

12   trial lapsed between them.  *See United States v. Estrada*, 453 F.3d 1208, 1213 (9th Cir. 2006)

13   (recognizing that the in admitting Rule 404(b) evidence, the Court must determine if the "act is

14   similar to the offense charged").[1]  More fundamentally, the apparent use of this prior act is to make

15   an improper propensity argument.  Specifically, it appears that the true probative value of this prior

16   act hinges on the inference that because Grant III resisted arrest on a prior occasion, it is more likely

17   that he did so in the instant case.  Such an argument is squarely foreclosed by Rule 404(b)(1).  *See*

18   *id.* ("Federal Rule of Evidence 404(b) excludes evidence of prior acts when offered to prove that the

19   individual acted in conformity with those prior acts."); *cf. Smith*, 725 F.3d at 342 (noting that to

20   introduce "prior acts," the proponent "must set forth 'a chain of logical inferences, *no link of which*

21

22   _____

23          [1] Specifically, the Court finds significant that Grant apparently ran from police officers
     almost immediately upon one of the officers ordering him not to move whereas in the instant action,
24   Grant never attempted to flee in the minutes leading up to his shooting.  Further, while the police
     report does suggest that Grant refused to bring his arm and hand back to be arrested (which would
25   be arguably similar to what Mehserle argues Grant III did on the night of the shooting), this
     "refusal" occurred immediately after Grant III had been shot with a taser, collided with a parked
26   vehicle, and crumpled to the ground.  Docket No. 357, at 12-13.  The Court questions the degree to
     which this refusal was a volitional act by Grant III.  *Cf. Bryan v. MacPherson*, 630 F.3d 805, 824
27   (9th Cir. 2010) (describing the painful physiological effects of a taser in dart mode).  Accordingly,
     the Court finds this prior incident sheds little light on Grant III's "intent" on the night at issue in this
28   action.

United States District Court

For the Northern District of California

1   can be the inference that because the defendant committed . . . offenses before, he therefore is more

2   likely to have committed this one'" (citation omitted)).

3       Further, any probative value is substantially outweighed by its risk of unfair prejudice.  Thus,

4   the Court also excludes this evidence under Rule 403.  Any probative value the 2006 act may have

5   as to Grant III's motive or intent is substantially outweighed by the risk of unfair prejudice resulting

6   from the more apparent, and improper, "propensity" nature of the evidence.[2]

7       Accordingly, the Court excludes any reference to, or testimony, regarding Grant III's

8   October 2006 encounter with the San Leandro Police Department.  Mehserle's second motion in

9   limine is **DENIED**.

10  C.      Motion in Limine No. 3: Admit Evidence of BART Subsequent Policy Change

11      In his third motion in limine, Mehserle seeks an order that evidence regarding BART's

12  amendments to its Taser policies and training are admissible.  Docket No. 358.  Specifically, he

13  seeks to admit evidence that subsequent to the shooting of Oscar Grant III, BART changed its taser

14  policy to require officers to draw their taser with their support hand – the hand that is not used to

15  draw the firearm.  *Id.* at 2.  Mehserle contends that this evidence will support his contention that

16  Mehserle mistakenly drew his firearm when he believed he was deploying his taser and will support

17  his argument that he did not intend to harm Grant III.  *Id.*

18      Oscar Grant, Jr., opposes this motion, arguing the policy change is irrelevant and barred by

19  Federal Rule of Evidence 407.  *Id.* at 22.  He argues that any training policies not in place at the time

20  of the shooting are irrelevant insofar as the "reasonableness" of an officer's action must be based on

21  the perspective of the officer of the scene rather than in hindsight.  *Id.*  He further argues that Federal

22  Rule of Evidence 407 excludes this evidence because Mehserle is, in essence, using the policy

23  amendment to suggest BART was at fault for failing to properly train him regarding taser use.

24      Federal Rule of Evidence 407 provides:

25

26  ─────────────

27      [2] The Court also notes the additional risk of unfair prejudice that would result from
admission of the police report in question insofar as it states that Grant III was on probation for a
felony drug offense and possessed a firearm – inflammatory, and ultimately irrelevant, facts for
28  purposes of this action.

United States District Court

For the Northern District of California

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
>
> - negligence;
> - culpable conduct;
> - a defect in a product or its design; or
> - a need for a warning or instruction
>
> But the court may admit this evidence for another purpose, such as impeachment or – if disputed – proving ownership, control, or the feasibility of precautionary measures.

Fed. R. Evid. 407.  The Court finds that Rule 407 does not apply in these circumstances.  Mehserle is not seeking to use this evidence to establish BART's culpability in the shooting but rather to support his "weapon confusion" argument.  Because this evidence is not being introduced to prove that BART, or any other party, was negligent or engaged in culpable conduct, Rule 407 does not apply.  *Cf. Lamm ex rel. Doherty v. Bumbo, Bumbo Ltd.*, No. C07-04807 MHP, 2008 WL 2095770, at *9 (N.D. Cal. May 14, 2008) (holding that changes to warning label placement on a product was not admissible to show defendant's tort liability, but could be introduced to show defendant's "intent and purpose to respond to customer complaints and to maintain the marketability of its product").

Additionally, the Court finds the taser policy change relevant.  To prevail on his § 1983 claim familial relationship claim, Grant Jr. must demonstrate that Mehserle's conduct "shock[ed] the conscience."  *Gonzalez v. City of Anaheim*, — F.3d — , 2014 WL 1274551, at *6 (9th Cir. 2014) (en banc).  In *Gonzalez*, the Ninth Circuit noted that where an officer had little opportunity to deliberate, a use of force "shocks the conscience" only if the officers had "a 'purpose to harm' the decedent for reasons unrelated to legitimate law enforcement objectives."  *Id.*  Accordingly, Mehserle's intent in shooting Grant III is not only directly relevant, it is the critical question raised in this litigation. That BART subsequently altered its policy in a way to make it less likely that an officer would accidentally deploy his firearm when he intended to deploy his taser suggests that BART determined such a mistake was a real possibility under the prior policy.  This, in turn, supports Mehserle's testimony that the shooting was a mistake and not an act taken with the intent to harm.  While the probative value of this evidence is not great – evidence of the policy and practice (or lack thereof) at

**United States District Court**

For the Northern District of California

1  the time of the shooting is more directly on point – any prejudice from that evidence is minimal and

2  does not substantially outweigh that probative value.

3       Accordingly, the Court **GRANTS** Mehserle's third motion in limine.

4  D.    <u>Motion in Limine No. 4: Admit Evidence of Plaintiffs' Prior Convictions</u>

5       In his fourth motion in limine, Mehserle seeks an order that evidence of criminal convictions

6  and subsequent bad acts by Plaintiff Oscar Grant, Jr., as well as former plaintiffs Michael Greer and

7  Ferdnando Anicete are admissible under Federal Rules of Evidence 609 and 404(b)(2). Specifically,

8  he seeks admission of (1) Grant Jr.'s conviction of attempted murder under Rule 609; (2) Michael

9  Greer's no contest plea to grand theft in 2006 under Rule 609; and (3) Fernando Anicete's guilty

10  plea to grand theft in Rule 609. Docket No. 359. Grant Jr. opposes this motion, as it relates to his

11  prior murder conviction.

12       Federal Rule of Evidence 609(b) governs impeachment use of a conviction that is over 10

13  years old and provides that such evidence of conviction is admissible only if:

14             (1) its probative value, supported by specific facts and circumstances,
              substantially outweighs its prejudicial effect; and

15

16             (2) the proponent gives an adverse party reasonable written notice of
              the intent to use it so that the party has a fair opportunity to contest its
              use.

17

18  Stated another way, in *United States v. Bay*, 762 F.2d 1314 (9th Cir. 1984), the Ninth Circuit held

19  that "[e]vidence of a conviction more than ten years old is presumptively inadmissible as too

20  remote." *Id.* at 1317. Similarly, the advisory committee note to Rule 609 states "[i]t is intended that

21  convictions over 10 years old will be admitted very rarely and only in exceptional circumstances."

22  Fed. R. Evid. 609 committee note.

23       At the pre-trial hearing, the Court discussed the applicability of Federal Rule of Evidence

24  609(b). It appears that while Grant Jr. remains incarcerated (and has since his attempted murder

25  conviction), he may have served his sentence for the attempted murder conviction and is now

26  possibly serving time for a felony drug trafficking offense he committed while in prison.

27  Accordingly, the extent to which Fed. R. Evid. 609(b) bars introduction of the attempted murder

28  conviction is unclear. However, it is clear that *a* felony – whether attempted murder or drug

United States District Court
For the Northern District of California

trafficking – is admissible under Rule 609, since it is not disputed he is still incarcerated on one of the two charges and the 10 year rule does not apply.  Accordingly, the Court will permit Mehserle to impeach Grant Jr. with the fact that he has been convicted of a prior felony and has been sentenced to a term of imprisonment, but will exclude any reference or evidence regarding the nature or circumstances of that conviction because of its prejudicial nature.

Accordingly, the Court **GRANTS** in part and **DENIES** in part Mehserle's motion to admit evidence of Grant Jr.'s prior conviction.  This ruling does not affect Mehserle's ability to introduce evidence regarding the extent of Grant Jr.'s *incarceration* – a question which directly touches on the nature of Grant Jr.'s relationship with his son – a critical issue in this case.

Finally, for the reasons discussed *infra* in the Court's ruling on Caldwell's fourth motion in line, Mehserle's motion is **DENIED** to the extent it seeks admission of Greer's and Anicete's theft convictions for purposes of impeachment.

## XI.   BART / GEE MOTIONS IN LIMINE

A.   Motion in Limine No. 1: Limit Testimony of Plaintiff's Police Practices Expert

In its first motion in limine, BART seeks an order from the Court precluding Plaintiffs' police-practices expert, John "Jack" Ryan from offering opinions as to "(1) ultimate issue(s) in the case; (2) the law in this case; and (3) training-related opinion based upon non-California standards."  Docket No. 363, at 1.  BART points to a number of instances in Mr. Ryan's report where he purports to opine on the law and whether a given act was lawful.  By way of example, Mr. Ryan's expert includes statements such as "It is well known in law enforcement that anonymous information must be corroborated before law enforcement action such as stop and frisk is justified," and "It is my opinion . . . that once Officer Pirone spoke to the train operator there was clearly no justification to continue the detention of any of these individuals."  *Id.* at 5-6.  BART argues that expert witnesses are not permitted to give opinions as to legal conclusions and, as a result, any such opinions by Mr. Ryan should be excluded.  *Id.* at 8.

Oscar Grant, Jr. opposes BART's motion in limine, asserting that an expert's opinion is not objectionable "just because it embraces an ultimate issue."  Docket No. 363.  He further asserts that Mr. Ryan "will simply be providing opinions that are based on his special knowledge of the law and

education and will not usurp this Court's authority on this issue." *Id.* at 13.  Further, he states that

BART's challenge to his testimony on the basis that he relies on generalized police training around

the country (as opposed to California specific guides), does not effect its admissibility, but is rather a

fact the Defendants can explore on cross examination.  *Id.*

Federal Rule of Evidence 704 provides that an "opinion is not objectionable just because it

embraces an ultimate issue."  Fed. R. Evid. 704(a).  Rather, the touchstone of admissibility of an

expert's opinion is whether such an opinion would be helpful to the jury.  *See, e.g.*, *Lee v. Andersen*,

616 F.3d 803 (8th Cir. 2010) ("The touchstone for the admissibility of expert testimony is whether it

will assist or be helpful to the trier of fact." (internal quotation marks omitted)).  As a result,

objections which touch on an ultimate issue may not be objectionable solely on that basis, but if they

are not "helpful" to the jury, the opinion will not be admitted.  Moreover, caution must be taken so

that the expert's opinion on an ultimately legal question does not intrude upon the role of the jury.

Hence, courts have generally not permitted these experts to opine on what the law is or

whether a given officer's actions violated the Fourth Amendment.  For example, in *Peterson v. City

of Plymouth*, 60 F.3d 469 (8th Cir. 1995), the Eighth Circuit found that an expert who set forth "his

opinion as to why each action the officers took was consistent with 'nationally accepted standards'"

and that the officers' conduct "comported with the 'standards under the Fourth Amendment'" should

not have been admitted.  *Id.* at 475.  The Court noted that the expert's testimony involved "only his

views concerning the reasonableness of the officers' conduct in light of 'Fourth Amendment

standards'" and was therefore "not a fact-based opinion, but a statement of legal conclusion."  *Id.*;

*see also Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) (finding error in expert testimony being

offered that an officer's actions were "not 'justified under the circumstances,' not 'warranted under

the circumstances,' and 'totally improper'"); *Smith v. New Jersey*, No. 09-4268 (JBS/KMW), 2013

WL 3658786, at *4 (D.N.J. July 11, 2013) ("In short, Rule 702 does not permit the testimony of a

police practices expert who is rendering opinions about whether particular conduct violated the

relevant constitutional provisions.").

At the same time, courts have permitted police practices experts to speak of standard

practices among police and whether, in the expert's opinion, the officer's action was acceptable or

reasonable *under those standards*. For example, in *Peters v. Woodbury County, Iowa*, — F. Supp. 2d — , 2013 WL 5775027 (N.D. Iowa Oct. 25, 2013), the district court found that:

> [A]n expert's opinion may embrace an ultimate issue of *fact*, including what are standards or practices applicable to the incident involving Peters, and whether or not certain standards or practices were met by the conduct of the Defendant Officers in the incident involving Peters, but an expert may not testify that following or failing to follow certain standards met or failed to meet the applicable *legal* standard, such as "reasonableness" of the Defendant Officers' use of force against Peters.

*Id.* at *13; *see also Fate v. Village of Spring Valley*, No. 11 Civ. 6838 (JPO), 2013 WL 2649548, at *6 (S.D.N.Y. June 13, 2013) ("By virtue of his substantial background in law enforcement and training in the use of non-lethal force, Brave is qualified to offer expert testimony on whether the use of force against Plaintiff was unreasonable when set against standard police practices.").

The distinction between permissible opinion and impermissible legal conclusions is often a fine one. In *United States v. Perkins*, 470 F.3d 150 (4th Cir. 2006), the Fourth Circuit, in a criminal civil rights action, reviewed the district court's admission of both non-expert and expert police practice testimony that the witness' saw no "law enforcement" or "legitimate" reason for the defendant officer's use of force. The court found that, while a close question, the testimony was appropriate because "the Government's questions were phrased in such a manner so as to avoid the baseline legal conclusion of reasonableness. The officers' responses that they personally saw no reason for Perkins's kicks provided the jury with concrete examples against which to consider the more abstract question of whether an 'objectively reasonable officer' would have employed the same force." *Id.* at 159. Significantly, the questions in that case were "not couched in terms of objective reasonableness; instead they hone in on [non-expert] Officer House's and [expert] Inspector Burnett's *personal* assessments of Perkin's use of force." *Id.* at 160. In light of this, the court ultimately concluded:

> When the common and legal meanings of a term are not easily unfurled from each other, however, as is certainly the case with "reasonable," it is difficult for us to conclude that testimony was unhelpful to the jury unless the testimony actually framed the term in its traditional legal context. In this case, then, Rule 704 justifies differentiating between the officers' testimony that they saw no "law enforcement" or "legitimate" reason for Perkins's kicks and testimony

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

> that Perkins's actions were "objectively unreasonable." To be sure, this distinction must be measured in inches, not feet. Nevertheless, we cannot hold that the officers' testimony was necessarily unhelpful, nor can we say that it merely told the jury what verdict to reach or "supplant[ed][the] jury's independent exercise of common sense."

*Id.* at 160.

Accordingly, the Court must determine whether Mr. Ryan's expert report represents permissible expert opinion or an impermissible intrusion into the province of the Court or jury. In making this determination, the Court finds Judge Spero's approach in *Burdett v. Reynoso*, C-06-00720 JCS, 2007 WL 4554034 (N.D. Cal. Nov. 20, 2007), to be persuasive. There, Judge Spero held that a set of police practices experts could testify:

> as to the (1) training of police officers; (2) the standard practices in the use of force accepted in the industry; and (3) whether, in the expert's opinion, the force used here was acceptable according to standard police practices. Except as contained within these areas, police practices experts may not testify as to (1) the law; (2) probable cause or reasonable suspicion to arrest or detain; (3) whether Defendants or the San Francisco Police Department policies are in compliance with the law; or (4) whether any particular conduct violated any particular law or right. There will be no opinions on whether there was a false arrest in this case.

*Id.* at *1. It is this framework the Court will employ at trial in assessing a police practices expert's testimony and in ruling on any objections.

Mr. Ryan will be permitted to testify as to the training officers receive, what the general practices and procedures are in the industry (including with regards to use of force), and whether the practices here are consistent with those standard policies. Mr. Ryan will not be permitted to testify as to what the law is, whether given uses of force were consistent with the Fourth Amendment (or were "reasonable" or "unreasonable" as these are legal terms of art in the context of the Fourth Amendment), whether any act by the Defendant violated a law or legal or civil right of any individual, or whether any Defendant had "probable cause" or "reasonable suspicion" to detain any individual.

The Court declines to go line by line through Mr. Ryan's expert report and indicate which statements are permissible and which are not. However, by way of example, the Court notes that, in places, Mr. Ryan opines on whether actions are consistent with "legal mandates." *See* Docket No.

421, at 4 ("It is my opinion . . . that Officer Domenici's restraint on Mr. Caldwell's liberty interest was inconsistent with generally accepted policies, practices, training, *and legal mandates* with respect to detentions by law enforcement."). Mr. Ryan will not be permitted to opine on the substance or requirements of "legal mandates" or whether any officer's actions were consistent or inconsistent with them. This includes using legal terms of art in rendering his opinion. For example in the example just given, Mr. Ryan speaks of Mr. Caldwell's "liberty interest." It is not the province of a police practices expert to testify as to whether Mr. Caldwell's "liberty interest" (a legal concept) was restrained. Similarly, Mr. Ryan may not testify as to whether an officer had "individualized suspicion" to detain an individual.

The parties are advised to ensure that their experts steer clear of testimony that approaches legal conclusions. The above guidance reflects how the Court will evaluate any objection that an expert's testimony has crossed over into a legal conclusion. Should such an objection be sustained, the Court will immediately order the jury to disregard the objectionable statement and advise them that the witness is not a legal expert.

B.      Motion in Limine No. 2: Limit Testimony Regarding Video Evidence

In its second motion in limine, BART seeks an order precluding Plaintiffs' police practices expert, Mr. John "Jack" Ryan, from offering "opinions on video interpretation." Docket No. 364, at 3. Mr. Ryan's expert report provides various interpretations of what the video shows, for example:

> "On video from the station, Officer Pirone can be seen walking down the platform and passing individuals who would also meet the general description of the broadcast."

> "A review of the videos of the action leading up to the shooting of Oscar Grant depicts individuals who are compliant with the officers."

> "The Cross video clearly shows that as the officers release their weight from Grant's body, that Grant's hands are behind his back as the shot from Mehserle's handgun is fired."

*Id.* at 4. BART argues that Mr. Ryan has "not been qualified as a video expert" and therefore should not be permitted to offer an opinion interpreting the videos or photographic evidence. *Id.* at 5. Oscar Grant, Jr., opposes this motion asserting that Mr. Ryan should be permitted to testify as to his

1    interpretation of the video insofar as his viewing of the video is one of the bases for his opinion as to

2    the Defendants' actions in this case. *Id.* at 9-10.

3        BART's second motion in limine is **GRANTED** in part and **DENIED** in part.  As a police

4    practices expert, Mr. Ryan will be permitted to opine on standard police practices, training, and

5    whether the Defendants' conduct met these standards.  As part of this testimony, Mr. Ryan will be

6    permitted to testify as to the factual bases for this opinion – including his perception of the video as

7    it pertains to evaluating Defendants' conduct.  The Court finds that police practices experts would

8    reasonably rely on videos of a challenged police encounter in arriving at an opinion of that

9    encounter. *See* Fed. R. Evid. 703.  Accordingly, statements from Mr. Ryan that, in his opinion, the

10   video depicts Oscar Grant III as being "compliant" and therefore Defendants' conduct violated

11   standard police practices for "x" reasons will not be objectionable.  Further, in this example, Mr.

12   Ryan would be permitted to why he believes  Grant III was "compliant."

13        At the same time, however, Mr. Ryan is not a video analysis expert and his testimony may

14   not be focused on analyzing or interpreting in detail what he believes the video shows if that

15   testimony is not used as a basis for his opinion.

16        In summary, Mr. Ryan may, as provided in the Court's ruling on BART's first motion in

17   limine, testify as to general police practices and procedures and whether Defendants' conduct

18   complied with those practices and procedures.  Further, he may reference facts from the video in

19   support of that opinion to the extent he relied on the video in arriving at his opinion.  The Court,

20   however, will not permit Mr. Ryan to simply recite Plaintiffs' detailed interpretation of what the

21   video shows unless it informs his expressed opinion.

22   C.     <u>Motion in Limine No.3: Exclude "Golden Rule" Arguments</u>

23        In their third motion in limine BART and Gee seek to exclude any "golden rule" type

24   arguments which would ask jurors to determine damages as if they themselves had been victims or

25   required to undergo similar pain and suffering.  Docket No. 365.  No opposition to this motion in

26   limine has been filed.

27        Such arguments to the jury have been consistently rejected by courts.  For example, in

28   *Forrestal v. Magendantz*, 848 F.2d 303 (1st Cir. 1988), the First Circuit held:

> There can be little doubt that suggesting to the jury that it put itself in the shoes of a plaintiff to determine damages is improper argument. This so-called Golden Rule argument has been universally condemned "because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence."

*Id.* at 308 (quoting *Ivy v. Security Barge Lines, Inc.*, 585 F.2d 732, 741 (5th Cir. 1978)). The Court agrees. BART and Gee's third motion in limine is **GRANTED**.

D.     Motion in Limine No. 4: Demonstrative Exhibit Presentation

In their fourth motion in limine, BART and Gee request that the Court order Plaintiffs show any demonstrative exhibits to the Court and Defendants prior to publishing to the jury and to provide Defendants an opportunity to object before it is published. Docket No. 366.

As provided above, at the end of each trial day, counsel is required to provide notice to opposing counsel of which exhibits, *including demonstrative exhibits*, he intends to use the following day. This permits the other side an opportunity to object to use of such exhibits outside the presence of the jury. The Court will clarify here that both sides will be required to provide the other with copies of any demonstrative they will seek to use at trial the day before they intend to use such demonstrative. The Court will hear any objections as to the use of the demonstratives the following morning.

BART and Gee's fourth motion in limine is **GRANTED**.

## XII.     CALDWELL MOTIONS IN LIMINE

A.     Motion in Limine No. 1: Exclude Details of Caldwell's Death

In his first motion in limine, Caldwell seeks to exclude the details of his death. Defendant Domenici does not oppose this motion. The parties have met and conferred and agreed that the jury should simply be advised that Caldwell "died on July 15, 2011 as the result of events unrelated to this proceeding." Docket No. 360-1, at 2-3. Accordingly, Caldwell's first motion in limine is **GRANTED**. The parties will be permitted to advise the jury of the stipulated fact that Caldwell died on July 15, 2011, as the result of events unrelated to this proceeding. Either party may introduce such stipulation at an appropriate juncture.

United States District Court

For the Northern District of California

B.     Motion in Limine No. 2: Exclude Details of Which Defendants Had No Knowledge

In his second motion in limine, Caldwell seeks an order from this Court excluding any evidence, argument, or testimony regarding information of which Domenici was not aware prior to her contact with Caldwell.  Docket No. 361 This includes any insinuation or testimony that the Plaintiffs had been drinking or evidence regarding the fight on the train or who was involved.  *Id.* at 3.  Caldwell asserts that Domenici has "consistently testified" that the only information she had during the evening in question (up until Defendant Mesherle shot Oscar Grant, III) was that the "train operator reported a 248 misdemeanor fight, on the lead car involving black males with dark clothing." *Id.*  Thus, he argues, "[a]ny other assumptions, thoughts, facts or evidence of events that night at Fruitvale station or elsewhere are irrelevant to the determination of the reasonableness of the seizure and detention of Caldwell." *Id.*

Domenici states in her opposition that she has "no intention of relying upon facts learned after the fact to support the decisions made" and that any "facts relied upon or introduced into evidence to support and/or explain her actions would, of course, be subject to the laying of an appropriate foundation."  Docket No. 361-1, at 2.  She argues however, that Caldwell's motion is broader and seeks to preclude her from introducing evidence of matters of which she does have direct knowledge.

To the extent that Caldwell's motion seeks to prevent Domenici from testifying or introducing evidence regarding facts that she did not have knowledge of at the time of the incident, the motion is **GRANTED**.  However, the Court declines to hold, simply based on Caldwell's assertion (unsupported by any record citations or exhibits), that the universe of facts to which Domenici had personal knowledge is limited to those stated in his motion in limine.  Rather, the Court will simply state, as Defendant Domenici recognizes, facts she learned *after* the incident are irrelevant to the Fourth Amendment inquiry.  *See, e.g., John v. City of El Monte*, 515 F.3d 936 (9th Cir. 2007) ("It is essential to avoid hindsight analysis, *i.e.*, to consider additional facts that became known only after the arrest was made.").

United States District Court

For the Northern District of California

C.       Motion in Limine No. 3: Exclude Reference to Creation of a Law Enforcement "Perimeter"

In his third motion in limine, Caldwell seeks to exclude any evidence regarding or testimony about the creation of a "perimeter" on the BART platform by Defendant Domenici.  Docket No. 362. Specifically, Caldwell asserts that the Defendants' police practices expert, Mr. Rose, proposes to testify that the interaction between Domenici and Caldwell was reasonable "because Dominici [sic] was attempting to create a police barrier and that Caldwell had violated Penal Code 148 by interfering with police activity."  *Id.* at 3.  Caldwell claims that this evidence is irrelevant because "there is no evidence that Dominici [sic] ever conveyed to anyone that night that she was intending on creating a police barrier or perimeter."  *Id.*  Thus, because the information "was never conveyed to the Plaintiff, the subjective intent of the officer is irrelevant and thus any testimony regarding her intent to create a police perimeter, or anyone's violation of that intent, should be excluded."  *Id.*

Defendant Domenici opposes this motion.  Domenici states that the evidence shows that her and Officer Woffinden conveyed to individuals they were not to "encroach upon the detention, arrest and shooting scenes" but could access other portions of the platform and that they told individuals multiple times to "get back" or "stay back."  Docket No. 362-1, at 3.  She further states that the video evidence "clearly shows DOMENICI and WOFFINDEN standing with their backs to the detention scene, giving commands to keep people back from the scene, and using their physical presence along with body language to communicate that individuals could not move toward the detention, arrest, and shooting scene."  *Id.*

Plaintiff is correct that whether Domenici subjective intent in interacting with Caldwell is not directly relevant to the question of whether Caldwell was "seized" for purposes of the Fourth Amendment.  Stated another way, whether or not Domenici intended to seize Caldwell does not affect the Fourth Amendment inquiry.  *See United States v. Mendenhall*, 446 U.S. 544, 554 n.6 (1980) ("[T]he subjective intention of the DEA agent in this case to detain the respondent, had she attempted to leave, is irrelevant except insofar as that may have been conveyed to the respondent."); *see also Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006).  However, evidence of the intent behind her actions – while not dispositive for the reasons just stated – may be relevant to the extent it tends to show that she took action consistent with her intent.  In other words,

**United States District Court**
For the Northern District of California

1   it may be probative to the question what Domenici did and/or said to Caldwell and his group during

2   the incident.

3          Further, both parties are introducing the testimony of police practices experts to describe the

4   actions of the BART officers that evening and whether those actions comply with the training,

5   standards, and practices common to law enforcement.  Just as Plaintiffs' police practices experts will

6   be able to argue that the conduct in question conflicts with those standards and practices, so too may

7   Defendants' experts argue the contrary.  Accordingly, the Court will not prevent Domenici or the

8   experts from referencing the concept of a defensive barrier or perimeter as part of their testimony.

9          Additionally, the Court notes that there appears to be a dispute to the extent to which

10  Domenici expressed an intent to create such a perimeter.  For example, Domenici argues that the

11  posture of the officers and their orders to stay back conveyed this intent.  Caldwell disputes this.

12  Ultimately, this is a question for the jury.  Of course, the jury instructions will advise the jury that

13  they are only to consider *objective* facts in determining (1) whether the use of any force was

14  reasonable; or (2) whether Caldwell was seized for Fourth Amendment purposes.

15         Finally, Caldwell references the possibility that Defendants' expert will opine that Caldwell

16  violated Cal. Penal Code § 148.  As discussed in the Court's ruling on Caldwell's seventh motion in

17  limine, Defendants' experts will not be permitted to opine on the ultimate question whether

18  Caldwell's actions violated Cal. Penal Code § 148.

19         For the foregoing reasons, Caldwell's third motion in limine is **DENIED**.

20  D.     <u>Motion in Limine No. 4: Exclude Evidence of Caldwell's Prior Convictions</u>

21         In his fourth motion in limine, Caldwell seeks to exclude any reference to his conviction for

22  theft of a cell phone.  Docket No. 370.  He argues that the evidence is irrelevant, unfairly prejudicial,

23  and that Rule 609(a)(1) is inapplicable as he pled guilty to a misdemeanor charge.  He further argues

24  that even if a felony, it should be excluded under Rule 403.  *Id.* at 4.  Domenici opposes this motion,

25  arguing that it is clear Caldwell pled no contest to a felony theft charge and that its probative value

26  outweighs its prejudicial value.

27         First, the Court finds Rule 609 is inapplicable.  The  exhibits attached to Domenici's

28  opposition establish that Caldwell plead no contest to Cal. Penal Code § 487(c) – grand theft where

**United States District Court**

For the Northern District of California

property is taken from the person of another ("grand theft person").  Punishment for grand theft is determined under Cal. Penal Code § 489.  At the time Caldwell was convicted, this section provided that, except where the grand theft involved the theft of a firearm, grand theft was punishable by "imprisonment in a county jail not exceeding one year or in the state prison."  Grand theft involving the theft of a firearm, however, is and was punishable by "imprisonment in the state prison for 16 months, or two or three years." *Id.* § 489(a).  Here, there is no indication that Caldwell's grand theft involved the theft of a firearm – to the contrary, the exhibits attached to Domenici's opposition demonstrate the theft was of a cellular phone.  "[T]he status of a conviction should be determined by the specifics of [the] case in which the witness was convicted."  Wright & Miller, 28 Fed. Prac. & Proc. Evid. § 6134 (2d ed.).

As a result, Caldwell's conviction for grand theft person was punishable by a term of imprisonment "not exceeding one year."  Whether or not California considers "grand theft person" under section 487(c) a felony, Rule 609 utilizes the *federal* definition of a felony – that is, crimes punishable by death or "imprisonment for more than one year."  Fed. R. Evid. 609(a)(1).  Because Caldwell could only have been sentenced to a term of imprisonment "not exceeding one year," his conviction for grand theft person does not constitute a crime punishable by a term of imprisonment "for more than one year."  *See Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 538 n.3 (E.D.N.Y. 2011).[3]  Accordingly, Rule 609(a)(1) is inapplicable.

Further, the Court finds that "grand theft" does not fit under Rule 609(a)(2).  Rule 609(a)(2) provides that a prior conviction is admissible for impeachment purposes, regardless of punishment, if the crime "required proving . . . a dishonest act or false statement."  Fed. R. Evid. 609(a)(2).  Courts have held that the crimes of "theft" or "grand theft" do not qualify under this provision.  *See*

---

[3] It is true that the "Felony Advisement of Rights, Waiver, and Plea Form" lists the "maximum term" for a section 487(c) conviction as "3" years.  As discussed above, this is true where the grand theft involved theft of a firearm. Cal. Penal Code § 489(a).  The other exhibits demonstrate the theft was of a cell phone, representing the three year maximum to be inapplicable. Ultimately, Domenici, as the party seeking to admit the prior conviction, bears the burden of establishing that Caldwell was punishable by a term of imprisonment of more than one year.  She has not met this burden. *See United States v. Meserve*, 271 F.3d 314, 327-28 (1st Cir. 2001) ("It is a principle too simple to need stating, however, that the government, as the party seeking to introduce evidence of a prior conviction for impeachment purposes under Rule 609, was obligated to have researched Kevin's prior offenses and to have determined that they were admissible.").

United States District Court

For the Northern District of California

1   *United States v. Glenn*, 667 F.2d 1269, 1273 (9th Cir. 1982) ("Generally, crimes of violence, theft

2   crimes, and crimes of stealth do not involve 'dishonesty or false statement' within the meaning of

3   Rule 609(a)(2)."); *see also  United States v. Washington*, 702 F.3d 886, 893 (6th Cir. 2012) ("Theft

4   is a prime example of a crime of stealth, and it has been distinguished from crimes of dishonest in

5   most federal circuits.").  Accordingly, theft of a cellphone does not qualify under Rule 609(a)(2).

6        Domenici's opposition argues that, beyond Rule 609, there are facts related to Caldwell's

7   conviction that are relevant to show bias.  For example, she argues that the fact that Caldwell was on

8   probation at the time the underlying events occurred, he had "considerable incentive to

9   mischaracterize his conduct and deflect blame" for his conduct.  Docket No. 370-1, at 3.  The Court

10  finds that any impeachment value of Caldwell's probation status is substantially outweighed by the

11  risk of unfair prejudice that Caldwell would suffer by having his probationary status revealed to the

12  jury.  Any individual who obstructs or interferes with law enforcement commits a crime and suffers

13  potential charge and conviction – whether on probation or not.  Therefore, under Domenici's theory,

14  any individual who did what Caldwell is alleged to have done regardless of his or her probationary

15  status would have "considerable incentive to mischaracterize [their] conduct and deflect blame."

16       Finally, Domenici argues the prior conviction is highly relevant insofar as the prior incident

17  involved (1) Caldwell assaulting police officers and jail staff while being arrested and (2) accusing

18  the prosecutor of "intimidating" him into entering the plea.  Thus, she argues that "the similarity of

19  his violent actions" at that time to the underlying facts of this case warrant admission.  Docket No.

20  370-1.  In essence, Domenici seeks to use Caldwell's alleged actions related to his prior conviction

21  to show that it is more likely that he was aggressive with the BART police here.  This type of

22  "propensity" argument, however, is squarely foreclosed by Rule 404(b)(1)'s prohibition on using

23  prior act evidence to "prove a person's character in order to show that on a particular occasion the

24  person acted in accordance with the character."  Fed. R. Evid. 404(b)(1); *cf. United States v. Smith*,

25  725 F.3d 340, 342 (3d Cir. 2013) (noting that to introduce "prior acts," the proponent "must set forth

26  'a chain of logical inferences, *no link of which* can be the inference that because the defendant

27  committed . . . offenses before, he therefore is more likely to have committed this one'" (citation

28  omitted) (emphasis in original)).

1    Accordingly, Domenici has not articulated a theory under which Caldwell's prior admission

2  for grand theft person is admissible.  Accordingly, the Court **GRANTS** Caldwell's fourth motion in

3  limine.

4  E.    Motion in Limine No. 5: Exclude Reference to Insurance Coverage

5    Caldwell moves to exclude all evidence or mention of "insurance coverage or collateral

6  source of payment of his medical bills."  Docket No. 371.  Domenici opposes the motion.  Docket

7  No. 371-1.  Domenici argues that insurance payments are relevant to the "reasonable value of the

8  medical services provided," and further, that medical bills that were not paid, either by Caldwell or

9  his medical insurer, are inadmissible because they are irrelevant.  *Id.* at 2, 4.

10    "A person who undergoes necessary medical treatment for tortiously caused injuries" may

11  recover from the tortfeasor "any reasonable charges for treatment the injured person has paid or,

12  having incurred, still owes the medical provider."  *Howell v. Hamilton Meats & Provisions, Inc.*, 52

13  Cal. 4th 541, 551 (2011).  Under the "collateral source rule,"

14    "if an injured party receives some compensation for his injuries from a
     source wholly independent of the tortfeasor, such payment should not
15    be deducted from the damages which the plaintiff would otherwise
     collect from the tortfeasor." . . . The rule thus dictates that an injured
16    plaintiff may recover from the tortfeasor money an insurer has paid to
     medical providers on his or her behalf.

17

18  *Id.* (quoting *Helfend v. Southern Cal. Rapid Transit Dist.*, 2 Cal.3d 1, 6 (1970)).  On the other hand,

19  "an injured plaintiff whose medical expenses are paid through private insurance may recover as

20  economic damages no more than the amounts paid by the plaintiff or his or her insurer for the

21  medical services received or still owing at the time of trial."  *Id.* at 566.

22    In terms of evidentiary rules:

23    when a medical care provider has, by agreement with the plaintiff's
     private health insurer, accepted as full payment for the plaintiff's care
24    an amount less than the provider's full bill, evidence of that amount is
     relevant to prove the plaintiff's damages for past medical expenses
25    and, assuming it satisfies other rules of evidence, is admissible at trial.
     Evidence that such payments were made in whole or in part by an
26    insurer remains, however, generally inadmissible under the evidentiary
     aspect of the collateral source rule.  (*Hrnjak v. Graymar, Inc.*, *supra*, 4
27    Cal.3d at p. 732, 94 Cal.Rptr. 623, 484 P.2d 599.)  Where the provider
     has, by prior agreement, accepted less than a billed amount as full

28

32

United States District Court

For the Northern District of California

payment, evidence of the full billed amount is not itself relevant on the issue of past medical expenses.

*Id.* at 567. *Howell* and the cases cited therein relied on California Evidence Code section 352[4] – the analog of Federal Rule of Evidence 403 – found inadmissible evidence that payments were made by insurers. The United States Supreme Court has also held in various contexts that "evidence showing that the defendant is insured creates a substantial likelihood of misuse." *See Eichel v. New York Cent. R. Co.*, 375 U.S. 253, 255 (1963) (holding that, in an action against the employer railroad for a disabling injury, the district court properly excluded evidence of disability social insurance benefits because of "a substantial likelihood of prejudicial impact").

The Court concludes that evidence of "insurance coverage or collateral source of payment" of Caldwell's medical expenses is admissible only to establish the *amount* of past medical expenses for injuries caused by the defendants, not who paid them. *See Pooshs v. Phillip Morris USA, Inc.*, No. C04-1221 PJH, 2013 WL 2253780, at *1 (N.D. Cal. May 22, 2013) (noting that only evidence of "amounts actually paid (not the total amounts billed)" would be admitted); *see also Van Maanen v. Youth with a Mission-Bishop*, No. 1:10-cv-0-493AWI JLT, 2011 WL 5838185 (E.D. Cal. Nov. 21, 2011) ("Therefore, under *Howell*, evidence of what is actually paid on Plaintiff's behalf – even if paid by an insurance company – is properly introduced without a violation of the collateral source rule."). The defendants shall not introduce evidence or mention that such payments were made by an insurer or collateral source. *See Hrnjak*, 4 Cal. 3d at 732. On the other hand, medical bills that exceed the amounts paid by Caldwell or his insurer, and are not still owing, are irrelevant, and thus inadmissible.

Accordingly, Caldwell's fifth motion in limine is **DENIED**, subject to the above limitations.

F.    Motion in Limine No. 6: Exclude Reference to Summary Judgment Outcome

In his sixth motion in limine, Caldwell seeks to exclude any reference to the outcome of the motion to summary judgment. Docket No. 372. Defendant Domenici does not oppose this request.

---

[4] California Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

1    Docket No. 372-1.  Reference to the outcome of the summary judgment motion, or any specifics

2    regarding Judge Patel's order is irrelevant to this action.  Accordingly, Caldwell's sixth motion in

3    limine is **GRANTED**.

4    G.    Motion in Limine No. 7: Motion to Exclude Factual/Legal Conclusions by Expert Witnesses

5         In his seventh motion in limine, Caldwell seeks an order from this Court preventing expert

6    witnesses from making "legal or factual opinions."  Docket No. 373.  Specifically, Caldwell seeks to

7    prevent Defendants' expert, David Rose, from opining on whether Caldwell's actions on the BART

8    platform constituted a violation of California Penal Code § 148 ("resisting, delaying or obstructing

9    officer").  *Id.* at 4-5.  Defendant Domenici does not expressly oppose this request, stating that "an

10   expert is limited to the opinion of whether the actions reviewed meet the standard of care or training

11   in the industry.  No expert should be allowed to apply the facts they believe are established to the

12   law they believe is applicable."  Docket No. 373-1.  As detailed in addressing BART's motion in

13   limine number 1, the Court agrees.

14        Accordingly, Caldwell's seventh motion in limine is **GRANTED**.  Mr. Rose will not be

15   permitted to opine on the ultimate question whether Caldwell's actions violated California Penal

16   Code § 148 (or any other law).

17   H.    Motion in Limine No. 8: Motion to Exclude References to Caldwell Throwing a Phone

18        In his eighth motion in limine, Caldwell seeks to exclude any evidence or testimony

19   suggesting that he threw a cell phone on the Fruitvale Station platform.  Docket No. 374.  He bases

20   this motion on the fact that Defendant Domenici has, allegedly, "repeatedly testified that she never

21   saw Caldwell throw a cellphone."  *Id.* at 3.  As a result, he alleges that insofar as Domenici did not

22   see or believe that Caldwell had thrown a cell phone, such a fact is irrelevant for purposes of

23   whether she lawfully seized or detained him or had grounds to do so.  *Id.*

24        Domenici opposes the motion, stating that Domenici has testified that she knew a cell phone

25   had been thrown towards the BART officers on the platform but believed that it was thrown by

26   Fernando Anicete – a former Plaintiff in this action.  Docket No. 396, at 2-3.  She thus argues that

27   this evidence is relevant on two grounds: (1) showing the totality of circumstances insofar as it

28   illustrates the "tenor and tone of the crowd on the platform, along with the level of chaos that

34

United States District Court

For the Northern District of California

ensued," and (2) is appropriate impeachment evidence undermining the credibility of Caldwell's assertion that he was acting peaceably and committed no crime before being approached by Domenici. *Id.* at 2-3.

The evidence is relevant and will not be excluded. The reasonableness of a law enforcement officer's actions – both the decision to detain an individual or the decision to employ force – are assessed based on the totality of circumstances. *See, e.g.*, *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) ("[T]he touchstone of the Fourth Amendment analysis remains reasonableness. The reasonableness of a search or seizure depends on the totality of the circumstances . . . ." (citation omitted)). Cases discussing the Fourth Amendment in a variety of contexts have recognized that the tone and tenor of the circumstances confronting an officer should be considered in applying the totality of circumstances test. For instance, in *Graham v. Connor*, 490 U.S. 386 (1989), the seminal use of force case, the Supreme Court held that the calculus of reasonableness must allow for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. *Id.* Similarly, in *United States v. Sharpe*, 470 U.S. 675 (1985), the Court stated that courts assessing whether a detention had become too long to be justified as a mere "investigative stop" should "take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Id.* at 686. It is therefore apparent that what may be "reasonable" under the Fourth Amendment in a quickly developing, tense situation may very well be "unreasonable" under a more stable, calm situation.

In this way, if Domenici was aware that a cell phone had been thrown towards the officers on the platform after a gun shot had been fired, this fact is properly considered in the Fourth Amendment's "totality of the circumstances" analysis, even if she was not aware that it was Caldwell who threw the phone. However, because Domenici has conceded that she did not witness *Caldwell* throw the cell phone and did not believe that he was the one who threw the phone, she will not be able to offer testimony that he threw the phone. On the other hand, evidence that Caldwell in fact threw the phone would corroborate Domenici's testimony that she did see a cell phone thrown. It is thus probative. Moreover, it is impractical to prevent the fact that Caldwell threw the phone

United States District Court

For the Northern District of California

from coming out at trial because it was captured on the video recordings of the evening. Further, this video is highly relevant, particularly to Pirone's defense that he never had any personal involvement with Caldwell and will likely be admitted. The Court declines to order that the videos in question be edited to exclude the depiction of Caldwell and the throwing of the cell phone.

The Court acknowledges that this creates a risk that the jury will use the fact that Caldwell threw the phone in its Fourth Amendment analysis. However, the Court finds this risk of prejudice can be eliminated in three ways. First, Caldwell's counsel will be free to bring out through cross-examination and closing argument that Domenici had no knowledge or belief that Caldwell in particular threw the cell phone. Second, the jury instructions in this case will instruct the jury that they are to assess the reasonableness of Defendants' actions from the perspective of a "reasonable officer" on the scene, and not with the benefit of 20/20 vision or hindsight. *See, e.g.*, *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011) ("Reasonableness therefore must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (internal quotation marks omitted)). This instruction will include an admonition that the jury is not to consider facts that were unknown to the Defendants at the time. *See, e.g.*, *Withers v. Riley*, No. 90 C 3986, 1994 WL 91960, at *3 (N.D. Ill. Mar. 18, 1994) ("Unknown information is not information upon which a reasonable person is likely to act."). Third, Caldwell's admission in his deposition that he threw the phone will be excluded at trial, and Domenici will not be permitted to emphasize in questioning or argument the fact that *Caldwell* threw the phone.[5]

---

[5] The Court will not permit Caldwell's statement made in his declaration in opposition to summary judgment that he had only been "peaceably" observing the events on the platform to be used to impeach its later admission during his deposition that he threw a cell phone immediately after Mehserle shot Oscar Grant, III because he was angry. Federal Rule of Evidence 613(b) provides that extrinsic evidence of a witness's prior inconsistent statement "is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it." Fed. R. Evid. 613(b). Given Caldwell's unfortunate death, he does not have this opportunity.

At the same time, however, Plaintiffs' counsel is strongly advised to avoid eliciting testimony or making arguments which presents a misleading picture of Caldwell's conduct on the platform. The most extreme examples would be a statement that he did not throw anything, or that he only yelled at the officers. More subtle statements such as the statement in his declaration that he only "peaceably" observed the events would likewise be troublesome. Should such testimony or argument be made, the Court will revisit its ruling limiting Domenici's ability to highlight the fact that Caldwell threw the phone.

1    With the above protections, the Court concludes that the probative value of the fact that a

2   cellphone was thrown is not substantially outweighed by the risk of unfair prejudice.  Accordingly,

3   Caldwell's eighth motion in limine is **DENIED** in part and **GRANTED** in part.

**XIII.    OSCAR GRANT, JR. MOTIONS IN LIMINE**

5   A.    Motion in Limine No. 1: Exclude Prior Acts/Convictions of Oscar Grant, III

6    In his first motion in limine, Oscar Grant, Jr., seeks to exclude from evidence regarding or

7   testimony about Oscar Grant, III's prior convictions or bad acts.  Docket No. 382.  Specifically, he

8   seeks to exclude the following: (1) that Grant III had a prior arrest and conviction for possession of a

9   firearm; (2) that he was on felony probation at the time of this arrest; and (3) that he was on parole at

10  the time he was shot by Defendant Mehserle.  Docket No. 382, at 2.  Mehserle does not oppose this

11  motion except to the extent that he seeks to introduce evidence of the details underlying Grant III's

12  arrest by San Leandro police officers in 2006.  *Id.* at 8.

13   For the reasons stated by the Court in addressing Mehserle's second motion in limine, *supra*,

14  the Court **GRANTS** Grant Jr.'s first motion in limine.

15  B.    Motion in Limine No. 2: Exclude Prior Acts/Convictions of Oscar Grant, Jr.

16   In his second motion in limine, Oscar Grant, Jr., seeks an order excluding any evidence

17  regarding prior convictions or other prior bad acts.  Docket No. 383.  Defendant Mehserle's

18  opposition only addresses the admissibility of the conviction as impeachment of Grant Jr.'s

19  character for truthfulness.  Docket No. 383, at 9-10.  The Court has addressed the use of Grant Jr.'s

20  prior convictions for impeachment purposes in ruling on Mehserle's fourth motion in limine.

21   Mehserle has not asserted any other prior acts he seeks to admit under Rule 404(b)(2).  The

22  Court is skeptical that evidence regarding Grant Jr.'s offenses in prison would be relevant in this

23  action for any proper Rule 404(b)(2) purpose (such as "motive, opportunity, intent, preparation,

24  plan, knowledge, identity, absence of mistake, or lack of accident").  Fed. R. Evid. 404(b)(2).

25   At the final pretrial conference, Defendant Mehserle raised that instances of Grant Jr. being

26  placed in administrative segregation could be relevant to show the extent of contact he had with his

27  son.  He argues this is relevant to the nature of the relationship between Grant Jr. and Grant III.  The

28  Court disagrees.  First, there has been no showing that Grant Jr. has spent such a significant time in

United States District Court

For the Northern District of California

1   administrative segregation to actually have had an impact on his relationship with his son.  Second,

2   no such evidence was included on the joint exhibit list, and the Court will not permit amendments to

3   the list at this late hour.  Third, even if there was some showing of relevance, the Court finds any

4   such relevance would be substantially outweighed by the risk of unfair prejudice to Grant Jr. and is

5   thus excludable under Rule 403.

6         Accordingly, Grant Jr.'s second motion in limine is **GRANTED** to the extent it seeks to

7   exclude "prior act" evidence and **GRANTED** in part and **DENIED** in part to the extent it seeks to

8   exclude evidence of his convictions (as stated in the Court's ruling on Mehserle's fourth motion in

9   limine).

10   C.      Motion in Limine No. 3: Exclude Expert Report and Testimony of David Rose

11        In his third motion in limine, Oscar Grant, Jr., seeks to exclude the expert report and

12   testimony of David Rose on the basis that Defendants failed timely to disclose his report.  Docket

13   No. 384.  Grant Jr. asserts that Defendants did not disclose Mr. Rose as an expert witness until

14   March 24, 2014 and "did not provide any reports provided by him as required by Rule 26(a)(2)(A)

15   and (B)."  *Id.* at 2.  Defendants Mehserle and Domenici have opposed this motion on the ground that

16   Rose was timely disclosed.

17        Resolution of this motion requires a timeline of relevant dates pertaining to expert discovery

18   in this case and Mr. Rose in particular:

19        •      On September 14, 2010, Judge Patel granted a stipulation between the parties

20               which set a deadline of January 21, 2011 as the deadline for expert disclosure

21               and reports.  Docket No. 86.

22        •      On December 13, 2010, Defendants filed a witness disclosure which listed

23               David Rose as a "non-retained expert" on the topic of "Defensive Tactics

24               Training."  Docket No. 96, at 5.

25        •      On April 11, 2011, Judge Patel held a hearing on the parties' cross-motions

26               for summary judgment.  Docket No. 204.  All jury and pretrial were vacated

27               and the parties were ordered to meet and confer re "amendment of further

28               pretrial/trial deadlines."  Docket No. 204.

United States District Court

For the Northern District of California

- On August 9, 2013, this Court held a case management conference in all of the consolidated actions.  As a result of this hearing, the Court ordered the parties to file a joint status report that included "an analysis of trial and expert witnesses in the updated joint status report and include latest witness list and summary of expected testimony.  Expert discovery is deferred until Mr. Caldwell's representation is resolved or further order.  Parties are expected to coordinate and consolidate expert witness testimony."  Docket No. 277, at 1.

- The Court issued a Case Management and Pretrial Order on August 9, 2013.  Docket No. 278.  This order stated that Expert Report disclosure was "Completed," both for "Opening reports" and "Rebuttal reports."  *Id.* at 1.  It stated, however, that the "Expert Discovery Cut-off" was "To be Determined."  *Id.* at 2.

- On November 1, 2013, the parties filed a Joint Further Case Status Report which indicated that the parties "have completed non-expert discovery and disclosed their experts."  Docket No. 299, at 3.  It further requested that "expert-discovery and pretrial schedule be discussed at the Further Case Management Conference."  *Id.* at 4.  Expert discovery was not discussed at the case management conference, however, held on November 7, 2013.

- Apparently, in January 2014, Defendant Domenici determined to convert David Rose from a non-retained expert to a retained expert and requested that he prepare a Rule 26 Report as part of the "consolidation and coordination process."  Docket No. 407-1, at 1.

- On March 24, 2014, Defendants submitted a Rule 26 Report for Mr. Rose on March 24, 2014.  Docket No. 407-3.

- At the March 27, 2014, status conference, Plaintiffs did not object to the March 24, 2014 disclosure as untimely.  Additionally, at that hearing the Court ordered that "[e]xpert discovery shall be completed by 5/2/14."  Docket No. 322.

- • On March 31, 2014, Defendants sent Plaintiffs a letter providing available dates for the deposition of retained experts, including Mr. Rose. Docket No. 307-3.
- • On April 14, 2014, counsel for Grant Jr. noticed the deposition of Mr. Rose for April 29, 2014. *See* Docket No. 407-3, at 10.
- • On April 28, 2014, counsel for Grant Jr. cancelled the deposition of Mr. Rose on the basis that a timely report had not been filed. Docket No. 407-3, at 33.

On the basis of this timeline, Defendants Mehserle and Domenici argue that the disclosure of Mr. Rose's report was, in fact, timely because Judge Patel had retroactively vacated pretrial deadlines related to expert disclosure in her April 11, 2011 order and that new cut off dates were not set until this court stated expert discovery would be completed by May 2, 2014. Docket No. 407, at 7-8. They further point out that in April 2014, they did not object when (1) Grant Jr's current counsel re-designated an expert who had previously been dropped by a Plaintiffs and (2) Caldwell's counsel designated Mr. Ryan as an expert and provided a supplemental declaration two days before his deposition suggesting, for the first time, that he had facts related to Mr. Caldwell's case. Docket No. 407, at 8.

Here, Defendants argument fails for the simple reason that this Court's August 9, 2013 scheduling order expressly stated that "Opening" and "Rebuttal" reports had been "Completed." Docket No. 278, at 1. It further stated that the "Expert Discovery Cut-Off" was "To be Determined." *Id.* at 2. It is thus apparent that when this Court subsequently issued orders stating that expert discovery was "deferred," it was referring to expert *discovery* (i.e., depositions) and not the deadline for disclosures. That time had already passed. Further, Defendants' argument that they only chose to designate Mr. Rose as an expert as a result of this Court's order that the parties "coordinate and consolidate" expert testimony fails for the simple fact that "coordinate and consolidate" does not mean "expand by designating new experts" – quite the contrary, in fact. Finally, even if there was ambiguity regarding the impact of Judge Patel's initial deadline for expert disclosures and subsequent vacating of the pre-trial deadlines, Rule 26 expressly provides that expert disclosure must occur, in the absence of a Court order to the contrary, "at least 90 days before the

1   date set for trial or for the case to be ready for trial."  90 days before trial in this case would have

2   been March 9, 2014.  There was no court order to the contrary.  Accordingly, Defendants' disclosure

3   of Mr. Rose's expert report was untimely even under the default rule contained in Rule 26.

4        Under Federal Rule of Civil Procedure 37(c), a party who fails to disclose a witness in

5   accordance with Rule 26(a) is barred from relying on that witness at trial "unless the failure was

6   substantially justified or is harmless."  Fed. R. Civ. P. 37(c).  A failure to comply with Rule 26(a) is

7   "substantially justified" if it is a "response to a genuine dispute or if reasonable people could differ

8   as to the appropriateness of the contested action. *Rodgers v. Sunrise Senior Living Mgmt., Inc.*, No.

9   2:12-cv-0415 MCE AC, 2014 WL 197791, at *4 (E.D. Cal. Jan. 16, 2014);  *see also MGA Entm't,*

10  *Inc. v. Nat'l Prods. Ltd.*, No. CV 10-07083 JAK (SSx), 2012 WL 4052023, at *3 (C.D. Cal. Sept. 14,

11  2012) (same).  In light of the above discussion, the Court finds Defendants failure to designate Mr.

12  Rose as a retained expert and to timely disclose his expert report is not substantially justified.

13       Further, the Court finds that the failure to disclose was not harmless.  While Oscar Grant, Jr.

14  had an opportunity to depose Mr. Rose in April and declined to do so (choosing to put all of his

15  proverbial eggs in the motion in limine basket), this fact alone is insufficient to support a finding of

16  harmlessness. *See, e.g.*, *Estate of Gonzalez v. Hickman*, No. ED CV 05-00660 MMM (RCx), 2007

17  WL 3237635 (C.D. Cal. June 28, 2007) ("Even were defendants to depose Hunt, moreover this

18  would not cure the prejudice they have suffered Deposing Hunt will not enable defendants to

19  challenge, with documentary evidence or rebuttal expert testimony, the numerous assumptions

20  underlying her calculation of Gonzalez's lost earnings potential.").

21       For the foregoing reasons, Grant Jr.'s third motion in limine is **GRANTED** to the extent it

22  seeks to bar Mr. Rose from testifying as an expert.  However, Defendants timely designated Mr.

23  Rose as a "non-retained expert" insofar as Mr. Rose was personally involved in Domenici's training.

24  Mr. Rose will be able to testify, not as an expert witness, but rather as a fact witness based on his

25  percipient knowledge pertaining to Domenici's training.  Accordingly, to the extent Grant Jr. seeks

26  to have Mr. Rose's testimony completely excluded, the motion in limine is **DENIED**.

27

28

D.      Motion in Limine No. 4: Exclude Expert Report and Testimony of Daniel Lawson

In his fourth motion in limine, Oscar Grant, Jr. seeks to exclude the testimony and expert report of Daniel Lawson.  Docket No. 385.  Grant Jr. broadly asserts that Mr. Lawson's testimony is "irrelevant, and prejudicial and does not meet the requirements of Rule 702 of the Federal Rules of Evidence."  *Id.* at 1.  He argues the proposed testimony is irrelevant and prejudicial because his expert report is only based on

> various documents relating to California Peace Officer Training, BART Police training, Emails regarding managers meetings in 2008, BART management Audit, Review of BART PD Policies, Practices and Procedures Re: New Year's Day, 2009, conducted by the National Organization of Black Law Enforcement Executives ('NOBLE'), etc. which have nothing to do with the events and the conduct of BART officers on January 1, 2009, leading to the shooting death of Oscar Grant, III, caused by defendant Johannes Mehserle.

*Id.* at 4.  He further states that the expert report "does not raise any issues, contain any statements about the issues in the present case, or how Dawson [sic] can explain away, behavior and conduct of Defendant Mehserle."  *Id.*  Finally, Grant Jr. argues that Dr. Lawson's report is unreliable because he:

> seems to have selectively taken information that is favorable to his conclusion and to BART and its officers, to the exclusion of other remarks not favorable to BART and its officers, such as instances 'racial profiling,' the existence of a 'culture of civil rights violations' and concluding that BART officials that BART officials took appropriate action in these cases but does not elaborate on what action, if any, did BART take and with what results.

*Id.* at 5.

In response, Defendant Mehserle states that he does not intend to seek introduction of Dr. Lawson's testimony and "therefore, does not oppose the motion to exclude any testimony related to Defendant Mehserle or the event that occurred on January 1, 2009."  *Id.* at 10.  BART, on the other hand, opposes the motion to exclude Dr. Lawson's testimony.  It notes that (1) none of plaintiffs' counsel has sought to depose Dr. Lawson; (2) that Dr. Lawson does not seek to opine on Mehserle's mental state; and (3) that he does not intend to refer to the NOBLE report (a post-incident review of the department and actions related to the department).  *Id.* at 13.

United States District Court

For the Northern District of California

1    In his expert report (Docket No. 416), Dr. Lawson opines on a number of factors.  First, he

2 states that there is no evidence to suggest that BART's training fell below Peace Officer Standards

3 and Training ("POST") standards.  *Id.* at 3.  Second, he states there is no evidence to suggest that

4 BART "hired police officers with a proclivity toward use of force."  *Id.* at 4.  Third, he states that

5 there was "no empirical data cited in the NOBLE or MEYERS/NAVE Reports that would support

6 that racial profiling occurred during traffic stops by BART police officers."  *Id.*  Fourth, he critiques

7 the NOBLE and Meyers/Nave reports conclusions on a number of grounds.  For example, he states

8 that he found "nothing in either report[] to suggest that BART PD was deficient in use of taser

9 training.  This finding is supported by the fact that no empirical data was provided to suggest the

10 manner in which BART trained and applied tasers was contrary to best police practices established

11 by POST."  *Id.*

12    The Court finds that Dr. Lawson's expert testimony is admissible.  An expert witness may

13 provide expert testimony if: "(1) the testimony is based upon sufficient facts or data; (2) the

14 testimony is the product of reliable principles and methods; and (3) the expert has reliably applied

15 the principles."  *GPNE Corp. v. Apple, Inc.*, No. 12-CV_02885-LHK, 2014 WL 1494247, at *1

16 (N.D. Cal. Ap. 16, 2014).  *See* Fed. R. Evid. 702(b), (c), and (d) (listing three reliability factors).

17 The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 578 (1993),

18 identified a number of specific factors to consider in determining if an expert's testimony is

19 scientifically reliable.  However, these factors are simply not applicable to non-scientific testimony

20 "whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the

21 methodology or theory behind it."  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998,

22 1017 (9th Cir. 2004).  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (not all *Daubert*

23 factors may be applicable to certain kinds of expert testimony).  "Expert testimony police practices

24 and the use of force has generally been found to be admissible in cases involving allegations of

25 police misconduct."  *Tubar v. Clift*, No. C05-1154-JCC, 2009 WL 1325952, at *2 (W.D. Wash. May

26 12, 2009); *see also Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc).

27    Here, the Court finds that some of Dr. Lawson's testimony is relevant.  The extent to which

28 Domenici or Mehserle's training was consistent with standard police practices and standards makes

1    it more likely that their actions, in fact, complied with those practices and standards.  This is, in turn,

2    relevant to the determination of whether Domenici's conduct complied with the Fourth Amendment

3    or whether Mehserle violated Grant's Fourteenth Amendment rights.  On the other hand, whether

4    BART tended to hire officers with a proclivity to violence is irrelevant to what the named

5    defendants did or did not do in this case.  Dr. Lawson's testimony regarding the NOBLE and

6    MEYERS/NAVE reports is not relevant unless those reports (or portions thereof) or testimony about

7    them are introduced by Plaintiffs and admitted by the Court.  Thus, Dr. Lawson's testimony thereon

8    will be limited to rebut those matters in concerning those reports which are raised at trial by

9    Plaintiffs.

10           The Court does find that Dr. Lawson's testimony is otherwise reliable (assuming it is

11   relevant).  Dr. Lawson has served as a law enforcement officer for 34 years with the San Francisco

12   Police Department, with 6 years of those as a captain responsible for the supervision, training, and

13   discipline of officers.  Docket No. 416, at 6-7; *see also Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d

14   657 (E.D.N.Y. 2013) (finding that a former NYPD captain with almost 40 years experience was

15   qualified to testify as an expert regarding police practices regarding tasers); *Feliciano v. City of*

16   *Miami Beach*, 844 F. Supp. 2d 1258, 1263 (S.D. Fla. 2012) (finding a former law enforcement

17   officer with 26 years of experience, including supervisory roles as sergeant, lieutenant, captain,

18   deputy chief, and Acting Chief had sufficient experience to testify as a police practices expert).

19   Finally, Dr. Lawson has reviewed the relevant trial and deposition testimony, the applicable POST

20   training domains, relevant BART general orders, and internal BART emails.  To the extent Plaintiffs

21   allege that Dr. Lawson failed to consider relevant information (or otherwise selectively selected the

22   information upon which he relief), Plaintiffs may attack Dr. Lawson's testimony on this ground

23   through cross examination.  *See, e.g.*, *Palatka v. Savage Arms, Inc.*, 535 F. App'x 448, 456 (6th Cir.

24   20130 (noting that the fact that an expert failed to consider certain facts "can be highlighted on cross

25   examination to question the weight that should be given to his opinion"); *Eolas Techs., Inc. v.*

26   *Microsoft Corp.*, 270 F. Supp. 2d 997, 1008 (N.D. Ill. 2003) (noting that an expert's failure to

27   consider relevant information should be addressed on cross-examination).  Dr. Lawson's testimony

28   satisfies the reliability requirements of *Daubert*, *Kumho Tire*, and Rule 702.

United States District Court

For the Northern District of California

1    For the foregoing reasons, Grant Jr.'s fourth motion in limine is **GRANTED** in part and

2    **DENIED** in part.

3    E.    Motion in Limine No. 5: Exclude Expert Testimony of William Lewinski

4    In his fifth motion in limine, Oscar Grant, Jr. seeks an order excluding the testimony of

5    William Lewinski as no formal expert disclosure (including an expert report) has occurred.  Docket

6    No. 386.  Instead, Grant Jr. represents that he has only received a copy of the transcript of Mr.

7    Lewinski's testimony at Mehserle's criminal trial.  *Id.* at 1.

8    Defendant Mehserle describes Dr. Lewinski as a "renowned psychologist and expert in the

9    field of police officer response to high stress, high threat situations."  *Id.* at 7.  He further states, that

10   he has conducted "numerous studies" of how police officers respond to deadly force situations and

11   how "training of highly repetitive nature can result in what is commonly called 'muscle memory.'"

12   *Id.*  At Mehserle's criminal trial, Dr. Lewinski apparently testified that :officers in eight situations

13   other than this one have mistaken [sic] shot individuals they were attempting to arrest when they had

14   intended to use their tasers."  *Id.*  Mehserle asserts that he only seeks to use Dr. Lewinski in rebuttal

15   to refute any contention that the Mehserle shot Oscar Grant, III was intentional, willful, or the result

16   of a character flaw.  *Id.*

17   Mehserle concedes that he did not comply with the requirements of Federal Rule of Civil

18   Procedure 26.  He states:

19        Regrettably, there was a miscommunication between counsel
          for BART and counsel for Mehserle concerning both the disclosure of
20        Dr. Lewinski and his production of a report required by Rule 26,
          which resulted in no such report being prepared.  Thus, while Dr.
21        Lewinski does not remain a mystery witness in this case, Defendant
          Mehserle concedes that he has not provided a report concerning
22        anticipated testimony to-date.

23   *Id.*  He states that because of this failure, he does not propose to introduce his testimony, but

24   "reserves his right" to introduce the testimony at rebuttal to the extent Grant Jr. introduces testimony

25   "which alleges that the shooting of Grant III by Mehserle was intentional, the result of a character

26   flaw, or had nothing to do with either the type or adequacy of training Mehserle received on both use

27   of firearm and taser."  *Id.* at 8.

28

45

1       Mehserle's failure to comply with Rule 26 implicates his ability to use Dr. Lewinski's

2  testimony on rebuttal.  Rule 26 requires disclosure of *all* experts and expert reports, rebuttal or not.

3  Rule 26 provides that where expert testimony "is intended solely to contradict or rebut evidence on

4  the same subject identified" by another party's expert, the report must be disclosed within 30 days

5  after the other party's initial disclosure.  *See* Fed. R. Civ. P. 26(a)(2)(D)(ii); *see also Finley v.*

6  *Marathon Oil Co.*, 75 F.3d 1225, 1230-31 (7th Cir. 1996) ("The federal civil rules, as recently

7  revamped, require disclosure to one's opponent of expert testimony intended for use as rebuttal

8  evidence within 30 days of the opponent's disclosure of *his* expert testimony, unless the district

9  court otherwise directs or the parties otherwise stipulate.").

10       In *Yeti v. Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001), defendant

11  disclosed the identity of an expert witness, but failed to provide an expert report for two and a half

12  years.  Defendant attempted to justify "this shortcoming by noting that he would be used only as a

13  rebuttal witness, and that an expert report would be disclosed if Deckers decided to have him

14  testify." *Id.* at 1105.  Despite his status as a "rebuttal" expert, the district court excluded the expert's

15  testimony and the Ninth Circuit affirmed.  The court noted that "[p]laintiffs received Vuckovich's

16  report one month before they were to litigate a complex case.  To respond to it, plaintiffs would have

17  had to depose Vuckovich and prepare to question him at trial." *Id.* at 1107.  In these circumstances,

18  it determined that "the use of the 'automatic' sanction of exclusion was not an abuse of discretion."

19  *Id.*

20       As noted above, under Federal Rule of Civil Procedure 37(c), "[i]f a party fails to provide

21  information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that

22  information or witness . . . unless the failure was substantially justified or is harmless."  Fed. R. Civ.

23  P. 37(c).  Here, Mehserle's failure cannot be deemed "substantially justified" insofar as it resulted

24  from an unidentified "miscommunication" between counsel.  *See, e.g.*, *Rodgers*, 2014 WL 197791,

25  at *4 ("A discovery response is 'substantially justified' if it is a response to a genuine dispute or if

26  reasonable people could differ as to the appropriateness of the contested action."); *see also MGA*

27  *Entm't, Inc.*, 2012 WL 4052023, at *3.

28

1    Further, the Court cannot find that the failure to comply with Rule 26 was harmless.

2   Mehserle argues that there is no prejudice here because Grant Jr. has had a copy of Dr. Lewinski's

3   criminal trial testimony since 2010.  First, Dr. Lewinski's criminal trial testimony was almost four

4   years ago.  Significantly, Mehserle's opposition merely states that any expert report Dr. Lewinski

5   had filed would have "closely mirrored" his prior testimony.  He does not state that it would be

6   identical.  Second, Mehserle has not provided any indication about when, or whether, Plaintiffs were

7   notified that Dr. Lewinski would be testifying at trial.  *Cf. United States v. Booth*, No. 1:09-cv-1689

8   AWI GSA, 2013 WL 3541615, at *11 (E.D. Cal. July 11, 2013) ("A party may show lack of surprise

9   and harmlessness by explaining how the opposing side had full notice of the existence of the witness

10  and fully understood the important role he/she had in relation to the facts of the case.").  He has not

11  proven Plaintiffs had ample time to respond to the disclosure.  In short, Mehserle has failed to meet

12  his burden to show the failure to disclose was harmless.  *See Yeti*, 259 F.3d at 1107 ("[T]he burden

13  is on the party facing sanctions to prove harmlessness.").

14    Accordingly, the Court will **GRANT** this motion in limine.  Mehserle will not be permitted

15  to rely on Dr. Lewinski's testimony, in rebuttal or otherwise.

16  F.    Motion in Limine No. 6: Exclude/Limit Testimony of Michael Schott

17    In his sixth motion in limine, Oscar Grant, Jr., seeks an order either excluding Michael

18  Schott (a video expert retained by Defendants) or limiting his testimony to his expert report and area

19  of expertise.  Docket No. 387.  First, Grant Jr. contends that the analysis of the synchronized videos

20  does not require expert testimony because what the videos depict (reaction of individuals on the

21  train, whether officers pointed tasers at individuals, etc.) are not beyond common experience.  *Id.* at

22  2.  He therefore contends that Mr. Schott's testimony would usurp the role of the jury by giving his

23  analysis of the video the imprimatur of "expertise."  *Id.* at 3.  In the alternative, he requests that Mr.

24  Schott's testimony be limited to commenting on what the pictures show but "excluding any

25  comments, observations, conclusions of fact or law which are beyond the scope of his experience."

26  *Id.*

27    Mr. Schott is a forensic image analyst who reviewed available video recordings of the events

28  on the Fruitvale Station platform, the audio tracks, BART police and dispatch records, as well as

47

United States District Court

For the Northern District of California

1 | scene photographs.  Docket No. 417.  As a result of his review, Mr. Schott created a "6-camera

2 | matrix" of the available video sources of the events, in which each available video source is

3 | synchronized with each other to within 13/100 of one second (or, for the BART platform

4 | surveillance video, 26/100 of one second).  *Id.*  This synchronized video contains a text overlay

5 | which displays the frame number and time in hours, minutes, seconds, and milliseconds.  *Id.*  Mr.

6 | Schott also created a textual master timeline of the events recorded in his 6-camera matrix that also

7 | includes audio transmissions to BART dispatch.  *Id.*

8 |         In their opposition, Domenici and Mehserle contend that Mr. Schott's testimony would be

9 | helpful to the jury and is relevant because each one of the videos that Mr. Schott synchronized

10 | "utilized a different frame rate and resolution that makes understanding what is depicted in each

11 | video difficult for a layperson to understand.  They also were shot from various angles.  Without the

12 | assistance of an expert to explain what is occurring, the videos, even when synchronized, would be

13 | greatly difficult to dissect for any lay person."  Docket No. 387.  They further point to the fact that

14 | this issue was addressed in Mehserle's criminal trial, with the state judge stating:

15 |         I found [Mr. Schott's] testimony to be very helpful.  I thought it was
   |         helpful explaining two dimensional versus three dimensional issues . .
16 |         . . I felt that it is something the jurors could benefit from hearing.  I
   |         did not feel that this was wild speculation.  I thought his opinions were
17 |         measured . . . . I particularly was impressed with the way the toggling
   |         between still photos showed us things that I think it [sic] would be
18 |         very difficult for a lay person to perceive.

19 | *Id.* at 13.

20 |         As noted above, under Federal Rule of Evidence 702, an expert who is qualified as an expert

21 | may render opinion testimony if "(b) the testimony is based upon sufficient facts or data; (c) the

22 | testimony is the product of reliable principles and methods; and (d) the witness has reliably applied

23 | the principles and methods to the facts of the case."  Fed. R. Evid. 702 (b) - (d).  The trial court acts

24 | as a gatekeeper to the admission of expert scientific testimony under Fed. R. Evid. 702.  *Daubert*,

25 | 509 U.S. at 592-93; *Kumho Tire*, 526 U.S. at 141, 147-48.  Accordingly, the Court must conduct a

26 | preliminary assessment to "ensure that any and all scientific testimony or evidence admitted is not

27 | only relevant but reliable."  *Id.* at 589.  This two-step assessment requires consideration of whether

28 | (1) the reasoning or methodology underlying the testimony is scientifically valid (the reliability

48

United States District Court

For the Northern District of California

1   prong); and (2) whether the reasoning or methodology properly can be applied to the facts in issue

2   (the relevancy prong). *Daubert,* 509 U.S. at 592-93.

3        First, the Court finds that Mr. Schott qualifies as an expert in forensic image analysis.  A

4   witness may be qualified as an expert by knowledge, skill, experience, training, or education.  Fed.

5   R. Evid. 702.  Mr. Schott served with the Contra Costa Sheriff's Department for 17 years, during

6   which time he received training in the field of forensic photography, videography, and

7   photogrammetry as well as crime scene measurement and reconstruction.  Docket No. 417, at 17, 20.

8   In addition, Mr. Schott has spoken at a number of conferences on the issue of forensic image

9   analysis.  *Id.* at 18.  Finally, the Court notes that Mr. Schott has been deemed an expert by a number

10  of state and federal courts – including the state court in Defendant Mehserle's criminal trial.  *See,*

11  *e.g.*, *Newmaker v. City of Fortuna*, No. C12-4675 PJH, 2013 WL 6774098, at 811 (N.D. Cal. Dec.

12  23, 2013); *Hill v. Bay Area Rapid Transit Dist.*, No. C-12-00372 DMR, 2013 WL 5272957, at *1

13  (N.D. Cal. Sept. 18, 2013).

14       Second, Grant Jr. has not challenged Mr. Schott's synchronization work as unreliable.

15  Nonetheless, the Defendants are advised that Mr. Schott will be required to set forth the process and

16  methodology he employed in synchronizing the video so the Court can assess its reliability.

17       Finally, Grant Jr.'s main challenge to Mr. Schott's testimony is that it will not be helpful to

18  the jury and, in fact, will usurp the jury's role as fact-finder.  As stated above, he argues that the jury

19  is just as capable as Mr. Schott at evaluating what the videos do, and do not, show.  Expert

20  testimony is only helpful to the jury if it concerns matters which are "beyond the common

21  knowledge of the average layperson and is not misleading." *Moses v. Payne*, 555 F.3d 742, 756 (9th

22  Cir. 2008).

23       The Court concludes that Mr. Schott's testimony is relevant and will be helpful to the jury.

24  The process by which Mr. Schott synchronized the video as well an explanation of the various

25  angles from which the videos were shot is clearly outside the common knowledge of the average

26  layperson.  Similarly, traditional forensic analyses of the resulting images – such as opinions of

27  distance, height, angles, and the like – are similarly helpful.  Finally, limited contextual analysis of

28  the video or images (such as identifying the various individuals shown in the video, placing a given

United States District Court

For the Northern District of California

1   segment of the video/image into context within the larger events, or describing the relationship of

2   the various views to each other) would likewise be helpful.

3   　　　However, the Court agrees with Grant Jr. that on many matters the jury is just as capable as

4   Mr. Schott at arriving at factual determinations from watching the video.  *See, e.g.*, *Lee v. Andersen*,

5   616 F.3d 803 (8th Cir. 2010) (affirming exclusion of expert testimony because "[a]lthough Dierks

6   testified that his experience and training allow him to look at an image more critically than a lay

7   person, the jury was entirely capable of analyzing the images and determining whether Fong Lee

8   had anything in his hands"); *Dunlap v. Hood*, No. 3-07-CV-2147-BD, 2009 WL 362292 (N.D. Tex.

9   Feb. 13, 2009) ("Because Dickey is no better suited than the jury to interpret the contents of the

10  video, his supplemental opinion is not the proper subject of expert testimony.").

11  　　　At the final pre-trial conference, the Defendants raised two examples which illustrate what

12  Mr. Schott will, and will not, be able to testify about.  First, Mehserle raised the example of having

13  Mr. Schott highlight to the jury Mehserle's thumb movements while attempting to draw his firearm.

14  A video expert is not the proper vehicle for such testimony.  While Mr. Schott is the proper witness

15  for authenticating the video, testimony regarding Mehserle's alleged thumb movements and their

16  significance is properly elicited from Defendants' police practices expert rather than Mr. Schott.

17  Second, Domenici stated that Mr. Schott planned to testify as to the location of various parties based

18  on the various video angles (and, at times, based on their reflection in the glass) and the distances

19  between them.  This testimony is proper for a forensic video expert like Mr. Schott.

20  　　　Accordingly, for the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part

21  Grant Jr.'s sixth motion in limine.

22  G.   Motion in Limine No. 7: Exclude Evidence re Oscar Grant, III's Tattoos, etc.

23  　　　In his seventh motion in limine, Oscar Grant, Jr. seeks an order excluding evidence of Oscar

24  Grant, III's tattoos or suggesting that Grant III was in a gang.  Docket No. 389.  In his opposition,

25  Defendant Mehserle states that he does not seek to introduce any evidence referencing gangs or gang

26  activity or any photos of Grant III's tattoos.  *Id.* at 6.  He asserts, however, that he "reserves the

27  right" to introduce this evidence if "Plaintiff attempts to unfairly portray Grant to the jury in an

28  inaccurate fashion or as one who shunned associating with gangs in Hayward or gang activity."  *Id.*

United States District Court

For the Northern District of California

1       The probative value of any evidence or inference that Grant III was a gang member or

2   engaged in gang activity would be substantially outweighed by the risk of unfair prejudice.  Courts

3   have repeatedly recognized that evidence of a party's gang membership is highly prejudicial,

4   "especially when the gang evidence is not relevant to a central issue in a case." *Anderson v. City of*

5   *Chicago*, No. 09 C 2311, 2010 WL 4811937, at *1 (N.D. Ill. Nov. 19, 2010); *see also United States*

6   *v. Alviar*, 573 F.3d 526, 536 (7th Cir. 2009) ("We have recognized there is substantial risk of unfair

7   prejudice attached to gang affiliation evidence . . . ."); *see also Lee v. Andersen*, 616 F.3d 803, 810

8   (8th Cir. 2010); *Joyner v. O'Neil*, No. 3:10CV406, 2012 WL 2576355, at *3 (E.D.Va. July 3, 2012).

9   Here, any alleged gang evidence is irrelevant to any central issue in this case.

10      Accordingly, Grant Jr.'s seventh motion in limine is **GRANTED**.  In the unlikely event

11   Mehserle believes Plaintiffs' evidence at trial has made this evidence relevant for purposes of

12   impeachment, he shall promptly notify the Court outside the presence of the jury for an advanced

13   ruling.

14   H.    Motion in Limine No. 8: Exclude Reference to Alleged Fight on BART Train

15      In his eighth motion in limine, Oscar Grant, Jr. seeks to exclude any reference to or

16   testimony about the alleged fight which occurred on the BART train which precipitated the police

17   encounter with Oscar Grant, III.  Docket No. 390.  He argues that "[a]ny attempt to show that Oscar

18   Grant, III, was involved in a fight on the BART train to show that he had tendencies or traits towards

19   violence and creating trouble, without any basis therefor, would have no probative value, is

20   inadmissible hearsay, and inadmissible character evidence, and highly prejudicial." *Id.* at 2.  He

21   states that allowing evidence that Grant III was involved in a fight would "tend to prejudice the jury

22   as to the character of the victim, that he was a bad man, and so, deserved to be shot." *Id.*  Defendant

23   Mehserle and Domenici opposes this motion in limine, arguing: (1) that it would be impossible for

24   the jury to understand the police presence or why Grant III and his friends were detained without

25   explaining the reported fight; (2) that the evidence is not being introduced to show Grant III had a

26   bad character, but is relevant to his "motive and intent to resist the efforts of Mehserle to arrest

27   him." *Id.* at 7; *see also* Docket No. 409.

28

1      The Court finds that evidence of the fight is relevant to this action.  First, it provides

2  foundational evidence.  Without the jury being informed over the BART train operator's report of a

3  fight on the train, the jury might be left to speculate as to the reason why BART police were on the

4  platform, why they detained Grant III and his friends, and ultimately why Pirone ordered Grant III

5  arrested – issues which could all have bearing on Mehserle's intent if Mehserle lays a proper

6  foundation showing these facts relevant to his state of mind or provide basic foundation of facts.

7      At the same time, the Court rejects the Defendants' argument that the evidence of the fight is

8  relevant to show Grant III's "motive" or "intent" in allegedly resisting arrest.  Such an argument

9  creates the risk of unfair prejudice insofar as Grant III is not alive to testify as to his subjective

10  statement of mind during his arrest.  Further, such an argument necessarily raises the question of

11  whether Grant III was in fact involved in the altercation, thereby creating a mini-trial on what is, at

12  most, a tangential point to the issue in this trial – whether Mehserle intended to harm Grant III

13  without a legitimate law enforcement purpose.

14      Accordingly, the Court will not categorically exclude reference to the disturbance on the

15  BART train provided a proper foundation for its relevance is laid.  The parties are admonished,

16  however, that any testimony regarding the disturbance should be limited solely for explaining (1)

17  why BART police responded to the platform and (2) why Grant III and his friends were being

18  detained.  No evidence will be admitted on the question whether Grant III was actually involved in

19  the fight unless that issue is made directly relevant by Plaintiffs.  Accordingly, Grant Jr.'s eighth

20  motion in limine is **GRANTED** in part and **DENIED** in part.

21  I.      Motion in Limine No. 9: Exclude Reference to Oscar Grant, III's Blood Alcohol Content

22      In his ninth motion in limine, Oscar Grant, Jr. seeks to exclude any evidence of Oscar Grant

23  III's blood alcohol content at the time of his death.  Docket No. 391.  Defendant Mehserle does not

24  oppose this motion, but reserves the right to introduce this evidence on rebuttal if Grant Jr. attempts

25  to "misrepresent issues related to Grant's sobriety or lack of alcohol consumption" on the evening of

26  his death.  *Id.* at 6.  Accordingly, the Court **GRANTS** Grant Jr.'s ninth motion in limine.  Mehserle

27  will promptly notify the Court in advance outside the presence of the jury when, and if, he believes

28  that the Plaintiffs' presentation of their case renders this evidence relevant and admissible.

United States District Court

For the Northern District of California

J.       Motion in Limine No. 10: Exclude Dr. John Peters' Report as only "Preliminary"

In his tenth motion in limine, Oscar Grant, Jr., seeks to exclude the expert report and testimony of Dr. John G. Peters.  Docket No. 392.  He argues that Dr. Peters identified his expert report as "preliminary" and stated he retained the right to amend the report.  He further argues that Defendant Mehserle failed to timely disclose Dr. Peters.  No party has attached any portion of the report at issue, but the parties represent that on Page 2 of the report, Dr. Peters stated:

> **RIGHT TO AMEND**
> It is my understanding that discovery is continuing, hence this is only a preliminary opinion report.  I reserve the right to amend these opinions based upon additional testimony and/or discovery documents.

*Id.* at 2, 11.

Federal Rule of Civil Procedure 26(a)(2) governs disclosure of expert testimony.  First, a party is required to "disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."  Fed. R. Civ. P. 26(a)(2)(A).  Second, this disclosure must be accompanied by a written report that must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(A)(2)(B).  Further, parties are under a continuing obligation to supplement.  Rule 26 provides:

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition.  Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

53

United States District Court

For the Northern District of California

1    Fed. R. Civ. P. 26(e)(2).

2         Grant Jr. relies primarily on the Seventh Circuit case of *Salgado v. General Motors*

3    *Corporation*, 150 F.3d 735 (7th Cir. 1998) in arguing that exclusion of a "preliminary" report is

4    required.  In that case, the court affirmed the exclusion of two expert reports – one which was

5    simply "conclusory" in nature and the second "devoid of any factual basis for its conclusory

6    opinions."  *Id.* at 738.  Counsel sought to explain the condition of the reports by asserting that "the

7    reports were cursory because he and opposing counsel had an understanding that the reports would

8    be 'preliminary' in nature."  *Id.*  In affirming the exclusion, the court noted that "Rule 26(a) expert

9    reports must be 'detailed and complete'" and therefore must include the "substance of the testimony

10   which an expert is expected to give on direct examination together with the reasons therefor."  *Id.* at

11   741 n.6.  It noted that the report "must be complete such that opposing counsel is not forced to

12   depose an expert in order to avoid ambush at trial."  *Id.*  Thus, it held that "[e]xpert reports must not

13   be sketchy, vague or preliminary in nature."  *Id.*

14        The Court declines to exclude Dr. Peter's report simply because he labeled it "preliminary."

15   Rule 26 does not speak of "preliminary" or "final" expert reports – rather, it provides a detailed

16   description of the information that must be contained in the report and imposes the obligation of

17   supplementing expert reports within a certain time frame, as necessary.  *See, e.g.*, *KBS Preowned*

18   *Vehicles, LLC v. Reviva, Inc.*, 1:13 CV 138, 2014 WL 1479196 (N.D. W.Va. Apr. 14, 2014) ("If

19   Barnes' report is complete, it matters not that he calls it 'preliminary.'  The fact is that Barnes has a

20   right and a duty under F.R.Civ.P. 26(e)(1)(A) and (B) to 'supplement or correct its disclosure or

21   response . . . .'"); *see also Bruner-McMahon v. Sedgwick County Bd. of Comm'rs*, No. 10-cv-1064-

22   KHV, 2012 WL 33837 (D. Kan. Jan. 6, 2012) (denying motion to strike expert report listed as a

23   "Preliminary Affidavit" insofar as it set out the "complete statement of [the] expert's opinion subject

24   only to possible supplementation under Rule 26(e)"); *Acosta v. Electrolux N. Am.*, No. 08-60213-

25   CIV, 2008 WL 5246160, at *8 (S.D. Fla. Dec. 16, 2008) (denying motion to strike expert witness

26   despite the fact his report was labeled "preliminary" because the expert report met the requirements

27   of Rule 26 and plaintiffs stipulated that the report was, in fact, the final report).  *Salgado* is not to the

28   contrary.  While the court stated that expert reports must not be "preliminary" in nature, it is

54

United States District Court

For the Northern District of California

1  apparent from the discussion of the preliminary reports in that case, that the court was referring to

2  "preliminary" reports which were conclusory or otherwise incomplete.  *See Salgado*, 150 F.3d at

3  738.  Grant Jr. offers no other reason to exclude Dr. Peters' report other than it is labeled as

4  "preliminary."  The report contains sufficient specificity on the matters stated therein.

5          For the foregoing reasons, Grant Jr.'s tenth motion in limine is **DENIED**.  The Court makes

6  clear, however, that Dr. Peters' testimony will be limited to those opinions contained in his expert

7  report.  *See, e.g.*, *In re Katrina Canal Breaches Consol. Litig.*, No. 05-4182, 2012 WL 3815668, at

8  *3 (E.D. La. Sept. 4, 2012) ("[T]he Court has made clear and reiterates to all parties that all experts

9  will be limited to testify within the bounds of their respective reports.  No new opinions that are not

10 contained in the expert reports will be allowed to be proffered by any expert during trial."); *Riel v.*

11 *Warden*, No. Civ S-01-0507 LKK KJM, 2010 WL 4628142, at *7 (E.D. Cal. Nov. 5, 2010) ("To be

12 clear, all experts will be limited to testifying to matters covered by their reports.").

13                         **XIV.   WITNESSES & EXHIBITS**

14         The parties have filed a joint witness and exhibit list.  The parties' witness list identifies 24

15 "joint" witnesses, representing an estimated  16.5  hours of testimony.  Defendants have identified

16 an additional 25 witnesses, with an estimated 26.25 hours of testimony.  Finally, Plaintiffs have

17 identified an additional 63 witnesses, with an estimated 33.5 hours of testimony.  As discussed

18 above, each *side* will be given 25 hours to present opening statements, closing arguments, and direct

19 and cross examination of witnesses (the parties on each side to allocate time amount themselves).

20         Initially, the parties failed to comply with the Court's civil pretrial instructions which

21 provide, in part: "In addition to the above, a *joint* statement in which each party identifies fifteen

22 (15) of the opposing party's exhibits for which the identifying party seeks rulings on objections *in*

23 *advance* of trial."  No such statement was filed along with the parties' pre-trial filings.  Following

24 further instruction from the Court's staff, the parties filed the required statement.  Docket No. 429.

25 The Court rules on the identified exhibits as follows.

26 ///

27 ///

28 ///

United States District Court

For the Northern District of California

A.      Plaintiffs' Bellwether Objections to Defendants' Exhibits

1.      Exhibit 4: Guerra Transmission

OVERRULED.  Exhibit 4 is a short radio transmission between Officer Guerra on the Fruitvale Station platform and BART central dispatch.  Officer Guerra essentially states that a crowd is forming and surrounding the officers.  Loud crowd noise can be heard in the background.  The Court finds this exhibit is relevant to show the tone and tenor of the crowd.  Further, to the extent another officer (not a Defendant in this action) perceived the officers as having been "surrounded" tends to support a finding that a reasonable officer would have likewise objectively perceived the situation in the same way.  The Court finds the relevance of the exhibit is not substantially outweighed by the risk of unfair prejudice.

2.      Exhibits 14(a)-(d): Still Images from Video

OVERRULED.  Plaintiffs object to the introduction of various excerpts of the video clips (or photos from the videos) on the ground that this constitutes a manipulation of the videos "which speak for themselves."  *Id.* at 18.  More generally, they renew their objection that the Defendants' video expert, Mr. Schott, is not qualified to interpret the factual connotations from the video.  The Court has ruled on the Plaintiffs' motion in limine as to Mr. Schott's testimony and has delineated the limits of his testimony.  *See* Grant Motion in Limine No. 6, *supra*.  The Court concludes that Mr. Schott's (or another expert's) reliance on unedited clips of the video or photographic stills of the video to help explain his opinion and testimony is proper, relevant, and that the probative value is not substantially outweighed by the risk of any unfair prejudice.

3.      Exhibit 50: Photo of Alleged Fight Participant

SUSTAINED.  Exhibit 50 is a photo of the individual with whom Oscar Grant, III, allegedly fought with on the BART train prior to his encounter with Defendants.  As discussed, *supra*, in ruling on Grant Jr.'s eighth motion in limine, Defendants will not be permitted to introduce evidence or argument suggesting that Grant III was in fact involved in a fight on the BART train unless Plaintiffs put that question directly at issue at trial.  Rather, the jury may be informed that the BART officers were responding to a report of a fight on the train involving African American individuals and any facts of which Mehserle and/or Domenici were informed prior to the shooting of Grant III

United States District Court

For the Northern District of California

1  or alleged detaining of Caldwell.  Accordingly, a photograph of the individual with whom Grant III

2  was allegedly fighting is irrelevant and will not be admitted.

3          4.    Exhibit 52: Domenici Training Order

4          OVERRULED.  Plaintiffs object to the admission of Exhibit 52, Domenici's training order

5  from BART, as "hearsay and irrelevant."  The Court finds that the training order is relevant insofar

6  as it shows the training Domenici received.  Admission of this exhibit (or those similar) is

7  contingent upon Defendants laying a proper foundation for the exhibit and establishing the

8  applicability of a hearsay exception.

9          5.    Exhibit 66: Criminal History of Michael Greer

10          SUSTAINED.  Exhibit 66 is the criminal history of Michael Greer.  As discussed in the

11  Court's ruling on Defendant Mehserle's fourth motion in limine, Greer's grand theft conviction is

12  inadmissible for impeachment purposes under Rule 609(a).

13          6.    Exhibit 74: Robert McFarlane Declaration

14          SUSTAINED.  Exhibit 74 is the declaration submitted by Robert McFarlane, a private

15  investigator, in support of Defendant Mehserle's sentencing memorandum in Mehserle's criminal

16  prosecution.  The memorandum discusses an officer involved shooting where the shooting was

17  subsequently determined to have been the result of the officer accidently discharging his firearm

18  after intending to deploy his taser.

19          Mr. McFarlane created the declaration by speaking with a number of individuals and

20  reviewing various documents, such as Use of Force Board reports.  Plaintiffs argue the declaration is

21  heresay and irrelevant.  Defendants respond that this declaration was relied upon by their police

22  practices expert, Mr. Peters.  Federal Rule of Evidence 703 permits an expert to base an opinion on

23  otherwise inadmissible evidence if "experts in the particular field would reasonably rely on those

24  kinds of facts or data in forming an opinion on the subject."  Fed. R. Evid. 703. Here, facts of an

25  incident involving an officer mistaking his gun for a taser is relevant and the type of data upon

26  which a police practices expert would rely in these circumstances.  However, the materials on which

27  the expert relies are not generally admissible simply because of that reliance.  Indeed, Rule 703

28  provides that otherwise inadmissible facts or data may not even be disclosed to the jury unless "their

United States District Court

For the Northern District of California

probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *Id.* Here, the McFarlane declaration is not just hearsay, it is double hearsay and is therefore independently inadmissible and lacks substantial probative value. Given its double-hearsay nature, the Court concludes that Exhibit 74's probative value does not substantially outweigh the prejudicial impact that would result from introducing the double-hearsay declaration to the jury. Under Rule 703, it may not be disclosed to the jury unless Plaintiffs open the door.

### 7. Exhibit 87: Prior Police Incident Involving Officer Pirone

SUSTAINED. Exhibit 87 is a series of reports stemming from a 2008 incident where Officer Pirone responded to a call regarding a fare-evader. Upon his arrival at the scene, the suspect attacked Pirone, causing injuries to his head and face. Plaintiffs object to this exhibit on the ground it has hearsay and irrelevant. Defendants argue the exhibit is relevant to the extent Plaintiffs continue to argue that Defendant Pirone lacked reasonable suspicion to detain Oscar Grant, III and his friends. The documents relating to this incident are irrelevant insofar as they involved a different individual and occurred over eight months before the event in question. Moreover, the reasonableness of Pirone's detention decisions is not directly at issue in this trial; Mehserle's intent in shooting Grant III is.

### 8. Exhibit 134: Mr. Schott Timeline

SUSTAINED. Exhibit 134 is a timeline of the events on the Fruitvale Station platform created by Defendants' expert Mr. Schott from the videos of the events. Plaintiffs argue that no expert should be qualified to interpret the videos for the jury. The Court agrees. Mr. Schott will be able to testify pursuant to the Court's ruling on Grant III's sixth motion in limine. The timeline he created, which advances his interpretation of those events, is not admissible.

### B. Defendant's Bellwether Objections to Plaintiffs' Exhibits

### 1. Exhibit 214: Internal Affairs Report - Mehserle

SUSTAINED. Plaintiffs have labeled Exhibit 214 as "Internal Affairs Report - Mehserle." The Defendants object to admission of this exhibit as not-produced. While Plaintiffs' exhibit binders have a tab 214, there is no copy of the exhibit provided. Further, Plaintiffs response to

United States District Court

For the Northern District of California

1  Defendants' objections does not reference Exhibit 214.  As Plaintiffs have not provided a copy of

2  the exhibit for the Court to review, it will be excluded as not timely produced.

3          2.      Exhibit 217: Noble Report

4          OVERRULED-IN-PART.  Exhibit 217 is a 300+ page report prepared by the National

5  Organization of Black Law Enforcement Executives ("NOBLE") at the request of BART to receive

6  an independent analysis of BART's police policies and procedures.  Defendants seek to have the

7  report excluded as irrelevant and unduly prejudicial.  They further argue that given the length of the

8  report, explaining the origin, methodology, and findings of the report will result in an "undue

9  consumption of time."  Plaintiffs respond that the report is relevant insofar as it makes "findings

10  about the policies and procedures of [the BART] police department and how those policies and

11  procedures compare to international police standards of practice."  They further argue that they only

12  intend to utilize the sections of the report dealing with "use of force, training, racial profiling and

13  international accreditation."

14          According to the NOBLE Report, it is a "management audit" that was conducted between

15  June 2009 and September 2009.  Ex. 214, at 14.  The purpose of the report was to compare "specific

16  areas of the administration and operation of the BART Police Department and compare[] it with

17  international law enforcement accreditation standards."  *Id.*

18          The Court finds that the NOBLE Report is relevant only in its discussion of BART's use of

19  force policies and how they compare to international police standards.  For example, if BART's

20  training on use of force principles failed to comply with international police standards, this fact

21  makes it more likely that Defendant Domenici's alleged use of force against Caldwell was

22  unreasonable.  Similarly, questions of Mehserle's training may be relevant to informing his state of

23  mind in his use of force against Oscar Grant, III.  Accordingly, Plaintiffs may introduce this portion

24  of the NOBLE Report if a proper foundation is laid.  The other sections are either irrelevant or of

25  such low probative value such that their relevance is substantially outweighed by the risk of

26  confusion of issues and undue consumption of time in having mini-trials as to the bases of the report,

27  quality of investigation, etc.  The Court disagrees with Defendants that the Report constitutes a

28  subsequent remedial measure.  *See* 23 Fed. Prac. & Proc. Evid. § 5284 (1st ed.) (suggesting that the

**United States District Court**
For the Northern District of California

1   literal reading of the rule does not exclude evidence that remedial measures were considered or

2   recommended but only those that were actually taken).

3        Defendants' objection is overruled to the extent that Plaintiffs are able to lay a sufficient

4   foundation that the NOBLE Report fits within the "business records" or "public records" exception

5   to the hearsay rule.  For instance, the record is not sufficient at this time to determine whether the

6   NOBLE audit was a routine management audit or rather a special audit in light of the events

7   underlying this lawsuit. *See, e.g.*, *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254 (9th Cir. 1984).

8        3.      Exhibit 218: BART General Order III and Operational Directive 44

9        OVERRULED.  Exhibit 218 is a copy of BART General Order III ("General Duty

10   Regulations).  Defendants object to this exhibit (as well as Exhibit 211 – another BART General

11   Order) on the ground that much of the general orders contain irrelevant information and that

12   Plaintiffs should have narrowly tailored the subsections in the exhibit.  The Court finds the exhibits

13   contain relevant information regarding police practices and use of force and therefore will not

14   exclude them.  Specifically, evidence regarding the Defendants training – and whether their actions

15   complied with this training – is relevant either to the reasonableness of Defendant Domenici's

16   alleged use of force and/or Defendant Mehserle's state of mind in using force against Oscar Grant,

17   III.  The Court does not find the exhibits are so voluminous as to create the risk of juror confusion.

18        4.      Exhibit 223: Letter from Oscar Grant, III to Oscar Grant, Jr.

19        OVERRULED.  Defendants object to an undated letter apparently sent from Oscar Grant, III,

20   to Oscar Grant, Jr. stating "I love you dad."  Defendants state that no foundation or authenticity has

21   been shown.  Defendants' objection is overruled to the extent that Plaintiffs are able to establish the

22   foundation and authenticity of the letter at trial.  The parties shall stipulate as to authenticity if there

23   is no dispute thereon.

24        5.      Exhibit 225: Oscar Grant, III Employment Records

25        OVERRULED.  Exhibit 225 contains W2s and other tax documents showing Oscar Grant,

26   III's earnings in 2008.  Defendant Mehserle objects to the records on grounds of hearsay,

27   authentication and relevance.  Oscar Grant, Jr., argues the documents are relevant to support his

28   claim that Oscar Grant, III, would have provided his father with financial support if he had not been

1   killed.  The Court finds the exhibits are relevant but admission will be subject to Plaintiffs laying a

2   foundation for the application of a hearsay exception as well as establishing their authenticity.  The

3   parties shall stipulate to authenticity if there is no dispute thereon.

4         6.    <u>Exhibit 230: Still Images of Vargas Video</u>

5         OVERRULED.  Exhibit 230 is a series of still images from the Karina Vargas video of the

6   events on the Fruitvale Station platform.  Defendants object to these exhibits on relevance and Rule

7   403 grounds.  Plaintiffs simply respond that the photos are "relevant to the issues raised in this

8   litigation and will provide the jury with context."  As these are stills from the video of the events at

9   issue in this case, the Court will not exclude these images *in limine*.  However, the Court's ruling is

10  without prejudice to renewal should Plaintiffs fail to lay a foundation at trial.

11        7.    <u>Exhibit 234: Meyers/Nave Report</u>

12        SUSTAINED.   Exhibit 234 is a copy of the Meyers/Nave internal affairs investigation of the

13  January 1, 2009 incident at issue in this case.  Defendants have moved to exclude the report on

14  relevance grounds, unfair prejudice, and as improper opinion evidence.  Defendants argue the report

15  was simply a "fact-finding process" to determine "whether procedures, policy, and conduct needed

16  to be addressed or corrected."  Defendants also point out that after an evidentiary hearing, the factual

17  findings of the report were found to have no merit as to Domenici and that Pirone's challenge to the

18  report is ongoing.

19        The Court finds that the Meyers/Nave report is hearsay.  The question is whether the

20  business records exception or the public records exception apply.  First, the Meyers/Nave report

21  itself recognizes that the outside law firm was called in to do the Internal Affairs analysis because of

22  the community outcry over the shooting and pressure on BART to have an independent investigation

23  conducted.  Accordingly, on the basis of the record, this report cannot be said to be a record "kept in

24  the course of a regularly conducted activity" of BART or that it reflected a "regular practice" to

25  record the activity.[6]  F.R.E. 803(6) does not apply.  *See Paddack*, 745 F.2d at 1258 ("This was not a

26  regularly conducted audit of the Employer; it was a special audit ordered in response to the Trustees'

---

27

28       [6] There is no evidence, for instance, that internal investigation reports such as the one ordered here have been undertaken by BART with any degree of regularity.

suspicion of irregularities.  These reports, which are the direct product of the accountants, are not 'business records' of the accounting firm within the meaning of Rule 803(6). . . .  Such reports do not contain the same reliability that normally attends records kept in the course of a regularly conducted business activity.").

Second, Meyers/Nave report is not a record containing matters observed while under a "legal duty" to report; the report was not legally required.  Thus, Fed. R. Evid. 803(8)(iii) does not apply.  On the other hand, factual findings in the Meyers/Nave report appear to be from a "legally authorized investigation" duly ordered by BART.  Thus, Fed. R. Evid. 803(8)(ii) appears to apply.

As to Fed. R. Evid. 803(8)(B), however, there are substantial questions raised as to whether the report contains sufficient indicia of trustworthiness; the adverse findings against Domenici were squarely reversed by an arbitrator who was critical of the report.

In any event, even if the reports are deemed otherwise inadmissible under Rule 803, the probative value of the report is substantially outweighed by the risk of unfair prejudice; the report contains credibility findings and conclusions of wrongdoing – the very questions the jury is being called on to decide in this action.  *See, e.g.*, *United States v. MacDonald*, 688 F.2d 224 (9th Cir. 1982) (noting that an EEOC investigative report was properly rejected because, "[t]o the extent they contain credibility determinations, they tend to undermine the exclusive province of the jury"); *see also Richardson v. Mendez*, No. 2:10-cv-0025-GEB-EFB, 2013 WL 4441599 (E.D. Cal. Aug. 19, 2013) (excluding administrative disciplinary finding of battery on a peace officer on ground that the jury could find it difficult to independently evaluate the evidence regarding the incident if it found the CDCR had already found the plaintiff guilty). The probative value of the report is further reduced by the fact that the adverse findings as to Domenici were subsequently overturned in arbitration and the findings against Pirone remain pending following an extensive arbitration hearing.  Accordingly, the report is excludable under Fed. R. Evid. 403.

8.      Exhibit 235: Mehserle Criminal Judgment

OVERRULED.  *See* discussion regarding Mehserle's first motion in limine.

United States District Court

For the Northern District of California

9.      Exhibit 236: Photos of Caldwell & Sons

SUSTAINED.  Exhibit 236 is listed on the exhibit list as "Photos of Caldwell & Sons." Defendants object to this exhibit on relevance grounds as well as the failure of the Plaintiffs to produce the exhibit.  No copy of Exhibit 236 is in the set of exhibits provided by Plaintiffs to the Court, precluding the Court from reviewing it.  Further, Plaintiffs have failed to articulate a theory of relevance for the photo.  Because it was not timely produced and Plaintiffs failed to establish relevance, the objection is sustained.

10.      Exhibit 237: Dr. Griffith Notes

OVERRULED.  Exhibit 237 is listed on the exhibit list as "Dr. Griffith Notes re Caldwell Treatment Attached to his Deposition as Exhibit and associated bills."  Defendants object to this exhibit on the ground it has not been produced.  Plaintiffs represent that Defense counsel told them that they did not require another copy of the exhibit as they already had Dr. Griffin's deposition. On the basis of this representation, the Court will overrule the objection.  However, no copy of Exhibit 237 is contained in the exhibit binders.  Caldwell is **ORDERED** to supplement the exhibit binders provided to the Court with a copy of Exhibit 237 within two business days of this order.  To be admissible, a foundation must be laid.

11.      Exhibit 238: Exhibit Withdrawn

12.      Exhibit 239: Exhibit Withdrawn

Note:  as to all exhibits, the parties are ordered to stipulate to authenticity and best evidence issues (Fed. R. Evid. 901 and 1002) absent a good faith objection.

## XV.   JURY VOIR DIRE

The parties have filed a joint questionnaire containing questions for the proposed jury members.  Docket No. 347.  The Court will employ this jury questionnaire, as modified and filed by the parties pursuant to this Court's order at Docket No. 472, and give each side an additional 30 minutes to voir dire the potential jurors.

///

///

///

**XVI.**   **JURY INSTRUCTIONS & JURY VERDICT FORM**

The parties have each submitted proposed jury instructions.  (Docket No. 401). The Court shall file shortly hereafter proposed jury instructions.  **The parties shall provide comments on the instructions on a date to be specified**.

Both Plaintiffs and Defendants have provided proposed verdict forms.  (Docket No. 378, 400).  In light of this Court's rulings on the outstanding legal issues as well as the motions in limine, the parties are ordered to meet and confer regarding the form of the verdict and shall file a *joint* proposed verdict form no later than **Wednesday, June 11, 2014** at **5:00 p.m.**

IT IS SO ORDERED.

Dated:  June 3, 2014

_____
EDWARD M. CHEN
United States District Judge

*United States District Court*
For the Northern District of California

64